IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION


UNITED STATES OF AMERICA,   )
            ) 5:09CR27
     Plaintiff,  ) JULY 14, 2010
            )
  vs         )
            )
BERNARD von NOTHAUS,    )
            )
     Defendant.  )
_____/

TRANSCRIPT OF ELECTRONICALLY-RECORDED
BOND HEARING

BEFORE THE HONORABLE DAVID S. CAYER
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

FOR THE UNITED STATES  MARK ODULIO, ESQ.
          U. S. Attorney's Office
          227 W. Trade Street
          Suite 1700
          Charlotte, NC 28202


FOR THE DEFENDANT    AARON E. MICHEL, ESQ.
          3736 Surry Ridge Court
          Charlotte, NC 28210



Proceedings digitally recorded and transcript prepared by:

JOY KELLY, RPR, CRR
U. S. Official Court Reporter
Charlotte, North Carolina
704-350-7495

1
2
3                           I N D E X

4

5    WITNESS                                              PAGE

6

7    BERNARD von NOTHAUS

8        Direct Examination By Mr. Michel ...................8
         Cross Examination By Mr. Odulio ...................15
9        Redirect Examination By Mr. Michel ...............25

10

11

12                          EXHIBITS

13   DEFENDANT'S                                          PAGE

14   1        ...........................................14

15
16
17
18
19
20
21
22
23
24
25

1    **WEDNESDAY, JULY 14, 2010**

2                  (Hearing commenced 2:24:01 p.m.)

3                  THE COURT:  This is United States v. Bernard von

4    NotHaus.  And this is before the Court on a violation filed

5    by the Probation Office on June 7th, 2010.  And the Court

6    has reviewed the violation report.  Does the government wish

7    to present any evidence?

8                  MR. ODULIO:  Your Honor, at this point we'd stand

9    on the submission by Pretrial Services.

10                  THE COURT:  Do you want to make any argument,

11   Mr. Odulio?

12                  MR. ODULIO:  Just briefly, Your Honor.

13                  As set forth in the violation report, I think the

14   Court's October 16, 2009, order makes it plain that the

15   defendant was prohibited from minting or producing any

16   coinage or currency, and from circulating any coinage or

17   currency that has not been produced by the United States

18   Mint.

19                  As set forth in the violation report, the

20   defendant is continuing to maintain a website,

21   hawaiidala.com, and as reflected in the violation report, it

22   is offering for sale various products, including what appear

23   to be Hawaiian coins.

24                  So just as a threshold matter, it does appear that

25   by continuing to operate and maintain the website, that

1    there may be a potential violation.  We would ask the Court

2    to make inquiry, as reflected in, I think, defense counsel's

3    filing, he did point out that the website, there's no way

4    that someone on the website can actually acquire, purchase a

5    coin on the website.  But based on our review of the

6    website, there is some contact information where a purchaser

7    can submit an order.  So that's all the government has.

8         THE COURT:  All right.  Mr. Michel.

9         MR. MICHEL:  And, Your Honor, our proffer would be

10   pretty much as I represented in our motion to quash, and

11   Mr. Von NotHaus is willing to address the Court on these

12   specific issues.

13        But that website has been dormant since last year,

14   and there's some issues arising last fall, I believe, that

15   being addressed in the October of 16th order.  I think

16   primarily at that point it was an issue of --

17        THE COURT:  Which website are you saying has been

18   dormant?  He's got a number of websites.

19        MR. MICHEL:  There are two websites:  One is the

20   Liberty Dollar website, and the other one is the Hawaii Dala

21   website, and both are there.  They have been there, they

22   have been known to the parties, and the issue that came

23   before the Court last fall was there was an order for some

24   Tea Party medallions that Mr. von NotHaus --

25        THE COURT:  Let me get back to my question:  Which

1    website do you see is dormant now?

2         MR. MICHEL:  Well, definitely the Hawaii Dala has

3    been dormant.  There's been no -- sort of like out of sight,

4    out of mind for Mr. von NotHaus.  He hasn't done anything

5    with that.  And we've got some records from his IT guy that

6    support that.  But nobody raised any issues about it.

7    Nobody questioned it.

8         When he appealed Your Honor's decision about the

9    modification of the order, and then the subsequent

10   clarification, that, yes, that order applied to the Tea

11   Party medallions, and after that -- and an appeal was filed

12   and denied by Judge Voorhees after the status conference in

13   December, I don't know if Your Honor is familiar with the

14   appeal and the status conference, but the status conference

15   dealt with some pretrial issues, primarily some venue

16   issues, but it also dealt with the question of the Liberty

17   Dollar website.

18        And I think the government's concern, I believe

19   the government had been in conversation with Deke Falls to

20   try to resolve those issues, and they were addressed at that

21   time.  And I just kind of laid out the framework for what he

22   would be satisfied with as far as what could stay on the

23   Liberty Dollar website; what had to come off.

24        And I've reviewed the correspondence between

25   Mr. von NotHaus and Deke.  And this man's always wanted to

1    comply with whatever the requirements are.  "Explain what

2    they are and I'll do them."  And you see that in the

3    exchange of e-mails.  And he made the change to the Liberty

4    Dollar website, and as far as he knows, there's no objection

5    to that.

6            Now, there's an issue about Hawaii Dala.  I think

7    it's really a matter of he moved back home to Hawaii so that

8    he had better prospects for finding a place to live and a

9    job to work at.  And the pretrial officer out there got

10   involved and looked into the matter and had a question about

11   the Hawaii Dala website.  And it's just the new guy getting

12   involved and looking at, fresh set of eyes looking at it,

13   asking questions -- which is fine, we're not trying to hide

14   anything -- but there's been no activity with regard to that

15   website.

16           I think, as I pointed out in my motion, there's no

17   click-and-order feature ever for that.  You have to send in

18   a request, an order.

19           THE COURT:  On that website or anywhere?

20           MR. MICHEL:  On the Hawaii Dala or anywhere could

21   you click and order as far as the defendant's aware of.

22   Like I said, it's been out of sight, out of mind for him

23   because nobody raised the issue until it got to pretrial in

24   Hawaii and they asked about it and he responded honestly

25   about it.  So I'm not sure what -- how this would constitute

1  new concerns, if there are new concerns, because now we're

2  focused on that.

3          We're willing to address those concerns and do

4  whatever it takes to satisfy the Court that he's not doing

5  anything while on pretrial release.  It's his desire to stay

6  out of trouble.  And I've seen that in the correspondence

7  between him and Deke Falls.

8          Does the Court have any specific questions that --

9          THE COURT:  I don't have questions.  I'll hear

10 whatever you want to present, Mr. Michel, because as I said,

11 he is in a position where the Probation Office has reported

12 an alleged violation, and the Court has to determine whether

13 or not that's a violation.  So whatever you want me to

14 consider, I'll be glad to consider it.

15         MR. MICHEL:  Okay.  Well, this is a very serious

16 matter for the defendant.  His liberty is at stake, so I

17 guess if the Court is -- we would present some testimony to

18 support that.

19         THE COURT:  All right.

20         MR. MICHEL:  Do you want to go up and take the

21 stand?

22         DEFENDANT von NOTHAUS:  Sure.

23         THE COURT:  Sir, before you begin testifying, I

24 want to remind you that you have charges pending against

25 you.

1          DEFENDANT von NOTHAUS:  Yes, sir.

2          THE COURT:  And as I'm sure you have been advised

3   at other points in these proceedings, you have a right to

4   remain silent and anything you say may be used against you.

5   Do you understand that right?

6          DEFENDANT von NOTHAUS:  Yes, sir.

7          THE COURT:  And if you choose to testify, that's

8   your choice.  That's entirely up to you.  You should talk to

9   your attorney and consider what his recommendations are, but

10  ultimately the decision about testifying is yours.

11         DEFENDANT von NOTHAUS:  Yes, sir.

12         THE COURT:  But if you chose to testify, then the

13  United States Attorney will get to cross-examine you.  Do

14  you understand that?

15         DEFENDANT von NOTHAUS:  Yes, sir.

16         THE COURT:  All right.  All right, Mr. Michel.

17                      **BERNARD VON NOTHAUS**

18  being duly sworn, was examined and testified as follows:

19                      **DIRECT EXAMINATION**

20  **BY MR. MICHEL**

21  Q    Did you have a conversation with the Pretrial Services

22  officer in Hawaii at some point about the Hawaii Dala

23  website?

24  A    No, sir.

25  Q    The pretrial officer out there, who is that?

1    A    His name is Eric Iverson.

2    Q    Iverson?

3    A    Iverson.   I-V-E-R-S-O-N.

4    Q    And did you have contact with him?

5    A    I reported to him as directed, and subsequently after

6    that, he visited me to see where I lived.   And I reported to

7    him on my monthly report.   And then this -- this matter came

8    to our attention.   He never asked me about it.

9    Q    When you say "this matter came to our attention," how

10   did it come to your attention?

11   A    Well, I got to -- what did I get, an e-mail that he --

12   the e-mail that Iverson wrote about is the Hawaii Dala

13   website a violation to my -- terms of my appearance bond.

14   Q    And who sent that e-mail?

15   A    How did I hear about it.   Oh, I got a phone call.

16   Mr. Iverson was on vacation to Prague or Stuttgart, some

17   place, and somebody at pretrial called me and told me about

18   it.  He -- I guess he e-mailed it to me.   It was a pretrial

19   officer in Honolulu.

20   Q    At some point did you receive a summons?

21   A    Yes.   That's why I'm here today.

22   Q    And when you received the summons, was there a

23   violation report or notice attached to that?

24   A    Yes.

25   Q    And that described to you the questions about the

1  Hawaii Dala website?

2  A    Yes.  Mr. Iverson was doing a good job.  He probably

3  Googled me or something or other on the new person assigned

4  to him.  As he explained to me with my initial appearance,

5  that it was his duty to do whatever the North Carolina

6  pretrial office said for him to do.  He was doing his job.

7  So he found the website and -- I'm sorry, what was the

8  question again?  I'm rattling on.

9  Q    At some point did someone from pretrial have a

10  conversation with you about the Hawaii Dala website?

11  A    No.  They just sent -- they just sent that report to

12  me.  I called.  He wanted to know where to send it to me and

13  I believe he e-mailed it to me.

14  Q    Okay.  And with regard to the alleged violation report

15  where it says that the defendant is prohibited from minting

16  or producing any coinage or currency and from circulating

17  any coinage or currency that has not been produced by the

18  United States Mint.  It goes on to say on, May 17th, 2010,

19  by continuing to operate the Internet website,

20  www.hawaiidala.com, which is utilized for a sale and

21  distribution of Hawaii Dala, 50th Anniversary coin, was

22  this --

23  A    What was that date?

24  Q    May 17th, 2010.

25  A    Uh-huh.

1  Q    And to your knowledge on that date was there a Hawaii

2  Dala website?

3  A    Well, yes, there was a Hawaii Dala website there.

4  There is still today.

5  Q    And to your knowledge has the prosecutor's office

6  objected to that being there?

7  A    No.

8  Q    And to your knowledge have the Pretrial Services, up to

9  the date that you got this e-mail, objected to that website

10 being there?

11 A    No.  In fact, that site was mentioned in the affidavit

12 back in 2007.  The government's known about the site all

13 that time.

14 Q    And is that website also mentioned in the Liberty

15 Dollar website?

16 A    I don't think so.  I haven't spent a lot of time with

17 the Liberty Dollar website.  I haven't spent any time at

18 all.  I don't think so.  To the best of my knowledge, it's

19 not there.  There's no direct link or anything that I know

20 of, but there's a lot of pages, so -- we don't make a big

21 deal about it.

22 Q    And the last -- since you have been out in Hawaii, how

23 much activity have you had with the Liberty Dollar website?

24 A    I write a monthly newsletter and it's posted on the

25 website and that's all the relationship I have with it.

1    Q    And were you required to make some changes to that

2    website?

3    A    Extensively, yes.

4    Q    And were those changes made?

5    A    Yes, sir.

6    Q    Once those changes made, were there any other

7    objections communicated to you about that website?

8    A    No.  We met the requirements and it became a nonissue.

9    Q    To your knowledge has there been any sales or anything

10   related to sales activity with regard to the Hawaii Dala

11   website since the October 16th order?

12   A    None.

13   Q    And that October 16th order was appealed.  Right?

14   A    Yes, I believe so, yes.  Because it was -- dealt with

15   Judge Voorhees when we got together in December.

16   Q    How frequent was your communication with your former

17   attorney, Deke Falls, concerning compliance with the

18   pretrial order?

19   A    Which order in particular?  What --

20   Q    Well, let's say from September of last year on, how

21   frequent were you in communication with your former

22   attorney, Deke Falls, as far as compliance?

23   A    How quickly?

24   Q    How frequently.

25   A    How frequently.  Well, quite frequently.  Sometimes as

1    often as several times within a day.  We were back and forth

2    on a particular issue explaining things, and then sometimes

3    there's lapses of a couple weeks because there's no issue to

4    deal with.  It's a matter of feast and famine.

5    Q    Okay.  And did you comply with everything that your

6    former attorney requested of you as far as being in

7    compliance with pretrial?

8    A    Absolutely.

9    Q    Was there an issue that you refused to comply with?

10   A    No, sir.

11   Q    And did you obtained some activity -- you report

12   information from the -- concerning the website?

13   A    Activity report regarding which website?

14   Q    The Hawaii Dala website?

15   A    Oh, yeah.  Right.  I went and I contacted our IT person

16   and asked him for a report on the activity to show that

17   there hadn't been any activity.

18            MR. MICHEL:  May I approach, Your Honor?

19            THE COURT:  Yes, sir.

20   BY MR. MICHEL

21   Q    I'm going to hand you a copy of Defense Exhibit 1.  Ask

22   you if you recognize that?

23   A    Yes, sir.

24   Q    What is that?

25   A    That is the activity report I requested of the Hawaii

1   Dala website from our IT person.

2   Q    And what does that report indicate?

3   A    It reports that there's no activity and there's no

4   historical data because it ranks so low in terms of website

5   activities.  He have notes here that it is ranked No.

6   10,392,504, and he goes on to say, in other words, there are

7   10,392,503 websites that have more activity than Hawaii

8   Dala.  There's virtually no activity.

9   Q    Okay.

10           MR. MICHEL:  Your Honor, we would offer that up to

11  the Court for the Court consideration.

12           THE COURT:  It's received.

13           (Defendant's Exhibit No. 1 received.)

14  **BY MR. MICHEL**

15  Q    You heard the prosecutor's concern about the website

16  offering to sell the Hawaii Dala saying that while you can't

17  click and buy it, that there's information about where you

18  can send to order it.  What can you tell the Court about

19  your personal knowledge about what's on that website about

20  that?

21  A    Well, there were abilities to order Hawaii Dalas before

22  the October 16th ruling.  And then after that, I was very

23  concerned so that I would not be in violation of the terms

24  of my appearance bond, so I -- somebody else said they would

25  take any orders, but they were going to do that on-line, but

1   they never got a merchant account so you couldn't order

2   on-line so they never took any orders.  There's never been

3   any orders.

4   Q    Okay.

5            MR. MICHEL:  No more questions.

6            THE COURT:  Mr. Odulio.

7            MR. ODULIO:  Just briefly, Your Honor.

8                       **CROSS EXAMINATION**

9   **BY MR. ODULIO**

10  Q    Good afternoon, sir.

11  A    Good afternoon.

12  Q    I think Defense Exhibit 1 you indicated there was no

13  activity.  Isn't that right?

14  A    Yes, sir.

15  Q    But doesn't the e-mail, Defense Exhibit 1, indicates

16  that --

17  A    Let me correct that just for a second.  There may have

18  been someone go to the website, but it didn't show up in the

19  report.  In other words, you could have gone to the website

20  and it wouldn't have showed up on the report.

21  Q    Defense Exhibit 1, sir, take a look at that.  Do you

22  have it in front of you?

23  A    Yes.

24  Q    And I'll direct your attention to the third sentence.

25  If you could read that aloud?

1  A    The third sentence?

2  Q    Yes, sir.

3  A    "Of all the websites Hawaiidala.com."

4  Q    It's the one before that, sir?

5  A    "This shows a site that did not receive very many hits

6  but does not give you any specific traffic data."

7  Q    Okay.  So the website did receive some hits.  Isn't

8  that right, sir?

9  A    Yes, sir.  Because if you did a search on Hawaii, for

10  example, then it would have received a hit.  Now, that may

11  not show up until page 240 in your search results, because

12  if you did a search on just the word "Hawaii," then it lists

13  all the sites on the Internet that have the world "Hawaii"

14  in it.  So it could receive some hits and it probably did

15  receive some hits, because if it's listed in the search

16  results, then that constitutes a hit.  But that doesn't mean

17  that somebody went hundreds of pages deep into the search

18  results and went to the site.

19  Q    Okay.  But nonetheless, sir, you'd agree that this

20  website is still available and active?

21  A    Yes, sir.  No one's ever asked me to take it down and

22  no one's ever brought it to my attention after the ruling of

23  October 16th.  It was simply a matter of out of sight, out

24  of mine.  I never thought about it.

25  Q    Well, someone is bringing to your attention now.  Isn't

1  that right?

2  A    Yes, sir.

3  Q    Okay.  The website has an address that's provided to

4  viewers where you can mail your order with payment.  Are you

5  familiar with that, sir?

6  A    Yes, I am.

7  Q    In fact, it says, "You can mail your order with payment

8  to Silver Liberty Marketing, POB 2105, Indianapolis, Indiana

9  46206."

10  A    Yes, sir.

11  Q    Okay.  And nowhere on the website does it inform the

12  reader that this coin is no longer available for purchase.

13  Isn't that right?

14  A    Yes, sir.

15  Q    And I think -- you made a claim with your counsel --

16  you clearly understood the Court's October 16, 2009, order.

17  Is that right?

18  A    Yes, sir.

19  Q    In fact, as you testified on direct, you were in

20  frequent communication with your prior counsel, up to

21  several times a day.  Isn't that right?

22  A    On some occasions, yes, sir.

23  Q    So the order by Judge Cayer that prohibited you from

24  minting or producing any coinage or currency and from

25  circulating or coinage or currency that has not been

1    produced by the United States Mint, you understood that very

2    clearly.  Is that right, sir?

3    A    Yes, sir.  May I mention something else about that?

4    Q    No.

5    A    Okay.

6    Q    Well, do you want to clarify something?

7    A    Yeah.

8    Q    I'm sorry.  Go ahead.

9    A    Yeah.  The order specifically, and it mentions it

10   twice, about coinage and currency, and the 2009 Hawaii Dala,

11   which is the subject of our focus here, I believe, does not

12   have a denomination on it.  So as a numismatic item, in

13   other words, any coin, currency, medals, everything that

14   deals with -- money, tokens, paper money -- if it doesn't

15   have a denomination on it, it can't be a coin or a currency.

16   For it to be a coin or currency, it must have a

17   denomination.  And my former attorney Deke Falls --

18   Q    Sir, I don't want to go into anything of what your

19   attorney says, advised you.  I don't want to go into that.

20   A    Yes, sir.

21   Q    Let me ask you:  Has there been any changes to the

22   Hawaii Dala website in the last several weeks?

23   A    No, sir.

24   Q    Specifically, were any photos or pictures of the coins

25   removed recently from the website?  Were you aware of that?

1   A    I don't believe so.

2   Q    Okay.

3            MR. ODULIO:  Your Honor, may I approach?

4            THE COURT:  Yes, sir.

5   **BY MR. ODULIO**

6   Q    I'm handing you Government's Exhibit 1.  Do you

7   remember that, sir?

8   A    Yes, I am.

9   Q    And generally that's a screen print or a printout of

10  the Hawaii Dala website?

11  A    Yes.

12  Q    And could you advise the Court whether or not any

13  pictures of the coins are displayed on that document,

14  Government's Exhibit 1?

15  A    Not when you printed it, it did not show.

16  Q    Okay.

17  A    No, the images did not print.

18  Q    Is there a date on the bottom of that document?

19  A    Yes, sir.  7/13.  The images have not been removed.

20           MR. ODULIO:  Your Honor, may I approach?

21           THE COURT:  Yes, sir.

22  Q    I'm handing you what's been marked as Government's

23  Exhibit 2.  Do you remember that, sir?

24  A    I beg your pardon?

25  Q    Are you familiar with that document, sir?

1    A    Yes.

2    Q    And Government's Exhibit 2, second page, is it a

3    pointout from the Hawaii Dala website?

4    A    Yes, sir.

5    Q    And on that particular printout, are the photos

6    displayed?

7    A    Yes.

8    Q    What do the photos depict?

9    A    It depicts the 2009 Hawaii Dala with the kala mo'i

10   nondenominational reverse.

11   Q    Okay.  And advise the Court, please, of the date listed

12   on the bottom of that page.

13   A    5/17/2010.

14   Q    Okay.  And, sir, is there a value indicated on the

15   currency there on the photo?

16   A    No, sir.

17   Q    There's not a value at all?

18   A    No, sir.

19   Q    Can you read for the Court what's displayed on the

20   coin?

21   A    Well, I take objection to the use of the word "coin."

22   I will read what's on here, but this is not a coin.

23   Q    Yes, sir.

24   A    On the averse it says "King Kamehameha" on one side of

25   the statue, and it says "Hawaii 2009" on the right-hand side

1   of the statue, and on the reverse it has "ua mau, ka pono,"

2   which is the state and model of Hawaii.  Below that it says

3   "kala mo'i," and below the artwork it says "1 ounce .999

4   silver."

5   Q    So it does indicate a value of that item?

6   A    No.  There is no value on this item.

7   Q    One ounce silver?

8   A    That's not a value.  I'm required by federal law to

9   denote at amount of silver that is any -- any item of

10  precious metal sold within the United States, I'm required

11  to denote what that is:  14 karat, 18 karat, finite silver,

12  whatever.

13  Q    Is that coin produced by the United States Mint?

14  A    This is not a coin.  It's not produced by the United

15  States Mint.

16  Q    That item is not produced by the United States Mint?

17  A    No, sir, it's not produced by the United States Mint.

18  Q    Where is it produced?

19  A    I believe it was produced by North American Mint.

20  Q    Are you getting any royalties in connection with any of

21  your work related to Silver Liberty Marketing?

22  A    Not really to Silver Liberty Marketing, but if they

23  used my design, I have received some royalties.

24  Q    Okay.  Explain that to the Court.

25  A    Well, I own the copyright of that image of Liberty

1    head, so if they use it, I get a royalty.

2    Q    And when you say "they use it," does it mean that they

3    generated a coin or an item?

4    A    They generate an item.

5    Q    Okay.  And what is that item?  Describe it for the

6    Court.

7    A    They've used it on a couple different issues.

8    Q    What does that mean?

9    A    They did an issue for the second amendment.  They used

10   it on that.

11   Q    Okay.  And that was sold to the public and made

12   available to the public?

13   A    The client sold it to the public, yes.

14   Q    And by the "client," do you mean the United States

15   Mint?

16   A    No.  The client who commissioned the second amendment

17   commemorative.

18   Q    Describe what one of those commemoratives would look

19   like or appear to a layperson?

20   A    It -- the second amendment commemorative says "second

21   amendment" on the aversus.  It has a Liberty head.  And on

22   the reverse it has a 1911 handgun on it.

23   Q    Okay.  And I know you take issue with the

24   characterization of a coin, but it appears -- it would look

25   like a coin, would you agree with that at least?

1    A    I can't attest to what somebody else may think it is a

2    coin or not, sir.

3    Q    But does it appear to be a token or some kind -- does

4    it look like the picture in Government's Exhibit 2

5    generally?

6    A    In Government's Exhibit 2.  Well, no, this is the

7    Hawaii piece here, so it doesn't look anything like that at

8    all.

9    Q    When you say "piece" you mean something that appears as

10   a photo there depicted on Government's 2?

11   A    No.

12   Q    In other words, we're not talking about a pillow or a

13   plate, we're talking about a coin.  Isn't that right?

14   A    No, sir.  This is not a coin.

15   Q    All right.

16   A    Numismatically it can't be a coin.  I have been a

17   numismatist for 36 years.  I know what a coin is.

18   Q    Well, tell us what a coin is?

19   A    A coin is something that is minted by the government

20   intended to be used as money.  If it's not minted by the

21   government, it cannot be a coin.

22   Q    So how would you characterize that item depicted in

23   Government's 2?

24   A    Exactly -- Government 2.  This one here.  Exactly as

25   the U. S. Mint did, it's a medallion.

1   Q    Okay.  And to be clear, though, let's get back to the

2   Liberty Dollar website.

3   A    Yes.

4   Q    When the events were occurring around that caused the

5   October 16th, 2009 order, you took steps to modify that

6   Liberty Dollar website, didn't you?

7   A    Yes, sir.

8   Q    And one of the things you did was to stop offering

9   those coins on that Liberty Dollar website.  Is that right?

10  A    We stopped before that, I believe.

11  Q    So you had acknowledged what you were offering on that

12  website was coins?

13  A    No, sir.

14  Q    Okay.  But nonetheless you modified your conduct as it

15  relates to that website to comply with the Court's order,

16  didn't you?

17  A    The Court order asked to modified the website and we

18  modified the website.

19  Q    So your viewpoint back then was that was not a coin?

20  A    It was never a coin.

21  Q    Okay.  Yet nonetheless you modified the website.  Isn't

22  that right?

23  A    It's a court order.

24  Q    And you did modify or bring to the Court's attention

25  the fact that you were still maintaining this Hawaii Dala

1  website?

2  A    They didn't ask.

3              MR. ODULIO:  Nothing further, Your Honor.

4              THE COURT:  Mr. Michel, anything else from you?

5                    **REDIRECT EXAMINATION**

6  **BY MR. MICHEL**

7  Q    Did you have a communication from your former attorney,

8  Deke Falls, around October 29th of last year and discussing

9  the Court's October 16th order where your attorney indicated

10 that --

11             MR. ODULIO:  I know it is the defendant's

12 privilege to waive any communications between him and his

13 counsel, but I think I'd ask the Court either to make an

14 inquiry of the defendant or just allow the government to put

15 its concern in the record concerning any potentially

16 privileged communications made by the defendant to prior

17 counsel, and that disclosure -- and effective that

18 disclosure in this litigation.  So obviously the defense can

19 do what they want.  I just voice that concern.

20             THE COURT:  Sir, communications between you and

21 Mr. Falls when he was your attorney are privileged.

22             DEFENDANT von NOTHAUS:  Yes, sir.

23             THE COURT:  And if Mr. Michel is now asking you

24 about those communications, you're in a position of waiving

25 that privilege.  Do you understand that?

1    DEFENDANT von NOTHAUS:  Yes, sir.

2    THE COURT:  All right.  Go ahead.

3    DEFENDANT von NOTHAUS:  Continue?

4  **BY MR. MICHEL**

5  Q    Well, this question relates to whether or not there's

6  any confusion about the judge's order at that time.  Do you

7  remember that communication?

8  A    There was extensive communication about that.

9  Q    And do you wish to testify to the Court about what your

10 attorney advised you about the confusion?

11 A    Yes, sir.

12 Q    Okay.  And would it assist you to have that

13 correspondence in explaining --

14 A    I'm sorry.

15 Q    Would it assist you to have that correspondence?

16 A    I'm sorry, I don't --

17 Q    Would it assist you to have that correspondence to

18 refresh your memory about exactly what was said?

19 A    Oh, yes.  Oh, yes.  Definitely.

20 Q    I'm going to hand you what's been marked as Defense

21 Exhibit 2 and ask you if you recognize that?

22 A    Yes.  It's correspondence from Deke Falls to myself.

23 Q    And does that accurately relate what you were advised

24 by him as far as the confusing nature of the order and

25 efforts to try and get some clarification of it?

1  A    Absolutely.  Deke and I had several different

2  communications back and forth regarding the judge's order,

3  and this is one of -- actually several regarding --

4  regarding the order.

5  Q    Okay.  And subsequent to that, did Deke receive any

6  clarification, to your knowledge, as -- your attorney as to

7  whether the judge's order intended to prohibit the Tea Party

8  medallion?

9  A    Well, that was part of it, and that's what I mention

10 here is -- the e-mail here is about the Tea Party Dollar

11 motion clarification regarding your order, Your Honor; if we

12 could distribute the Tea Party Dollars that had been ordered

13 before the October the 16th amended terms to my appearance

14 bond.

15 Q    Okay.  Are you familiar with the trade magazines in the

16 numismatic trade?

17 A    Very much some.

18 Q    Is there a *Coin World* magazine?

19 A    Yes, sir.

20 Q    Do you have any knowledge of what they consider to be a

21 coin?

22 A    Absolutely.

23 Q    What would that be?

24 A    They have a stated fact sheet in terms of advertising

25 or a press release that they will not accept any advertising

1   or any press release whereby an item is referred to as a

2   coin that is not issued by a government.

3   Q    Okay.

4           MR. MICHEL:  No more questions.

5           THE COURT:  Anything further?

6           MR. ODULIO:  No, Your Honor.

7           THE COURT:  You may step down, sir.

8           Do you have any further evidence, Mr. Michel?

9           MR. MICHEL:  No, Your Honor.

10          THE COURT:  Does the government want to be heard

11  further?

12          MR. ODULIO:  Just very briefly, Your Honor.

13          Your Honor, as reflected in the testimony, the

14  defendant was plainly aware, understood the scope of the

15  Court's October 16th, 2009 order.  I think the testimony

16  established that despite understanding the order, the

17  defendant did not make Pretrial Services aware of the

18  website.

19          In addition, Your Honor, as reflected in the

20  testimony, the website was ongoing at that time.  It's still

21  ongoing.  There is no mechanism for the public to be made

22  aware of if they stumble upon that site that they could not

23  place an order.  In fact, the opposite is true.  There's a

24  mechanism where you can place an order with a company in

25  Indianapolis, Indiana, and there's contact information there

1  to do that.

2          So based on that, the government would submit that

3  it appears that the defendant is in violation of the -- the

4  order, the Court's October 16th, 2009 order.  We'd ask the

5  Court to consider a range of options.  Among other things,

6  the Court can certainly order the defendant to take the

7  website down.  It would obviate this entire issue.  The

8  government is, however, concerned with the defendant's

9  acknowledgement that he is nonetheless still receiving some

10 royalties in connection with past activity.

11         We'd ask the Court to inquiry to ensure that --

12 that the defendant is still not distributing other items.

13 The order, October 16th, '09 order, reflects coinage or

14 currency.  I'm certainly not an expert in these matters, but

15 an plain reading of the Court's order I think would fairly

16 encompass the items reflected on the Hawaii Dala website.

17 And the defendant can try to parse as much as possible, but

18 I think he's aware, as well as the Court, the scope of this

19 order and the controversy around the Liberty Dollar or the

20 Tea Party coins, and certainly he was on notice that that

21 kind of conduct would be prohibited.

22         So for all those reasons, the government would

23 submit that there is certainly enough evidence to support a

24 finding of a violation and would defer to the Court in terms

25 of fashioning a solution

1    THE COURT:  Anything further, Mr. Michel?

2    MR. MICHEL:  I'd just add that if there was a

3    violation, it was not a willful violation.  That if taking

4    the website down is what will satisfy the Court, then we're

5    certainly -- we'll get that done right away.  It's his

6    desire to comply with this Court's order and submission to

7    the supervision of the pretrial services and to be fully

8    cooperative with them.

9    THE COURT:  Well, to review what's happened here

10   that bring us forward to where we are today, in September,

11   September 14 of '06, the United States Mint issued a warning

12   concerning the Liberty Dollar.  It was thereafter that the

13   defendant and the co-defendants were indicted on the charges

14   involving the Liberty Dollar.

15   When I set conditions of release in July of 2009,

16   I set as a condition of release -- and it's in the order, I

17   may not be quoting it exactly -- but that he be prohibited

18   from circulation, minting, production of the Liberty Dollar.

19   Then Mr. Falls, in September of '09, raised the issue of the

20   Tea Party Dollar and whether the defendant was able to do

21   anything with the Tea Party Dollar.

22   At that point -- and that's the October order,

23   October 16, '09.  The Court entered the order and tried to

24   make it as clear as possible, since we now had not only the

25   Liberty Dollar but the Tea Party Dollar, and that order said

1    he's not to mint or circulate any coin or currency that's

2    not produced by the U. S. Mint.  Now, that's about as clear

3    as the Court could make it.

4         He appealed that to Judge Voorhees and

5    Judge Voorhees upheld that as a condition of his bond.  So

6    that's the condition that's in effect.

7         Then in March of 2010 Judge Keesler entered an

8    order permitting the defendant to relocate to Hawaii.  And

9    then in May of this year is when the violation report was

10   filed, and the violation centered on the condition I

11   referred to earlier; the condition prohibiting him from

12   minting or producing coins or currency, or circulating coins

13   or currency that were not produced by the U. S. Mint.  And

14   the probation officer reported the Hawaii Dala, D-A-L-A, and

15   the website, www.hawaiidala.com.

16        Now upon receipt of the violation report, the

17   Court has looked at that website since that website was

18   referred to as the alleged violation.  That website

19   presently refers to the defendant as, quote, "The monetary

20   architect for the Liberty Dollar."  And it describes the

21   Hawaii Dala as a "new private, voluntary barter currency

22   that is 100 percent backed and 100 percent redeemable in

23   pure gold and silver."  And it then contains a picture --

24   and I don't know whether that's an exhibit that the

25   government handed up or not, but it contains a picture of a

1  paper currency that contains the words "negotiable, one

2  dollar silver certificate," then in the place where the

3  treasury secretary would sign a legitimate United States

4  dollar, the defendant's signature is there.

5      That website says "The Hawaii dala is local

6  currency designed to support and grow the local business

7  community.  The Hawaii dala is called," quote, "'just

8  another form of money.'"  It goes on to say, "The Hawaii

9  Dala is," quote, "'just as easy to use as the U. S.

10  dollar.'"  And this is where the evidence that's out there

11  conflicts with what the defendant says in court today,

12  because he's parsing words about what is a coin and what

13  isn't.  But it's clear on this website that this is being

14  promoted as money to be exchanged in commerce.

15      Now, the government did allude to this:  There's

16  another website called Silver Liberty Marketing, and that

17  website not only has the Hawaii Dala for sale, it has the

18  Tea Party Dollar for sale.  And, of course, he was

19  prohibited from involvement with the Tea Party Dollar since

20  the October 16, 2009 order.

21      The Liberty Dollar website is still up.  It still

22  has his photograph, and it happens the current date on it.

23  And in that website there's a statement from the defendant

24  where he says, "Hawaii is a wonderful place, but raising a

25  family in the high-priced islands was tough.  That's why I

1  created the Liberty Dollar." So since he relocated to

2  Hawaii in March of 2010, he's still promoting the Liberty

3  Dollar.

4          So to the Court, it's as clear as it can be that

5  despite the Court orders and the conditions of release, the

6  defendant has continued to be involved in the circulation

7  and promoting the circulation of money that is not produced

8  by the U. S. Mint.  The Liberty Dollar website also says the

9  Liberty Dollar is legitimate.

10         So in looking at each of these episodes here,

11 websites, it's all the same thing.  And the Court concludes

12 that the defendant has violated that condition of his

13 release.

14         And the Court further concludes further by clear

15 and convincing evidence that he, based on his past track

16 record, is unlikely to abide by any condition or combination

17 of conditions of release.  So I'm going to order his

18 pretrial release revoked, and he's remanded to the custody

19 of the marshal.

20         MR. MICHEL:  Your Honor, we which to appeal

21 that --

22         THE COURT:  All right, sir.

23         MR. MICHEL:  -- with Judge Voorhees, and we would

24 ask the Court to stay that until we've had a opportunity to

25 appeal.

1      THE COURT:  And obviously he has the right to

2   appeal.

3      I'm going to deny the motion to stay it for these

4   reasons:  He's a resident of Hawaii.  He has no ties to this

5   community.  And as I've alluded to in this ruling, in this

6   Court's view he has repeatedly violated the conditions of

7   his release, including the order that was originally entered

8   back in July of 2009 about the Liberty Dollar.  So given

9   those factors, obviously he can -- he can take appeal with

10  Judge Voorhees, but I'm going to deny the motion to stay.

11      THE WITNESS:  Your Honor, may I address the Court?

12      THE COURT:  No, sir.

13      All right.  Thank you, counsel.

14      (Hearing concluded at 3:21:25 p.m.)

15                      - - - - - -

16

17

18

19

20

21

22

23

24

25

1

2 **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**

3

4 **CERTIFICATE OF REPORTER**

5       I, JOY KELLY, RPR, CRR, certify that the foregoing
is a true and correct transcription from the digitally
6 recorded proceedings transcribed by me to the best of my
ability in the above-entitled matter.

7

8

9 S/   JOY KELLY                              _____

10 **JOY KELLY, RPR, CRR**                         Date
**U.S. Official Court Reporter**
11 Charlotte, NC

12

13

14

15

16

17

18

19

20

21

22

23

24

25