**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**5:09CR27-1**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Renewed Motion for** |
| **v.** | ***Brady* Materials and for** |
| **BERNARD VON NOTHAUS** | **Sanction of Dismissal** |

The defendant Bernard von NotHaus through counsel submits this renewed motion for disclosure of *Brady* materials and for a pretrial order for deadlines for compliance with pretrial notice requirements under the Federal Rules of Criminal Procedure, including but not limited to Rule 16, and for the production of witness and exhibit lists for trial, copies of exhibits, and expert information required under the Federal Rules of Evidence and Federal Rules of Criminal Procedure, and for the sanction of dismissal for the government's failure to comply with its discovery obligations.

This case is classified as a particularly difficult complex and extensive "mega" case. The superceding indictment contains three counts that allege counterfeiting, whether by similitude or original design, of coins issued by the United States government.

NORFED, the National Organization for the Repeal of the Federal Reserve and Internal Revenue Code, created and disseminated the Liberty Dollar beginning in 1998. Whenever a newspaper article was written about it, the newspaper or magazine would check with the appropriate federal authorities before publishing

the story. It received this scrutiny each year and each year the official position was that the Liberty Dollars were legal. This is exculpatory evidence that the defendant has asked the government to identify. The response ignored the *Brady* nature of the government's discovery obligations and focused only on the *Touhy* regulations for compelling production of witnesses and documents at trial. What we want is the information that will assist us in knowing specifically what there is to compel and we have done the best we can to provide what we have to the government's prosecutor to assist them in fulfilling their obligations to search for this information and produce before trial as critical discovery in the case.

For example, in a May 3, 1999, article, government spokeswoman Claudia Dickens, for the U.S. Treasury Bureau of Engraving and Printing in Washington, D.C., is quoted as saying the Liberty Dollar is legal. A February 1, 2000, article in Eye Magazine quotes Ron Legan, Special Agent in Charge of the Seattle Secret Service office as saying that, "'It's not counterfeit money.' Having investigated this regulatory matter closely, he concludes that the silver certificates are well within the highly restrictive boundaries of American monetary guidelines. We determined there wasn't a federal currency violation," he explained."

In an August 1, 2002, article a government spokesperson Tony Fratto in Portland, Maine, is quoted as saying, "this is all perfectly legal." In a January 14, 2003, article, government spokeswoman Carol Eckord, in Paradise, California, is

quoted as saying that what von NotHaus and NORFED are doing is not illegal. In a April 3, 2003, article, a police officer said that he contacted the Denver office of the Secret Service who said, "At this time, no law was being broken since the coins are not represented as U.S. currency. She went on to say that, through their research, it basically falls upon the merchant for accepting the coins." In the April 15, 2003, edition of Insight magazine, government spokeswoman Claudia Dickens is again quoted as saying, "it is perfectly legal."

In a March 18, 2004, article in the Des Moines Register, Andrew Williams, a spokesman for the Federal Reserve Board in Washington, D.C., is quoted as saying, "There is no law that says goods and services must be paid for with Federal Reserve notes. Parties entering into a transaction can establish any medium of exchange that is agreed upon."

In a January 22, 2006, article, Special Agent in Charge Michael C. Bryant, in Buffalo, said, "We did send an agent to question [the Buczeks], but we determined this was not a counterfeiting case." The day after the November 2007 raid, in a video report by Correspondent Alix Steel, Staff Reporter Simon Constable of TheStreet.com quoted the U.S. Mint as saying that it is not illegal to possess Liberty Dollars. http://www.thestreet.com/story/10390631/raid-on-ron-paul-dollar-maker.html. (see video report next to the written report).

Another example is a chain of events starting with a December 10, 2004, letter from Assistant Deputy Director George D. Rogers, Office of Government and Public Affairs, United States Secret Service, Department of Homeland Security. In this brief letter, Mr. Rogers demanded that an alleged and unspecified statement of endorsement by the Secret Service be removed from the Liberty Dollar website. Liberty Dollar counsel Marion Harrison discussed this with Mr. Rogers and in a letter dated March 22, 2005, confirmed "that <u>the Secret Service does not now consider NORFED in violation of law</u>."

We would want discovery on these matters, including any government records stating by memo dated January 19, 2005, that, "It is our understanding that the Liberty Coins are not counterfeits of or in similitude to any official United States coins." This is particularly significant given the decision by Congress to give the Secret Service sole jurisdiction for the investigation currency crimes and the personnel and other resources necessary to do so in a responsible manner. 18 U.S.C. § 3056. The FBI, which is investigating this case, has no such jurisdiction, authority, or expertise. 18 U.S.C. § 3052.

By email dated July 27, 2010, the undersigned first brought this *Brady* information to the attention of the prosecutor and asked for their assistance in locating and producing it. The undersigned had talked briefly about this to the prosecutor immediately preceding the bond hearing on July 19, 2010, in the

presence of the defendant's son and hoped that the son would see that I was actively working his father's case.

> I do not see in discovery the transcript of the Ed Wahler trial or any documents relating to statements by the U.S. Treasury, Federal Reserve, and U.S. Mint since 1999 concerning the Liberty Dollar, nor do I see any reports from the FBI and Secret Service concerning Liberty Dollar from 1999 forward. It is my understanding that starting in 1999 newspaper journalists would do articles on the LD and check with various federal authorities to confirm that it was legal. It is also my understanding that when LD introduced it's currency into a community it would first go to the local authorities and local federal authorities to introduce themselves and the LD. This is a request for any discovery relating to these events and contacts and a copy of the transcript of the Ed Wahler trial. Exhibit A

On July 30, 2010, I followed up with an email to the prosecutor and provided additional information we had to assist the prosecutor in identifying the information we were seeking. Exhibit B.

On August 2, 2010, the undersigned communicated with the prosecutor by email making a Rule 16 request which included the production of expert information. Also, a request was made for disclosure of any claimed privileged documents and the identification of those documents so that further review of any claimed privileged could be pursued.

> This is Mr. von NotHaus' request for Rule 16 discovery, including defendant's oral statement (Rule 16(a)(1)(A), defendant's written or recorded statement (Rule 16(a)((1)(B), defendant's prior record (Rule 16(a)(1)(D)), documents and objects (Rule 16(a)(1)(E)), reports of examination and tests (Rule 16(a)(1)(F)), and expert witnesses (Rule 16(a)(1)(G)).

Also, please let me know if you are claiming any privileges arising out of or in connection with the government's dealings with Liberty Dollar since its inception in 1998. If so, please identify the document by author and date of creation. Exhibit C.

On August 4, 2010, the undersigned followed up on these prior requests. Exhibit D. On August 6, 2010, the undersigned again addressed the importance of working together to address the prior requests. Exhibit E. On August 9, 2010, the prosecutor informed the undersigned of the need to comply with *Touhy* regulations. Exhibit H.

On October 6, 2010, the undersigned raised the issue of an early production of witness and exhibit lists and exhibits, which apparently had been addressed at the December status conference. Also, the undersigned, in an effort to comprehend the lack of responsiveness to prior requests, asked for specific assistance in locating the *Brady* information, which would not be in the documents seized by the government, but in the government's own records.

With regard to von NotHaus, I see that at the December pretrial conference the early production of the government's exhibit list and exhibits was identified as a way to address some of the discovery problems in this case. Please let me know if that is something the government is willing to do and if so what the proposed production date would be.

Also, getting back to our discussions about discovery of information about government personnel and records which would be exculpatory and your response about the need to comply with Touhy, does this mean that to your knowledge the materials we seek are in the

mountain of discovery and the only thing left to your knowledge is for us to use this information to take steps required by Touhey regulations to compel testimony and production of the witnesses and records at trial? The defense supersystem is not yet working at least for me so I have not yet been able to type in the names I provided you to see what pops up. I have completed the review of the documents identified by Sid Alexander as potential issues and will get back to him tomorrow about it so that that seizure portion of the discovery is back in your hands. Thank you for your assistance. Exhibit F.

On October 11, 2010, the undersigned engaged in further prodding of the prosecutor for action in the quest for *Brady* information.

With regard to von NotHaus, I've been researching the FBI's involvement in this currency matter and the question of jurisdiction and authority, including the qualification of an FBI agent to present himself to the court in the applications for search warrants as an expert in currency matters, and I see that the applications have a section on "Legality" attempting to bootstrap jurisdiction by saying that you'all requested a legal analysis from the Department of Treasury and coordinated with the United States Mint. I cannot find any discovery on the input from the Treasury or Mint. The only document referencing communications from either of these two entities to the FBI is a October 6, 2006, memorandum from Bartenfeld, FBI DC, to Romagnuolo CLT, concerning calls from LD counsel Harrison to Mint counsel Shaver. It references attached CD of recording and two letters, but I cannot find those items in discovery. Your assistance in tracking down this information and advising me of what authority the Department of Justice and its US Attorneys and FBI agents have in investigating and prosecuting alleged violations of currency laws would be appreciated. Exhibit G.

The undersigned has reviewed the client records seized by the government and marked by the conflict attorney Sid Alexander as potential privileged information, and met with Mr. Alexander and reviewed the gray area documents

and has a few more hours of review work left of the list of 525 items marked by the government as non-privileged. This should not, as stated to the prosecutor in the attached exhibits, inhibit a review of the government's own records for *Brady* information, expert information, and other discovery and agreement as to early production of the witness and exhibit lists and exhibits.

As pointed out in Mr. von NotHaus' October filings concerning this matter and related trial scheduling, this matter is for trial involves significant effort to prepare for trial and if we do not get deadlines set for completing each party's obligations in the process, the interests of the public and the defendants to a speedy trial will wither away, like the rhododendron outside my window due to a lack of water. That continues to be the case.

The delay caused by the government's inaction continues to mount, making it unlikely that the defense will be ready by the March term even if the government were to comply by the end of this month. For that reason, Mr. von NotHaus respectfully moves for dismissal of the charges as the only effective way to preserve his right to due process and a speedy trial and because justice requires that the misconduct of the government must have consequences. This consequence is mandated by law to be dismissal by the court and not left to politics under the unitary executive theory of government.

This delay should also be seen in the broader context of this case. NORFED was formed to reform government by promoting the idea of repealing the Federal Reserve and Internal Revenue Code. Prior to Mr. von NotHaus' protest against deficit spending in front of the New York Federal Reserve in 2006, the government had admitted, on several occasions, that there was nothing illegal about Liberty Dollar. Exhibit H.

The government did an about face and within one month of the demonstration in front of the New York Fed, issued and published a slanderous accusation suggesting that the use of the Liberty Dollar distributed by NORFED was illegal. Exhibit I.

After NORFED filed a suit for a declaratory judgment against the government in federal court on March 20, 2007, to address the false accusations of the government, Exhibit J, the government retaliated by illegally obtaining search warrants and seizing on November 14, 2007, millions of dollars in gold and silver Liberty Dollars that backed the warehouse receipts and digital certificates held by over one hundred thousand owners and over 16,000 ounces of .999 fine silver in raw bullion bar form owned by Mr. von NotHaus' mother, over $250,000 in cash from bank accounts, and other property, some of which is un-inventoried by the government. Exhibit K.

In June, 2008, the government preemptively filed a baseless civil forfeiture action against the seized property in order to prevent a return of property under Rule 41 of the Federal Rules of Criminal Procedure. Exhibit L.

Finally, in May, 2009, the government brought to bear the most onerous harassment by seeking and obtaining from an Asheville grand jury in a secret proceeding with no right to confront or cross examine or present evidence an indictment lacking in both factual and legal merit.

It is now December, 2010, and the government has yet to comply with its discovery obligations in this politically motivated criminal proceeding or respect the rights of the lawful owners of the wrongfully seized precious metals.

The unhealthy attitude of the government can be seen in its arrogant response to Congressman Ron Paul's December 5, 2006, letter asking three questions about the NORFED Liberty Dollar notice and the authority for the proposition that only the government can mint and issue currency and the authority for prosecuting barter arrangements. Exhibit M. We have only the Department of Justice response and not the U.S. Mint response, reflecting the inadequacies of discovery.

The Department of Justice declined to articulate reasons for the notice, only claiming to take allegations of criminal conduct seriously and to carefully review such allegations. Exhibit N. While this clearly does not attempt to explain to the

Congressman the legality of the questionable action taken by the U.S. Mint, it at least is a response, which is more than can be said about the government's treatment of Mr. von NotHaus.

This Honorable Court issued its *Standard Criminal Discovery Order* July 29, 2009. <u>Docket</u> Doc. No. 38. By the terms of that Order, the United States of America is required to disclose to the defendant "all Brady material." Id. ¶ 2. That paragraph describes in general terms what it means by "Brady" material. In reliance upon this Order, counsel for the defendant has requested that the government make available such *Brady* material, identified as such by the defendant, with specificity. These efforts are detailed in this motion. To date, the government has not provided the requested material and information.

The government's refusal to provide this requested discovery rises to such a level of the violation of Mr. von NotHaus' right to present a defense that the appropriate sanction is dismissal with prejudice of the charges against the defendant. While such a sanction is harsh, its application is warranted under the facts of this case. *Cf. United States v. Derrick*, 163 F.3d 799, 807 (4th Cir. 1998)(stating that dismissal of an indictment may be warranted but that such remedy is seldom appropriate)(dismissal appropriate only where prejudice to the defense exists). In *Derrick*, the court noted that even a lesser remedy, such as ordering a new trial, may be inappropriate. It did suggest that dismissal of the

indictment may be an appropriate remedy where even a new trial would be an ineffective remedy. *Id.* (amount of prejudice to defendant should be commensurate with remedy for violation). As noted in this motion, defense attempts to obtain the information have been rebuffed by an absence of meaningful response by the government.

The concept, as espoused in *Derrick,* that the remedy must bear some correlation to the *Brady* or discovery violation is well established. *See e.g. United States v. Hammoud*, 381 F.3d 316, 336 (4th Cir. 2004), *vacated on other grounds*, 543 U.S. 1097, 125 S.Ct. 1051, 160 L.Ed.2d 997 (2005). While discussing the range of sanctions available to the trial court in the context of Rule 16 discovery practice, where the government made late disclosure of a trial witness, the court provided the following guidance:

> "[the court] must weigh the reasons for the government's delay and whether it acted intentionally or in bad faith; the degree of prejudice, if any, suffered by the defendant; and whether any less severe sanction will remedy the prejudice and the wrongdoing of the government. *United States v. Hastings,* 126 F.3d 310, 317 (4th Cir. 1997). The court must impose the least severe sanction that will 'adequately punish the government and secure future compliance.' *Id.* A continuance is the preferred sanction. *See United States v. Golyansky,* 291 F.3d 1245, 1249 (10th Cir. 2002) ('It would be a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings.'). The sanction decision is reviewed for abuse of discretion. *See Hastings,* 126 F.3d at 316."

*Id*. 381 F.3d at 336. Note that the trial court is vested with discretion to determine the sanction.

As made known herein, the subjects of the defendant's discovery requests go to the very core of his ability to present a defense. Because defenses are creatures of the interplay between the facts of a case and the controlling law, Mr. von NotHaus is being limited in the full presentment of his defense: the defendant needs the requested information so that he can present his defense. The right to present a defense is grounded in Constitutional jurisprudence. Dismissal of the charges here, as a sanction, is the only way by which the defendant's rights to present a defense are preserved. Lesser sanctions merely serve to further delay the proceedings, which delay rewards the government and which inhibits the defendant.

While not a discovery sanctions case, in the case of *United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010), the Court was presented with an issue where the defendant challenged his conviction on the ground, in part, that he had been precluded by the district court from presenting a full defense. The defendant had wanted to show that it was not he, but another defendant, who possessed the firearm used to administer the fatal shot. In ruling that the defendant's rights had not been violated by the district court's exclusion of evidence that it was another person who possessed the firearm, the district court reasoned that the proffered evidence had not established any nexus between the crime of conviction and the possession of a firearm by a co-defendant on another occasion. *United States v.*

*Lighty*, 616 F.3d 321, 358. The appellate court therefore found no error in this regard by the district court. In reaching this holding, the appellate court's reasoning did not curtail or limit the right of the defense to present a defense — it merely ruled on the facts of this case. It did so with full recognition of the well established right:

> "Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth Amendment guarantee of due process, "the Constitution guarantees criminal defendants `a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)). This right includes, "at a minimum, . . . the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). Although a defendant has a constitutional right to present evidence in his favor, *United States v. Moussaoui*, 382 F.3d 453, 471 (4th Cir. 2004), "a defendant's right to present a defense is not absolute: criminal defendants do not have a right to present evidence that the district court, in its discretion, deems irrelevant or immaterial." *United States v. Prince-Oyibo*, 320 F.3d 494, 501 (4th Cir. 2003); *see also Crane*, 476 U.S. at 689-90, 106 S.Ct. 2142 (noting that the "Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues") (citation and internal quotation marks omitted)."

*Id*. 358.

While this concept of materiality or relevancy has some elasticity to it, Mr. Von Nothaus' needs for the discovery requested are absolute. In the facts of this instant case of Mr. von NotHaus, one of the very tenets of his defense is that the

14

United States of America — for years — examined the *Liberty Dollar* project and, significantly, held it out to the defendant and to the public as a lawful endeavor. It was not until the defendant protested against deficit spending in front of the New York Federal Reserve and criticized governmental monetary policy, that the federal government's position changed completely. After that protest, the government took the position the *Liberty Dollar* project was unlawful and needed to be shut down. As noted in this motion, the materiality of the information requested by Mr. von NotHaus cannot seriously be disputed by the government.

Even in the context of litigation squarely falling within matters going to the very heart of national security, the Fourth Circuit has not disregarded and thrown out the defendants' rights to have access to exculpatory witnesses, or to present a defense. *See United States v. Moussaoui*, 591 F.3d 263, 281 – 284 (4th Cir. 2010)(CIPA analysis). While the *Moussaoui* appeals court upheld the validity of the guilty plea entered into by the defendant, it surveyed the litigation history of the case, including the court's strong interlocutory rulings mandating the government provide (in *CIPA* compliant fashion) exculpatory witnesses who also happened to be enemy combatants. See id. 285 - 288 (characterizing the *Brady* right as a trial right, not a "guilty plea" right). This survey of the law of discovery and *Brady* are as applicable to Mr. von NotHaus as to the defendants in the *Moussaoui* case.

Underpinning this analysis that goes into deciding what the appropriate remedy should be for discovery violations are two core concerns. The first is the prejudice that befalls the defendant where the government ignores its compliance with discovery orders. The second is the need to bring the government to compliance. In Mr. von NotHaus' case, only dismissal of the charges will meet these two seemingly disparate interests. Lesser remedies will not alleviate the harm that is being done to the defense.

A continuance will not be appropriate because the purpose of the information being sought is to use it in a primary way, that is, to make out and present the defense. This is not a case where, for instance, the information is sought to better cross-examine a government witness by that witness's prior statements or to contest that witness's *bona fides*. Even in cases where the government engaged in outrageous misconduct, the remedy of dismissing the charges is not favored unless the prejudice done to the defendant is incapable of being remedied in any other fashion. *E.g. United States v. Dyess*, 478 F.3d 224, 236 (4th Cir. 2007)(government agent suborning perjury at sentencing hearing which, in context of this case, was not harmful)(witness committing perjury was paramour of case agent, and was allowed, unlawfully, by the case agent to keep significant sum of money that were proceeds of the drug conspiracy). In *Dyess*, the sentencing court's actions were well supported by evidence other than that perjured

testimony. However, the appellate court seemed to suggest that, had the sentence not been supported by proper, untainted evidence, the holding may have been different. Also, in *Dyess*, the appeals court scrutinized the misconduct of the agent and determined that it had not adversely affected the trial and the jury verdict. Otherwise, the court suggested dismissal may have been an appropriate consideration. While your undersigned counsel recognizes that unpublished opinions from the Fourth Circuit are not binding precedent, unpublished cases may offer clear exegesis of controlling principles. Such is the opinion in *United States v. Guild*, 341 Fed.Appx. 879, 884 - 885 (4th Cir. 2009), relying upon *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). In *Guild*, the appeals court stated the balancing test thusly:

> "the [Supreme] Court explained that the 'extraordinary relief of dismissal is not "appropriate in the absence of some adverse consequence to the representation [the defendant] received or to the fairness of the proceedings leading to [his] conviction,' *Id.* at 363-64, 101 S.Ct. 665. '[A]bsent demonstrable prejudice,' the Court held, 'dismissal of [an] indictment is plainly inappropriate, even though the violation may have been deliberate.' *Id.* at 365, 101 S.Ct. 665."

A continuance will not result in any strengthening of Mr. von NotHaus' defense - it merely delays the trial. The government's unwillingness to comply with its discovery obligations places the defendant, and his right to present a defense, in a precarious position. The government has indicated it will seek strict compliance with applicable *Touhy* regulations. In summary terms, those

regulations require that the defendant give notice to the various government agencies involved in this case of those government agents and employees it may seek to testify at trial. The notices that the defendant must provide must summarize the testimonies anticipated to be given by those government agents and employees. For the defendant to not be able to provide adequate *Toughy* notice precludes the defendant from presenting a defense. This is the sort of demonstrable prejudice envisioned by applicable legal authorities. *See e.g. Guild, supra*. *See also United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009)(*Touhy* issues as regards CIA witnesses subpoened)(defense sanctioned for non-compliance with *Touhy*).

Any remedy short of dismissal will not foster compliant behavior by the government. This is a classic case of where the government sits on information favorable — indeed, exculpatory — to the defense but seems under no duty to provide it.

A continuance will not foster compliance now, or in the future. It is not the government whom is harmed by continuing the trial. Even personal sanctions, directed at the government attorneys, are of dubious legality for criminal discovery violations. *See e.g. United States v. Willcox*, 696 F.Supp. 2d 536, 580 - 581 (D.Md. March 23, 2010)(monetary sanctions).

To grant endless rounds of continuances so that the government can comply with its obligations under this Court's discovery order will do no good. The

resulting delay of the government in complying with discovery, and the position of the defendant then being placed where endless streams of continuances may follow, suggests the applicability of Rule 48(b)(3)(court has inherent power to dismiss where unnecessary delay occurs in bringing defendant to trial).   *See United States v. Goodson*, 204 F.3d 508, 513 – 516 (4th Cir. 2000)(government's lapse in not having its witnesses at trial, whereupon government sought dismissal under Rule 48(a) but court dismissed charges, with prejudice, under either Rule 48(b) or under its plenary power to supervise case)(appeals court found an abuse of discretion in this case).   In *Goodson*, while finding the district court abused its discretion in dismissing with prejudice, the appeals court premised this finding upon an absence of prejudice to the defense by continuing so that the government's witnesses could appear.   *See  id*.

The tale of this case harkens back to the 1970's and two high profile cases in which evidence in the hands of the government was concealed resulting in dismissal in one criminal case and a wrongful conviction in another. In *United States v. Ellsberg*, the defense wanted the internal analysis of the impact of the Pentagon Papers (documents showing government deception of the public and Congress on the status of the Vietnam War) on national security to assist in their defense. The government repeatedly denied there was anything responsive to the defense request. Ultimately, the federal court dismissed the charges for failure to

comply with discovery obligations. Len Colodny and Tom Shachtman, *The Forty Years War: The Rise and Fall of the Neocons, from Nixon to Obama* p. 170-71, 214 (First Harper Perennial Edition 2010).

In *United States v. Ehrlichman*, the defense wanted the White House tapes that would have established the national security concerns justifying the actions of the defendant in question in the criminal case. The federal court rejected the defense request, resulting in a wrongful conviction. Len Colodny and Tom Shachtman, *The Forty Years War: The Rise and Fall of the Neocons, from Nixon to Obama* p. 214-15 (First Harper Perennial Edition 2010).

With the benefit of time, the rule of law would seem to have justified a dismissal in both *Ellsberg* and *Ehrlichman* and the discrepancies could be explained by the rule of people making judgments based more upon moral relativism rather than universal principles of truth and justice. Ellsberg was a sympathetic defendant, Ehrlichman was not. It is hoped that in the instant case, the rule of law will prevail and that this Court will dismiss the charges as a consequence of the government's failure to produce the discovery requested in a timely manner.

For these reasons, Mr. von NotHaus prays that this Court grant this motion.

This the 30th day of December, 2010.

/s Aaron E. Michel
Aaron E. Michel, Attorney at Law
Lead Counsel for Mr. von NotHaus
Phone: 704-451-8351
Email: mail@aaronmichel.com
3736 Surry Ridge Court
Charlotte, NC 28210


/s Randolph Marshall Lee
Randolph Marshall Lee, Attorney at Law
Counsel for Mr. von NotHaus
Phone: 704-841-2222
Email: RandolphLeeLaw@gmail.com
PO Box 77005
Charlotte, NC 28271

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served this 30th day of December, 2010, by means of the Electronic Filing System for the Western District of North Carolina, upon the following parties:

For the Government:

**Jill Westmoreland Rose**
Assistant U.S. Attorney
100 Otis Street, Room 233
Asheville, NC 28801
828-271-4661
Fax: 828-271-4670
Email: jill.rose@usdoj.gov

**Mark T. Odulio**
Assistant U.S. Attorney
227 W. Trade St., Suite 1700
Charlotte, NC 28202
704-344-6222
Fax: 704-344-6629
Email: mark.odulio@usdoj.gov

**Thomas R Ascik**
Assistant U.S. Attorney
100 Otis Street, Room 233
Asheville, NC 28801
828-259-0644
Email: thomas.ascik@usdoj.gov

For William Kevin Innes:

**Claire J. Rauscher**
Federal Defenders of Western North Carolina
129 W. Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
Fax: 704-374-0722
Email: Claire_Rauscher@fd.org

For Sarah Jane Bledsoe:

**Joe Von Kallist**
6743-A Fairview Road
Charlotte, NC 28210
704-366-9008
Fax: 704-365-2109
Email: joevonkallist@yahoo.com

For Rachelle L. Moseley:

**Matthew G. Pruden**
301 E. Park Avenue
Charlotte, NC 28203
704-338-1220
Fax: 704-338-1312
Email: mpruden@tinfulton.com

This the 30th day of December, 2010.

/s Aaron E. Michel
Aaron E. Michel, Attorney at Law