**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**5:09CR27-1**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Motion to Dismiss Challenging** |
| **v.** | **the Sufficiency of the Indictment** |
| **BERNARD VON NOTHAUS** | **to State an Offense** |

The defendant Bernard von NotHaus through counsel moves to dismiss the indictment for failure to state an offense.

The superceding indictment contains three counts that allege counterfeiting, whether by similitude or original design, of coins issued by the United States government, in violation of Title 18, United States Code, Sections 371, 485, and 486.

NORFED, the National Organization for the Repeal of the Federal Reserve and Internal Revenue Code, created and disseminated the Liberty Dollar beginning in 1998.

The indictment must allege the "nature and cause of the accusation," U.S.Const., Amend. VI, and the "essential facts constituting the offense charged." Rule 8(c)(1), Fed. R. Crim. P. This Court "may hear a claim that the indictment … fails … to state an offense" at any time while the case is pending. Rule 12(b)(3)(B), Fed. R. Crim. P.

We submit that no offense is charged by the indictment because of the unique appearance of the Liberty Dollars, the promotion of the Liberty Dollar as a

protest against the fiat nature and corresponding inflation prone current U.S. money, and the significant intrinsic value of the Liberty Dollar, all of which are admitted within the indictment and readily seen by inspection of the specimens identified by the indictment.

The Liberty Dollars in question are the five, ten, twenty, and fifty dollar silver specimens shown in Exhibits A through E. The U.S. money in question are the Kennedy half-dollar, Eisenhower dollar, James Monroe dollar, half-dollar, quarter, dime, and nickel specimens shown in Exhibits I through N and S. A comparison of these specimens is shown in Exhibits F through H. A summary of the size of these specimens is shown in Exhibit O and a summary of their markings is shown in Exhibit P. Looking at the totality of the circumstances and taking into consideration all of this information, the Liberty Dollars are unique.

As one can see, no Liberty Dollars are the same size as the current money of the United States nor are they marked in a similar fashion to or with an original design that would cause them to be confused with the current money of the United States. The "Dollar" and "$" sign are not unique to the current money of the United States. Exhibits Q and R. Dozens of countries including our neighbor Canada use the "dollar" to describe their currency. Exhibit Q. Most of the currency of the United States in question in the superceding indictment does not use the "$" dollar sign, until 2007, when it appears in the Presidential Dollar series. Exhibit R.

Even Mexico uses the "$" sign for its Peso. Exhibit R. None of the United States coins are in denominations above one dollar, while the Liberty Dollars are in denominations of no less than five dollars. United States coins are not fine silver, the Liberty Dollars are.

The protest nature of the Liberty Dollar is seen both in the specimens and the name of the promoter of the Liberty Dollar. The Liberty Dollars refer to NORFED, which stands for the National Organization for the Repeal of the Federal Reserve and Internal Revenue Code. According to the superceding indictment, "NORFED, as a core belief, views United States currency as worthless." Page 2. Please note, however, that NORFED did not refer to the United States currency as "worthless" and this hubris by the government shows the government's over-reaction to NORFED's political views on important monetary policies and constitutional limitations on the power of the government. United States coins function in the market place, as you can still buy and sell things with these coins. The true statement is that these coins are worth less due to actions of the government protested by NORFED through Liberty Dollar.

This is clearly evident in the book, *1998-2003, The Liberty Dollar Solution to the Federal Reserve* (Amer. Fin. Press 2003), and the warehouse receipts, both of which are referenced in the superceding indictment. The warehouse receipts specifically say that the receipt "is an exercise of the Bearer's First Amendment

right to petition the Government for a silver based currency as stated in the U.S. Constitution." The Liberty Dollars and warehouse receipts provide the phone number and website for people to contact NORFED to learn more and become more aware of and perhaps more involved in their community at least with regard to individual and community wide fiscal responsibility.

The Liberty Dollars in question are .999 fine silver. This information is on the Liberty Dollars along with the quantity of silver to aid in determining its value. The money of the United States at issue in the superceding indictment does not disclose its metal content. The search warrant affidavit states that the FBI lab tested the Liberty Dollars and confirmed their metal content as .999 fine and the weights consistent with one troy ounce. Exhibit T, p. 9.

Within the enumerated powers of the government is the power to punish the "counterfeiting" of the "current coin of the United States." U.S.Const., Art. I, § 8, para. 6. Congress has passed a number of statutes pursuant to this power to punish counterfeiting of the current coin of the United States, including the two statutes at issue in this instant indictment, Title 18, United States Code, Sections 485 and 486.

Section 485 punishes, "Whoever makes, forges, or counterfeits any coin or bar in resemblance or similitude of any coin of a denomination higher than 5 cents or any god or silver bar coin current in the United States or in actual use and circulation as money within the United States." It also punishes, "Whoever passes,

utters, publishes, sells, possesses, or brings into the United States any false, forged, or counterfeit coin or bar, knowing the same to be false, forged, or counterfeit, with intent to defraud any body politic or corporation, or any person." It also punishes attempt to commit these crimes. The scope of both sections of § 485 is the same and is intended to apply to coin or bar "current … or in actual use and circulation as money within the United States. *United States v. Falvey*, 676 F.2d 871, 872-3 (1st Cir. 1982).

Section 486 punishes, "Whoever, except as authorized by law, makes or utters or passes, or attempts to utter or pass, any coins of gold or silver or other metal, or alloys of metals, intended for use as current money, whether in the resemblance of coins of the United States or of foreign countries, or of original design." This statute was originally passed by Congress as the Act of June 8, 1864.

In *United States v. Bogart*, 24 Fed. Cas. 1185 (D.C.N.Y. 1878), the court examined the legislative intent of what is now § 486 and determined that the Act was simply a counterfeiting law directed at private coins that closely resembled circulating United States currency and could mislead the public, even if the markings were original, but still misleading. The court rejected the government's argument that the Act established the new, previously unknown crime of issuing private currency.

The octagonal gold piece at issue in Bogart had an American Indian on the obverse and an inscription "1/4 dollar, Cal." on the inverse and were passed by the defendant.

In analyzing the scope of § 486, the court in Bogart stated,

On first impression, this language seems sufficiently comprehensive to cover the present case; but, giving it that strict construction which is always to be applied to penal statutes, my conclusion is, that the language is satisfied by a much narrower application.

(1) The pieces of metal passed by the defendant do not purport to be coins, in the legal definition of the word, but are tokens.
(2) If it should be held that the section makes it a crime to make or utter any pieces of metal, with the intent that the pieces shall serve as a substitute for money, an offence is created which is new and foreign to the law of counterfeiting.

A coin is a piece of metal stamped and made legally current as money. A counterfeit coin is one in imitation of the genuine. The coins known to the law are those authorized to be issued from the mints of the United States, and those of foreign countries current here. The pieces in question are not in imitation of our own coin …
by limiting it to meet cases … where persons making or uttering coins which purported to be in imitation or similitude of current money of the country could not be convicted because the designs or devices were not those which the law prescribes as the devices or legends which shall be stamped upon the coin issued from the mints of the United States….
The act in question remedies this difficulty, and, if the spurious piece purports to be coin of the United States, or of foreign countries, it is one within the statute, although the devices with which it is impressed are so far from a similitude to the genuine as to be of original design.

In the instant case, the Liberty Dollars are not coins. Even the U.S. Mint, in its 2006 notice, did not refer to them as coin, and, instead, referred to them as medallions. Exhibit U. Coins would have specific devices prescribed by law that we are bound to know under the law. Liberty Dollars do not have these devices, but have their own, copyrighted markings. The Eisenhower dollar referenced in the superceding indictment isn't even current coin because it was last minted in 1978.

The government did not have much more success in *United States v. Gellman*, 44 F.Supp. 360, (D.C.Minn. 1942). The defendants in that case manufactured slugs that could operate vending machines. The court dismissed the indictment. With regard to § 485, the court held that,

> It would seem that the mere fact that these tokens are, by reason of this modern mechanical vending age, capable of use for purposes designed primarily for genuine coins, should not justify the substitution of the 'mechanical test' for the discrimination in accepting proffered coins commonly and usually employed by average, prudent persons. There would be no justification for such a strained and unwarranted interpretation of a criminal statute which clearly was not designed to prohibit the manufacture and sale of any metal pieces in the size of a genuine United States coin, unless they bore such resemblance or similitude to genuine coins that they would be likely to deceive some person into accepting them as genuine. The machine test suggested by the Government is not encompassed within the plain purview of the statutes referred to and it follows that these defendants are not guilty of the possession and sale of coins bearing any similitude or resemblance to genuine United States coins. In view of this finding, it does not become necessary to discuss the other element of the statutes, to wit, an intention to defraud.

With regard to the § 486 charge, the court likewise rejects the allegation in the indictment that the items were "intended for circulation as money." The court, however, added in *obiter dicta* that, "no one can interfere with the monopoly which this Government has obtained by reason of the Constitutional provisions without running afoul of these statutes."

The *Gellman* court correctly noted that § 486 differed from its other sister counterfeiting laws in relaxing the requirement for "resemblance or similitude". However, apparently swayed by the title, the court read § 486 to carry no requirement for any resemblance whatsoever, a reading directly at odds with *Bogart*, which held that the law carried the implicit context of a counterfeiting law and not the criminalization of simple coinage. Ironically, the *Gellman* decision earlier cites *Bogart* as part of a long set of citations establishing the standard requiring that counterfeiting be such that would deceive an "ordinary observer." However, the fact that the *Gellman* decision directly contradicts the core conclusion in *Bogart* (that simple issuance of currency is not within the purview of § 486) without referencing *Bogart* indicates that the court likely read only the case citation headnote relevant to the "ordinary observer" standard and did not actually read the full *Bogart* decision.

The reading's cursory nature shows in discussion of constitutional authority - the Constitution places restrictions only on States and on the Federal government, not on individuals, so any "monopoly" given to the Federal government would be

simply a prohibition on the powers of States, not of individuals. Since Article I, Section 8 of the Constitution also grants the Federal government the power to establish post offices and roads, in the same section that grants the power to coin money, such an interpretation would prohibit Federal Express or United Parcel Service from competing with the United States Post Office. In reality, Article I, Section 8, which granted the Federal government the power of coinage, confers no monopoly. Article I, Section 10 (powers denied to States), specifically prohibits States from coining money, and nothing here prevents individuals from coining money. Congress has the power to "provide for the punishment of counterfeiting the Securities and current Coin of the United States" - a power of prosecution from which counterfeiting cannot be separated.

The *Gellman* court did not visit §486 deeply, because the court knew it to be inapplicable even if it had completely relaxed the "resemblance or similitude" requirement:

> But the intendment must be that the coin shall be 'for the use and purpose of current money' under Section 281, and 'to be used as money' under Section 282. Now, money is a medium of exchange. It is something which has general exchange-ability as such. Obviously, these tokens or slugs were never intended for circulation as money. The very inscriptions-- 'No Cash Value'-- 'For Amusement Purposes Only'-- dispel any doubt in that regard. There is no promise to pay money or anything of value, either impliedly or by reason of any express inscription on the coin.

The government temporarily did much better in *United States v. Yeatts*, 639 F.2d 1186 (11th Cir. 1981), in which the defendant attempted to sell counterfeits of gold coins no longer in circulation and was convicted of violation of § 485. Unfortunately, this was in error according to the First Circuit in a subsequent decision in *United States v. Falvey*, 676 F.2d 871 (1st Cir. 1982). In *Falvey*, defendants were charged under Sections 485 and 486, with uttering and possession with intent to defraud of counterfeit gold South African Krugerrands. The District Court had previously considered the question of the term "current money". It found that current money is money that is in actual use and circulation, and that neither 485 nor 486 criminalize the possession or use of counterfeit foreign coin unless such coin was in current use in the United States. The government appealed, and the First Circuit affirmed that Sections 485 and 486 do not reach the counterfeiting of foreign coins that are not current money in actual use and circulation in the United States.

At the time of the *Falvey* decision, the current coding of 18 USC 485 appeared on a plain reading to apply to Falvey:

> Whoever falsely makes, forges, or counterfeits any coin or bar in resemblance or similitude of any coin of a denomination higher than 5 cents or any gold or silver bar coined or stamped at any mint or assay office of the United States, or in resemblance or similitude of any foreign gold or silver coin current in the United States or in actual use and circulation as money within the United States; or
> Whoever passes, utters, publishes, sells, possesses, or brings into the United States any false, forged, or counterfeit coin or bar, knowing the same to be false, forged, or counterfeit, with intent to defraud any body

politic or corporate, or any person, or attempts the commission of any offense described in this paragraph-
Shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both.

Falvey was charged under the second paragraph, which did not contain the requirement for actual use and circulation as money. However, the District Court had carefully considered the legislative history of 18 USC 485, finding that in earlier codifications of the statute the restriction of "actual use and circulation" had applied to both paragraphs.

Examining the legislative intent of subsequent amendments documented in their House and Senate reports, the court in *Falvey* found no evidence of intent to change the restriction and concluded that the change had been a simple and inadvertent result of the statute's redrafting. Therefore, the District Court concluded (and the Circuit Court affirmed) that the statute must be read as if the restriction applied to both paragraphs. In doing so, the *Falvey* court noted that it followed the same path that the Fifth Circuit had earlier taken in *Yeatts*. This appears to be mistaken on the part of the *Falvey* court; the *Yeatts* court appears to have incorrectly worked off the statute's plain meaning as if the restrictive claim did not apply to the second paragraph.

The *Falvey* court noted that,

Cases construing changes in statutory language tend to rely in part on evidence of congressional intent or at least attention to the change in deciding whether to give the change its literal effect.... In the absence of

these factors, courts are not bound to read a statute literally in a manner entirely at odds with its history and apparent intent.

The *Falvey* court also recognized that all counterfeiting statutes have implicit in their nature certain restrictions arising from the common law understanding of counterfeiting, whether or not those restrictions appear explicitly in the statute's plain language. Referring to 18 USC 485, the court notes:

> While the statute now literally punishes possession of "any" counterfeit coin, certainly some limitation must be read into it: we have found no evidence throughout the history of the statute of an intention to punish counterfeit ancient Greek or Roman coins, for example. *Cf. United States v. Gertz*, 249 F.2d 662, 664-65 (9th Cir. 195 7).

Addressing the applicability of 18 USC 486, the *Falvey* court attempted to review evidence of legislative intent, but did not reach as far as the *Bogart* court did. The court went so far as to reference the bill's stated purpose "to punish and prevent the counterfeiting of coin of the United States," both in the Statutes at Large and in the Congressional Globe. Unfortunately, while the *Falvey* court referenced the Congressional Globe, it appears not to have reached, or at least not to have referenced, the debate on the Act and the letter from Secretary of the Treasury Chase explaining the need for the Act. Rather, *Falvey* cites Gellman's (unsupported and overly simplistic) description of 18 USC 486's purpose, noting it "seems to have been with the prohibition of private systems of coinage created for use in competition with the official United States coinage." Had the court proceeded farther into the Congressional Globe, it would have found a firsthand, and more accurate, description of

what legitimate counterfeiting problem would necessitate a law referring to coins "of original design" and without a clause for "intent to defraud." The absence of both clauses was noted by the court in its discussion of the applicability of 18 USC 486 to Falvey's case, and *Falvey* makes no reference to *Bogart*.

For purposes of the matter at hand, the distinction was irrelevant to the *Falvey* court, which was concerned with establishing whether 18 USC 486 made any reference to foreign coins intended for circulation outside the United States. The court correctly concluded that 18 USC 486 was not intended to reach that case and dismissed the charge against Falvey.

Throughout American history, private coinage appeared, waned, and re-appeared. For example, blacksmith John Higley in Granby, Connecticut, minted copper money in 1737 and 1739, which saw general use until the United States opened its first mint in 1792. His coins bore the inscription ""I am good copper/Value me as you please." Edgar H. Adams, "Higley Coppers 'Granby Coinage,'" The Numismatist, August 1908. From 1831 to 1847 Christopher Bechtler of Rutherfordton, North Carolina minted gold money despite competition from the nearby Federal mint established in 1837 in Charlotte. Clarence Griffin, "The Story of the Bechtler Gold Coinage," The Numismatist, September 1929.

An article by the Numismatic Guarantee Association notes:

The failure of the United State Mint to produce an adequate coinage of its own perpetuated the circulation of Spanish coins for decades.

Contributing to this problem was that the Spanish coins, which were frequently clipped and worn, were readily spent, while the federal coins, with their higher intrinsic value, were either hoarded or shipped overseas for recoining in Europe.

From the very outset, Congress established legal tender values for each of the various foreign pieces familiar to 18th Century Americans. It was hoped that this step would be a temporary one, but practical necessity mandated that their legal tender status be renewed time and again. It was not until the 1850s that the USA had enough domestic coinage in circulation to permit withdrawal of the Spanish issues, the only foreign pieces that still maintained a large presence.

Despite the loss it would incur on the underweight Spanish coins, the Treasury began redeeming these pieces in 1857 at a modest discount from their nominal face value. Given in exchange were the new small cents first coined that year as a replacement for the large copper cents and half cents, which were also being retired with the Spanish pieces. This program was renewed through 1860, and it brought to an end the circulation of these historic coins in most of the nation, though rural areas continued to utilize the old bits as late as the 1870s."

"Spanish American Colonial Coinage", 2001, the Numismatic Guarantee Association,

available at http://www.coinsite.com/content/articles/Spanish.asp.

Note that the Constitution did not confer any power to ban private coinage of money, whether in gold or silver or in any other form, although it did confer a power to punish counterfeiting, and to set the value of foreign coin. When Congress sought to extinguish the use of Spanish currency, it did so by producing better and more desirable currency in its mints, and by paying a slight premium for Spanish currency, so people brought it to be re-coined. In doing so, Congress pursued its legitimate mission to guarantee to the citizens of the United States a reputable standard of lawful money. Congress did not simply declare the use of Spanish coins illegal - it

had no power to do so. The contention that Section 486's purpose and effect was to ban all privately issued currency is an overstatement of the Act's true legislative intent and power. To have this effect, the Act would have had to create new Constitutional power, a thing that cannot be done in an act.

Section 486 refers specifically to metal tokens of "gold, silver, any other metal, or alloy of metal", deliberately excluding tokens of other materials such as wood, paper, glass, or plastic. If the Act really were to have banned private currency, it would only have banned private currency made of metal. Were this (incorrect) interpretation true, Americans would still be able to create a circulating private currency based on any item, regardless of lack of intrinsic value, as long as it were not metal. That is to say, Americans could create a currency based on anything, regardless of how worthless it was, except gold and silver - which have intrinsic worth. Under such an interpretation, a currency whose coins were made of wood, with almost no intrinsic value, would be legal for use in commerce, but one whose coins were made of silver (which is valuable) would not be, to protect the public interest. Clearly, this is ridiculous proposition, and the underlying assumption about the Act of June 8's purpose and effect is suspect.

Closer examination of the Act and its legislative history show clearly that the Act's purpose was simply to punish counterfeiting. As such, the Act derives its legitimate Constitutional authority directly from Article I, Section 8 of the Constitution,

cited above. Conversely, simply minting and circulating coins of gold or silver does not constitute counterfeiting, provided that the coins do not closely resemble existing currency, whether issued by the United States of by some other source.

The "Act of June 8, 1864", Chapter 114, was enacted by the 38th Congress, 1st Session. It appears in the United States Statutes at Large on this date and chapter with the original title, "An Act to punish and prevent the Counterfeiting of Coin of the United States" (p. 120). The margin note on the next page (p.121) reads "Penalty for counterfeiting coin of the United States."

In its current form as 18 USC 486, the law reads almost identically:

Whoever, except as authorized by law, makes or utters or passes, or attempts to utter or pass, any coins of gold or silver or other metal, or alloys of metals, intended for use as current money, whether in the resemblance of coins of the United States or of foreign countries, or of original design, shall be fined under this title or imprisoned not more than five years, or both.

The debates on H.R. 455 is consistent with this focus on counterfeiting. This transcript is taken from The Congressional Globe of 1864, page 2265, and its scanned image is archived here: http://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=066/llcg066.db&recNum=314.

PUNISHMENT OF COUNTERFEITING

Mr. KASSON: I am instructed by the Committee on a Uniform System of Coinage, Weights, and Measures, to report a bill to prevent and punish the counterfeiting of the coin of the United States. I am aware that it is not a private bill, but it is considered on important to be passed, and I now ask the consent of the House to report it now and put it on its passage.

There being no objection, the bill was reported and read a first and second time.

The Bill providers a penalty of a fine not exceeding $3,000, and imprisonment not exceeding five years, or both, in the discretion of the court, for counterfeiting any of the gold or silver or other coins of the country, or for uttering or passing any token or original device resembling the coins of the United States or of any foreign Government.

[brief interjection of unrelated Army field reports as more Confederate armies were captured, deleted]

PUNISHMENT OF COUNTERFEITING - AGAIN

MR. KASSON: I ask that the following letter may be read from the Treasury Department. The clerk read, as follows:

"Treasury Department, May 2, 1864

"SIR, it has been the practice during the last few years for parties in the gold producing regions of our country to issue coins of gold largely alloyed with the silver naturally present. The devices on these pieces, in most instances, are in close imitation of those on the legal coins, and they pass currently in considerable extent in the far West, although much below the professed value.

"This issue by private parties of coins bearing a close resemblance to coins of the United States, is a reprehensible practice, and is injurious to the public interests. It therefore seems proper that some provision should be made by law to prohibit it. To this end I submit the accompanying draft of a bill for the consideration of your committee and such action as they may think proper.

"I am, very respectfully,

"S.P.CHASE,
Secretary of the Treasury"

Hon John A. Kasson, Chairman Committee on Coinage, House of Representatives. Mr. BROOKS: Is this a regular report from the committee?

Mr. KASSON: It is.

Mr. BROOKS: In the first place, I desire to call the attention of the members from California and Oregon to this bill, for it concerns them more than it does my section of the country. If it is satisfactory to them I will not oppose it; but it strikes me that $3000 fine and five years imprisonment is a pretty severe penalty for the circulation of gold tokens, which at one time, if not now in California and the Pacific coast, were used for business purposes.

Mr. SHANNON: I say to the gentleman from New York that that time has passed.

Mr. BROOKS: If the bill is satisfactory to the gentleman from the Pacific coast I will not object to it.

Mr. SHANNON: I think this is a very proper bill, and hope the House will pass it. We have a mint at San Francisco, the capacities of which, it is true, are not sufficient for the wants of our commerce, but with the additional machinery which I have no doubt Congress will give us an appropriation to purchase, it will be quite sufficient so far as California is concerned. It is also asked that a mint be established in Oregon and another in Nevada. If that be done, the facilities for furnishing all the United States coin required for commercial purposes on the Pacific coast will be ample.

It is true that in the earlier history of that country it became necessary for private parties to engage in stamping coin for circulation, but that day has passed. There may still be some little difficulty in Nevada. I think Congress should establish a mint there; but if not, they will have to supply themselves from California. I think the bill is a proper one.

Mr. ELIOTT: I wish to ask whether, if this bill passed in its current shape, it will not prevent the coinage of money altogether? This provides a penalty for coinage without discriminating by whose authority it is done.

Mr. KASSON: It was not, of course, the intent of this bill, nor do I think it is its effect. Government does its own coinage still, while this bill prevents fictitious coinage. I have no objection, however, to an amendment which shall make it clearer.

Mr. ELIOTT: I am afraid it is just that thing.

The SPEAKER: Does the gentleman move an amendment?

Mr. ELIOTT: I would rather that the gentleman who reported this bill should suggest an amendment. I will, however, move to insert after the word "persons," in the first line, the words "except as authorized by law."

The amendment was agreed to.

The bill, as amended, was ordered to be engrossed and read a third time; and being engrossed, it was accordingly read the third time and passed.

The following enumerates previously presented points of evidence showing that the Act of June 8, 1864 was a counterfeiting bill, deriving its authority from the Constitutional power to punish counterfeiting. First, the bill was titled "An Act to punish and prevent the counterfeiting of coin of the United States." Second, the margin note in the United States Statutes at Large for the Act reads "Penalty for counterfeiting coin of the United States." Third, the letter from the Secretary of the Treasury explaining the bill's intent clearly refers to the private coinage's close resemblance to the United States coins as the underlying issue requiring regulation: "This issue by private parties of coins bearing a close resemblance to coins of the United States, is a reprehensible practice, and is injurious to the public interests." Fourth, Secretary Chase's letter further establishes that the problem is not simply the close resemblance of the private coins to United States coins, but also that they do not have the professed face value: "they pass currently in considerable extent in the far West, although much below the professed value. In the Atlantic cities, a large amount of ersatz tokens have

been issued by private parties and are now in circulation." Fifth, Rep. Kasson's description of the bill notes that it provides a penalty for "counterfeiting any of the gold or silver or other coins of the country, or for uttering or passing any token or original device resembling the coins of the United States or of any foreign Government." Sixth, in the legislative debate, Rep. Elliot asks whether the bill, in its current shape, would prevent the coinage of money altogether. Rep. Kasson answers, "It was not, of course, the intent of this bill, nor do I think it is its effect." and continues to note that the bill addresses only fictitious coinage. Seventh, Rep. Elliot requests an amendment to further clarify that the statute criminalizes only fraudulent coinage, which is added to the bill, and is its only amendment.

The modern codification of the Act of June 8, 1864 appears in the United States Code at Title 18, Chapter 25, Section 486. Chapter 25 is titled "Counterfeiting." The current federal sentencing guidelines for § 486 are associated with sentencing guidelines §§ 2B1.1 and 2B5.1 in the Federal Sentencing Guide. Section 2B1.1 is titled "Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States". The background section for § 2B1.1 reads "This guideline covers offenses involving theft, stolen property, property damage or destruction, fraud, forgery, and counterfeiting (other than offenses involving altered or counterfeit bearer obligations of the United

States)."  Section 2B5.1 is titled "Offenses Involving Counterfeit Bearer Obligations of the United States". Application notes 2 and 3 of § 2B5.1 reads "Applicability to Counterfeit Bearer Obligations of the United States. This guideline applies to counterfeiting of United States currency and coins, food stamps, postage stamps, treasury bills, bearer bonds and other items that generally could be described as bearer obligations of the United States, i.e., that are not made out to a specific payee." Application note 3 of § 2B5.1 reads: "Inapplicability to Genuine but Fraudulently Altered Instruments.-"Counterfeit," as used in this section, means an instrument that purports to be genuine but is not, because it has been falsely made or manufactured in its entirety. Offenses involving genuine instruments that have been altered are covered under §2B1.1 (Theft, Property Destruction and Fraud)." No sentencing guidelines cover cases involving the simple issuance of private currency in a manner that is not fraudulent.

Looking at the general context of the Liberty Dollar, it is clearly a complex entity that brings together numismatists, monetary economists, political scientists, lawyers, and sociologists to address the interwoven threads of individual freedom that form a community with needs that are not always satisfied by big government solutions like United States currency. Many of us have credit or debit cards rather than having to depend on government coins to handle change from transactions, but that does not address those without cards or the bigger concern about inflation or the preference for holding a Liberty Dollar for its value, beauty, and political

statement. It provides an easy way for middle class Americans to hold silver in a form that is elegant, well recognized, and exchangeable.

The government need not fear this development for Gresham's Law assures us that bad money (United States coins) will drive out good money (Liberty Dollars). It should instead restrain itself from unconstitutionally restricting individual freedom to possess Liberty Dollars and at least tolerate if not accept the criticism it promotes.

For these reasons, Mr. von NotHaus prays that this Court grant this motion. This the 30th day of December, 2010.

/s Aaron E. Michel
Aaron E. Michel, Attorney at Law
Lead Counsel for Mr. von NotHaus
Phone: 704-451-8351
Email: mail@aaronmichel.com
3736 Surry Ridge Court
Charlotte, NC 28210

/s Randolph Marshall Lee
Randolph Marshall Lee, Attorney at Law
Counsel for Mr. von NotHaus
Phone: 704-841-2222
Email: RandolphLeeLaw@gmail.com
PO Box 77005
Charlotte, NC 28271-7000

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served this 30th day of December, 2010, by means of the Electronic Filing System for the Western District of North Carolina, upon the following parties:

For the Government:

**Jill Westmoreland Rose**
Assistant U.S. Attorney
100 Otis Street, Room 233
Asheville, NC 28801
828-271-4661
Fax: 828-271-4670
Email: jill.rose@usdoj.gov

**Mark T. Odulio**
Assistant U.S. Attorney
227 W. Trade St., Suite 1700
Charlotte, NC 28202
704-344-6222
Fax: 704-344-6629
Email: mark.odulio@usdoj.gov

**Thomas R Ascik**
Assistant U.S. Attorney
100 Otis Street, Room 233
Asheville, NC 28801
828-259-0644
Email: thomas.ascik@usdoj.gov

For William Kevin Innes:

**Claire J. Rauscher**
Federal Defenders of Western North Carolina
129 W. Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
Fax: 704-374-0722
Email: Claire_Rauscher@fd.org

For Sarah Jane Bledsoe:

**Joe Von Kallist**
6743-A Fairview Road
Charlotte, NC 28210
704-366-9008
Fax: 704-365-2109
Email: joevonkallist@yahoo.com

For Rachelle L. Moseley:

**Matthew G. Pruden**
301 E. Park Avenue
Charlotte, NC 28203
704-338-1220
Fax: 704-338-1312
Email: mpruden@tinfulton.com

This the 30th day of December, 2010.

/s Aaron E. Michel
Aaron E. Michel, Attorney at Law