UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:09CR27-1

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>v.<br>**BERNARD VON NOTHAUS** | Motion to Dismiss Challenging the Sufficiency of the Indictment to State an Offense – 1st Amend. |

The defendant Bernard von NotHaus through counsel moves to dismiss the indictment for failure to state an offense under the First Amendment, specifically, the speech that is the subject of these counts is protected by the First Amendment to the Constitution of the United States.

The superceding indictment contains three counts that allege counterfeiting, whether by similitude or original design, of coins issued by the United States government, in violation of Title 18, United States Code, Sections 371, 485, and 486.

NORFED, the National Organization for the Repeal of the Federal Reserve and Internal Revenue Code, created and disseminated the Liberty Dollar beginning in 1998.

The indictment must allege the "nature and cause of the accusation," U.S.Const., Amend. VI, and the "essential facts constituting the offense charged." Rule 8(c)(1), Fed. R. Crim. P. This Court "may hear a claim that the indictment … fails … to state an offense" at any time while the case is pending. Rule 12(b)(3)(B), Fed. R. Crim. P.

1

We submit that no offense is charged by the indictment because NORFED is a nonprofit organization dedicated to promoting a free market solution to the serious problems in this county and used the Liberty Dollar as a vehicle to promote the protest against the fiat nature and corresponding inflation prone current U.S. money.

The Liberty Dollars in question are the five, ten, twenty, and fifty dollar silver specimens shown in Exhibits A through E. A summary of their markings is shown in Exhibit F.

The protest nature of the Liberty Dollar is seen both in the specimens and the name of the promoter of the Liberty Dollar. The Liberty Dollars refer to NORFED, which stands for the National Organization for the Repeal of the Federal Reserve and Internal Revenue Code. According to the superceding indictment, "NORFED, as a core belief, views United States currency as worthless." Page 2. Please note, however, that NORFED did not refer to the United States currency as "worthless" and this hyperbole by the government shows the government's over-reaction to NORFED's political views on important monetary policies and constitutional limitations on the power of the government. United States coins function in the market place, as you can still buy and sell things with these coins. The true statement is that these coins are worth less due to actions of the government protested by NORFED through Liberty Dollar.

This political speech goal is clearly evident in the book, *1998-2003, The Liberty Dollar Solution to the Federal Reserve* (Amer. Fin. Press 2003), and the warehouse receipts, both of which are referenced in the superceding indictment. The warehouse receipts specifically say that the receipt "is an exercise of the Bearer's First Amendment right to petition the Government for a silver based currency as mandated in the U.S. Constitution." The Liberty Dollars and warehouse receipts provide the phone number and website for people to contact NORFED to learn more and become more aware of and perhaps more involved in their community at least with regard to individual and community wide fiscal responsibility.

Under Fed. R. Crim. P. 12(b)(3)(B) a defendant may move to dismiss an indictment for "failure to state an offense" on grounds the indictment seeks to punish speech protected by the First Amendment. *United States v. Bly*, 510 F.3d 453, 457-58 (4th Cir. 2007). When ruling on a motion to dismiss, the Court accepts the allegations in the indictment as true. *See*, e.g., *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009). If, however, the allegations in the indictment are not sufficient to state an offense under the governing statute, the indictment must be dismissed. *See*, *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988). When the government prosecutes a person based on the content of his speech, the indictment is not sufficient if that speech is protected under the First Amendment.

510 F.3d at 457- 58. *See also, NCBA v. United States*, 876 F.2d 787, 795 (10th Cir. 1989)(that the presence of some commercial activity does not change the standard of first amendment review).

The First Amendment provides that "Congress shall make no law…abridging the freedom of speech." At our country's inception, its leaders crafted and its citizens demanded that this basic freedom be guaranteed. Without the First Amendment, protesters could be silenced, and had protesters been silenced in 1776, America would not exist.

The scope of constitutional protection of a person's speech does not hinge on whether his message is appealing or abhorrent. Sixty years ago the Supreme Court recognized this principle, saying: "[A] function of free speech under our system of government is to invite dispute…Speech is often provocative and challenging (and) may …have profound unsettling effects as it presses for acceptance of an idea." *Terminiello v. City of Chicago*, 337 U.S. 1, 4-5 (1949). The Fourth Circuit has given constitutional protection to deeply offensive speech, including racial stereotyping and caricaturing, and has held that the First Amendment "protects from state interference the expression in a public place of the unpopular as well as the popular." *Nat'l Socialist White People's Party v. Ringers*, 473 F.2d 1010, 1015 (4th Cir. 1973); *see Berger v. Battaglia*, 779 F.2d 992 (4th Cir. 1985), *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,

993 F.2d 386 (4th Cir. 1993). "Pleasing speech," then Chief Judge J. Harvie Wilkinson III once wrote, "is not the kind that needs protection." *Sons of Confederate Veterans, Inc. v. Comm'r of Motor Vehicles*, 305 F.3d 241 (4th Cir. 2002).

The Supreme Court's decision involving internet regulations provided a candid statement of where we stand on free speech in *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 660 (2004), writing:

> **Content-based prohibitions**, enforced by severe criminal penalties, **have the constant potential to be a repressive force in the lives and thoughts of a free people**. To guard against that threat the Constitution demands that content-based restrictions on speech be presumed invalid, and that the Government bear the burden of showing their constitutionality…(emphasis added)

When James Madison crafted the Bill of Rights and proposed it to Congress in 1789, his clear intent was first and foremost to protect political speech – what the Supreme Court has called "the right of any person, or of any association of persons, to speak out on political matters." *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 680 (1990) (Justice Scalia dissenting). The Supreme Court has over and over reiterated what Justice Scalia characterized as "the absolutely central truth of the First Amendment that government cannot be trusted to ensure, through censorship, the 'fairness' of political debate." *Id*. The Fourth Circuit has acknowledged the importance of protecting "our cherished right to

political speech free from government censorship." *Federal Election Com'n v. Christian Action Network, Inc.*, 110 F.3d 1049, 1051 (1997). Political speech is as protected on the Internet as it is in newspapers, on television, in cinema and on the street corners of America's cities and towns.

The government cannot punish speakers because it dislikes the content of their expression. Oftentimes, the First Amendment protects the flag-burner, the tobacco advertiser, the pornographer and the hateful speaker. The First Amendment's protections, however, are not absolute, and certain types of expression may be proscribed by law.

The first test enunciated by the Supreme Court for determining whether political speech receives constitutional protection was that of "clear and present danger," exemplified by Justice Oliver Wendell Holmes' well known declaration, "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." *Schenck v. United States* 249 U.S. 47, 52 (1919). This test was used during the Cold War to limit speech of communists and socialists. Later the Warren Court abandoned the "clear and present danger test" in favor of one holding that political speech was constitutionally protected unless it incited "imminent lawless action" or was "likely to produce such action." *Brandenburg v. Ohio*, 395 U.S. 444 (1969). This test is in effect today.

As an outgrowth of *Brandenburg*, speech that is found to be a "true threat" is not a protected category of expression. *Watts v. United States*, 394 U.S. 705 (1969). In *Watts*, a young African-American man allegedly stated during a protest in Washington D.C.:

> They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday morning. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J. They are not going to make me kill my black brothers.

394 U.S. at 706. Watts was convicted of the felony of knowingly and willfully threatening the life of the president. *Id*.

The Supreme Court reversed, holding that Watts' statement was not a "true threat" but rather "political hyperbole…a kind of very crude offensive method of stating a political opposition to the President," despite Watts actually saying he would like to get President Johnson in his rifle sights. 394 U.S. at 708. Because the Court did not find Watts' words to rise to the level of a "true threat," it neither reached the issue of defining a "true threat" nor enunciated a test for deciding what constitutes a "true threat."

The Supreme Court next addressed the "true threat" issue in *Rogers v. United States*, 42 U.S. 35 (1975), which, like *Watts*, involved a defendant convicted under 18 U.S.C. §871(a) for making threats against the life of the President. Rogers, an unemployed carpenter with a ten year history of alcoholism, accosted people in a Louisiana coffee shop, loudly declaring he was Jesus Christ

and opposed President Nixon's visiting China. In the course of his outburst, Rogers announced he was going to Washington to "whip Nixon's ass" or to "kill him in order to save the United States." 42 U.S. at 42. The Supreme Court heard the case intending to resolve an apparent conflict among the Courts of Appeals concerning the elements of a true threat but reversed on procedural grounds without reaching that issue.

Justice Thurgood Marshall did, however, discuss various "true threat" tests, noting that an objective test construed 18 U.S.C. §871(a) too broadly and warning that the Court should be wary of such a test because the statute regulated "pure speech." 42 U.S. at 47. Justice Marshall reasoned that the statute would only have a deterrent effect on statements that were intended to convey a threat and that this degree of deterrence would have "substantial costs in discouraging the 'uninhibited, robust, and wide-open' debate that the First Amendment is intended to protect." 42 U.S. at 48.

Most recently the Supreme Court considered the "true threat" issue in the context of two consolidated Virginia cross-burning cases. *Virginia v. Black*, 538 U.S. 343 (2003). One case involved a Ku Klux Klan leader who burned a cross in a field with the permission of the property owner; the other involved two people who burned crosses in the yard of their African American neighbor. The Supreme Court considered the constitutionality of a Virginia statute that prohibited cross burning

on another person's property. This law presumed that all cross-burnings were done with intent to intimidate.

Although the Supreme Court upheld most of the law, it struck down the portion providing that all cross-burnings were presumed to be intentional. In doing so, Justice Sandra Day O'Connor utilized this definition of true threats: "True threats…encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat." 538 U.S. at 344.

Looking at the general context of the Liberty Dollar, it is clearly a complex entity that brings together numismatists, monetary economists, political scientists, lawyers, and sociologists to address the interwoven threads of individual freedom that form a community with needs that are not always satisfied by big government solutions like United States currency. Many of us have credit or debit cards rather than having to depend on government coins to handle change from transactions, but that does not address those without cards or the bigger concern about inflation or the preference for holding a Liberty Dollar for its value, beauty, and political statement. It provides an easy way for middle class Americans to hold silver in a form that is elegant, well recognized, and exchangeable.

The government need not fear this development for Gresham's Law assures us that bad money (United States coins) will drive out good money (Liberty Dollars). It should instead restrain itself from unconstitutionally restricting individual freedom to possess Liberty Dollars and at least tolerate if not accept the criticism it promotes.

For these reasons, Mr. von NotHaus prays that this Court grant this motion.

This the 14th day of January, 2011.

>/s Aaron E. Michel
Aaron E. Michel, Attorney at Law
Lead Counsel for Mr. von NotHaus
Phone: 704-451-8351
Email: mail@aaronmichel.com
3736 Surry Ridge Court
Charlotte, NC 28210

/s Randolph Marshall Lee
Randolph Marshall Lee, Attorney at Law
Counsel for Mr. von NotHaus
Phone: 704-841-2222
Email: RandolphLeeLaw@gmail.com
PO Box 77005
Charlotte, NC 28271-7000

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served this 14th day of January, 2011, by means of the Electronic Filing System for the Western District of North Carolina, upon the following parties:

For the Government:

**Jill Westmoreland Rose**
Assistant U.S. Attorney
100 Otis Street, Room 233
Asheville, NC 28801
828-271-4661
Fax: 828-271-4670
Email: jill.rose@usdoj.gov

**Mark T. Odulio**
Assistant U.S. Attorney
227 W. Trade St., Suite 1700
Charlotte, NC 28202
704-344-6222
Fax: 704-344-6629
Email: mark.odulio@usdoj.gov

**Thomas R Ascik**
Assistant U.S. Attorney
100 Otis Street, Room 233
Asheville, NC 28801
828-259-0644
Email: thomas.ascik@usdoj.gov

For William Kevin Innes:

**Claire J. Rauscher**
Federal Defenders of Western North Carolina
129 W. Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
Fax: 704-374-0722
Email: Claire_Rauscher@fd.org

11

Case 5:09-cr-00027-RLV -DCK   Document 121   Filed 01/14/11   Page 11 of 12

For Sarah Jane Bledsoe:

**Joe Von Kallist**
6743-A Fairview Road
Charlotte, NC 28210
704-366-9008
Fax: 704-365-2109
Email: joevonkallist@yahoo.com

For Rachelle L. Moseley:

**Matthew G. Pruden**
301 E. Park Avenue
Charlotte, NC 28203
704-338-1220
Fax: 704-338-1312
Email: mpruden@tinfulton.com

This the 14th day of January, 2011.

/s Aaron E. Michel
Aaron E. Michel, Attorney at Law