UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 5:09CR27-V |
| | ) | |
| v. | ) | UNITED STATES' RESPONSE IN |
| | ) | OPPOSITION TO DEFENDANT'S |
| | ) | MOTIONS TO DISMISS THE |
| (1) BERNARD VON NOTHAUS | ) | INDICTMENT PURSUANT TO |
| | ) | FED.R.CRIM.P. 12(B) |
| | ) | |
| _____ | ) | |

NOW COMES the United States of America, by and through Anne M. Tompkins, United States Attorney for the Western District of North Carolina, and submits this Response in Opposition to (1) *Defendant's Motion to Dismiss Challenging the Sufficiency of the Indictment to State an Offense* (Doc. Nos. 114 and 141)*,* and (2) *Defendant's Motion to Dismiss Challenging the Sufficiency of the Indictment to State an Offense-First Amendment* (Doc. No. 121). Given the similarity of the claims in both defense motions, and the common governing legal authority, the Government responds to both motions herein. For the reasons set forth below, Defendant's motions to dismiss lack any support in law and should be denied.

**PROCEDURAL BACKGROUND**

On May 19, 2009, a federal grand jury sitting in the Western District of North Carolina returned a Bill of Indictment against Defendant and three co-defendants. (Doc. No. 3). Defendant von NotHaus (hereinafter "Defendant") was charged with violating Title 18, United States Code, Section 371 (conspiracy to violate 18 U.S.C. §§ 485, and 486), and substantive violations of Title 18, United States Code, Sections 1341, 485, 486, and 2. On November 17, 2010, the grand jury

1

returned a Superseding Bill of Indictment against the same group of defendants. (Doc. No. 103). The Superseding Bill of Indictment charged Defendant along with co-defendants Innes, Bledsoe, and Moseley with violating Title 18, United States Code, Section 371 (conspiracy to violate 18, U.S.C. §§ 485 and 486). Defendant and co-defendant Innes were also charged with substantive violations of Title 18, United States Code, Sections 485, 486, and 2.

The Superseding Bill of Indictment includes, in relevant part, the following factual allegations against Defendant. In 1998, Defendant founded the National Organization for the Repeal of the Federal Reserve and Internal Revenue Code (NORFED), which was renamed Liberty Dollar Services, Inc. in or about 2007. The organization (NORFED/Liberty Dollar, Inc.) was in operation from in or about 1998 until in or about May 2009 and functioned for the purpose of minting Liberty Dollar coins to inject into the current money of the United States. Defendant designed the Liberty Dollar currency in 1998 and intended for the Liberty Dollar to be used as current money in order to limit reliance on, and to compete with, United States currency.[1] Defendant was the president of NORFED and the Executive Director of Liberty Dollar Services, Inc. until on or about September 30, 2008. He was also the Regional Currency Officer (RCO)[2] in Evansville, Indiana, where

---

[1] In his book entitled *The Liberty Dollar, America's Inflation Proof Currency, 100% backed by and Redeemable in Gold and Silver*, Defendant writes that the Liberty Dollar is "direct competition to the current money of the United States," and that the Liberty Dollar is a "free market currency" which was designed "to be in commerce" and is "meant to be spent."

[2] There were four levels of membership, or participation, in NORFED. The first was the Regional Currency Officer (RCO). RCOs marketed the Liberty Dollar currency regionally. Each RCO paid an annual fee to obtain a geographic region where they sold and distributed the Liberty Dollars, and where they also recruited new members. The second level of membership in NORFED was the Liberty Dollar Associate. The Liberty Dollar Associates paid $250 (U.S. currency) for membership and then received 100 Liberty Dollars (coins and warehouse receipts), information about how to access the eLiberty Dollars, and a packet of information designed to help them market the Liberty Dollar currency. The third level of membership in NORFED was the Merchant. The term "Merchant" refers to people within a community who own or run a business which accepts U.S. currency as payment for goods and

NORFED corporate offices were maintained.

The corporate office, also known as the NORFED Fulfillment Office, was located in Evansville, Indiana. This office contracted for the printing and minting of the Liberty Dollar, received orders and monetary payments in United States currency for Liberty Dollars, distributed materials, distributed Liberty Dollar currency, and organized the Liberty Dollar University, which trained RCOs and Liberty Dollar Associates in methods of sale and distribution of Liberty Dollars. NORFED minted the Liberty Dollar coins at the Sunshine Mint in Coeur D'Alene, Idaho. Defendant, NORFED, and the members and associates of NORFED circulated the Liberty Dollar in the United States' economy from 1998 until the present date.

The Liberty Dollar currency was made available in three forms: coins, warehouse receipts, and eLiberty Dollars (Digital/Electronic Liberty Dollars). NORFED issued, exchanged, presented, uttered, and circulated five primary coins in the following denominations: one dollar, five dollar, ten dollar, twenty dollar, and fifty dollar. NORFED advertised that the currency was 100% backed by silver or other precious metals.

Liberty Dollar coins resemble coins of the United States in the following ways:

(1) The Liberty Dollar coins of five, ten, twenty, and fifty dollars are engraved with the "$" (dollar sign), which signifies and is universally known as the symbol for the United States dollar. In addition, the word "dollar" is printed on the coins;

(2) The five "dollar" denominations of the Liberty Dollar is the same size as the Kennedy

---

services. Merchants were recruited by members of the Liberty Dollar organization to accept Liberty Dollar currency in exchange for goods and services, just as the Merchant would accept official U.S. currency. The fourth level of membership of participation in the Liberty Dollar scheme is the purchaser who receives money from Liberty Dollar Merchants as change for a purchase. Some purchasers knowingly and willingly accepted the Liberty Dollar currency as change. Other purchasers however did not know that they had been provided Liberty Dollar currency as change for a purchase because the Liberty Dollar currency appeared to be official U.S. currency.

3

half-dollar coin of the United States;

(3) The ten "dollar" denominations of the Liberty Dollar is the same size as the Eisenhower dollar coin of the United States;

(4) United States coins in the denominations of dollar, half-dollar, quarter, dime and nickel are engraved with the phrase "In God We Trust"; Liberty Dollar coins of five, ten, twenty, and fifty "dollars" are engraved with the phrase "Trust in God";

(5) United States coins in the denominations of dollar, half-dollar, quarter, dime and nickel are engraved with the word "Liberty". Liberty Dollar coins of five, ten, twenty and fifty "dollars" are engraved with the word "Liberty";

(6) The dime of the United States is engraved with a burning torch. The one dollar coin of the United States is engraved with the Statue of Liberty holding a burning torch. Liberty Dollar coins of five, ten, twenty, and fifty "dollars" are engraved with a burning torch;

(7) The one-dollar James Monroe coin of the United States is engraved with the Statue of Liberty. Liberty Dollar coins of five, ten, twenty and fifty "dollars" are engraved with a crowned head remarkably similar, if not exactly the same, as the crowned head on the Statue of Liberty;

(8) United States coins in the denominations of half-dollar, quarter, dime and nickel are silver in color. Liberty Dollar coins in the denominations of five, ten, twenty, and fifty "dollars" are silver in color;

(9) Liberty Dollar coins in the denominations of five, ten, twenty, and fifty "dollars" are engraved with "USA".

NORFED, the RCOs, Associates, and member Merchants made a profit circulating the Liberty Dollar currency. NORFED sold the Liberty Dollar to RCOs, Associates, and Merchants at a price greater than the daily spot price of silver, but less than monetary denomination reflected on the currency's face value. NORFED's profit, therefore, was the difference between the value for which the silver minted in the coin was purchased by NORFED, and the price for which it sold the coin. That is, the RCOs, Associates, and Merchants sold the Liberty Dollar at a price greater than they paid for it. Thus, the profit for these individuals was the difference between their discounted

4

purchase price and the price for which they sold the coin or, in the Merchant's case, the value that they equalized it to U.S. currency when making change. A person who was not affiliated with NORFED paid the face value minted on the coin.

For the conduct set forth in the Indictment, Defendant is currently charged with violating Title 18, United States Code, Section 485, which establishes criminal penalties for:

> Whoever falsely makes, forges, or counterfeits any coin or bar in resemblance or similitude of any coin of a denomination higher than five cents...coined or stamped at any mint or assay office of the United States...or in actual use and circulation as money within the United States; or [W]hoever passes, utters, publishes, sells, possesses...any false, forged, or counterfeit coin..., knowing the same to be false, forged or counterfeit, with intent to defraud any body politic or corporate, or any person...

Defendant is also currently charged with violating Title 18, United States Code, Section 486, which establishes criminal penalties for:

> Whoever, except as authorized by law, makes or utters or passes, or attempts to utter or pass, any coins of gold or silver...intended for use as current money, whether in resemblance of coins of the United States...or of original design...

Finally, Defendant is charged with conspiring with others to violate these statutes in further violation of Title 18, United States Code, Section 371.

## DISCUSSION

Defendant now moves this Court to dismiss the Indictment against him pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure on two separate grounds: (1) the Indictment fails to state an offense (Doc. Nos. 114 and 141), and (2) the Indictment fails to state an offense because it seeks to punish First Amendment protected speech (Doc. No. 121). Because Defendant's claims do not raise any legitimate questions as to the legal sufficiency of the Indictment at this pretrial stage of the proceedings, both motions should be denied.

5

Our Constitution provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment by a grand jury[.]" U.S. Const. Amend. V. "The indictment ... must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Fed.R.Crim.P. 7(c)(1). As a general rule, an indictment is constitutional if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). *Accord United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002).

There is no federal criminal procedural mechanism that resembles a civil motion for summary judgment. *United States v. Yakou*, 428 F.3d 241, 246 (D.C.Cir. 2005). Federal Rule of Criminal Procedure 12(b)(2) provides, however, that a "party may raise by pretrial motion any defense, objection, or request that the court can determine *without a trial of the general issue*." (emphasis added). The "general issue" has been defined as "evidence relevant to the question of guilt or innocence." *United States v. Ayarza-Garcia*, 819 F.2d 1043, 1048 (11th Cir.1987) (citing *United States v. Barletta*, 644 F.2d 50, 58 (1st Cir. 1981)). A court "must decide every pretrial motion before trial unless it finds good cause to defer a ruling." Fed.R.Crim.P. 12(d).

Though Rule 12(b) authorizes courts to rule on motions involving questions of law, courts will not rule on motions involving questions of fact. *United States v. Souder*, 2009 WL 88919, *5 (M.D.N.C.) (citing *United States v. Wilson*, 26 F.3d 142, 159 (D.C.Cir. 1994) (holding that courts should not rule on factual issues that "are substantially founded upon and intertwined with evidence concerning the alleged offense") (quotation and citation omitted)); *accord United States v. Rosen*, 445 F.Supp.2d 602, 645 (E.D.Va. 2006) (holding that a court may not consider "factual questions

6

embraced in the general issue" when considering a pretrial motion to dismiss the indictment); *see also United States v. Doe*, 63 F.3d 121, 125 (2d Cir.1995) (holding that "[a] defendant is not entitled to raise in a pretrial motion the question whether the government breached an agreement with him if the agreement provides a defense to liability for the crimes charged in the indictment; resolution of that question requires trial of the general issue and is not properly decided in a pretrial motion").[3]

The sole function of a motion to dismiss is to test the sufficiency of the indictment to charge an offense; it is not a device for the summary trial of evidence. *United States v. Sampson*, 371 U.S. 75, 78-79 (1962); *United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir.1998) ("[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment"); *see also United States v. Williams*, 111 F.3d 130 (4thCir. 1997) (unpublished) (district court properly denied motion to dismiss indictment where Defendant did not allege in his motion that there were defects in the institution of the prosecution, apart from suggesting that there was insufficient evidence on which to charge him) (citing *Costello v. United States*, 350 U.S. 359, 363 (1956) (indictment returned by a legally constituted grand jury may not be challenged on ground of inadequate or incompetent evidence)).

Further, in considering a motion to dismiss under Rule 12, "the Court is bound to accept the facts stated in the indictment as true." *United States v. Syring*, 522 F.Supp.2d 125, 128 (D.D.C. 2007); *Sampson*, 371 U.S. at 78-79 ("[A]t this stage of the proceedings the indictment must be tested by its sufficiency to charge an offense."); *see also United States v. Yashar,* 166 F.3d 873, 880

---

[3] As the Court noted in *Souder*, "[c]ourts will venture beyond the face of the indictment to decide a pretrial motion on rare occasions...several courts have considered undisputed evidence on pretrial motions because the absence of any dispute effectively renders the motion a question of law. *Souder, supra* at FN9.

7

(7th Cir.1999) (when considering a motion to dismiss under Rule 12(b)(2), a court assumes all facts in the indictment are true and must "view all facts in the light most favorable to the government."); *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994); *United States v. Besmajian,* 910 F.2d 1153, 1154 (3d Cir. 1990); *Winslow v. United States*, 216 F.2d 912, 913 (9th Cir.1955). Thus, to survive a Rule 12 motion to dismiss, an indictment must allege facts that, if proven true, would sustain a violation of the offense charged. *United States v. Hasan*, 2010 WL 4281892, *2 (E.D.Va. October 29, 2010) (citing *United States v. Shabbir*, 64 F.Supp.2d. 479, 481 (D.Md. 1999)).

### **DEFENDANT FAILS TO IDENTIFY AN ISSUE OF LAW THAT WARRANTS PRETRIAL DISMISSAL OF THE CHARGES**

Defendant first moves to dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3) for a general failure to state an offense. Significantly, Defendant does not assert a defect in the Indictment, but rather attempts to set forth a substantive factual defense to the charges. Specifically, Defendant claims that the Indictment fails to state an offense due to the following three factual assertions: (1) the unique appearance of the Liberty Dollars; (2) the promotion of the Liberty Dollars as a protest against the fiat nature and corresponding inflation prone U.S. money; and (3) the significant intrinsic value of the Liberty Dollar...." (Doc. 114 at 2). Because these assertions raise issues of fact for determination by the jury at trial, Defendant's motion to dismiss the Indictment at this pretrial stage must fail.

First, the Superseding Bill of Indictment in this case properly and sufficiently charges Defendant with violations of Title 18, United States Code, Sections, 371, 485, 486, and 2. It includes eight pages of introductory paragraphs that set forth, in significant detail, the activities of the co-defendants that serve as the basis for the charges against them. Further, the three counts

8

against Defendant properly include all elements of the offenses charged and fairly inform Defendant of the charges against which he must defend. A properly constituted federal grand jury in the Western District of North Carolina returned the Superseding Bill of Indictment against Defendant and his co-defendants on these charges. Therefore, assuming the facts set forth in the Indictment are true, and viewing them in the light most favorable to the Government, the Indictment sets forth offenses that would sustain convictions against Defendant.

Second, Defendant fails to identify a question of law appropriate for pretrial determination under Rule 12(b) at this pretrial stage of the proceedings. All three of Defendant's assertions present questions of fact relevant to the pending charges that require a "trial of the general issue"- that is, evidence related to Defendant's guilt or innocence - and fall within the province of the finder of fact. Defendant's self-serving assessment of the "uniqueness" of the Liberty Dollar (Doc. No. 114 at 2-5; Doc. No 141 at 1-2 and attachments) addresses purely factual questions for the jury to determine at the trial of the general issue, namely those of "resemblance" and "similitude." Similarly, the issue as to Defendant's intent behind the creation and distribution of Liberty Dollars presents a factual question for the jury, namely that of Defendant's "intent to defraud" and whether the Liberty Dollar was "intended for use as current money." Defendant may very well have intended to promote the Liberty Dollar as a protest; however, at the same time, the Government contends that he intended to issue the Liberty Dollar to be used as current money and as a method to defraud. Finally, the relevance, if any, of the "significant intrinsic value of the Liberty Dollar," would also be a factual matter to be considered by the jury.

The Government objects to the consideration of anything beyond the face of the Indictment for purposes of this motion, including any evidence proffered by Defendant in his Motions and

9

attached exhibits. Any such consideration would not be proper at this stage of the proceedings. Further, the Government has not made a full proffer of the evidence it intends to present at trial on the issue of Defendant's guilt. Because the basis for Defendant's motion to dismiss the Indictment relies upon a factual determination of the "general issue"- that is, Defendant's guilt or innocence- his motion to dismiss the Indictment for a failure to state a claim is not appropriate for consideration in this pretrial motion.

**DEFENDANT FAILS TO ESTABLISH ANY CONSTITUTIONAL JUSTIFICATION FOR PRETRIAL DISMISSAL OF THE INDICTMENT**

Defendant next moves to dismiss the indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3), claiming that the Indictment seeks to punish speech protected by the First Amendment to the U.S. Constitution. Specifically, Defendant claims that "no offense is charged by the indictment because NORFED is a nonprofit organization dedicated to promoting a free market solution to the serious problems in this country and used the Liberty Dollar as a vehicle to promote the protest against the fiat nature and corresponding inflation prone current U.S. money." (Doc. No. 121 at 2). Once again, Defendant has not moved to dismiss the Indictment based on an alleged defect. Instead, Defendant asserts that his actions related to the Liberty Dollar constitute speech on political issues that is protected by the First Amendment. Defendant's argument amounts to a claim that, since the alleged illegal activity was part of a protest against the U.S. currency system, the First Amendment shields him from prosecution for that activity. Because the First Amendment affords no such protection, Defendant's Motion to Dismiss based on First Amendment grounds must fail.

The First Amendment to the United States Constitution provides that "Congress shall make no law...abridging the freedom of speech." "The hallmark of the protection of free speech is to allow

10

'free trade in ideas'-even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 358 (2003) (quoting *Abrams v. United States*, 250 U.S. 616 (1919)). Nevertheless, the First Amendment's protections are not absolute, and the Supreme Court has "long recognized that the government may regulate certain categories of expression consistent with the Constitution." *Id.; see also United States v. Matthews*, 209 F.3d 338, 342 (4th Cir. 2000). "Put simply, the First Amendment was not intended to protect every oral or written utterance." *United States v. Bly*, 510 F.3d 453, 458 (4th Cir. 2007) (rejecting defendant's claim that certain threat-related statements were protected by the First Amendment) (citing *Beauharnis v. People of State of Ill.,* 343 U.S. 250, 266 (1952)).

The Constitution permits limitations on "speech which advocates conduct inimical to the public welfare," *American Communications Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 394-95 (1950), or speech which constitutes "no essential part of any exposition of ideas," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383-85 (1992) (concluding that threats of violence are outside First Amendment protection) (quotation marks omitted). Moreover, the Supreme Court, "in different contexts, has consistently held that government may directly regulate speech to address extraordinary problems, where its regulations are appropriately tailored to resolve those problems without imposing an unnecessarily great restriction on speech." *Denver Area Educ. Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 741 (1996) (certain restrictions on "patently offensive" television programming survived strict scrutiny despite the law's generally expansive view of artistic speech).

As an initial matter, Defendant fails to explain why pretrial dismissal of the Indictment is warranted on First Amendment grounds, and fails to cite to any legal authority that would support a dismissal at this stage of the proceedings. Defendant relies to a significant degree on the First

11

Amendment "threat" cases in support of his Motion; however, these cases lend no support to Defendant's claim that the Indictment should be dismissed for "failure to state an offense" on First Amendment grounds. The Constitutional issue in the "threat" cases focuses on what is a "true threat" as opposed to what falls short of a true threat and is therefore protected speech under the First Amendment. In *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969), the Supreme Court held that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." However, "[s]peech is not protected by the First Amendment when it is the very vehicle of the crime itself." *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970) (citing statutes criminalizing perjury, bribery, extortion, threats, and conspiracy).

Even with respect to the "threat" cases, which arguably lend themselves to an easier pretrial assessment than the immediate case, courts have been reluctant to view the issue of the characterization of the speech as a purely legal one at the pretrial juncture. For example, in *United States v. Syring*, 522 F.Supp.2d 125, 131 (D.C. Cir. 2007), the D.C. Circuit held that "[t]he Court should "dismiss" the indictment only if the language [is] so facially insufficient that no reasonable jury could find that the language amounted to a true threat."(quoting *United States v. Zavalidroga*, 156 F.3d 1241 (9th Cir. 1998); *see also United States v. Whiffen*, 121 F.3d 18, 22 (1st Cir. 1997) ("The proper interpretation of [defendant's] remarks, however, is a question of fact and, therefore, appropriately left for the jury. We cannot conclude that the interpretation preferred by [defendant] is, as a matter of law, the correct one.").

Defendant cites *United States v. Bly*, 510 F.3d 453 (4thCir. 2007), for the proposition that

12

"a defendant may move to dismiss an indictment for 'failure to state an offense' on grounds the indictment seeks to punish speech protected by the First Amendment." (Doc. No. 121 at 3). However, in *Bly* the Fourth Circuit rejected the defendant's contention that the statements at issue were protected by the First Amendment, holding that "[t]hreats-including threats of extortion- are not constitutionally protected simply because they are verbalized or written." (citations omitted). 510 F.3d at 458.

It is important to note, however, that the charges against Defendant in the Indictment proscribe conduct, and not pure speech. The First Amendment "threat" cases are dissimilar to the immediate case in important respects, primarily in that the "threat" cases tend to involve the punishment of pure speech, as opposed to the proscription of illegal *conduct* that is at issue here. "When 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968); *see also New York v. Ferber*, 458 U.S. 747, 761-62 (1982) ("It has rarely been suggested that the constitutional freedom for speech . . . extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute."); *Cox v. Louisiana*, 379 U.S. 559, 563 (1965); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." (citing *Fox v. Washington*, 236 U.S. 273, 277 (1915)).

Where a defendant's speech is combined with action, as when a defendant encourages and is actually involved in the preparation of false or fraudulent tax returns for others, for example, the

13

defendant has gone beyond the protection of the First Amendment and may be subject to criminal prosecution. *See, e.g., United States v. Fleschner*, 98 F.3d 155, 158-59 (4th Cir. 1996) (First Amendment lends no protection to speech which urges the listener to commit violations of current law).[4] The Ninth Circuit Court of Appeals held that a tax payer cannot claim protection under the First Amendment by simply characterizing his filing of false information and tax returns as "petitions for redress." *United States v. Kuball*, 976 F.2d 529, 532 (9th Cir. 1992); *see also United States v. Ambort*, 405 F.3d 1109, 1117 (10th Cir. 2005) ("[T]he First Amendment provides no protection for knowingly fraudulent or frivolous claims"). "[N]oncompliance with the federal tax laws is conduct that is afforded no protection under the First Amendment." *Welch v. United States*, 750 F.2d 1101, 1108 (1st Cir. 1985); *see also United States v. Rowlee*, 899 F.2d 1275, 1279 (2d Cir. 1990) ("The consensus of this and every other circuit is that liability for a false or fraudulent tax return cannot be avoided by invoking the First Amendment").

Defendant's case is less similar to the "threat" cases involving the regulation of pure speech and more analogous to cases involving statutes that proscribe *conduct* that may also include an

---

[4] In *Fleschner*, the Fourth Circuit discussed some of the factors that made the First Amendment defense inapplicable:

> The evidence in this case, however, does not support a First Amendment defense. The defendants' words and acts were not remote from the commission of the criminal acts. The evidence shows that the defendants held meetings and collected money from attendees whom they instructed and advised to claim unlawful exemptions and not to file income tax returns or pay tax on wages in violation of the United States Tax Code. The evidence shows that the attendees followed the instruction and advice of the defendants, that the attendees' unlawful actions were solicited by the defendants, and that the defendants were aware that the attendees were following their instructions and advice. The evidence discloses that a purpose of the meetings was to encourage people to unlawful actions by convincing them that it was legal to claim false exemptions, to hide income, and to refuse to file income tax returns or pay income tax.

14

element of speech, such as the "tax protestor" cases. It is Defendant's alleged conduct that is prohibited by federal law, not the communication of his underlying political message. He is charged pursuant to 18 U.S.C. § 485 with *making, forging, counterfeiting, and passing, uttering, publishing, selling and possessing* the Liberty Dollar. Additionally, he is charged pursuant to 18 U.S.C. § 486 with *making, uttering, and passing* the Liberty Dollar, a coin of silver intended for use as current money. Just as a taxpayer cannot claim protection under the First Amendment by characterizing the filing of false tax returns as "petitions for redress," Defendant cannot claim protection under the First Amendment by characterizing his creation and issuance of the Liberty Dollar as merely a political statement against the U.S. system of currency.

Defendant has every right to advocate his beliefs regarding the U.S. system of currency in a lawful manner. He is, of course, free to advocate his political beliefs, to write about his position on the U.S. system of currency, to speak about his position on the U.S. system of currency, and to address his concerns to U.S. lawmakers. What is not permitted under federal law is to make and issue coins in violation of current federal statutes, or to conspire to do so. The First Amendment provides no shield to this illegal conduct. The Government certainly has a compelling interest in maintaining the integrity of the U.S. currency system and, in furtherance of this compelling interest, enforcing 18 U.S.C. §§ 485 and 486.

Further, as detailed in the Superseding Bill of Indictment, Defendant was not simply issuing the Liberty Dollar to make a political point. Defendant and NORFED sought to, and did in fact, make a profit on the issuance of the Liberty Dollars. Because NORFED was a business that made profits on the issuance of the Liberty Dollar for Defendant, the company, and others, Defendant's contention that his conduct was merely a political statement rings particularly hollow.

15

In moving to dismiss the charges pursuant to Federal Rule of Criminal Procedure 12(b)(3), Defendant alleges that no offense is charged in the Indictment because Defendant and NORFED were merely exercising First Amendment rights to free speech through the minting and issuance of the Liberty Dollar. Whatever the purported justification by Defendant for minting and issuing the Liberty Dollars to compete with U.S. currency, Defendant cannot avail himself of the protections of the First Amendment to shield himself from prosecution by claiming that the reason he violated the law was to make a political point in the process.

## CONCLUSION

For the foregoing reasons, the Government contends that Defendant's *Motion to Dismiss Challenging the Sufficiency of the Indictment to State an Offense* and *Motion to Dismiss Challenging the Sufficiency of the Indictment to State an Offense-First Amendment* are unsupported by law and should therefore be denied.

RESPECTFULLY SUBMITTED, this 17th day of February, 2011.

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

**s/ Craig D. Randall**
CRAIG D. RANDALL
JILL W. ROSE
Attorneys for the United States
CDR NC Bar Number: 26638
United States Attorney's Office
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: 704.344.6222
Fax: 704.344.6629
E-mail: craig.randall@usdoj.gov

16

CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of February, 2011, the foregoing document was electronically served upon Defendants at the following addresses:

**Aaron E. Michel**
Attorney at Law
3736 Surry Ridge Court
Charlotte, NC 28210-6921
704/451-8351
Fax: 704/643-1004
Email: mail@aaronmichel.com

**Randolph Marshall Lee**
P. O. Box 77005
Charlotte, NC 28271
704-841-2222
Email: Randolph@LeeLaw.biz

**Claire J. Rauscher**
Federal Defenders of Western North Carolina
129 W. Trade Street
Suite 300
Charlotte, NC 28202
704-374-0720
Fax: 704-374-0722
Email: Claire_Rauscher@fd.org

**Erin Kimberly Taylor**
Federal Defenders of Western North Carolina
129 West Trade St.
Suite 300
Charlotte, NC 28202
704-374-0720
Fax: 704-374-0722
Email: Erin_Taylor@fd.org

**Joe VonKallist**
6743-A Fairview Road
Charlotte, NC 28210
704-366-9008
Fax: 704-365-2109
Email: joevonkallist@yahoo.com

**Matthew G. Pruden**
301 E. Park Avenue
Charlotte, NC 28203
704-338-1220
Fax: 704-338-1312
Email: mpruden@tinfulton.com

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

**s/ Craig D. Randall**
Assistant United States Attorney
NC Bar Number: 26638
United States Attorney's Office
Suite 1700, Carillon Building
227 West Trade Street

Charlotte, North Carolina 28202
Telephone: 704.344.6222
Fax: 704.344.6629
E-mail: craig.randall@usdoj.gov