IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

CIVIL NO. 5:09CR27

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| 1) BERNARD VON NOTHAUS, | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF AND SUMMARY OF EVIDENCE FOR FORFEITURE**

I.      **Only the connection, the "nexus," of the specific property to the crimes of conviction, is to be decided in the forfeiture phase of this trial.**

II.     **There must be a "nexus," that is, a "connection," by a preponderance of the evidence between proceeds, counterfeits, and used property and the offenses of conviction**.

III.    **All the various organizations and names of organizations throughout the period January 1998 to May 2009 (the dates of the convicted conspiracy) were alter egos of the defendant, Bernard von NotHaus. That is, Bernard von NotHaus is NORFED is Liberty Services is Liberty Dollar is American Liberty Dollar is Royal Hawaiian Mint is Liberty Numismatics**.

IV.     **There is the "requisite nexus," by a preponderance of the evidence, either as proceeds or counterfeits or used property, connecting all the seized property to the defendant's convictions for conspiracy, making counterfeit coins, and passing resembling silver coins.**

1

I.      Only the connection, the "nexus," of the specific property to the crimes of conviction, is to be decided in the forfeiture phase of this trial.

After a finding of guilty, "the court must determine what property is subject to forfeiture under the applicable statute."  Fed. R. Crim. P. 32.2(b)(1)(A).  To prove that specific property is "subject to forfeiture," the government must establish "the requisite nexus between the property and the offense." *Id.*

A.      The offenses of conviction

The jury has found the defendant guilty of all three Counts in the Superseding Bill of Indictment, that is:

**Count One**, a violation of 18 U.S.C. § 371, conspiracy with William Kevin Innes, Sarah Jane Bledsoe, and Rachelle L. Mosely to violate 18 U.S.C. § 485, falsely make, forge, and **counterfeit** coins in resemblance and similitude of United States coins greater than a denomination of five cents, and knowingly with intent to defraud  pass, utter, publish, sell, and possess false, forged, and counterfeited coins; **and** to violate 18 U.S.C. § 846, make, pass, utter and pass, and attempt to do so, **silver** coins in resemblance of United States coins.

**Count Two**, a violation of 18 U.S.C. §§ 485 and 2, falsely make, forge, and **counterfeit** coins in resemblance and similitude of United States coins greater than a denomination of five cents, and knowingly with intent to defraud  pass, utter, publish, sell, and possess false, forged, and counterfeited coins, and aid and abet William Kevin Innes in doing so.

**Count Three**, a violation of 18 U.S.C. §§ 486 and 2, make, pass, utter and pass,

2

and attempt to do so, **silver** coins in resemblance of United States coins, and aid

and abet William Kevin Innes in doing so.

**B.      The applicable forfeiture statutes**

The defendant, having been convicted of the violations set out in all the three Counts in

the Superseding Bill of Indictment, shall now forfeit to the United States "any property

constituting, or derived from, **proceeds** that person obtained directly or indirectly, as the result of

such violation(s)**.**"[1]  In addition, he shall now shall now forfeit to the United States "**counterfeits**

of any coins or obligations of the United States . . . or any articles, devices, or other things **made,**

**possessed or used** . . . or any material or apparatus **used or fitted or intended to be used** in the

making of such counterfeits, articles, devices, or things found in the possession of any person

without authority from the Secretary of the Treasury or other proper officer**.**"[2]

_____

[1]18 U.S.C. § 982(a)(2) (citing 18 U.S.C. § 485 and § 486,  as "violation(s);" and citing "conspiracy to violate," here, 18 U.S.C. § 371, as a "violation").

**§ 982. Criminal forfeiture**

**(a)(1)** . . . **(2)** The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate--

**(A)** . . . or

**(B)** section . . .  485, 486, . . . of this title,

shall order that the person forfeit to the United States any property constituting, or derived from, **proceeds** the person obtained directly or indirectly, as the result of such violation.

[2]**§ 492. Forfeiture of counterfeit paraphernalia**

All **counterfeits** of any coins or obligations or other securities of the United States or of any foreign government, or any articles, devices, and other things made, possessed, or **used** in violation of this chapter or of sections 331-333, 335, 336, 642 or 1720, of this title, or any material or apparatus **used or fitted or intended to be used**, in the making of such counterfeits, articles, devices or things, found in the possession of any person without authority from the Secretary of the Treasury or other proper officer, shall be

3

**C.    The property alleged to be "subject to forfeiture"**

In the Notice of Forfeiture and Finding of Probable Cause in the Superseding Bill of Indictment, the defendant was notified of specific property, namely, eleven groups of coins, two groups of silver,  one amount of cash currency, and one group of dies, molds, and casts that the United States alleged was subject to forfeiture upon conviction(s).  That specific property is listed in the Appendix to this pleading and also appears as US Ex. F34 with its helpful annotations as to the places where the property was seized.

**D.    The burden of proof is "by a preponderance of the evidence" and is on the government.**

Now that the defendant has been convicted of all three Counts in the Superseding Bill of Indictment and with the United States and the defendant having agreed to waive a jury determination of the forfeiture,  *United States v. Singh*, 390 F. 3d 168, 190 (2d Cir. 204) (jury determination of forfeiture may be waived), the Court must now determine in the "Forfeiture phase of the trial," Rule 32.2(b)(1), if there is a "nexus" between the noticed specific properties and the offenses of conviction.  If the Court so decides, then it must enter a "preliminary order of forfeiture."  Rule 32.2(b).

The burden of proof is "by a preponderance of the evidence" and is on the government. *United States v. Gaskin*, 364 F.3d 438, 461-462 (2d Cir. 2004) ("Because criminal forfeiture is viewed as part of the sentencing process. . .  the government need prove facts supporting forfeiture only by a preponderance of the evidence.").

_____

forfeited to the United States.

4

"Because forfeiture is viewed as part of the sentencing process . . .hearsay is admissible."

*United States v. Evanson*, 2008 WL 3107332, 2 (D. Utah 2008). The hearsay must be "reliable."

*United States v. Higgs*, 353 F.3d 281, 324 (4th Cir. 2003). A finding of forfeiture may be based

"on evidence *or information* presented by the parties at a hearing after . . . the finding of guilt."

Rule 32.2(b)(1)(emphasis added). "[I]n determining what evidence or information should be

accepted, the court should consider relevance and reliability." Advisory Committee Note to Rule

32.2 (2009).

The Court's decision may be based "on evidence already in the record," Rule 32.2(b)(2),

in the "guilt phase" of the trial as well as on new evidence introduced in the forfeiture phase.

"[T]he parties may submit additional evidence relating to the forfeiture in the forfeiture phase of

the trial." Advisory Committee Note to Rule 32.2 (2009). "The court makes this determination

based upon the evidence in the record of the criminal trial or evidence presented at a hearing after

the verdict." *United States v. Schlesinger*, 396 F.Supp.2d 267, 271 (E.D.N.Y. 2005). "The

government may rely on circumstantial evidence to establish forfeitability. *United States v. v.

Herder*, 594 F.3d 352, 364 (4th Cir. 2010)

**E.    The ownership interest of the defendant is not at issue in the forfeiture phase of the trial.**

Because the only issue for the Court in the forfeiture phase of the trial is the "nexus" or

connection of the property to the offenses of conviction, the ownership interest of any party,

including the defendant or any co-defendants, is not at issue.

"The Preliminary Order of Forfeiture does not determine Defendant's interest in the

property." *United States v. Weidner*, 2003 WL 22176085, 1 (D.Kan.2003). "The new rule . . .

5

postpon(es) the determination of the extent of the defendant's interest until the ancillary proceeding. . . it is not necessary to determine at this stage what interest any defendant might have in the property." Advisory Committee Note to Rule 32.2 (2000). "[T]he extent of the Defendant's ownership or interest in the property is not at issue in determining whether the court should enter a preliminary order of forfeiture." *Schlesinger*, *supra*, at 273.

### F. The defendant may not object to the forfeiture on the ground that the property belongs to a third party.

"[A] defendant does not have standing to object to forfeiture on the grounds that a third party owns the property." *United States v. Wittig*, 2006 WL 13158, 3 (D.Kan.2006). "The defendant may not object to the entry of the final order on the ground that the property belongs, in whole or in part, to a codefendant or third party." Rule 32.2(c)2).

### G. In the forfeiture phase of the trial, a third party may not object to the forfeiture; a third party must wait until the ancillary hearing before asserting an ownership interest.

"The court must enter" a preliminary order of forfeiture "without regard to any third party's interest in the property. Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c)." Rule 32.2(b)(2)(A).

"In issuing a preliminary order of criminal forfeiture, the district court must determine that the property at issue is forfeitable under an applicable statute. Fed.R.Crim.P. 32.2(b)(1). At this stage the court does not – and, indeed, may not – determine the rights of any third parties who assert an interest in the property. *Id.* at 32.2(b)(2). Third parties then have an opportunity to assert their rights to the property in an 'ancillary proceeding,' *id.* 32.2(c)." *United States v.*

6

*Andrews*, 530 F.3d 1232, 1236 (10th Cir. 2008). "To the extent that his wife has a legitimate interest in the property, she is entitled to bring that to the court's attention in a separate proceeding." *United States v. Brown*, 2006 WL 898043, 5 (E.D.N.Y. 2006).

**II.     There must be a "nexus," that is, a "connection," by a preponderance of the evidence between proceeds, counterfeits, and used property and the offenses of conviction.**

        **A.     A nexus is a connection.**

According to Rule 32.2(b)(1), a property is "subject to forfeiture" if there is a "nexus" between the property and the crimes of conviction.

A nexus is what "a reasonable juror could have found that the property was forfeitable by a preponderance of the evidence." *United States v. Neal*, 2003 WL 24307070, 3 (E.D.Va. 2003). *See United States v. Juluke*, 426 F.3d 323, 327 -328 (5th Cir. 2005) (handguns had "sufficient connection" to drug crimes of conviction so as to be forfeited as facilitating property). "The inquiry into the nexus between the property and the offense is the same regardless of whether the judge or the jury is the factfinder." *United States v. Neal*, 2003 WL 24307070, 3 (E.D.Va.,2003).

        **B.     Counterfeit coins and any devices used to make them are contraband, they can be legally possessed by no person and are directly and *per se* forfeitable.**

In *Boggs v. Rubin*, 161 F.3d 37, 41-42, (D.C. Cir.1998), the appellate court cited and quoted with approval the finding of  the district court concerning counterfeit paper currency to the effect that

> all of the items that the Secret Service contends are contraband are, to this court's satisfaction, reproductions of genuine currency of the United States or reproductions of genuine foreign currency. Each are in the likeness and similitude of genuine currency and therefore in violation of 18 U.S.C. §§ 472 or 481. Each

7

reproduction has the general design and appearance of genuine United States or foreign currency. None of the pieces in dispute meet the size and coloration exemptions of 18 U.S.C. § 504 and 31 C.F.R. 411.1. This court is therefore compelled to hold that [the disputed items] are contraband. These items are therefore forfeited to the United States without the necessity of forfeiture procedures.

"Counterfeit coins are contraband *per se*, their mere possession is illegal, and they must be forfeited to the United States." *United States v. Simmons*, 2000 WL 33138083, 3 (E.D.Cal. 2000) (*construing* 18 U.S.C. § 492). "The provisions of § 492 provide for the forfeiture of material or apparatus used or fitted or intended to be used, in making counterfeit obligations or other securities of the United States." *United States v. Mustek . . . Scanner . . .* , 1998 WL 756809, 1 (10th Cir.1998) (forfeiting computer equipment used to make counterfeit checks and identification cards).

There are two kinds of contraband. Contraband *per se* can never be possessed by any person. "Derivative contraband," however, may later be cured of its taint under the right circumstances. On the other hand, it may still be forfeited under a forfeiture statute.

There are two types of contraband: contraband per se and derivative contraband. Contraband per se is "intrinsically illegal in character." . . . On the other hand, derivative contraband "includes items 'not inherently unlawful but which may become unlawful because of the use to which they are put.' . . . "[W]hile a criminal defendant has no expectation that contraband *per se* will ever be returned, a criminal defendant does have a legitimate expectation that other property, including property that may well be derivative contraband, will be returned to him once the criminal proceedings against him conclude, unless and until the government successfully forfeits that property.

*United States v. Yah*, 2008 WL 818882, 2 (D.Neb. 2008) (*citing Helton v. Hunt,* 330 F.3d 242, 247 (4th Cir.2003)) (citations omitted).

  **C.**  **Forfeitable proceeds or derived proceeds must be obtained during and as a result of the offenses of conviction**.

8

According to 18 U.S.C. § 982(a)(1)(B), a convicted defendant shall "forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation."

For property to be forfeitable "proceeds," there must be "a causal link" between the offenses of conviction and the property. *United States v. DeFries*, 129 F.3d 1293, 1313 (D.C. Cir.1997). The defendant must not have acquired the property "but for" the offenses of conviction, in other words, the defendant's acts must be "a cause in fact of the acquisition or maintenance of the property. " *Id.* (*citing* four other circuits). "Proceeds are property that a person would not have but for the criminal offense. . ." *United States v. Grant,* 2008 WL 4376365, at 2 n. 1 (S.D.N.Y. 2008).

The same joint and several liability for criminal fault applies as well to the forfeitable proceeds that is the result of the conspiracy. *United States v. George*, 2010 WL 1740814, 3 (E.D.Va. 2010) (defendant held responsible for total proceeds received by her and by her drug co-conspirators). Indeed, joint liability may be more readily available regarding forfeiture than the conviction for conspiracy itself. *United States v. Browne*, 505 F.3d 1229, 1280 (11th Cir. 2007) ("to hold otherwise would be to assign to the Government the onerous task of proving to the trial judge which proceeds were reasonably foreseeable to each defendant in a conspiracy. Such a move would significantly blunt the effectiveness of a weapon that Congress specifically authorized 'to strike at the heart of an illegal enterprise by confiscating tainted property and proceeds in hopes of putting the criminal enterprise out of business.'") (citation omitted).

      **1.**      **The proceeds or derived proceeds must be "obtained directly or indirectly as a result of" the offenses of conviction.**

9

In *United States v. Peters*, 257 F.R.D. 377, 386 -387 (W.D.N.Y. 2009)**,** a case concerning the same forfeiture statue, 18 U.S.C. § 982, as here, the court found that the defendant had obtained proceeds "indirectly" through two corporations, held that "the corporate veil should be pierced," and ordered that the defendant "should be held accountable for criminal forfeiture of proceeds obtained through" those two corporations.  In *United States v. Warshak*, 631 F.3d 266, 332-333 (6th Cir. 2010), another § 982 case, the court found that "[a]ny money generated through these potentially legitimate sales is nonetheless subject to forfeiture, as the sales all resulted 'directly or indirectly' from a conspiracy to commit fraud."  Section 982 "require[s] forfeiture of proceeds that result from conspiracies." *Id*.

In *United States v. Ivanchukov*, 405 F.Supp.2d 708, 712 -713 (E.D.Va. 2005), the court found that the "timing and circumstances" surrounding a payment that the defendant had received "while the conspiracy was still underway" and as a result of his and his co-conspirator's "illegal conduct" demonstrated that the payment had been "obtained directly or indirectly from the commission of the offense." (Emphasis in original).  In *United States v. Pantelidis*, 2005 WL 1320135, 2 (E.D.Pa.2005), another § 982 case, the court found that the United States had succeeded in "linking the proceeds from the sale of defendant's properties to the illegal activity. . . The money obtained through the fraudulent loan applications was used to purchase the properties in question in this case."  Therefore, "any profit defendant made from the sale of those properties stems from his acquisition of those properties with fraudulently obtained funds." *Id*.

### D.    Used or intended to be used

Property forfeitable because it was "used" or "intended to be used,"as defined in 18 U.S.C. § 492, is quite similar to the frequently defined standard that property that "facilitates" a

10

crime is forfeitable.  *See e.g.* 18 U.S.C. § 982(a)(6)(A).  In a recent decision, the Fourth Circuit

borrowed the term "substantial connection" from civil forfeiture[3]  and attempted to explain that

"facilitating" property is property that has a "substantial connection" to the crime facilitated:

> Under the "substantial connection" test, where the government's theory is that the
> property was used to commit, or to facilitate the commission of, the offense of
> conviction, the government must establish that there was a substantial connection
> between the property to be forfeited and the offense.

*United States v. v. Herder*, 594 F.3d 352, 364 (4th Cir. 2010).

"The provisions of § 492 provide for the forfeiture of material or apparatus used or fitted

or intended to be used, in making counterfeit obligations or other securities of the United

States."*United States v. Mustek . . . Scanner . . .* , 1998 WL 756809, 1 (10th Cir.1998) (forfeiting

computer equipment used to make counterfeit checks and identification cards).  *See Mayo v.*

*United States*, 425 F.Supp. 119, 122 (D.C.Ill. 1977) (United States must show that a

counterfeiting press "was actually used to counterfeit money or government securities" in order

for it to be subject to forfeiture).  *United States v. Juluke*, 426 F.3d 323, 327 -328 (5th Cir. 2005)

(handguns had "sufficient connection" to drug crimes of conviction so as to be forfeited as

facilitating property).  *United States v. Sabhnani*, 599 F.3d 215, 262 (2d Cir.2010) (office in

house was "used or intended to be used" to facilitate the crime; therefore, entire house was

forfeitable.).

---

[3]18 U.S.C. § 983(c)(3)

11

**III.** **All the various organizations and names of organizations throughout the period January 1998 to May 2009 (the dates of the convicted conspiracy) were alter egos of the defendant, Bernard von NotHaus. That is, Bernard von NotHaus is NORFED is Liberty Services is Liberty Dollar is American Liberty Dollar is Royal Hawaiian Mint is Liberty Numismatics.**

On several occasions in his trial testimony, Bernard von NotHaus testified that Shelter Systems, NORFED and Liberty Services were all the same organization, just a progression of names. He testified that he was the CEO of all those entities at all times. He stated that the Evansville office was "the fulfillment center" for NORFED/Liberty Services. In fact, not only were all these three named organizations, as well as Liberty Dollar, silver Liberties, the Royal Hawaiian Mint, the same, they were all alter egos of the defendant.

On January 1, 1999, by a resolution of the board of directors of **NORFED**, Inc.,

NORFED acquired

all existing rights, copyrights, registrations, stock of printed American Liberty Currency certificates, stock of special banknote paper, and title to all and any proprietary information, designs and codes pertaining to said **American Liberty Currency certificates** or the **Silver Liberty silver rounds**.

from **Shelter Systems**. Def. Ex 32. NORFED acquired the right to "deal directly with Sunshine Minting, Inc. . . . pay all costs including the cost the silver, manufacturing, and shipping." *Id*.

The defendant's Exhibit 310 shows a photograph of **1998** "**Liberty**"coin with the names "**The Shelter System**" and "**NORFED**" imprinted on the reverse side. In defendant's Exhibit 312 is a photograph of a **1999** coin with the names **"American Liberty Dollars"** and "**NORFED**" imprinted on the reverse side. Among the photographs of coins in defendant's Exhibit 316 is a photograph of a **2003** coin with the names **"Liberty Dollar," "American Liberty Dollar"** and "**NORFED.ORG**" imprinted on the reverse side. In defendant's Exhibit

12

320 is a photograph of a **2005** coin that with the names **"Liberty Dollar"** and "**Liberty**

**Dollar.Org**" imprinted on the reverse side. In defendant's Exhibits 326, 327, and 329 are

photographs of three **2006** coins that with the names **"Liberty Dollar"** and "**Liberty**

**Dollar.Org**" imprinted on the reverse side, respectively, with "Washington," "California," and

"Michigan." All the coins mentioned in this paragraph, as well as the **Hawaiian Dala**, have the

same image of a crowned Liberty head on the obverse side and the word "Liberty" somewhere on

the coin.

On November 22, 2006, NORFED was dissolved as a corporation by an act of its board

of directors, including its chairman, Bernard von NotHaus, and the board voted to "assign all

current assets, payables, loans, and all other business obligations of said Corporation **to Bernard**

**von NotHaus**." Def. Ex. 272. Bernard von NotHaus convened the meeting or the board and

signed the minutes recording the vote. *Id.* In his trial testimony, the defendant acknowledged the

dissolution.

**Liberty Services**, as demonstrated by the Integra account, *see infra*, pages 25-27, was a

continuation of NORFED. All four of the co-defendants, including Bernard von NoutHaus, in

the charged conspiracy, received payments from Liberty Services Integra account in 2006 and

2007, and Liberty Services paid the Mint hundreds of thousands of dollars during the life of that

account. According to the account documents, the Integra account was the alter ego of the

defendant, Bernard von NoutHaus. The Integra account business records described the account

as a "sole proprietorship" and as "customer type . . . individual" and "Bernard von NotHaus,

owner." US Ex. F1, p.4-6.

An Accounts Receivable Agency Report of the Sunshine Mint dated June 26, 2007,

13

shows invoices to and payments received from "Liberty Services" and in the name of "Bernard" in account. US Ex. 75.

The **Royal Hawaiian Mint**, *see infra*, page 26, received more than $4,149.00 from the same Integra account in 2006 and 2007. Oral testimony by the defendant characterized the Royal Hawaiian Mint as a private business of the defendant beginning before NORFED. It was originally that, but became NORFED. No witness, including the defendant, alleged or other evidence showed that the Royal Hawaiian Mint ever went out of existence. That is demonstrated by the entries in 2006 and 2007 in the Integra account. In truth, the evidence demonstrates that it merged with NORFED and continued, as it was from its beginning, to be a sole proprietorship of and alter ego of the defendant. himself. A letter on NORFED letterhead addressed to Qwest and dated May 16, 2000, and signed by co-defendant Sarah Bledsoe, an accused co-conspirator in Count One, the conspiracy count of conviction, was for the purpose of "authorization and permission to merge" a NORFED and a Royal Hawaiian Mint account. US Ex. F57.

Documents seized along with the coins and silver from the Sunshine Mint on November 14, 2007, demonstrate well beyond a preponderance of the evidence that the essential Liberty Dollar conspiracy and other offenses of conviction were one continuous undertaking, regardless of periodic changes of names. A Sunshine Mint Order Acknowledgment on August 19, **2003**, bills **Royal Hawaiian Mint**, at a Evansville, Indiana, address for the purchase of 1,000 ounces of silver for a price of $5,040.00 at account 496468[4] to "lock in for new Hawaiian series metal to go

---

[4]See also *infra*, pages 21-25. The evidence here on page 14 and in the following three paragraphs demonstrates that account 496468 was an active NORFED operating account. It was not a segregated safekeeping, savings, or retirement account for the defendant's mother, Mary Nothhouse.

into PH2 warehouse." US Ex. F56a.

A Sunshine Mint Order Acknowledgment to Bernard von NotHaus at 527 N. Greenriver Rd. #158, Evansville, Indiana, on November 16, **2005**, was for 1,100 ounces of "fine silver metal for R2 warehouse" for $8,833.00 at account 49648. The order was billed to **Royal Hawaiian Mint** c/o Bernard von NotHaus at the same address: 527 N. Greenriver Rd. #158, Evansville, Indiana. US Ex. F56b, US Ex. 71.[4] This is the same address listed on Integra account number 2980, which account was in the name of Bernard von NotHaus as sole proprietor of **Liberty Services**. Infra,

A Sunshine Mint Order Acknowledgment to Bernard von NotHaus at 527 N. Greenriver Rd. #158, Evansville, Indiana, on March 30, **2006**, was for 2,050 ounces of silver for $23,575.00 at account 496468. The order was billed to **Royal Hawaiian Mint** c/o Bernard von NotHaus, at the same address: 527 N. Greenriver Rd. #158, Evansville, Indiana. US Ex. F56c. The Acknowledgment contained this notation:

> **999 fine silver metal to be put in R2 warehouse; Bernard will email information on transferring AG [i.e. silver] into SK2 warehouse from this warehouse.**

It has been averred that "SK2" was the 'safekeeping' account of Mary Notthouse for her supposed retirement. *See infra*, pages 21-25. This Order Acknowledgment document demonstrates, however, that the SK2 account was an account used by the defendant and by his

---

[4]US Ex. 71, admitted into evidence during the testimony of FBI agent Gunnerson, is the catalog of all items seized at the Sunshine Mint, except for the 16,000.05 ounces of silver. The exhibit not only lists metals, coins, dies, casts, and molds, it also lists files and documents seized. For example, page 7 includes as seizures: File Box - Liberty Services; File - Royal Hawaiian Mint, 1998-1999; File - Royal Hawaiian Mint, 2000; File - NORFED, 2000; File Box - Shelter, Sept-Dec 2003.

alter ego, Royal Hawaiian Mint, during the defendant's crimes.

Another Sunshine Mint Order Acknowledgment, dated September 26, **2007**, to ship "300 of the $20" coins at account 496468 links the defendant, Royal Hawaiian, Liberty Services, and the same address.  US Ex. F56d.  Another Sunshine Mint Order Acknowledgment, dated October 26, **2007**,[5] to place 1,000 ounces into the R2 warehouse at account 496468 links Royal Hawaiian to the same address.  US Ex. F56f.

**IV.**  **There is the "requisite nexus,"by a preponderance of the evidence, either as proceeds or counterfeits or used property, connecting all the seized property to the defendant's convictions for conspiracy, making counterfeit coins, and passing resembling silver coins.**

**A.**  **All seized coins are counterfeits and are contraband and are also otherwise forfeitable as proceeds and property intended to be used.**

The jury has found in Counts of conviction One and Two that the defendant made and conspired to make counterfeit coins, and also in Count One that he conspired to pass and utter silver coins.  The evidence, as reviewed *supra*, pages 12-13, and as testified to by FBI agent Andrew Romangnuolo at the first session of the forfeiture phase on March 18, 2011,  is that all the coins seized in Asheville, Evansville, and at the Sunshine Mint had  some version of "Liberty," "Liberty Dollar," "NORFED," and other identifications of the counterfeiting conspiracy, stamped on their faces.  Details of their designs changed over the years, but the evidence is that they are all "Liberties." They all resemble or are similar to United States coins, and the jury has so found.   They were located at the Sunshine Mint or at the main office ('the fulfillment office") of NORFED or at alleged co-conspirator Kevin Innes' office in Asheville because of the defendant's acts during his eleven-year conspiracy to produce and utter counterfeit

_____

[5]That is, about three weeks before all the search and seizure warrants in this case.

16

coins. As counterfeit coins, they are more than "connected" to the offenses of conviction. They are the products, that is, the derived proceeds, of the offenses as well.

According to 18 U.S.C. § 492, "All counterfeits of any coins or obligations or other securities of the United States . . . shall be forfeited to the United States." Because they are also "contraband *per se*," *United States v. Simmons*, *supra*, they may not be possessed by any person. Thus, even without the separate statutory authority provided by 18 U.S.C. § 492 or any other forfeiture statute, they are directly forfeited to the United States. *Boggs v. Rubin*, *supra*.

These **counterfeit, contraband** coins are, therefore, forfeited:

> **5930.32 troy Ounces of Silver Coins,**
> **63.24 troy Ounces of Gold Coins,**
> **3 Platinum Coins,**
> **168,599 Silver troy Ounce Coins,**
> **147 Gold troy Ounce Coins,**
> **17 Gold .05 troy Ounce Coins,**
> **710 Silver .5 troy Ounce Coins,**
> **1,000.5 troy Ounces of Silver Coins,**
> **100 Ounces of Copper Coins**

The defendant was able to produce the coins only "as a result of" the income he, the organizations that were his alter egos, and other members of the conspiracy realized from selling or distributing the Liberty Dollar in all its forms and names. Whatever any of the Liberty Dollar organizations or any of the three accused co-conspirators, Kevin Innes, Sarah Bledsoe, and Rochelle Mosely,[6] or any member of any Liberty organization or any alter ego of the defendant or "other persons" (Count One) did to further the conspiracy establishes, by virtue of the conspiracy's joint and several liability, the "connection" of these coins to the counterfeiting

---

[6]The defendant and his three accused co-conspirators, the regular employees of Liberty Services, were all paid out of the Liberty Services operating account in 2007. *See infra*, page 26.

counts of conviction. *Warshak, Ivanchukov, supra*, page 10.

The defendant himself as well as FBI agent Karen Walsh testified that millions of United States dollars worth of Liberty Dollars were in circulation. The defendant testified to $15 million. The defendant and Walsh testified at great length about how income came into NORFED from the regional currency officers, associates, merchants, and members of the public. That income was also proven by United States' Exhibits 29 and 29a, "the pyramids." That income, "obtained directly or indirectly as the result of" the conspiracy such violation was used by the defendant and NORFED to pay the costs of printing the counterfeit coins at the Sunshine Mint. The coins, which exist only because of the defendant's conspiracy to make and utter counterfeit coins, are, therefore, **also proceeds** or "derived from proceeds" of the conspiracy. They are also property "intended to be used" for and thus connected to Count Two, making counterfeit coins. The silver coins among them are also the actual "silver coins "intended to be used" to be passed and uttered in Count Three.

**B        Likewise, all devices used to make and mint the coins are contraband and are also otherwise forfeitable as proceeds and property intended to be used.**

According to 18 U.S.C. § 492, "things made, possessed, or used . . . or any material or apparatus used or fitted or intended to be used, in the making of such counterfeits, articles, devices or things" shall be forfeited to the United States. The dies, casts, and molds, US Ex.. 72, seized from the Sunshine Mint pursuant to the same seizure warrant that was the basis for the seizure of coins and silver, are the "devices" by which the counterfeit coins were minted. In his trial testimony, the defendant stated that he had designed the dies. He testified that the Sunshine Mint maintained the dies for the Liberty coins. Because these devices are contraband-producing

18

devices with the exact image of contraband molded on them, they are contraband as well.  Thus, they cannot be regarded as potentially curable "derivative" contraband. *Yah*, *supra*, page 8.

Thus, these "used and intended to be used" and contraband devices are forfeited:

**Dies, Molds, and Casts Seized at Sunshine Minting, Inc. on November 14, 2007**

**C.      The unminted silver is forfeitable as proceeds and as devices "used or intended to be used" to mint counterfeit coins and silver coins.**

The jury has found the defendant guilt in Count Three of making, passing, and uttering, and attempting to do so, silver coins resembling United States coins, and in Count One of conspiracy to do so.  An essential part of those offenses was having unminted silver on hand to make into silver coins.  Two seized amounts of unminted silver bars, silver scrap, and raw silver were at the Sunshine Mint in preparation for being minted into silver coins.  Records from the 2006-2007 Integra account, *infra*, page , and from seized documents, *supra*, page  , show that minting orders or warehousing orders from Liberty Services (NORFED) to the Sunshine Mint occurred periodically and roughly monthly.  And, of course, the emphasis, especially after the early beginnings of the conspiracy,  was on producing the coins.  It was coins that were needed "to make money, make change" and to do "the drop."

The defendant had to have had unminted silver available and stockpiled at the Mint in order to fulfill his plans to mint and distribute the coins.  That stockpiled raw silver and silver bars (together with the already minted coins) held by the Mint in Liberty's name was seized from the Mint when agents served the seizure warrant (1:07mj121)[7]  In the Matter of "American

---

[7]The returns of which have been stipulated to by the defendant and are admitted into evidence as US Ex. 71.  US Ex.. F29.  See also US Ex.. 29 (not admitted but published and demonstrated during trial), 57.

Liberty Dollar . . . Hawaii Dala . . . NORFED . . . Liberty Services" for "precious metals . . . or other substances" on the Mint on November 14, 2007. The silver "scrap" was detritus of the minting of the NORFED's silver coins.

According to the testimony of FBI undercover agent Karen Walsh and the undercover recordings that she played during the trial, in 2005, the Liberty Dollar "moved-up" from each coin having $10 minted on it to each coin having $20 minted on it. In order to facilitate the exchange process, NORFED instructed the Sunshine Mint to mint coins with the $20 face and hold them at the Sunshine Mint to back the e-Dollars and the paper currency. When the "move-up" officially occurred, the $10 American Liberty Dollar coins were substituted for the ready-to-go $20 American Liberty Dollar coins. Thus, the silver which backed the e-Dollars and the paper currency was not maintained in the form of silver bars, silver scrap and raw silver. It was maintained in the form of coins. In 2007, the Liberty Dollar did the same procedure in anticipation of the $20 coin "moving-up" to the $50 coin. The defendant discussed this openly on the recordings which were played. He also admitted this was his procedure while on the witness stand during the criminal phase of the trial.

The inevitable conclusion is that any Liberty Services's silver bars, silver scrap and raw silver found at the Sunshine Mint was there in preparation for minting. The coins may have been minted at the current distribution level or at the next anticipated level. However, it is not realistic to believe that any silver bars, silver scrap, or raw silver was intended to remain in raw form for any length of time.

Thus, these two amounts of unminted silver bars, silver scrap, and raw silver:

**11 Silver Bars and Silver scrap totaling 10,720.60 troy Ounces,**

20

**16,000.05 troy Ounces of Raw Silver**

seized at the Sunshine Mint, were "connected" to the conspiracy, Count One, as proceeds

"derived" from and paid for by money the defendant and his organizations received from the

public during the course of the conspiracy. They would not have existed or been located at the

Mint "but for" the conspiracy. They are also property "intended to be used" for and thus

connected to Count Two, making counterfeit coins, and for Count Three, passing and uttering

resembling silver coins.

     D.     **The unminted silver, that is, 16,000.05 troy ounces of raw silver, that involves the name Mary Notthouse was connected to the defendant's offenses of conviction.**

     Likewise, the **16,000.05 troy ounces of raw silver** were also part of the same silver

resources warehoused and available for coining for production into "silver Liberties," the

evidence below will show. By the same reasoning, the 16,000.05 troy ounces of silver were

"connected" to Count One because they were "proceeds," to Count Two because they were

property "intended to be used" and to Count Three because they were property "intended to be

used" in passing and uttering resemblng silver coins.

     However, because the defendant's mother is also associated with this silver and because

there is the allegation that this silver was segregated for her savings or retirement, additional

analysis is needed. This is in addition to the analysis, *supra*, pages 14-15, that has already shown

that the supposed Mary Nothhouse segregated account was an account used by the defendant and

his Royal Hawaiian Mint.

     The seizure warrant served by federal agents at the Sunshine Mint, Coeur d'Alene, Idaho,

on November 14, 2007, produced the returns and list of property seized comprising most of the

property listed in the Notice of Forfeiture in the Superseding Bill of Indictment and being what was mutually stipulated to and admitted as evidence. US Ex. 29, 57. That seizure warrant sought property described as

> **American Liberty Dollar** and/or **Hawaii Dala** currency and/or precious metals of gold, silver, copper, platinum or other substance, Safekeeping Account holdings, and United States currency holdings for The National Organization for the Repeal of the Federal Reserve and Internal Revenue Code (**NORFED**) **dba Liberty Services, Inc**., located at Sunshine Minting, Inc., 7750 West Canfield Avenue, Coeur d'Alene, Idaho 83815.

US Ex 29 (emphasis added).

According to the testimony of FBI agent Cody Muse during the first session of the forfeiture phase of the trial on Friday, March 11, 2011, at the time that agents were serving the seizure warrant on the Sunshine Mint, Shari Galdi, an accountant at the Sunshine Mint stated that another silver account was associated with NORFED. The agents then secured a new search warrant for property described as

> Precious metal holdings, Safekeeping Account holdings, and United States currency related to **Mary S. Nothhouse** and **Bernard von NotHaus**

US Ex 56. Seized on November 15, 2007, pursuant to that warrant was the 16,000.05 Ounces troy Ounces of Raw Silver listed in the Notice of Forfeiture in the Superseding Bill of Indictment.

According to the testimony of FBI agent Cody Muse and documents taken from the Mint and admitted into evidence during the first session of the forfeiture phase of the trial on Friday, March 11, 2011, Mary "Suzy" Nothhouse sent documents by fax to the Sunshine Mint on September 26, 2005, for the alleged purpose of warehousing silver. The Mint noted account 951650 and warehouse account "SK2" for her. US Ex F40. In the "SMI Safekeeping Account

Application" that she filled out on September 26, 2005, Mary S. Nothhouse wrote that the

account was not only "individual" but she also added:

**"please grant access to Suzy Voye or Bernard von NothHaus or Bob Nothhouse."[8]**

On its Sunshine Order Form on September 26, 2005, the Mint described the Customer as

"Bernard's Mom" and the person to be shipped to as "Mary Notthouse, Spec. Acct" (SK2). The

quantity of silver was 11,475 troy ounces of fine silver. US Ex F42. And on its Sunshine Order

Form on September 28, 2005, the Mint further identified the account as

**"New Whse set up SK2 for Liberty dollars - Norfed."**

US Ex F41.

The Mint acknowledged the order and account 951650 by a letter to Mary S. Nothhouse

on September 26, 2005, and noted in the acknowledgment that it also had "emailed Bernard."

US Ex F44. And the Mint billed Mary Nothhouse for $84,456.00 for the 11,475 troy ounces of

"fine silver." *Id.* The Mint stated that the silver was going "to be put into new 'safekeeping'

warehouse for customer." US F45.

On March 20, 2006, the Mint received a Sunshine Order Form for an order for 4,300 troy

ounces of fine silver at a cost of $44,935.00 for account 951650 of "Mary NotHause

Safekeeping," also described as "Mom Bernard's Safekeeping." US Ex F46, 47, 48. Mary

Nothhouse sent checks to the Mint on March 30, 2006, for $20,987.50 and $2,137.50 US Ex 49.

On April 4, 2006, according to the records of the Mint, those amounts was not applied to her

Safekeeping Account (951650, SK2) but to the "Royal Hawaiian Mint" account 496468. US Ex

───────────────

[8]Mary S. Nothhouse apparently has two sons: Bernard and Bob. Suzy Voye is a person
who received checks from the Integra Account in Evansville, Indiana, in 2007. US Ex F4-23.

23

F49a,b. That account, 496468, has already been referred to, *supra*, pages 14.15, as the account

that the defendant and his Royal Hawaiian Mint regularly used over a period of at least four years

for American Liberty Dollar operation.

An Inventory Transaction History Report printed out at the Mint on November 15, 2007,

covering the period of time from July 31, 2005, until November 1, 2007, for "Safekeeping

Account 2," includes an entry for the purchase of 4,300 troy ounces of silver by Mary Nothhouse

on March 20, 2006, and a purchase by the Royal Hawaiian Mint of 225 troy ounces of silver on

March 30, 2006. That latter purchase brought the total amount of silver maintained by the Mint

for the Safekeeping Account 2 (SK2) to 16,000 troy ounces, which balance did not change for a

year and a half, up and including the last entry on the Report, November 1, 2007. As stated, the

amount of 16,000.05 troy ounces was seized on November 15, 2007. US Ex F50, 50a.

Mary Notthouse, or her alter ego, the defendant, had an active warehouse account at the

Mint as early as 2003. Her bank issued a check on her behalf to the Mint on August 20, 2003.

US F51. The check included and the notation "496468," that is, again, the Royal Hawaiian Mint

account. *Id.* US Ex 49, 52.

Summary. Account 9511650 and Safekeeping Account SK2 were always associated not

only with Mary Nouthhouse but also with the defendant Bernard von NotHaus and

Norfed/Liberty Dollar. The Mint noted the account as "New Whse set up SK@ for Liberty

dollars - Norfed," and Bernard von NouthHaus had access to the account from it beginning. Mary

Notthouse purchased silver in the Royal Hawaiian Mint Account, and her purchases for account

SK2 were commingled with her Royal Hawaiian Mint purchases. At all times throughout its

history, the Royal Hawaiian Mint, as testified to by the defendant himself during the trial, was

the defendant's private business private business of the defendant, Bernard von NoutHaus. The connection or nexus of the 16,000.05 troy ounces of silver to the three crimes of conviction, and notably the conspiracy, is proven by a preponderance of the evidence. The silver was not only income (proceeds) of the defendant's scheme to counterfeit coins, it was also property "intended to be used" to do so. By a preponderance of the evidence, the account is "connected" to the offenses of conviction, as "derived" proceeds "obtained" during the course of the conspiracy, Count One, or as property "intended to be used" to make counterfeit coins in Count Two and pass and utter silver coins in Count Three.

### E.     The $254,424.09 seized from the Integra bank account was both proceeds of the conspiracy and property used to commit the conspiracy.

On November 14, 2007, a seizure warrant was served on Integra Bank Account Number 7801142980 at Integra Bank, 401 North Main Street, Evansville, Indiana 47711. US Ex. F30. The amount of $254,424.09 was seized. The account, opened on November 24, 2006, was held in the name of "Bernard von NotHaus, d/b/a Liberty Services." US Ex. F30, p.1. The defendant Bernard von NotHaus was listed as a signatory on the account, as was co-defendant Sarah Bledsoe. The account was further described in Integra account documents as a "sole proprietorship" and as "customer type . . . individual" and "Bernard von NotHaus, owner." US Ex.. F30, F1 p.4-6. According to the testimony of Kelly Schwartz, Integra Bank security officer, during the post-verdict forfeiture phase of the trial on Friday, March 18, 2011, the account was closed by the bank on February 5, 2008.

According to the testimony of Kelly Schwartz and according to the monthly statements of the account from the first monthly statement on November 30, 2006, until November 14, 2007, a

25

total of $2,190,150.79 was deposited into the account over that one-year period. US Ex.. F2,

F3a-3i. F54.

The testimony of Kelly Schwartz and the United States' exhibits, which exhibits are

*samples*[9] selected from the account documents, demonstrate the most important purposes of the

account:

– payments to the defendant;[10]

– payments to the three accused co-defendants and co-conspirators (Count One), Kevin

Innes,[11] Sarah Bledsoe,[12] and Rachelle Moseley,[13] all of whom were further described in the

Introductory Paragraphs to the Superseding Indictment as having worked for NORFED.

- at least seven payment to the Royal Hawaiian Mint totaling more than $4,149.00.[14]

– payments to Sunshine Minting, Inc.[15] The $2,190,150.79 received by Liberty Services

---

[9]All the documents of the account were brought to the forfeiture hearing by Integra
security officer Kelly Schwartz and admitted into evidence on Friday, March 11, 2011.

[10]US Ex.hibits: F5 (3 checks); F6 (1 check); F8 (2 checks);  F9;  F10(2 checks); F12 (4
checks); F16(5 checks); F20(6 checks).

[11]US Ex.hibits: F7, F11, F13, F21, F23.

[12]US Ex.hibits: F4, F6, F8, F9, F11, F13, F17, F18, F19, F21, F22, F23.

[13]US Ex.hibits: F5, F7, F8, F10, F12, F13, F14, F15, F17, F19

[14]US Ex.hibit: F20, F55a-e.

[15]According to the US Ex.hibits below, which are *samples* of payments by this Liberty
Services account to Sunshine Minting, Inc., the total is more than $200,000.00 from December
2006 until August 2007.  In addition, for Ex.ample, is new US Ex.hibit F53, a payment from the
account on August 3, 2007, to Sunshine Minting, Inc. for $139,612.00.

US Ex.hibits: F4 (in Dec: $9462.00, $2248.18); F6 (in Dec: $2395.20, $26,645.50); F9(in April:
$719.35, $10,576.00); F11 (in Jan: $696.20, $9,284.06); F12 (in Jan: $10,329.00); F 13 (in Feb:
$2036.50, $681.18); F14(in Feb: $14,833.24, $1816.77); F15 (in May: $634.52, $17,112.00);

26

Overall, then, the $254,424.09 seized Integra bank account was what was left on November 14, 2007, from the $2,190,150.79 proceeds and derived proceeds the defendant and his organizations received during the one-year life of the account. Both amounts would not existed "bur for" the conspiracy, Count One, to counterfeit coins and to pass and utter silver coins.

In addition, the account was the operating account "used" by Liberty Services/NORFED/Bernard von NotHaus/Royal Hawaiian Mint to further all three Counts of conviction. The defendant and his three other accused co-conspirators all received payments from the account. The major expenditure of the account was to make payments for the regular orders to the Sunshine Mint.

Respectfully submitted this the 30th day of March, 2011

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

_____
s/ THOMAS R. ASCIK
ASSISTANT UNITED STATES ATTORNEY
North Carolina Bar No. 17116
100 Otis Street
Asheville, NC 28801
828-259-0644
828-271-4122 (fax)
thomas.ascik@usdoj.gov
**Electronic Service**
mail@aaronmichel.com
Randolph@LeeLaw.biz
Mark Patrick Foster , Jr., counsel to Tom Power
mpfosterjr@bellsouth.net
Ronald A. Van Wert, counsel to Tom Power
rvw@ettermcmahon.com

_____

F19(in May: $32,121.25, $502.04); F21(in Aug: $41,143.00, $1416.45); F22(in July: $14,119.00, $1,846.95).

27

# APPENDIX

**Properties Seized and Noticed to be Forfeited in the Superseding Bill of Indictment**

3039.375 Pounds of Copper Coins,

5930.32 troy Ounces of Silver Coins,

63.24 troy Ounces of Gold Coins,

3 Platinum Coins,

168,599 Silver troy Ounce Coins,

147 Gold troy Ounce Coins,

17 Gold .05 troy Ounce Coins,

710 Silver .5 troy Ounce Coins,

11 Silver Bars and Silver scrap totaling 10,720.60 troy Ounces,

1,000.5 troy Ounces of Silver Coins,

1,000.5 troy Ounces of Silver Coins,

Dies, Molds, and Casts Seized at Sunshine Minting, Inc. on November 14, 2007,

16,000.05 troy Ounces of Raw Silver,

100 Ounces of Copper Coins,

and

$254,424.09  in United States Currency.