# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
### 5:09CR27-1

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>**v.**<br>**BERNARD VON NOTHAUS** | **Post-Conviction Motions Under**<br>**Rules 29, 33, and 34 of the**<br>**Fed.R.Crim.Proc.** |

The defendant Bernard von Mr. von NotHaus through counsel moves for relief from the jury verdict pursuant to Rules 29, 33, and 34 of the Federal Rules of Criminal Procedure.

Under Rule 29, of the Federal Rules of Criminal Procedure, a "defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Rule 29(c)(1). Judgment of acquittal is appropriate where "the evidence is insufficient to sustain a conviction." Rule 29(a). For the reasons stated herein, there was insufficient evidence that the Liberty Dollars were counterfeits of United States coins and that Mr. von NotHaus acted with the necessary criminal intent.

The Court "may vacate any judgment and grant a new trial if the interests of justice so requires." Rule 33(a), Fed.R.Crim.Proc. A Rule 33 motion "must be filed within 14 days after the verdict or finding of guilty." Rule 33(b)(2). For the reasons stated herein, the jury rendered a verdict on improper bases, which can be correctly only through a new trial.

The Court "must arrest judgment if the indictment or information does not charge an offense." Rule 34(a)(1), Fed.R.Crim.Proc. A Rule 34 motion must be made "within 14 days after the court accepts a verdict or finding of guilty." Rule 34(b), Fed.R.Crim.Proc. For the reasons stated herein, the grand jury was given bad legal advice as shown in the indictment, including paragraph 33, and when viewed in the proper light of the correct law the indictment does not charge an offense.

The jury was given the following instruction as to Count One, conspiracy to violate 18 U.S.C. §§ 485 and 486, in violation of 18 U.S.C. § 371:

> In order to find Defendant guilty of the conspiracy charge alleged in **Count One** of the Bill of Indictment, the Government must prove the following essential elements beyond a reasonable doubt before there could be a conviction. For your information, the first essential element has to do with the existence of a conspiracy; the second with membership in a conspiracy; the third with the alleged objects of the conspiracy; and the fourth involves the requisite overt acts. More particularly, here are the essential elements the Government must prove beyond a reasonable doubt before there could be a conviction: That on or about the dates alleged, within the Western District of North Carolina –
> 5) The conspiracy, agreement, or understanding described in Count One of the Bill of Indictment  *[January 1998 thru May 19, 2010]*  was formed, reached, or entered into by two or more persons;
>
> 2) At some time during the existence or life of the conspiracy, agreement, or understanding, the Defendant knew the purpose of the agreement, and, with knowledge, then deliberately joined the conspiracy, agreement, or understanding;
>
> 3) The alleged object of the conspiracy was to violate either (or both):
>      - 18 U.S.C. §485

- to falsely make, forge or counterfeit any coin in resemblance and similitude of coins of a denomination higher than five cents, or in actual use and circulation as money within the US

- pass, utter, publish, sell, or possess any false, forged, or counterfeit coin, knowing the same to be false, forged or counterfeit, with intent to defraud

    - 18 U.S.C. §486
- to make, utter or pass [attempt to make, utter or pass] counterfeit coins of silver intended for use as current money, in resemblance of genuine coins of the US, or of original design; and

4) At some time during the existence or life of the conspiracy, agreement, or understanding, one of its alleged members knowingly performed one of the overt acts charged in the indictment and did so in order to further or advance the purpose of the agreement.

The jury was instructed as follows on Count Two, making and distributing counterfeit coins in violation of 18 U.S.C. §485:

In order to find Defendant guilty of the offense alleged in **Count Two** of the Bill of Indictment, the Government must prove the following essential elements beyond a reasonable doubt before there could be a conviction. That on or about the dates alleged, within the Western District of North Carolina:

**Section 1 / First Avenue of Proof:**
*[Making counterfeit coins]*

1) Defendant falsely made, forged or counterfeited coins; and

2)    The falsely made, forged or counterfeit coins were in resemblance and similitude of coins of a denomination of higher than five cents; or

3)    The falsely made, forged or counterfeit coins were in actual use and circulation as money within the United States; or

4)    The Defendant otherwise aided, abetted, counseled, commanded, induced, or procured the commission of this offense.

**Section 2 / Second Avenue of Proof:**
*[Passing / uttering counterfeit  coins with intent to defraud]*

1)    Defendant passed, uttered, published, sold, or possessed any false, forged, or counterfeit coins;

2)    Defendant did so knowing the coins to be false, forged or counterfeit; and

3)    The Defendant did so with the intent to defraud; or

4)    Defendant otherwise aided, abetted, counseled, commanded, induced, or procured the commission of this offense.

The jury was instructed as follows on Count Three, making and distributing

counterfeit coins intended for use as currency money in violation of 18 U.S.C.

§486:

In order to find Defendant guilty of the offense alleged in **Count Three** of the Bill of Indictment, the Government must prove the following essential elements beyond a reasonable doubt before there could be a conviction.  That on or about the dates alleged, within the Western District of North Carolina:

5)    Defendant knowingly made, uttered or passed, *[or attempted to make,  utter or pass]*, coins of silver;

2)    The coins were in resemblance of genuine coins of the United States; or

3)    The coins were of original design; and

4)    The Defendant intended the coins for use as current money; or

5)    Defendant otherwise aided, abetted, counseled, commanded, induced, or procured the commission of this offense.

The jury was given a copy of the indictment with paragraph 33 redacted. The redaction consisted of incorrect legal conclusions about the law, specifically, that, "It is a violation of federal law for private coin or currency systems to compete with the official coinage and currency of the United States." The term "coin" used in conjunction with "private" is an oxymoron because the term "coin" has a special meaning, specifically, that it is minted by the United States.

The jury returned a verdict of guilty on all three counts and on all avenues of proof in Count Two. We believe that the evidence is insufficient to support the jury's verdict and that the government painted NORFED, Liberty Dollar, Mr. von NotHaus, and the governing law in a false light, resulting in an indictment that does not charge an offense under the correct statement of the law, and an unfair trial and a wrongful conviction. The government has consistently presented bad legal advice to the grand and petit juries about the status of private currency and the freedom to choose a medium of exchange in an effort to obtain by coercion what the Constitution and even Congress prohibit, and using the criminal justice system to impose upon everyone policy choices preferred by the government. This

is clear from the government's actions, including the government's misleading and prejudicial public press release made on the day of the verdict. Exhibit A.

The government advocated the

- the use of the Liberty Dollar as a circulating currency,
- the "Do the Drop" promotion of the Liberty Dollar,
- the pyramid, multi-level marketing system of distribution using regional currency officers, associates, and merchants, and
- the profit motive associated with the discounting of the Liberty Dollar at the regional, associate, and merchant levels of distribution.

The defense advocated

- the legitimate mission and purpose of the Liberty Dollar as a protest against the current monetary system including the instrumental role of the Federal Reserve in buying coin and currency from the United States Treasury at face value, rather than cost, in what has been described as a Ponzi scheme that creates inflation and a redistribution of wealth,
- the use of the Liberty Dollar as an educational tool that facilitates discussion of these important monetary and economic issues,

- the benefits to the individual and community of having a private barter value based currency that functioned parallel to and was interchangeable with United States currency by means of denominations similar to Federal Reserve Notes,

- the dissimilarities in appearance, weight, denomination, intrinsic value, and marketing of the Liberty Dollar compared to United States coin,

- the extensive promotion of the Liberty Dollar in the media and promotional materials as something in competition with rather than counterfeiting United States currency, and not legal tender or bankable,

- the use of the discount of the Liberty Dollar to regional currency officers, associates, and merchants to cover costs and the general lack of a net profit, compared to the excessive markup and profit going to the United States Treasury from the sale of United States coin and currency, and

- the reliance by NORFED, Liberty Dollar, and Mr. von NotHaus upon legal advice from attorneys, general literature on private currencies and monetary and economic policy, and statements by the Federal Reserve, United States Treasury, and Secret Service to believe that the

Liberty Dollar was legal and that the United States Mint's subsequent press release challenging the legitimacy of the Liberty Dollar eight years into its existence was untenable, and certainly not definitive or the appropriate subject of a criminal proceeding.

The case agent Romagnuolo was allowed to testify over the objection of the defense that a "detective told me that they had attempted to pass a fake coin that looked similar to United States coinage at that branch location." (Tr. 3/8/11, p. 14). This referred to what an employee of the State Employees Credit Union had said to the detective. Id. This was testimony of an out-of-court statement of an out-of-court statement that did not afford the in-court confrontation of the SECU employee or detective, in violation of the Sixth Amendment. More importantly, it misled the jury by the incorrect use of the term "coin" and the argumentative terms "fake coin that looked similar to United States coinage."

This was improper opinion testimony invading the province of the jury. It also lacked any indicia of reliability as to the accuracy of what actually happened at the credit union, whether someone attempted to deposit it and what happened as a consequence. There was no one to cross exam those circumstances, to identify what Liberty Dollar was presented, what its markings and weight were, whether the credit union or customer contacted the phone number or website address on the Liberty Dollar, whether the credit union or customer ultimately decided to keep the

8

Liberty Dollar or sought to return it to NORFED or the regional currency officer, associate, or merchant involved. The testimony was a cheap shot at the expense of the truth.

Case agent Romaguolo also made reference to seeking the opinion of the Chief Counsel for the Secret Service about the Liberty Dollar. (Tr. 3/8/11, p. 15). By testifying that as a result, he "initiated a federal investigation related to the currency violations," the case agent was allowed to give the jury an inadmissible hearsay opinion. It also deceived the jury about the opinion, because the actual opinion was that there was not a violation of 485, because "the Liberty Coins are not counterfeits of or in similitude to any official United States coins." See Exhibit B, p. 3. The case agent forgot to mention this and he testified as to his opinion to the exact opposite conclusion, even as he attributed it to the Secret Service opinion.

The case agent continued, over the objection of the defense, to invade the province of the jury with inflammatory statements about NORFED and Liberty Dollar. (3/8/11, p. 15). For example, he used the phrase, "whose purpose was to distribute this fake currency," when ask what actions he took to gather information Id. In this particular instance, he was improperly expressing an opinion as to the "purpose" to the distribution of the Liberty Dollar and an improper opinion as to the status of the Liberty Dollar as "fake."

The case agent responded to evidence of Mr. von NotHaus' honest business dealings with the derogatory reference to "fake currency." (Tr. 3/18/11, p. 54). The agent reviewed the audits of NORFED, Liberty Dollar, and Sunshine Mint posted on the Liberty Dollar website and the records seized from the auditing firms, and all he could say is that "they confirmed that he had the amount of fake currency that he said he did." Id.

The case agent testified that he obtained a list of merchants in Asheville accepting Liberty Dollars and started to go to them. (Tr. 3/8/11, p. 16). He went to Express Emporium. Id. They were out of stock and referred him to the Fresh Quarter. At the Fresh Quarter, he observed Liberty Dollar marketing materials and a merchant list. The cashier "indicated that she had Liberty Dollars in the cash register and would provide them to me as change if I wished to buy something or that I could purchase them." Id.

This contradicts the theory of the government's own case. There was literature to draw the public's attention to the competing nature of Liberty Dollar. There was a cashier who was open and honest about the offer of Liberty Dollars as change. There was nothing deceptive about it. This testimony supported the government's case only if private currency systems were illegal and it was illegal to compete with the official currency of the United States. That is exactly the picture the government was trying to paint in a subtle and deceptive way.

The case agent tainted the jury with testimony "that there were a number of subjects that were in my sovereign citizen case that were also Liberty Dollar associates." (Tr. 3/8/11, p. 18). This Court sustained the objection, but that did not cure the disease that was beginning to infect this case from beginning to end. The case agent proceeded to say that use of an undercover FBI agent was called for by the "difficulties" and "other issues" presented by this situation. Id.

The case agent was allowed to testify over the objection of the defense about the 2006 United States Mint press release warning that "we felt it was necessary to warn the public because in essence this is what I view as a pyramid scheme or a multilevel marketing … scheme where the defendant's at the top of the pyramid. He brings in these regional currency officers who are located throughout the country, who then in turn recruit Liberty Dollar associates or merchant businesses and they're all part of that pyramid." (Tr. 3/8//11, p. 32-33).

This was a total disregard of the express prohibition in Rule 803(8) of the Federal Rules of Evidence and *Beech Aircraft v. Rainey*, 488 U.S. 153 (1988), of factual findings, conclusions, and opinions derived from an investigation made pursuant to law against a defendant, and a violation *of Crawford v. Washington*, 541 U.S. 36 (2004). When the defense tried to confront this impermissible testimony with a question of where in the code is it against the law for a citizen to

violate an opinion of the Department of Justice, this defense was disallowed and Mr. von NotHaus silenced. (Tr. 3/9/11, p. 109).

Note that he did not say that the press release by the Mint was necessary because of counterfeiting, the only legitimate issue for the jury. Instead, it's a FTC trade practices matter that the case agent is allowed to testify to with the freedom to opine about there being a scheme involving a pyramid or multilevel marketing. This invited bias and a verdict based on improper bases such as whether there was a pyramid or multilevel marketing or that such a distribution channel is legal.

The agent furthered this theory and the single currency theory.

It's not a one time thing because as they continue to purchase the currency to put it into circulation, they are making money by distributing it to unknowing individuals. The RCOs in turn are making money distributing it to the merchants and the associates. And Mr. von Mr. von NotHaus is making money off of every single transaction. So it's not just a one time sign up of a RCO or a merchant or an associate. It's a gift that keeps on giving. (Tr. 3/8/11, p. 53).

This is an interesting and unsupported theory of multilevel marketing and legal business practices, but has nothing to do with counterfeiting. It and subsequent refrains of these theories only served to further confuse the jury. It's not even supported by the agent's own personal observations of the use of the Liberty Dollar. There is no factual basis to support the improper opinion. Not even

the undercover agent would adopt the case agent's use of the terms pyramid or multilevel marketing, although she did preach about profits. (Tr. 3/9/11, p. 75-76).

Furthering the FTC fair trade practices notion, the agent testified, not that the Liberty Dollars were counterfeits of the United States currency, but that the consumer needed to know that the intrinsic value was less than the face value. (Tr. 3/8/11, p. 32-33).

> The problem occurs when these coins that they're distributing in currency leave the pyramid of the people who are educated about the Liberty Dollar Organization and they distribute them by making change with no further information to unsuspecting people in those businesses. They could end up with a 10, 20, or even 50 dollar coin that's worth half, or in some cases less than what the coin is marked as.
> So we felt it necessary to do a consumer advisory through the United States Mint.

This introduced a new theory of criminal liability uncharged by the grand jury and made it a matter of whether there was sufficient notice on or about the Liberty Dollar to the consumer to know the intrinsic value of the silver. The agent subsequently contradicts this assertion, saying the intrinsic or numismatic value of the Liberty Dollar is irrelevant. (Tr. 3/8/11, p. 74-75). This could only serve to confuse the jury about the proper basis for their verdict.

Looking at the silver content of the Liberty Dollar, it does a poor job of counterfeiting United States currency. The intrinsic value of the silver in the Liberty Dollar is much greater than the intrinsic value of the base metals and paper

of United States currency. The jury verdict may on the surface suggest a new definition of counterfeit where the fake is worth more than the genuine, but looking beyond the surface, we see a bait and switch by the government. Charge counterfeiting, but convict on something else.

The case agent testified that he was able to get a search and seizure warrant from a federal judge, and by implication this suggests that there is a factual and legal basis for the search and seizure. (Tr. 3/8/11, p. 40). The government is using the federal judge to vouch for the factual and legal basis of the search and seizure and the case as a whole. The prosecutor isn't missing a trick in selling this case to the jury. It is this Court that has supervisory responsibility for protecting the public from unfair or deceptive or misleading trade practices in prosecuting this case.

The case agent argued that the "Liberty Dollar Organization during the investigation came up with a state-by-state Liberty Dollar. … And it was introduced about the same time as the United States currency coinage quarters which had a state-by-state marking on the back of them." (Tr. 3/8/11, p. 42-43). The undercover agent also testified about this and the North Carolina Liberty Dollar underwritten by Innes and Vernon Robinson. (Tr. 3/9/11, p. 22-23). If as the government maintained in paragraph 33 of the indictment and in its post-conviction press release that it is illegal to compete with the United States currency and that a single currency system is mandatory, then this example of competition

would have relevance to the case. It is this false light cast upon the evidence throughout the trial that tainted the jury's verdict.

The case agent also falsely claimed that the competing state programs were introduced at about the same time, when in fact the government's state quarter program was signed into law in 1997 and began distribution in 1999, seven years before the Liberty Dollar program began in 2006.

The case agent also falsely suggested that the Liberty Dollars competed with United States coin, when in fact they competed with Federal Reserve Notes. The government piled one red herring on top of another in an effort to confuse the jury and to get the jury to render a verdict on an improper basis or bases.

A similar example is seen in the case agent's choice of words in describing merchant Belsito's receipt of Liberty Dollars. (Tr. 3/8/11, p. 46). He says that the "Liberty Dollar was actively being utilized in the community as currency." Id. If a competing currency is illegal then this is relevant, albeit bordering on opinion testimony. It is consistent with the improper theme developed by the government that it is illegal to compete with the United States currency. This theme tainted the case and the verdict.

Yet another example of shifting the question from counterfeiting to these other themes of single currency and hapless consumer is the case agent's testimony that, "it was easily mixed with United States coinage." (Tr. 3/8/11, p. 55). This

concerned the parallel feature of the Liberty Dollar that made it a complement to United States currency, easily converted by merchants and consumers into Federal Reserve Notes and from Federal Reserve Notes to Liberty Dollars. It is this "mix in currency money" that the case agent testifies makes the Liberty Dollar counterfeit. (Tr. 3/8/11, p. 56). Please note that banks do not accept the Liberty Dollar as shown by how this case got started, according to the case agent. (Tr. 3/8/11, p. 73). So there is no basis for the fear sold to the jury by the agent that Liberty Dollars are mixed into the United States currency system.

The case agent argued that it wasn't the face of Liberty on the Liberty Dollar, "in and of itself" that was the crime, but "the use of that currency and its similar appearance." (Tr. 3/8/11, p. 55). The term "use of that currency" is the prejudicial addition to the equation that was constantly driven home by the government. As to similarities with United States coins, the case agent admitted that he was not trained to identify counterfeits, but added that the Secret Service provided that expertise. (Tr. 3/8/11, p. 55). This case agent was acting more as advocate than fact witness and put before the jury way too much prejudicial material and improper testimony.

The case agent argued that in evaluating the counterfeit nature of the Liberty Dollar, it wasn't the unique marking on the Liberty Dollars that it contained one ounce of .999 silver, but, "The dollar denominations," the Liberty Statue head, and

reference to God that in totality made it "similar." (Tr. 3/8/11, p. 57). Again, he is using the competitive feature, the dollar denominations that provide for convertibility, to characterize the Liberty Dollar as illegal. He also is ignoring the fundamental question of what United States coin does the Liberty Dollar counterfeit? By denomination, dimension, weight, silver content, and markings, there is no United States coin it competes with because it was not intended to compete with coin, but with Federal Reserve Notes. The government distracted and confused the jury on this point. There is no circulating United States coin with a face value of $5, $10, $20, or $50.

The case agent testified that, "When they were mixing it, as merchants passed it as change, there was no statement of this is a Liberty Dollar." (Tr. 3/8/11, p. 59). Based upon the agent's earlier testimony about his initial investigation and experience at the Fresh Quarter, this was at best misleading and at worst perjury. To say under oath that, "It was just simply given out mixed in United States currency," is false and misleading. Even the government's own Exhibit 44, a distributed Liberty Dollar brochure, distinguishes it from United States currency, saying it's inflation proof, does not add to the national debt, is not bankable, and that it can be used to barter with any business that wants to take it and the bank doesn't have to accept it. (Tr. 3/8/11, p. 71).

As to the Ron Paul and Second Amendment Dollars, the case agent explained that, "they were seized because they were making money for the organization and it was all being reintroduced and utilized to further the creation of Liberty Dollars." (Tr. 3/8/11, p. 58). Note that there was no evidence showing that a profit was generated by these items. The evidence tended to show that there wasn't even a profit generated by the Liberty Dollar. At best they were recovering most of their expenses and capital. This is an odd way to counterfeit, sort of a nonprofit version of crime, we will call it Robin Hood counterfeiting, where it is done not for the benefit of the people who dedicate their time and money to the effort but for the benefit of society as a whole. The only problem is that it is not really counterfeiting.

The case agent agreed that the Liberty Dollars "legitimately contain that which they presented on the face of the medallion itself." (Tr. 3/8/11, p. 58). But, according to the case agent people involved might not know that the Liberty Dollar had one ounce of silver in it because they might not actually look at or read what is written on the Liberty Dollar. (Tr. 3/8/11, p. 58). The agent also said that people would read the denomination on the Liberty Dollar and not know that their value was not as marked. There seems to be some inconsistency here and with the earlier testimony about the displays at Fresh Quarter and statements by the cashier. It was mixed with United States currency but distinguished from United States currency.

It had more intrinsic value unlike the Federal Reserve Notes it competed with and merchants were willing to enter into voluntary barter arrangements with it, but people, according the agent were clueless about it, not reading what it said or what the displays said, or what the cashier said.

The case agent explained to the jury that it does not matter whether the Liberty Dollar has intrinsic value and the Kennedy half dollar does not, because the Kennedy half dollar is "legally authorized to be passed as currency by the United States government and it is the official currency of the United States." (Tr. 3/8/11, p. 59-60). The emphasis here by the agent is on "legally authorized" and "official currency," which incorrectly suggests that private currencies are not legal or authorized and that only official currency is legal and authorized.

The case agent refused to acknowledge that the official currency is not backed by any intrinsic value of the Federal Reserve Notes with which the Liberty Dollar competed or even United States coin. (Tr. 3/8/11, p. 60). It is by fiat worth what the government says its worth. Id. This ignores the fair market value of the official currency and the market forces that determine value in relation to the goods and services money can buy. To overcome this obstacle, the government will attempt to force transactions at the value it assigns to the official currency. The government has less power to do this if there are alternative currencies, which is why the government is trying to craft a monopoly out of this case.

The case agent was inconsistent in his characterization of the $50 Liberty Dollars seized at Sunshine Mint, "Warehouse Receipts that we collected from the Sunshine Mint had already been redeemed and there are people who are ostensibly holding Warehouse Receipts with the promise that NORFED or the Liberty Dollar Organization would then give them silver if they decided to redeem it." (Tr. 3/8/11, P. 63-64).

He says there is evidence that redemptions were honored, and then he uses the word "ostensibly" to bring into question the status of the seized Liberty Dollars as being subject to the claims of holders of the warehouse receipts. He doesn't explain why he questions this, but does go on to say, "Those Warehouse Receipts are floating out there and have not been redeemed." (Tr. 3/8/11, p. 64). Please note that he testifies that the warehoused Liberty Dollars are in the $50 piece minted in 2008, which contains the "MSRP," the "PVBC," "Notice – Not Intended to Be Used as Legal Tender, Current Money, or Coin," "888.LIB.DOLLAR," and "LiberyDollar.org" The jury verdict did not specifically find this version to be a counterfeit coin, nor could it.



This was minted in 2008. Def. Exhibit 376.



This was minted in 2008. Def. Exhibit 377.

The case agent did testify that, "I think that he would redeem them if he were capable of it." (Tr. 3/8/11, p. 64). By the term "he," the agent was referring to Mr. Mr. von NotHaus. By "them" he was referring to the outstanding warehouse receipts representing claims to the seized $50 Liberty Dollars held at Sunshine Mint. This is consistent with his testimony about evidence of redeemed warehouse receipts. The agent added, "he can't redeem them because we seized them." (Tr. 3/8/11, p. 65).

The case agent testified that to his knowledge the United States Mint, Secret Service, Federal Reserve, and U.S. Treasury will not render an opinion or approval

of a design on a medallion or token to be stamped by the Sunshine Mint or other private mint. (Tr. 3/8/11, p. 66). One cannot run the piece by these authorities and has only the statutory definition of a coin found in 31 U.S.C. § 5112 for guidance.

The Liberty Dollar did not qualify as a coin under this section. The statute did not authorize the denominations, weights, or dimensions found in the Liberty Dollars. The Liberty Dollars did not have the statutory required "E Pluribus Unum," "Trust in God," or "United States of America." It didn't even have the same required combination of markings on the obverse and reverse. The case agent improperly and inaccurately opined that the Liberty Dollars were similar to United States pennies, nickels, dimes, quarters and half dollars. (Tr. 3/8/11, p. 73).

The case agent was personally familiar with local currency and private barter currency, due to his prior work near the home of the Ithaca Hour. (Tr. 3/8/11, p. 66-67). He distinguished barter from a precious metal marked and created to look like United States currency. (Tr. 3/8/11, p. 67). The agent avoided responding to defense questions about the precious metal content of United States coins. Id. He made reference to copper plate used in United States coins, but this incorrectly and improperly and falsely informed the jury that copper is a precious metal. *Pacific Fast Mail, Inc., v. United States*, 63 Cust.Ct. 468 (1969); *Nasssau Smelting and Refining Co. v. United States*, 725 F.Supp. 544 (Ct. Int'l Tr. 1989); *Mid-Fla. Coin Exchange, Inc. v. Griffin*, 529 F.Spp. 1006 (M.D. Fla. 1981); 31 U.S.C. § 5133; 31

U.S.C. § 5312; 16 CFR §23.9; 31 CFR § 103.140(a)(4)(defines precious metal as gold, iridium, osmium, palladium, platinum, rhodium, ruthenium or silver of certain levels of purity).

The jury was mislead into thinking that copper and even copper clad were precious metals and to consider the .999 fine silver composition of the Liberty Dollar as equivalent to the base metal used in United States coin.

Given that the case agent was allowed to express an opinion about the merits of the three counts against Mr. von NotHaus, (Tr. 3/8/11, p. 68), when asked what the basis for that opinion was, the case agent gave an incorrect statement of the law to the jury, "486 makes it illegal to utter and pass coins of precious metal in currency or using them as currency whether they look similar or are of original design." (Tr. 3/8/11, p. 69).

This improper opinion evidence misled the jury as to the proper basis for rendering a verdict, because the agent was repeatedly using the term "coin" in the broadest sense as anything that was minted by private or public authority. The agent, other government witnesses, and prosecutors were consistent in referring to the Liberty Dollar as a coin, even though it was not minted by the United States. The prosecutors even insisted and argued with defense witnesses who made the proper use of the term "coin" that it is a term with no distinction. This cast the Liberty Dollar and the proper law of the case in a false light and misled the jury.

The case agent testified that the distinctions made between the Liberty Dollar and United States currency in the marketing brochures and cashiers in talking to customers and associates talking to merchants and in the publicity through advertisements and newspaper articles were irrelevant because of the use of denominations by Liberty Dollar. (Tr. 3/8/11, p. 71-2).

This was an incorrect statement of the law that misled the jury and called upon them to adopt the government's personal policy preference that there be a single currency system in which the government has a monopoly. As to the impact of a denomination on barter, just because a Federal Reserve Note says $20 does not mean that it will buy what the government believes it should buy for $20. Even the official currency is subject to market forces that determine how many Federal Reserve Notes it takes in the trade. This FBI agent is not qualified to testify as an economist and it shows.

The case agent improperly and inaccurately opined that it didn't matter whether the Liberty Dollars were not capable of penetrating the official banking channels or that the banks, automated clearing houses, Federal Reserve, United States Treasury, and United States Mint would identify and recognize them as not being official United States coin. (Tr. 3/8/11, p. 73-74).

The case agent at this point says that the confusion created by Liberty Dollar is that it is mixed with United States currency outside the banking system and

people might not know that it is not United States currency. (Tr. 3/8/11, p. 74). The case agent improperly argued that this was a case of deceit. Id. The agent's own testimony as to the markings on the Liberty Dollar and information in the brochures and other marketing materials, and the conversations he had with merchants contradict his improper argument to the jury. It is the government that is trying to create confusion and mislead the jury, "And therein lies the deceit in this." Id.

The case agent improperly and inaccurately argued that it didn't matter what the intrinsic value or numismatic value of the Liberty Dollar was. (Tr. 3/8/11, p. 74-75). What mattered, according the agent, was that the Liberty Dollar was similar to United States currency and no explanation was given to the recipient, who might think it was United States currency. Id.

This is inconsistent with the profit motive argument and ignores the distinguishing characteristics on the Liberty Dollar, the marketing materials and conversations he had with merchants, and the motive for giving and receiving the Liberty Dollar rather than Federal Reserve Notes. It confuses the jury into thinking that the change concerns United States coin, rather than Federal Reserve Notes. The question of similitude is really whether the Liberty Dollar looks like the Federal Reserve Notes it is intended to replace. The government successfully misled the jury on these important issues.

The case agent admitted that the Liberty Dollars had a marking on them, "BVNH," which refers to Bernard von Mr. von NotHaus. (Tr. 3/8/11, p. 76). When asked about the inscription around the obverse, the agent said there were a lot of different versions and he would have to look at one of them to be able to describe it.  Id. No distinction was made by the case agent as to markings of the different versions of the Liberty Dollar. This is quite odd in a counterfeiting case.

The case agent improperly and inaccurately opined that "when you do the drop, people feel the heft of it and it's easily mistaken and mixed in with U.S. currency." (Tr. 3/8/11, p. 77). There is no basis in fact for this testimony, no evidence that the heft of the Liberty Dollar made it indistinguishable from United States currency.

Quite the contrary, the heft distinguished it from the typical United States coins used as change, and the change given by means of Liberty Dollar would be in denominations of Federal Reserve Notes, not nickels, dimes, quarters, or half dollars. This confusion of the United States coin with the practical and intended use of the Liberty Dollar, as an alternative to Federal Reserve Notes, was created by the government to mislead the jury. Therein lies the deceit.

The undercover agent testified that the Asheville regional currency officer for Liberty Dollar provided her information in October 2005 consisting of the phone number of the organization, the website address, and the upcoming training

seminar referred to as Liberty Dollar Seven. (Tr. 3/8/11, p. 85). This is the same information available to anyone with a Liberty Dollar, which has the phone number and website address on it. It would be the same information reviewed by the case agent about the Liberty Dollar.

The undercover signed up as an associate and received by email the monthly newsletters, (Tr. 3/8/11, p. 85), which are also posted on the website for public review. The undercover received a "bunch of material" which was later described as including the 2003 Liberty Dollar book and a video of the Learning Channel Making Money production. Id; (Tr. 3/8/11, p. 88). These things were in the public domain for anyone to acquire and review. (Tr. 3/9/11, p. 70). The book contained everything one could learn about Liberty Dollar, including Chapter 59, "Use the Currency – Do the Drop."

Equally available to the public were the four $10 one ounce Liberty Dollars included in the package, the same Liberty Dollars offered to the case agent at Fresh Quarter. (Tr. 3/8/11, p. 91-2). The undercover agent testified that most of the Liberty Dollars in circulation at this time were $10 Libertys. (Tr. 3/8/11, p. 122).



This is the $10 Liberty Dollar in use in 2003 at the time of the undercover agent's activity. Def. Exhibit 319.

The Cancun video in the associate package received by the undercover agent was consistent with the training at Liberty Dollar University Seven, (Tr. 3/8/11, p. 95-6), which was consistent with the other publicly disseminated materials on the website, book, Learning Channel Making Money video, and brochures at stores like Fresh Quarter. (Tr. 3/8/11, p. 99-101, 115-6).

The undercover agent testified about paying the $250 membership fee and that $100 of that went to the person who referred her to Liberty Dollar. Id. Much was made of this referral fee as part of the profiteering and multilevel marketing allegedly used to promote the Liberty Dollar, something that prejudiced the jury and deceived them into rendering a verdict on improper bases. Id.

The agent identified the price level of the Liberty Dollar at the regional currency officer level and the associate/merchant level, identifying the difference in prices as profit. (Tr. 3/8/11, p. 98). No mention was made of revenue, expenses, and net profits/losses and this was consistent with the effort by the government

throughout the trial to suggest net profitability when there was in fact no evidence of such profitability. (Tr. 3/8/11, p. 106-8, Tr. 3/9/11, p. 8). The undercover agent explained that it was not her job to forensically trace down these profits. (Tr. 3/9/11, p. 77). Apparently the case agent didn't either, since no such evidence was presented.

In the example given by the undercover agent, she used the example of a spot price of $4.50 for one ounce of silver, (Tr. 3/8/11, p. 108-9), even though the case agent testified that the spot price at this time was $6.50. (Tr. 3/8/11, p. 57). This testimony had no basis in fact as to the spot price and was misleading in its omission of the costs of doing business covered by the markup, confusing profit margin with markup, and the suggestion that profiteering was going on and illegal. Therein is the lie in the government's case.

The undercover agent read from the marketing materials to establish what would be culpable if private currency is illegal, which continued the misperception given by the case agent in his testimony, and misled the jury to an improper basis for their verdict. (Tr. 3/8/11, p. 100-2). Phrases like, "join the free money movement … and start getting your money at a discount," "stop using their money. Start using the Liberty Dollar," and, "it functions dollar for dollar, i.e., in parallel, with the current Federal Reserve Notes," were emphasized for this illegitimate

purpose Id. The same was true of the "marketing pitch" of offering the merchant a choice of the Liberty Dollar or a Federal Reserve Note. (Tr. 3/8/11, p. 102).

The undercover agent described the Drop, just as it is described in the 2003 Book, Chapter 59, p. 404. By dropping the one ounce of fine silver into the hand, rather than handing it to the merchant or letting the merchant pick it up, the merchant can tell by its weight that it feels like one ounce of fine silver. (Tr. 3/8/11, p. 102). The same was true for the drop done by the merchant when offering a Liberty Dollar as change. (Tr. 3/8/11, p. 117).

The undercover agent then describes the admonition to not inundate the merchant with educational information on the "Federal Reserve and their inflationary, fiat currency." (Tr. 3/8/11, p. 102-3). And here too the agent is merely repeating that which is not only in the training materials and associate package but in the 2003 Book and website as well. These materials explain that the policy reasons for having a private barter value based currency were unwanted and not needed to understand what the simple drop of the one ounce of fine silver will say to the merchant at the time of the initial introduction of the Liberty Dollar.

The government successfully and unfairly painted this as a deception, even though the Liberty Dollar not only speaks by its weight and beauty, but also words including the phone number and website address on the Liberty Dollar, and the brochure offered to the merchant, and the associate's directing the merchant to

more information on the website. And the object was to create an ongoing relationship with merchants and customers which could not happen if there was a deception. The government exaggerates the introduction of the Liberty Dollar to a potential Liberty Dollar merchant to swallow all that happens as a result of that introduction – the development of a network of Liberty Dollar to people. Neither the case agent nor undercover agent testified as to their observing any person actually deceived by the Drop and the literature and training show that no deception was intended.

The literature itself points out two important facts. First, the associate is encouraged to leave the brochure and business card with the merchant in case they have any questions. 2003 Book, p. 405. Second, the purveyors of Federal Reserve Notes thrive on the ignorance of people about money. Id. "In contrast, the Liberty Dollar is a *door opener* that solicits a response and in so doing, helps identify "the choir" – those who already know about the fraudulent Federal Reserve and want to finally **do something about it**." Id.

In explaining the meaning of the term FRN, the undercover agent cast it as "real U.S. currency," which would be fine if this were a marketing competition where Pepsi and Coke take turns claiming to be the real thing. In a judicial proceeding, this terminology took on significance in large part due to the case agent's prejudicial testimony suggesting that there can be only one currency. The

undercover agent further misled the jury to an improper basis for their verdict throughout her testimony.

The 2003 Book and materials received by the undercover agent instructed the agent and others to "**never misrepresent the currency as US currency or legal tender.**" 2003 Book, p. 408 (bold in the original). The undercover agent did not testify that a contrary instruction or practice or incident occurred during her undercover activities with Liberty Dollar.

The undercover agent, however, did improperly opine and mislead the jury into thinking that the "Liberty Dollar is not legal." (Tr. 3/9/11, p. 88). The reasoning was that legal tender is that which can be forced upon people. Id. "So if the Liberty Dollar is not legal, it couldn't be forced on someone." Id. This was nonsense that lead the jury to an improper basis for their verdict.

The undercover agent's explanation of how the $10 Liberty Dollars was to be offered to the merchant showed that it was not intended as change for a United States coin or used as United States coin. (Tr. 3/8/11, p. 122-3). A $10 Liberty Dollar was offered if the goods were between $5 and $10 in value. Id. The barter was this margin of $5. There was no United States coin of such a value to compete with this use of the Liberty Dollar or to counterfeit any United States coin.

The undercover agent argued that the intended function of the Liberty Dollar in the hands of the public was as a medium of exchange and not a store of value.

(Tr. 3/9/11, p. 16-17). "It was a currency." Id. This misled the jury into thinking that it is a crime to have a private currency. The same was true about the Burger King story told by Mr. von NotHaus, where a Liberty Dollar was used there and while he was present the cashier provided the Liberty Dollar to a customer as change. The prosecutor argued that Mr. von NotHaus was training people "how to inject this currency into the marketplace." (Tr. 3/9/11, p. 22). This improperly and deceitfully suggested that injecting currency into the marketplace was a proper form of counterfeiting for which the jury could convict.

The undercover agent did testify that Mr. von NotHaus wanted the Liberty Dollar "to compete with the Federal Reserve Note," but the prosecutor quickly had that notion substituted by, "Legitimate U.S. currency." (Tr. 3/9/11, p. 18-19). This shows the prosecutor's guilty mind, wanting to hide the truth and substitute their propaganda. The truth being that it is legal for private currency to compete with United States currency and that the Liberty Dollar competed with the Federal Reserve Note, and not with the United States coin. Both currency systems relied upon United States coins to make small change.

The undercover agent did admit that some Liberty Dollars were recognized as having numismatic value, and gave the example of Mr. von NotHaus having a striking device he often used to put a mark on the Liberty Dollar, "which would some day make it more valuable." (Tr. 3/9/11, p. 17).

The undercover agent also admitted that besides the Drop, which emphasized the qualities of the Liberty Dollar and compared it with a $10 Federal Reserve Note, the Liberty Dollar was also promoted as a way of locally owned stores keeping the currency local by using the Liberty Dollar and providing local control of the supply of money. (Tr. 3/9/11, p. 21). Note that it stays local because it is not bankable.

The undercover agent testified that after the Liberty Dollar was revalued to the $20 base, she purchased eight of these $20 Liberty Dollars in December 2005 and in 2006. (Tr. 3/9/11, p. 32-35, 53-56).



This was minted in 2005. Def. Exhibit 324.



This was minted in 2006. Def. Exhibit 352.



This was minted in 2006. Def. Exhibit 345.



This was minted in 2006. Def. Exhibit 325.



This was minted in 2006. Def. Exhibit 327.

The undercover agent was allowed to chime in on the United States Mint press release in September 2006, further injecting this improper, irrelevant, inaccurate, and prejudicial opinion from the United States Mint into the trial and the jury's verdict. (Tr. 3/9/11, p. 37-38). The response by Innes shows that he believed that they were doing nothing wrong and that the United States Mint was mistaken. Id. He did not know that the FBI had asked the United States Mint to issue this press release.

Mr. von NotHaus had the same reaction to it, saying "nobody was buying their story." (Tr. 3/9/11, p. 39-40). And no wonder since it was by an organization whose profits were being eaten by the competition and could do not more than make vague, false claims about the Liberty Dollar when for years spokespersons for the United States Treasury, Secret Service, and Federal Reserve had had no objection to it, issued no cease or desist order or civil enforcement action, consistent with the opinion of Mr. von NotHaus' attorneys and the research by RCO Rostcheck. They had every right to proceed with business as usual and for the government to prove its case, without interjection of a self-serving opinion in the form of this press release.

The field training received by the undercover agent in Skokie, Illinois, as part of Liberty Dollar University Eleven produced similar results to the case

agent's personal experience during his initial investigation, no evidence of counterfeiting. (Tr. 46-48). The point the government wanted to make is that Mr. von NotHaus was attempting to promote Liberty Dollars as a competing private voluntary barter currency. This resulted in an improper basis for the jury's verdict.

The undercover agent admitted that the Liberty Dollar materials "were dissatisfied with the current money system," and admitted that, "They were exercising their First Amendment rights." (Tr. 3/9/11, p. 86).

The undercover agent admitted that, according to the training materials, website, brochures, etc., it is improper to refer to the Liberty Dollar as a "coin." (Tr. 3/9/11, p. 14). She later qualified this to say that Mr. von NotHaus and the others would accidently let the word slip out, but that Mr. von NotHaus insisted that the Liberty Dollar not be referred to as "coin," "legal tender," or "current money." (Tr. 3/9/11, 103-104). Here is evidence of an effort to be clear in communicating the difference between the Liberty Dollar and United State currency. A clear expression of intent not to confuse the two forms of currency.

The undercover agent twisted this around and improperly argued that Mr. von NotHaus and all the others involved with Liberty Dollar were deluding themselves by maintaining this distinction. (Tr. 3/9/11, p. 104, 106). This could make sense only if private voluntary barter currency is illegal. Again, the authorities were calling upon the jury to render a verdict on an improper basis. This

fit in with the consistent use of the term "coin" by the prosecutors and agents for both Liberty Dollars, which are not coins, and United States coins.

This was willful manipulation of words to confuse the jury. Even if Liberty Dollars were counterfeit, it would be improper to refer to them as coin, since only the real thing is properly called coin. This was the government playing games with words, liberty, and the jury.

The United States Mint attorney testified that "circulating coins are commonly pennies, nickels, dimes, quarters, and dollar coins." (Tr. 3/9/11, p. 130). Note that he did not say anything about $5, $10, $20, or $50 coins. He also admitted that the United States Mint sells these circulating coins "to the Federal Reserve at their face value." Defense counsel was not permitted in its questioning of the undercover agent to inquire about the cost of these coins. (Tr. 3/9/11, p. 124).

The government attorney misrepresented the term "legal tender" when he testified that "the sole purpose of stamping denominations on the silver, gold, and platinum coins is so that they have a nominal denomination so that they can be considered legal tender." (Tr. 3/9/11, p. 131). Nowhere in 31 U.S.C. § 5103, which defines legal tender, does it make express or implicit reference to the denomination of United States currency. This was a deceptive manipulation of the jury into thinking that a denomination connotes United States currency and this led to an

improper basis for its verdict. He did not inform the jury that there was no counterpart United States silver coin denomination to the Liberty Dollar denominations.

The government attorney admitted that § 5103 defines legal tender and that a merchant or whoever is offered the United States currency, is not required by law to accept legal tender. (Tr. 3/9/11, p. 148). The Constitution does not give the government a monopoly on currency, the statutes clearly define what United States currency is and do not require its acceptance in trade, but somehow private voluntary barter currency is illegal because it functions as United States currency does. This is the scheme of things sold to the jury.

The government attorney testified that the design of circulating coins changes every five years, including ten new designs per year. (Tr. 3/9/11, p. 132). This costly effort is inconsistent with the claim by the government that a hapless public would not notice that what they had in the hand was a Liberty Dollar. Why change designs if the public isn't going to notice? Why assume that the public is not going to discern a Liberty Dollar?

The government attorney was allowed to testify about the 50-State Quarter Program, Presidential $1 Coin Program, and the Native American $1 Coin Program, and the America the Beautiful Quarters Program, even though none of these were shown to be or even claimed to be similar to the Liberty Dollars. (Tr.

133-134). The government had been allowed to elicit testimony from the case agent falsely claiming that State Monetary Initiative Liberty Dollars came out about the same time as the government's the 50-State Quarter Program. Tr. 3/8/11, p. 42-43). The defense was not allowed to offer an alternative explanation for the Liberty Dollar SMI Program, namely a movement to have states mint their own currency.

The government attorney admitted that he had known of NORFED and Liberty Dollar before the Justice Department approached him about issuing a press release. (Tr. 3/9/11, p. 134-135). In fact, since 1998, journalists and Liberty Dollar people and others had asked spokespersons for the United States Treasury, Secret Service, and Federal Reserve about it and received no suggestion that the Liberty Dollar violated 18 USC §§ 485, 486. The Bureau of Engraving and Printing provided a number of records corroborating these newspaper reports. Exhibit C. This did not deter the United States Mint's about face at the request of the Department of Justice. No change in law, just change in policy.

The government attorney admitted that for suspected criminal violations of the coinage laws, the United States Mint is required to report it to the Inspector General of the United States Treasury, who is responsible for investigating it with the assistance of the Secret Service or the Department of Justice. (Tr. 3/9/11, p. 149). No such procedure was followed in the instant case and no assurances of due

process were afforded to anyone affected by the press release or subsequent role that press release played in the Department of Justice's pre-existing misadventure with Liberty Dollar. This lack of due process spilled over into the trial through repeated assurances by the authorities, which impermissibly invaded the province of the jury and called upon the jury to render a verdict on improper bases.

The government attorney admitted that had the Liberty Dollar been marketed by suggesting in any way that it was minted by or associated with the United State Mint, the United States Mint would first issue a cease and desist order and then proceed with civil process leading to a fine or civil penalty. (Tr. 3/9/11, p. 136, 144). Note that no such misrepresentations were made by Liberty Dollar and no cease and desist order or civil process issued against Liberty Dollar. The 50-State Quarters Program, was a registered trademark the United States Mint owns, and would allow enforcement against any infringement on this trademark. (Tr. 3/9/11, p. 145). No such action was taken against the State Monetary Initiative Liberty Dollar Program because it was clearly competing with Federal Reserve Notes rather than counterfeiting the United States quarters and doing it in conjunction with the movement for State minting of their own currency.

The government attorney was allowed to further advocate the merits of his agency's press release and letters to regional currency officers informing them of the opinion by the Department of Justice, in clear violation of Rule 808(8) of the

Federal Rules of Evidence. To allow the jury to repeatedly hear about this opinion and its development and implementation could only serve to invade the province of the jury as to whether there was a violation of the law and to compel an improper basis for the verdict.

The government attorney testified that the markings on United States coins are not sufficiently unique to the United States coins to be proprietary and are in fact in the public domain. (Tr. 3/9/11, p. 146). This undermines any reliance by the public upon the general markings of a medal such as a torch or liberty head or other allegorical images. Adding to these markings the name and phone number of someone other than the United States Mint or United States of America as the issuer would certainly impose upon the public sufficient information to believe that the medal is not issued by the United States Mint.

The government attorney confirmed what the case agent said about the United States Mint not giving an advisory opinion, even though they do get requests for them. (Tr. 3/9/11, p. 146). Note that their press release does give an opinion by the Department of Justice, but the context of the press release was to intimidate Liberty Dollar after they had been in business in the open and with the knowledge of the authorities for eight years and had reached a following of a quarter of a million holders of Liberty Dollars worth today about $50,000,000.

The government attorney admitted that in effect they give advisory opinions "on the back end." (Tr. 3/9/11, p. 146-147). He also admitted that, "once that member of the public consults his or her attorney, there's no further thing they can do except to wait for a mint warning or Justice Department action to come down." (Tr. 3/9/11, p. 147).

The alleged victim testified that she accepted $10 Liberty Dollars at her business on several occasions in 2003 and asked if the Liberty Dollar was bankable and was told by Innes that it was. (Tr. 3/9/11, p. 153-160). This is inconsistent with the testimony of the case agent and undercover agent who testified about their observations, the promotional materials given to merchants to recruit them which said the Liberty Dollar is not bankable, the undercover agent's instructions from the associate package and Liberty Dollar University training, and her observations and field training.

This Court allowed it in as an admission of a co-conspirator, but the only conspiracy established by the evidence was to distribute Liberty Dollars with full disclosure that it is not bankable and not United States currency. Yet, over the objection of the defense, the alleged victim was allowed to offer this testimony of an out-of-court statement attributed to Innes allegedly made over seven years ago, lacking any indicia of reliability due to the inability to confront the declarant and inconsistencies with the evidence of how the Liberty Dollar was distributed and

evidence of the pattern of dealings by the alleged victim with Liberty Dollar, and the lapse of time, in violation of Rule 801 of the Federal Rules of Evidence and *Crawford v. Washington*, 541 U.S. 36 (2004).

The true value of the Liberty Dollar, distinguishable from United States currency, is seen in the fact that the first one was placed in the son's piggy bank, the second one was placed in the grandson's piggy bank, the third one was saved by an employee, "And this happened over and over. So it never really got put in the deposit." (Tr. 3/9/11, p. 153). Note that this was not treated like United States currency, which did go to the bank to be circulated in the Federal Reserve System.

The Liberty Dollar received special treatment, as it should, because of its substantial differences from United States currency. It was treated not as currency but as "a collector's coin for my son's collection that I was collecting for him." (Tr. 3/9/11, p. 161).

Trying to deposit it seems odd under the circumstances given the nature of the marketing and markings of the Liberty Dollar and the treatment it received from the alleged victim. Claiming at trial that "it was no good" is odd given that it is .999 fine silver worth 350 percent of its face value. (Tr. 3/9/11, p. 157).

Claiming there was nothing she could do when the bank refused to take it is odd, given that she did not contact Innes or call the 800 number on the Liberty Dollar or complain to the authorities; instead, she treated it with the same

appreciation of its value as she afforded the other Liberty Dollars by putting it in her son's piggy bank. (Tr. 3/9/11, p. 154).

It wasn't until the authorities broadcast the frivolous charges in this case against Innes and falsely informed the alleged victim that the Liberty Dollar was no good in 2009 did she indicate any problems with the Liberty Dollar, over six years after receipt of it. (Tr. 3/9/11, p. 157, 159-160).

The government's expert on metal could only testify that the Liberty Dollars were made of high quality solid silver in the quantity indicated on the Liberty Dollars. (Tr. 3/9/11, p. 168, 171). He testified that it was .9995, which is greater quality than the .999 advertised on the Liberty Dollar. (Tr. 3/9/11, p. 171).

The second undercover agent's description of what Innes told her about being a merchant who accepts the Liberty Dollar is somewhat inconsistent and misleading. (Tr. 3/9/11, p. 177). According to the first undercover and the literature, the merchant and associate operate at the same level in terms of pricing the Liberty Dollar, not at different levels. The second undercover agent was candid about the markup being such that she "would be able to make a little bit of money off of it." (Tr. 3/9/11, p. 177). She also testified that she could earn additional money ($100) by recruiting others (who would buy at a discount rather than whatever rate the merchant would charge in a bartered exchange). Id.

There was no testimony of counterfeiting, only the distribution of the Liberty Dollar, including the use of the Liberty Dollar to make change and pay employees. (Tr. 3/9/11, p. 178). This tied into the theme already well developed by the government that it was the nature of the Liberty Dollar as a private voluntary barter currency that was the crime. The second undercover agent did receive $10 and $20 Liberty Dollars at this time in March 28, 2007. (Tr. 3/9/11, p. 180). These have already been displayed in this brief.

The second undercover agent testified that Innes considered the United States Mint press release "as libel and slander," they had it "all wrong," "it was not illegal," and that the "government was trying to scare people." (Tr. 3/9/11, p. 179). That sounds like an accurate assessment by a man who honestly (and with substantial justification) believed that he was complying with the law.

## CONCLUSION

For the foregoing reasons, this Court should enter judgment of acquittal pursuant to Rule 29, because the evidence is insufficient to support the verdict, particularly as to the element that the Liberty Dollars in question were counterfeits of United States coin and the criminal intent element of the crimes charged. In the alternative, this Court should, pursuant to Rule 33, arrest judgment because the indictment does not charge an offense with regard to these elements and the legal standard stated in the indictment is not supported by the facts or law. In the

alternative this Court should, pursuant to Rule 34, in the interest of justice vacate the verdict and order a new trial free from the errors above-specified. Mr. von NotHaus is willing to have the new trial by the bench with defense witnesses appearing voluntarily at their own expense.

The prosecutors successfully painted Mr. von NotHaus in a false light and now the U.S. Attorney responsible for the prosecution is painting the case in a false light saying that it establishes that private voluntary barter currency is illegal. The press release goes further than the redacted paragraph in the indictment, adding two more phrases about how important it is for the government to have a monopoly on money.

Nobel laureate F.A. Hayek thought that private voluntary barter currency was better for the community, a number of other economists agree. Even Dr. Bruce Champ of the Federal Reserve Bank agrees. The U.S. Attorney considers them domestic terrorists. Of course she has no credentials in economics. Her expertise is taking away the individual's civil rights through the criminal justice system.

By outlawing private voluntary barter currency and the use of any medium of exchange other than Federal Reserve Notes, the government is taking us back to the days of FDR and the Great Contraction, chronicled by Milton Friedman as a total economic disaster tied directly to the mismanagement of money, first by the Federal Reserve and then by the government proper.

The worst part of this is that it is being done the way that a socialist society would do it, by force, rather than voluntary choice. The government is using the criminal justice system to impose their policy choices on everyone, like the white supremacist used the criminal justice system to maintain control of African Americans. The government is prosecuting those who disagree with its policy against private voluntary barter currency. Say good-bye to liberalism.

This the 31st day of March, 2011.

/s Aaron E. Michel
Aaron E. Michel, Attorney at Law
Counsel for Mr. von Mr. von NotHaus
Phone: 704-451-8351
Email: mail@aaronmichel.com
3736 Surry Ridge Court
Charlotte, NC 28210

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served this 31st day of March, 2011, by means of the Electronic Filing System for the Western District of North Carolina, upon the following parties:

For the Government:

**Jill Westmoreland Rose**
Assistant U.S. Attorney
100 Otis Street, Room 233
Asheville, NC 28801
828-271-4661
Fax: 828-271-4670
Email: jill.rose@usdoj.gov

**Craig D. Randall**
Assistant U.S. Attorney
227 W. Trade St., Suite 1700
Charlotte, NC 28202
704-344-6222
Fax: 704-344-6629
Email: craig.randall@usdoj.gov

**Thomas R Ascik**
Assistant U.S. Attorney
100 Otis Street, Room 233
Asheville, NC 28801
828-259-0644
Email: thomas.ascik@usdoj.gov

**Benjamin Bain-Creed**
Assistant U.S. Attorney
100 Otis Street, Room 233
Asheville, NC 28801
828-271-4661
Fax: 828-271-4670
Email: Benjamin.bain-creed@usdoj.gov

For William Kevin Innes:

**Claire J. Rauscher**
Federal Defenders of Western North Carolina
129 W. Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
Fax: 704-374-0722
Email: Claire_Rauscher@fd.org

**Erin Kimberly Taylor**
Federal Defenders of Western North Carolina
129 W. Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
Fax: 704-374-0722
Email: Erin_Taylor@fd.org

For Sarah Jane Bledsoe:

**Joe Von Kallist**
6743-A Fairview Road
Charlotte, NC 28210
704-366-9008
Fax: 704-365-2109
Email: joevonkallist@yahoo.com

For Rachelle L. Moseley:

**Matthew G. Pruden**
301 E. Park Avenue
Charlotte, NC 28203
704-338-1220
Fax: 704-338-1312
Email: mpruden@tinfulton.com

This the 31st day of March, 2011.

/s Aaron E. Michel
Aaron E. Michel, Attorney at Law