IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
NO. 5:09CR00027-RLV

_____
UNITED STATES OF AMERICA    )
                            )
    v.                      )
                            )
BERNARD VON NOTHAUS         )
_____ )

**MOTION FOR RETURN OF SEIZED PROPERTY**

NOW COMES defendant Bernard von NotHaus, on behalf of Mary S. ("Suzy") Nothhouse and Robert K. ("Bob") Nothhouse, owners of 16,000.05 troy ounces of raw silver, and files this motion for the release of said property or, in the alternative, for a prompt hearing. In support of this motion, Mr. Von NotHaus shows the Court the following:

1. Per Federal Rule of Criminal Procedure 41(g), on a Motion to Return Property, "[a] person aggrieved by an unlawful search and seizure of property *or* by the deprivation of property may move for the property's return." Fed. R. Crim. P. 41(g). Entitlement to relief under this rule requires a showing that "(1) [the moving party] is "entitled to lawful possession of the seized property; (2) the property is not contraband;

1

and (3) either the seizure was illegal or the government's need for the property as evidence has ended." Ferreira v. United States, 354 F. Supp. 2d 406, 409 (S.D. N.Y. 2005) (quoting United States v. Van Cauwenberghe, 827 F. 2d 424, 433 (9th Cir. 1987)).

    2.    Mrs. Nothhouse is entitled to lawful possession of the seized property. She is a 92-year-old widow who invested most of her life's savings in silver. The government seized that silver over four-and-a-half years ago,[1] apparently because it was stored at the same institution (Sunshine Minting Inc.) that provided services to her son, Bernard von NotHaus,[2] and because his name is mentioned in connection with her account.[3] The mention of his name, however, is due to the fact that Sunshine Minting, Inc. typically only opened large accounts for businesses, not individuals like Mrs. Nothhouse, except on recommendation of an established customer, in this case Bernard von NotHaus. As such, Mrs. Nothhouse was only permitted to store her silver at Sunshine Minting, Inc. due to the corporation's established relationship with her son. In fact, when Mrs. Nothhouse's other son, Robert K. Nothhouse, wished to purchase

---

1 The F.B.I. seized the 16 bars of raw silver from her account at Sunshine Minting, Inc. on November 15, 2007. This silver is identified in the indictment as "16 000.05 Troy Ounces of Raw Silver."
2 Note that Sunshine Minting, Inc., is undoubtedly a highly respected company. It is, for instance, listed as having an $80 million contract with the U.S. Mint for "Fabrication of Precious Metal Blanks." Exhibit Q (US Mint Forecast of Contract Opportunities Existing Contracts Tablet 2012.pdf as downloaded from http://www.treasury.gov/resource-center/sb-programs/SiteAssets/Pages/dcfo-osdbu-mp-forecast/US%20Mint%20Forecast%20of%20Contract%20Opportunities%20Existing%20Contracts%20Tablet%202012.pdf).
3 "Sunshine Order Forms" from 09/26/2005 and 03/20/2006 are attached as Exhibits A and B. These exhibits show notations in the "Customer" box that say "Bernards Mom [sic]" and "Mom Bernard [illegible] Safekeeping."

2

and store silver through Sunshine Minting, Inc., he had to make his purchase with his mother due to the fact that Sunshine Minting, Inc. would not permit him to open a storage account for what they considered to be such a small quantity of silver.

3. Since the government seized the silver that is the subject of this motion, Mrs. Nothhouse initiated contact with the government, provided voluntary discovery, and answered all questions propounded by the government. The government has provided no indication that it believes Mrs. Nothhouse knew of, approved of, participated in, or was otherwise involved in any of the activities for which her son was prosecuted; or that the seized property does not belong to Mrs. Nothhouse or Mr. Robert Nothhouse; or that they held it as nominees for their son or his brother; or that they did not purchase this property with their own savings for their own investment purposes. In fact, throughout Bernard von NotHaus's entire trial, no questions or issues related to Mrs. Nothhouse or the silver she stored at the Sunshine Mint were ever raised.[4] A supporting affidavit is attached.[5]

4. As set forth below, Mrs. Nothhouse's acquisition of the silver at issue predated and was unrelated to Bernard von NotHaus's case. During their 55 year

---

[4] The only time Mrs. Nothhouse was mention in front of the jury was when the defense questioned Bernard von NotHaus about an article published in a local newspaper from Mrs. Nothhouse's hometown. *See* Trial Transcript Vol. 5, p. 141 (March 15, 2011).
[5] "Mary S. ('Suzy') Nothhouse Affidavit" attached as Exhibit C.

3

marriage, Bernard W. Nothhouse and Mary S. Nothhouse lived frugally.[6] Mr. Nothhouse was a salesman while Mrs. Nothhouse ran a swimming school for young children.[7] When the United States government stopped issuing silver coins in 1965, Mrs. Nothhouse "decided that silver would go up in price and so I began to save these silver quarters and my husband began to bring back silver coins he obtained on his travels. We collected silver coins for many years and held them as a long-term investment."[8] On October 23, 1992, Mrs. Nothhouse and her husband, Bernard W. Nothhouse, set up and transferred their joint assets to a revocable trust.[9] Under the trust arrangement, Mr. and Mrs. Nothhouse served as trustees, with their son, Robert K. Nothhouse, appointed successor trustee.[10] The trust was arranged so that after the couple's deaths the estate would be divided equally and distributed amongst their three children.[11] When Bernard W. Nothhouse passed away in September of 1995, Mrs. Nothhouse continued to serve as trustee.[12]

---

6 Exhibit C, p. 1, ¶ 1.
7 Exhibit C, p. 1, ¶ 3. In fact, Mrs. Nothhouse continued to teach swimming lessons until 1997. Her independence and strength of character are illustrated by the fact that she won two silver medals in swimming at the 2011 nation senior Olympic Games less than three months after breaking her hip and having hip replacement surgery. Exhibit R. It is obvious she is a strong-willed individual, and not the pawn of anyone.
8 Exhibit C, p. 1, ¶ 3.
9 A "Declaration of Trust" executed on October 23, 1992 and signed by Bernard W. Nothhouse and Mary S. Nothhouse is included as Exhibit D. Because the trust is revocable, Mrs. Nothhouse retains the right to change these arrangements at any time.
10 Exhibit D.
11 Exhibit C, p. 1, ¶ 2.
12 Exhibit C, pp. 1, 3, ¶¶ 1, 10.

4

Mrs. Nothhouse's silver purchases were as follows:

(a) <u>First Silver Purchase</u>

*(1) Mrs. Nothhouse closed her CD account.*

On September 20, 2006, Mrs. Nothhouse closed a CD account administered by the trust, believing that with only a 4% interest rate, the CD account was not as strong of an investment choice as putting her money in silver.[13] Upon closing out the CD account, Mrs. Nothhouse deposited the account's $85,314.20 into the Bernard and Mary Nothhouse Trust account held by Colonial Bank in Florida.[14]

*(2) Mrs. Nothhouse purchased silver from Sunshine Minting, Inc.*

Six days later, Mrs. Nothhouse purchased $84,465.00[15] worth of .999 fine silver from Sunshine Minting, Inc. to be put into a new "Safekeeping Warehouse."[16] It was only because of her son, Bernard von NotHaus's, business relationship with Sunshine Minting, Inc. that the corporation permitted her, as an individual, to open what they

---

13 A "Time Deposit Statement" issued by the first Bank of Missouri for the period of July to September, 2005 is included as Exhibit E. Exhibit E shows the September 20, 2005 transaction that closed out the trust's five year CD; Exhibit C, p. 3, ¶ 11.
14 Exhibit C, p. 3, ¶ 1.
15 11,475 ounces at the then-current rate of $7.36/ounce.
16 A Sunshine Minting, Inc. invoice dated 09/26/05 invoice is included as Exhibit F. Exhibit F shows that Mary S. Nothhouse of 8504 Pepperwood Dr., Estero, FL 33928 purchased 11,475 ounces of "999 Fine Silver to be put into new 'safekeeping' warehouse for customer." Exhibit E shows that the unit price of the silver was $7.36 per ounce and the sale amount was $84,456. *See also* Exhibit C, p. 3, ¶ 12 (August 19, 2011); Exhibit G shows a check drawn from the account of "Bernard & Mary Nothhouse Trt, Mary S. Nothhouse, Trustee" dated 09/29/2005. The check was paid to the order of Sunshine Minting, Inc. for $84,556.00. The check's memo line says the check is for "Silver." The check was signed by Mary S. Nothhouse.

5

considered a relatively small account.[17]

*(3) Sunshine Minting, Inc. maintained a "safekeeping account" for Mrs. Nothhouse.*

Additionally, on that September 26, 2005 date, Mrs. Nothhouse filled out Sunshine Minting, Inc.'s Safekeeping Application.[18] The application stated that as Sunshine Minting, Inc.'s client, Mrs. Nothhouse "owns a defined number of ounces which is an un-segmented interest or portion in a pool of precious metal held in storage and insured by [Sunshine Minting, Inc.] at their secure facility."[19] Per the agreement, Mrs. Nothhouse's silver would be maintained and stored in her name by Sunshine Minting, Inc. in a safekeeping account (SK2).[20] With the application, Mrs. Nothhouse paid an additional $100 to Sunshine Minting, Inc. for two years' worth of safekeeping premiums, which essentially served as storage charges.[21]

(b) <u>Second Silver Purchase</u>

*(1) Mrs. Nothhouse closed a second CD account.*

Almost six months later, on March 14, 2006, Mrs. Nothhouse decided to close a

---

17 Exhibit C, pp. 1, 2 ¶ 4.
18 A "SMI Safekeeping Account Application" dated Sept. 26, 2005 and signed by Mary S. Nothhouse is included as Exhibit H. Exhibit H shows that Mary S. Nothhouse checked that her account was an "individual" account and she also listed her title as "individual." Exhibit H also includes Mrs. Nothhouse's biographical and bank contact information.
19 Exhibit H.
20 Exhibit H; Exhibit C, p. 2 ¶ 7.
21 A Sunshine Minting, Inc.-issued invoice dated 09/28/05 is included as Exhibit I. Exhibit I shows that Mary S. Nothhouse was sold two years of "Safekeeping Premiums" at $50 per year.

four year CD she and her late husband obtained during their marriage.[22] The CD was only earning only 3.75% interest and Mrs. Nothhouse decided to instead invest the funds in silver.[23]

> *(2) Mrs. Nothhouse made arrangements with her son, Robert K. Nothhouse, to make a joint purchase of silver.*

When she informed her son Robert Nothhouse of her intent to purchase more silver, he asked her to buy an additional 1,000 ounces for him since he would not be able to obtain similarly favorable terms for a small purchase.[24]

> *(3) Mrs. Nothhouse purchased silver from Sunshine Minting, Inc. for herself in an individual capacity and for her son in a trustee capacity.*

On March 20, 2006, Mrs. Nothhouse purchased 4,300 ounces of .999 fine silver at $10.45 per ounce, totaling $44,935.00.[25] A handwritten notation on her copy of the invoice documents that Mrs. Nothhouse made a portion of this purchase on behalf of

---

22 Exhibit C, p. 3, ¶ 13; A Time Deposit Statement dated from January to March, 2006 is included as Exhibit J. Exhibit J was issued by the First Bank of Missouri to the "Bernard W. & Mary S. Nothhouse Rev Tr, Mary S. Nothhouse" and shows that $34,832.14 was withdrawn on March 14, 2006; Exhibit K shows a March 14, 2006 Disbursement Account check from First Bank of Missouri that was paid to the order of "Bernard W. & Mary S. Nothhouse Rev Trust, Mary S. Nothhouse Trustee" for $34,832.14. The check lists the CD number as 100051416.
23 Exhibit C, p. 3, ¶ 13.
24 Robert's affidavit is attached as Exhibit P. The first phrase of para. 2 in this affidavit should refer to para. 15 of his mother's affidavit (Exhibit C) rather than para. 2 of his mother's affidavit; a March 20, 2006 check for $10,450 drawn from the joint account of Mary S. Nothhouse and Robert K. Nothhouse is attached as Exhibit P.
25 A Sunshine Minting, Inc. invoice dated 03/20/06 is included as Exhibit L. Exhibit L shows that 4,300 ounces of silver were purchased at $10.45 per ounce by Mary S. Nothhouse of 8504 Pepperwood Dr., Estero FL, 33928. Additionally, a handwritten notation on the invoice shows that Sunshine Minting, Inc. states that "1000.00 oz belongs to Bob." She remembered Robert as paying $10,000 by certified check. Exhibit C, p., ¶ 15. Her son Robert had the same memory, Exhibit O, ¶ 2. Yet he eventually found the check used for his portion of the purchase. Exhibit P.

7

her son, Robert Nothhouse.[26] In exchange for her 3,300 ounces of silver, Mrs. Nothhouse paid $34,935.00 to Sunshine Minting, Inc. via a check drawn from the Bernard & Mary Nothhouse Trust Account.[27] Robert Nothhouse paid $10,450.00 to Sunshine Minting, Inc. for his portion of the silver.[28] For some reason, she paid $450.00 more for her part of this silver than it cost, so she carried this amount forward towards her last purchase, only a few days later.

    (c) <u>Third Silver Purchase</u>

> *(1) Mrs. Nothhouse made arrangements with her son, Bernard von NotHaus, to make a combined purchase of silver.*

Mrs. Nothhouse, despite the fact that she had spent most of her life savings, wanted to purchase an additional 225 ounces from Sunshine Minting, Inc. in order to have an even 15,000 ounces of silver in her safekeeping account.[29] However, upon speaking with her son, Bernard von NotHaus, Mrs. Nothhouse decided that it would be unreasonable to ask Sunshine Minting, Inc. to sell her only 225 ounces of silver.[30] Instead, Mrs. Nothhouse arranged to combine her purchase with one of Bernard's upcoming purchases, similar to the arrangement she previously made with her other

---

26 Exhibit L.
27 Exhibit C, p. 4, ¶ 14; A copy of a March 20, 2006 check paid to the order of Sunshine Minting, Inc. for $34,935.00 is attached as Exhibit M. The check is drawn from the account of "Bernard & Mary Nothhouse Trt, Mary S. Nothhouse, Trustee" and signed by Mary S. Nothhouse. The memo line reads that the check is for "silver purchase."
28 Exhibit P.
29 Exhibit C, p. 4, ¶ 16.
30 Id.

8

son, Robert.[31]

At the time of the purchase, Mr. von NotHaus was visiting Mrs. Nothhouse at her home in Florida, and therefore it was easier to transfer funds from her account to lock in a favorable price for silver for both of them.[32] In all transactions with Bernard regarding silver at SMI, I was extremely careful that we paid each other exactly what we were due."[33] "Bernard and I have stayed at arms length regarding our finances. If we lend each other anything, we are careful to make sure the loan is precisely repaid. This has been true with each of my children since I wanted to encourage their independence, teach them to be financially responsible, and avoid playing favorites."[34]

> *(2) Mrs. Nothhouse purchased silver for her own account and advanced the money for Bernard von NotHaus's purchase.*

Upon purchase from Sunshine Minting, Inc., 225 ounces of silver were transferred to Mrs. Nothhouse's individual safekeeping account upon completion of the transaction, while the remaining 1,825 ounces were transferred to Bernard's Royal Hawaiian Mint account.[35] She wrote checks paying for all the silver, considering the

---

31 Exhibit C, p. 4, ¶ 17.
32 Exhibit C, p. 5, ¶ 20.
33 Exhibit C, p. 7, ¶31.
34 Exhibit C, p. 7, ¶32.
35 Exhibit C, p. 4, ¶ 18; A Sunshine Minting, Inc. invoice dated 03/30/06 is included as Exhibit N. The invoice shows that 2,050 ounces of "999 Fine Silver" was sold to Royal Hawaiian Mint, c/o Bernard von NotHaus, 527 N. Greenriver Rd. #158, Evansville, IN 47715 at a price of $11.50 per ounce, totaling $23,575.00. The invoice states, "Transfer 225 oz to SK2 Warehouse" (Mary S. Nothhouse's account) and "Transfer 1825 oz. to R2 Warehouse" (Royal Hawaiian Mint's account). Although the Royal Hawaiian Mint was closely associated with Bernard von NotHaus, it was not a part of the indictment or trial. It

9

$450 she had overpaid for the prior purchase. She paid for Bernard's silver in part as settlement of some outstanding personal transactions[36] and in part as an accommodation to him.

*(3) Mrs. Nothhouse's silver purchase is traced to her own bank accounts.*

Clearly she paid for her silver. The fact that she wrote a check to cover his purchase, through resolving outstanding loans or a new short term loan as an accommodation to lock in a favorable price when he had limited access to his own funds, is irrelevant. Each of the three purchases is clearly traced to her own money coming out of her own accounts.

5. There appears to be no solid basis for forfeiture and continued seizure of this property. Here, Mrs. Nothhouse and her son, Robert K. Nothhouse have clearly met the Van Cauwenberghe factors as explained in Ferreira v. United States. First, they are entitled to lawful possession of the seized property. As made clear by Mrs. Nothhouse's Sunshine Minting, Inc. account statements as well as in her affidavit, Mrs. Nothhouse was the sole owner of every ounce of silver in her SK2 safekeeping account maintained by Sunshine Minting, Inc. except for 1,000 ounces she held in trust for her son, Robert Nothhouse. Second, the property is not contraband. Because her account

---

appears to be a perfectly legitimate company that makes medallions commemorating Hawaiian history, e.g. the attack on Pearl Harbor. *See e.g.* http://royalhawaiianmint.com/
36 Exhibit C, p. 4, ¶ 19.

was an individual account, and in no way related to Bernard von NotHaus, NORFED, or Liberty Dollars, Mrs. Nothhouse's silver and the silver she held in trust for her son, Robert K. Nothhouse, was not contraband itself, nor was it associated with any contraband materials. Although Bernard's business relationship with Sunshine Minting, Inc. is what initially caused Sunshine Minting, Inc. to permit her to open an individual storage account, the relationship ends there. Mrs. Nothhouse used her own personal money from her individual and trust accounts to make personal purchases of silver to be stored in her individual account. The only time a purchase was ever remotely associated with Bernard von NotHaus was when Mrs. Nothhouse and her son combined a purchase so that she would be able to obtain a small amount of silver that she otherwise, due to Sunshine Minting, Inc. policy, would not have been able to purchase by itself. And finally, the government's need for the property as evidence has ended.[37] Bernard von NotHaus's jury trial has concluded and he has been convicted in federal court. The government no longer has a need to keep Mrs. Nothhouse from accessing the silver she rightfully owns.

It is one thing to seize arguably questionable property and hold it until satisfactory answers to reasonable questions can be obtained. But it is a very different thing to seize and hold such property after reasonable answers are obtained. This is

---

[37] Note the silver was not introduced at trial, and there was no need for either party to introduce it.

especially true when the property is undoubtedly owned by an elderly widow, with a relatively short life expectancy, and the reasonable desire to settle her affairs. A small percentage of her life remains for her to enjoy the fruits of her and her late husband's long lives of hard work and frugal living. To have most of her assets tied up by the government is an injustice in the present circumstances.

6. Mrs. Nothhouse's due process rights are violated by the government continuing to hold her property. Mrs. Nothhouse is both the most knowledgeable witness and the most persuasive witness for her case -- and even for her son, Robert, because she is the one who arranged his participation in her purchase of the relevant silver and held his silver in her name as trustee for him. Even today her ability to travel an extended distance is limited due to the fact that Mrs. Nothhouse requires both a companion to do the driving and frequent stops during any trip. She lives in Florida. She is alert and with excellent faculties for her age at this time, but there is always the possibility that may suddenly change. Indeed, that is natural and to be expected.

7. Due process requires a prompt post-seizure hearing, and in the present unusual circumstances the delay is a due process violation. The Court should adopt as the relevant test the four part test of Barker v. Wingo, 407 U.S. 514 (1972), adopted for forfeitures by United States v. $8,850, 461 U.S. 555 (1983). This test requires the Court to balance four factors: (1) the length of the delay; (2) the reason for the delay; (3) the

claimant's assertion of his right; and (4) the prejudice to the claimant. Id.

8. The delay has been long in an absolute sense, but more importantly it has been excessively long when considering the property owner's remaining life expectancy. There is no reason for further delay-- all the government's questions have been answered; Mrs. Nothhouse has asserted her rights; and she is subject to severe prejudice by more delay. She has been without the ability to enjoy her property in her declining years. Mrs. Nothhouse explained that she and her late husband set up the trust account and frugally saved money throughout their 55 year marriage so that they would be able to retire and receive appropriate care in their old age. The government is preventing this from being a reality. It is quite possible that Mrs. Nothhouse may die without having a hearing or the ability to set her affairs in order, knowing that her testimony is critical for vindication of her rights to dispose of her property. She has access to few assets to provide for her care, or to hire attorneys to fight for her property. The government may claim advantages in being able to forfeit the property from her estate that it would not have with her as a living owner.

9. An attorney for Mrs. Nothhouse has had several discussions with two attorneys for the government, and has conveyed to the undersigned that he has the greatest respect for them and absolutely no reason to believe they have deliberately delayed resolution of these issues in bad faith. The government has also conveyed to

13

the undersigned its view that it requires a ruling from this Court on Bernard von NotHaus' post-trial motions before it can determine its position on the claim asserted in this motion.  One cannot expect Mrs. Nothhouse to have such an objective view of the situation. Every day the seizure bothers and irritates her. She wakes up in the middle of the night worrying about why, at this stage of her life, the government is doing this to her. She wants to see the end of this before the end of her life. She wants to die in peace, not in the middle of litigation over her life's savings. She wants to know, before she dies, if she can leave something for her grandchildren or if she will die essentially impoverished. She wants to know whether she will have the resources to move to a "good" nursing home if she becomes unable to care for herself. She wants to regain access and be able to enjoy her property in her final years.

WHEREFORE, Bernard von HotHaus on behalf of Mrs. Nothhouse and Mr. Robert Nothhouse requests immediate release of the silver or a hearing before this Court to adjudicate this motion.

14

This the 21st day of May, 2012.

                                          Respectfully submitted,

                                          <u>s/ Noell P. Tin</u>
                                          Noell P. Tin
                                          Tin Fulton Walker & Owen, PLLC
                                          301 East Park Ave.
                                          Charlotte, NC 28203
                                          Phone: 704-338-1220
                                          Fax: 704-338-1312
                                          ntin@tinfulton.com

## CERTIFICATE OF SERVICE

I certify that I have served the foregoing **MOTION FOR RETURN OF SEIZED PROPERTY** on opposing counsel by submitting a copy thereof through ECF, to be sent to:

>Jill Rose
>Assistant United States Attorney
>227 West Trade Street
>Suite 1650
>Charlotte, NC 28202
>Jill.rose.usdoj.gov

This the 21st day of May, 2012.

>s/ Noell P. Tin
>Noell P. Tin
>Tin Fulton Walker & Owen, PLLC
>301 East Park Ave.
>Charlotte, NC 28203
>Phone: 704-338-1220
>Fax: 704-338-1312
>E-mail: ntin@tinfulton.com