**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CRIMINAL DOCKET NO.: 5:09CR27-RLV**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Memorandum and Order** |
| | ) | |
| **BERNARD VON NOTHAUS,** | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

      **THIS MATTER** is before the Court on Defendant Bernard von NotHaus's Post-Conviction Motions under Rules 29, 33, and 34 (Doc. 197), filed March 31, 2011; the Government's Response in Opposition (Doc. 201), filed April 7, 2011; Gold Anti-Trust Action Committee, Inc.'s ("Gold") Amicus Curiae Brief in Support of Defendant (Doc. 212), filed May 31, 2011; the Government's Response in Opposition to Brief of Amicus Curiae (Doc. 213), filed June 10, 2011; Defendant's Motion to Adopt the Amicus Brief (Doc. 214), filed June 12, 2011; and Gold's Reply (Doc. 217), filed June 17, 2011.

      The Defendant, through his newly retained counsel,[1] submitted a Supplemental Memorandum (Doc. 267) on March 25, 2013, which triggered another round of briefing. (Docs. 268, 269).

## I.      BACKGROUND

      On May 19, 2009, a federal grand jury sitting in the Western District of North Carolina returned a Bill of Indictment against Defendant and three co-defendants. (Doc. 3). This Order pertains only to Defendant von Nothaus. Defendant was charged with violating 18 U.S.C. § 371,

---

[1] Defendant is no longer represented by trial counsel, Attorney Aaron Michel. Effective October 13, 2011, Defendant retained new legal counsel.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CRIMINAL DOCKET NO.: 5:09CR27-RLV**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Memorandum and Order** |
| | ) | |
| **BERNARD VON NOTHAUS,** | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

      **THIS MATTER** is before the Court on Defendant Bernard von NotHaus's Post-Conviction Motions under Rules 29, 33, and 34 (Doc. 197), filed March 31, 2011; the Government's Response in Opposition (Doc. 201), filed April 7, 2011; Gold Anti-Trust Action Committee, Inc.'s ("Gold") Amicus Curiae Brief in Support of Defendant (Doc. 212), filed May 31, 2011; the Government's Response in Opposition to Brief of Amicus Curiae (Doc. 213), filed June 10, 2011; Defendant's Motion to Adopt the Amicus Brief (Doc. 214), filed June 12, 2011; and Gold's Reply (Doc. 217), filed June 17, 2011.

      The Defendant, through his newly retained counsel,[1] submitted a Supplemental Memorandum (Doc. 267) on March 25, 2013, which triggered another round of briefing. (Docs. 268, 269).

## I.      BACKGROUND

      On May 19, 2009, a federal grand jury sitting in the Western District of North Carolina returned a Bill of Indictment against Defendant and three co-defendants. (Doc. 3). This Order pertains only to Defendant von Nothaus. Defendant was charged with violating 18 U.S.C. § 371,

---

[1] Defendant is no longer represented by trial counsel, Attorney Aaron Michel. Effective October 13, 2011, Defendant retained new legal counsel.

conspiracy to violate 18 U.S.C. §§ 485 and 486, and substantive violations of 18 U.S.C. §§ 1341, 485, 486, and 2. On November 17, 2010, the grand jury returned a Superseding Bill of Indictment against the same group of defendants.[2] (Doc. 103). This Superseding Indictment charged Defendant with violating 18 U.S.C. § 371, conspiracy to violate 18 U.S.C. §§ 485 and 486, and substantive violations of 18 U.S.C. §§ 485, 486, and 2, eliminating the charge under 18 U.S.C. § 1341.

Defendant's jury trial began in Statesville, North Carolina, on March 8, 2011. The Government rested its case after two days of evidence. The Court denied Defendant's motion to dismiss pursuant to Fed. R. Crim. P. 29. Defendant presented evidence for approximately four days, and rested on March 17, 2011. The Government offered testimony from one rebuttal witness. The jury began deliberations on March 18, 2011. After approximately two hours of deliberation, the jury found Defendant guilty on all counts in the Superseding Bill of Indictment. Following announcement of the jury verdict, the Court likewise denied Defendant's renewed Rule 29 Motion.

Defendant now moves for post-conviction relief pursuant to Rules 29, 33, and 34 of the Federal Rules of Criminal Procedure.

## II.    Factual Background[3]

---

[2] On April 27, 2011, the charges brought against von Nothaus Co-Defendant William Kevin Innes were dismissed without prejudice. The charges brought against Co-Defendants Rachelle Moseley and Sarah Bledsoe were dismissed with prejudice on May 24, 2012, given their successful completion of a Pretrial Diversion Program.

[3] In light of the applicable Rule 29 standard, which requires the Court to "view the evidence in the light most favorable to the Government," *Glasser v. United States*, 315 U.S. 60 (1942), and allow all

This federal criminal prosecution arose out of an investigation undertaken by the Federal Bureau of Investigations ("FBI") in June 2004 following a report made to the Asheville Police Department from a local branch of the State Employees Credit Union ("SECU"). SECU reported an attempt to pass a coin that looked similar to United States coinage. The coin was not deposited or accepted by the credit union. (3/8/11 Tr. 14−15). The FBI initiated an investigation after consulting with the U.S. Secret Service. (3/8/11 Tr. 15−16).

The Superseding Bill of Indictment ("Indictment") alleged that between January 1998 and May 19, 2010, Defendant Bernard von Nothaus designed, created and minted coins called "Liberty Dollars," coins "in resemblance or in similitude" [or made to look like] of U.S. coins. The Indictment alleged that the Liberty Dollar coins were to be introduced into the U.S. economy and meant to compete with U.S. currency in violation of federal law. According to the Government, the Defendant sought to have his Liberty Dollar coins accepted by merchants (and distributed by merchants) in the place of U.S. currency in order to make a profit for the Defendant and those associated with his Liberty Dollar Organization.

NORFED was the original entity founded and solely owned by Defendant Bernard von Nothaus for the creation of and circulation of the Liberty Dollar. (3/8/11 Tr. 52). NORFED is an acronym for "The National Organization for the Repeal of the Federal Reserve Act and Internal Revenue Code." (3/8/11 Tr. 52). NORFED, a not-for-profit entity (not a 501(c)(3) organization because Defendant did not want to be prohibited from lobbying Congress), was incorporated in Nevada and dissolved, effective November 22, 2006. (3/8/11 Tr. 52; 3/9/11 Tr. 202). The NORFED headquarters, also known as the NORFED Fulfillment Office, was in

reasonable inferences that can be drawn from the facts proven, *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982), the factual background is taken primarily from the evidence presented during the Government's case-in-chief.

Evansville, Indiana.[4] NORFED began producing currency in 1998. (3/8/11 Tr. 52). There were five primary coins issued and circulated by NORFED: in one dollar, five dollar, ten dollar, twenty dollar, and fifty dollar denominations.

All of the Liberty Dollar coins were minted at Sunshine Minting, Inc. ("Sunshine Mint") in Coeur d'Alene, Idaho.[5] (3/8/11 Tr. 40–41; 3/9/11 Tr. 150). The Defendant, through the entity, Shelter Systems, LLC ("Shelter Systems"), was responsible for production of the original Liberty medallion. On August 24, 1998, Shelter Systems entered into an "Exclusive Manufacturing and Warehouse Agreement" ("EMW Agreement") with Sunshine Mint.[6] (Government Exh. F-60). The EMW Agreement contemplated that Shelter Systems would purchase specifically minted silver pieces (or "Liberty Silver") from Sunshine Mint at a favorable price for resale to the general public in the form of a paper certificate entitled "American Liberty Currency" (or "Liberty Certificates"). (EMW Agreement, 1). Sunshine Mint agreed to warehouse the silver and then mint a troy ounce .999 fine silver as "Liberty Silver" for each Liberty Certificate sold / issued. (EMW Agreement, 1). Sunshine Mint further agreed to issue the paper Liberty Certificate along with a Warehouse Receipt for each Liberty Silver it manufactured. (EMW Agreement, 1). The minted Liberty Silver coins were then to remain in the Sunshine Mint Warehouse pending further notice from Shelter Systems. (EMW Agreement, ¶6). This mechanism for the Liberty Dollar coin-minting enterprise remained intact throughout

---

[4] 225 North Stockwell Road, Evansville, Indiana.

[5] The Sunshine Mint is a private company that mints commemorative coins and provides minting services for private companies. (3/10/11 Tr. 338).

[6] Although the 1998 EMW Agreement was admitted into evidence during the adjudication phase of the trial, there was little evidence, if any, about the Shelter Systems entity and the original Liberty medallion.

the conspiracy period, although Defendant von Nothaus utilized multiple corporate entities (collectively, the "Liberty Dollar Organization") ("LDO") to conduct his operation.[7]

Defendant structured his Liberty Dollar Organization by relying on Regional Currency Officers ("RCOs") to distribute the Liberty Dollar coins across their respective regions to Liberty Dollar Associates ("LDAs"), who purchased the coins at a discounted rate. (3/8/11 Tr. 33−34, 54, 83−86, 97−99; Gvmt Exh. 29). Liberty Dollar Associates were then to insert the Liberty Dollar coins into the economy. Id. There was a $250 fee for LDO membership and $100 remittances for referrals for someone identified as the person responsible for a new recruit or member.

Defendant educated the Liberty Dollar Organization membership by conducting Liberty Dollar University events ("LDUs") hosted by RCOs. Defendant was the primary LDU instructor and physically present throughout. Video recordings of Liberty Dollar University seminars, as well as a variety of different print media, were introduced into evidence by the Government showing Defendant's practice tips on how to actually present the Liberty Dollar coins or "Do the Drop" "by literally dropping it[Liberty Dollar] into [a person's] hands from about three inches above their palm." (Government Exh. 25B−1, 25C, 25E, 25H; 3/8/11 Tr. 103−06, 120−21). One rationale for the "Do the Drop" method of presentation was to allow the merchant to feel the weight of the Liberty Dollar. (3/8/11 Tr. 77; 3/9/11 Tr. 103−04; Doc. 197, 26). In one instance, Defendant is shown on the training video approaching an individual and presenting the Liberty

---

[7] The entities include: NORFED, Liberty Services, Liberty Numismatics, and Shelter Systems. (3/8/11 Tr. 53). There is also evidence that von Nothaus used the name of his Hawaiian business, The Royal Hawaaian Mint, in the operation of the Liberty Dollar enterprise beyond the existence and operation of The Royal Hawaaian Mint. (4/4/11 Tr. 11−12). The Government appears to concede that Defendant von Nothaus and The Royal Hawaaian Mint may have originally had "noncriminal beginnings in Hawaii before 1998 . . . ." (4/4/11 Tr. 18).

Dollar coin by representing, "This is the new $10 silver."  (Government Exh. 25C−1; 3/8/11 Tr. 120−21).

Special FBI Agent Karen Walsh ("Walsh"), acting undercover as "Kristen Wallace," posed as a Liberty Dollar Associate in 2005 − 2006 while living in Asheville, North Carolina. (3/8/11 Tr. 23).  Walsh attended her first Liberty Dollar University event ("LDU 7") held in Asheville, North Carolina, October 19 through October 22, 2005.  During the October 2005 LDU 7, Defendant's "New RCO Strategy" was featured.  (Government Exh. 21).   The new strategy represented a shift from the organization's initial focus on having the consumer offer the Liberty Dollar to merchants to having the merchant either offer the Liberty Dollar to the consumer when making change or mixing the Liberty Dollar in with U.S. currency).  (3/8/11 Tr. 117−18).   Agent Walsh attended a second Liberty Dollar University seminar ("LDU 11") held in Skokie, Illinois, in October 2006 where she had occasion to speak directly with, and even train with Defendant in a small group setting. (3/9/11 Tr. 165−66, 171−73).  (Government Exh. 14, 15).

According to the Government, Defendant von Nothaus and his fellow Liberty Dollar Organization members made money on each transaction.  (3/8/11 Tr. 54, 106−11; 3/9/11 Tr. 245).  Walsh testified that when distribution of a given value of Liberty Dollar coin was no longer profitable for the organization, Defendant collected the existing coins (always the same 1 troy ounce silver coins) and had them reminted at a higher face value.  (3/8/11 Tr. 110−11; 3/9/11 Tr. 205).   This procedure was called the "move-up."[8]

---

[8] Agent Walsh testified:

"The Liberty Dollar structure was based on the moving average of the spot price of silver. So when the 30-day moving average of the spot price of silver was a certain level . . . if that spot price was less than $8, then . . . the Liberty Dollar was minted with $10 on the front of it. But once that average went over $8, it was minted with $20 on the front of it."

In 2006, the FBI and the U.S. Department of Justice contacted Daniel Shaver, Chief Counsel for the U.S. Mint, for his input concerning the lawfulness of the Liberty Dollar Organization's activities. (3/9/11 Tr. 261). On September 14, 2006, the U.S. Mint posted an advisory to consumers regarding the Liberty Dollar medallions on its website entitled "Consumer Awareness – Hot Items" with the caption or headline, "Liberty Dollars Not Legal Tender, United States Mint Warns Consumers, *Prosecutors with Justice Department Determine Use of Liberty Dollar Medallions as Circulating Money is a Crime.*"[9] (Doc. 114-21 / Defendant's Motion To Dismiss) (italics in original). The consumer advisory received national attention in the press and was also sent to each of the Liberty Dollar Organization Regional Currency Officers and the Defendant via certified mail to make clear that the U.S. Department of Justice viewed the activities of the Liberty Dollar Organization as unlawful. (Government Exhs. 47, 48; 3/9/11 Tr.

---

(3/9/11 Tr. 151). The Defendant was responsible for determining the price point or when to remint and move-up to a greater face value. (3/9/11 Tr. 155–56). Agent Walsh testified about the events leading up to the move from a $10 silver base Liberty Dollar to a $20 silver base in November 2005. (Government Exhs. 30–32).

[9] The consumer advisory, further discussed, *infra*, which was not admitted into evidence, read in

part:

> The United States Mint urges consumers considering the purchase or use of "Liberty Dollar" medallions, marketed by the National Organization for the Repeal of the Federal Reserve Act and the Internal Revenue Code (NORFED), to be aware that they are not genuine United States Mint bullion coins, and not legal tender. These medallions are privately produced products that are neither backed by, nor affiliated with, the United States Government. Prosecutors with the Department of Justice have determined that the use of these gold and silver NORFED "Liberty Dollar" medallions as circulating money is a Federal crime.

(3/8/11 Tr. 34–35; 3/9/11 Tr. 261–63). The advisory stated that according to NORFED, "more than $20 million dollars worth of Liberty Dollar coins and notes are in circulation." Id. The advisory warned that advertisements for the Liberty Dollar might be confusing, that advertisements refer to the product as "real money" and "currency," and then described certain similarities in the appearance of the Liberty Dollar and genuine U.S. currency. Id.

252–61, 263–64). The Liberty Dollar Organization continued to operate notwithstanding the consumer advisory.

In March 2007, a second undercover FBI Agent, Julia Mueller ("Mueller"), posed as an Asheville business owner named "Julie Mills" to team up with Agent Walsh. (3/8/11 Tr. 38–40; 3/9/11 Tr. 183, 299). Agent Walsh scheduled a meeting with William Kevin Innes ("Innes"), the Regional Currency Officer (and former co-defendant) in Asheville, to provide Innes an opportunity to sell Mueller on the Liberty Dollar Organization. (3/8/11 Tr. 38; 3/9/11 Tr. 183–84). On or around March 28, 2007, the two undercover agents met with Innes. (3/9/11 Tr. 184, 300, 302). This meeting was recorded by Agents Walsh and Mueller.[10] (Government Exh. 16).

At trial, the Government's theory of the case was *"making money making change."* Agent Walsh testified that as a Liberty Dollar Associate, she was trained via the Liberty Dollar Organization to pitch the Liberty Dollar coins to merchants as a means for "making money by making change" for consumers with the Liberty Dollar as opposed to ordinary U.S. currency or legal tender. (Government Exhs. 19–25). The Welcome Packet included a book entitled, *The Liberty Dollar Solution*; Chapter 58 was titled, "Making Money – Making Change." (3/9/11 Tr. 242–44; Government Exh. 25A).

The Government produced evidence during its case-in-chief that Liberty Dollar training materials *[dated as early as 2006 and as late as 2007]* expressly state that associates are *not* to "attempt to educate people about money when using Liberty Dollars." (3/8/11 Tr. 121–22).

---

[10] Both agents made an audio recording. A video recording of the meeting was made as well. (Government Exhs. 16A, 16B).

Special FBI Agent Andrew F. Romagnuolo ("Romagnuolo") explained that the FBI's concern was not the merchants voluntarily accepting the Liberty Dollar coin, but rather the folks receiving Liberty Dollar coins without being educated about the coin and its actual value:

> "The problem occurs when these coins that they're distributing in currency leave the pyramid of the people who are educated about the Liberty Dollar Organization and they distribute them by making change with no further information to unsuspecting people in those businesses. They could end up with a 10, 20 or even 50 dollar coin that's worth half, or in some cases less than what the coin is marked as."

(3/8/11 Tr. 34; 60, 75–76).

Although Defendant admits to most of the facts alleged, namely, that he designed, minted, marketed, sold, and used the Liberty Dollar coins in commerce, Defendant disputes that his purpose or intent was unlawful. The Defendant maintains that his purpose and intent was, and always has been, to promote use of a "local currency" or "private barter currency" and to repeal the Federal Reserve Act as opposed to attempting to compete with U.S. currency.[11]

The jury verdict reflects that the fact finders accepted the Government's evidence and theory.[12]

---

[11] Special FBI Agent Andrew F. Romagnuolo explained that a "local currency" or "private barter currency" is "something where a trade occurs" and "could be as simple a barter as trading a chicken for chopping a cord of wood." (3/8/11 Tr. 67–68). Agent Romagnuolo was familiar with a local currency used in Ithaca, New York, called the "Ithaca Hours." (3/8/11 Tr. 68). The "Ithaca Hours" community issued certificates with a designated hour and worth that could be used for trading. Id. According to Agent Romagnuolo, the only legal requirement for the Ithaca Hours was that individuals report whatever is gained to the Internal Revenue Service. Id.

[12] The Verdict Form was largely a general verdict. (Doc. 191). For Counts One (§ 371 conspiracy) and Three (§ 486), the jury was simply asked to select either "Guilty" or "Not Guilty." For Count Two (§ 485), which contemplated conviction on one of two possible avenues of proof, or both, if the jury found Defendant "Guilty" on that offense, the jury was asked to answer additional questions and indicate whether their verdict was unanimous as to one or both of the avenues of proof specified. The first avenue of proof under § 485 was described as "Making Counterfeit Coins" and the second avenue of proof was called "Passing / Uttering Counterfeit Coins With Intent To Defraud." The jury indicated it based its Count Two conviction on both avenues of proof.

### III.    PROCEDURAL MATTERS

First, the Court will, in its discretion, consider the arguments raised by Gold's amicus brief.[13] (Doc. 212).  The Government contends that certain amicus arguments should not be entertained.  According to the United States, the constitutional challenges advanced by the amicus party are not properly before this Court because they were not raised by defense counsel at trial.  The Government correctly states that defense counsel did not assert <u>during</u> <u>trial</u> that the portion of Section 486 that criminalizes the making, uttering, or passing of coins "of original design" intended for use as current money was unconstitutional.  However, within his pretrial "Motion to Dismiss Challenging the Sufficiency of the Indictment to State an Offense," Defendant von Nothaus argued that 18 U.S.C. § 486 should not be construed to prohibit the issuance of private currency.  Defendant made an argument that the Constitutional power of coinage should not be construed or applied so as to restrict the individual person as opposed to another sovereign.  (Doc. 114, 5, 8−9).  According to Defendant, "the Constitution places restrictions only on States and on the Federal government, not on individuals, so any "monopoly" given to the Federal government would be simply a prohibition on the powers of States, not of individuals."  (Doc. 114, 8−9).  Because Defendant raised this issue within his Motion to Dismiss, and brought up similar theories, albeit less articulately, throughout the proceedings, the Government had ample notice and opportunity to respond to the issues raised. Gold's Amicus Curiae brief is <u>allowed</u>.

---

[13]  Amicus sums up its filing as a motion for reconsideration of Defendant's pretrial motion to dismiss the indictment.  (Doc. 217 / Amicus Reply,  4) ("In reality, *amicus* is urging this Court to reconsider Defendant's Motion to Dismiss, having marshaled additional support for Defendant's constitutional claims.")

Next, the Court considers the more recent submission of the Defendant, filed on his behalf by new counsel. The Government objects to Defendant's "Supplemental Memorandum" on timeliness grounds as well as substantive grounds. Defendant posits that the supplement is filed for the purpose of "clarifying and developing" the legal arguments presented in Defendant's initial filing. As an initial matter, the Court agrees that it is improper to file an untimely "supplement" advancing new arguments and seek to "relate back" to the timely filings. *See generally, United States v. Holt*, 170 F.3d 698, 702-03 (7th Cir. 1999) (describing such a practice as an attempt to create a "back door" for additional support and undermining the express language of Rule 33). However, based upon the Court's reading, Defendant's supplement does not introduce any new substantive legal argument. In his supplement, Defendant proffers written statements of individuals who provided testimony for the defense at trial. For instance, Mr. Harrison, Mr. Pitagora, Mr. Burk, and Mr. Pratt, each of whom testified at trial, now also submit sworn statements in support of Defendant's post-trial motions. (Def.'s Suppl., Exhs. A, B, H, L). Much of what is provided could be characterized as either improper lay opinion or character evidence. *See* Fed. R. Evid. 404(a) and 702. Several of the proffered statements fault trial counsel for failing to call specific individuals as witnesses on Defendant's behalf and insist that the outcome of the trial would have been different had a given declarant been allowed to testify (or in some cases if a witness had been permitted to offer testimony on additional subject matter).[14] (Def.'s Suppl. Exhs. B, C, E, H, J–M). Because the undersigned views Defendant's

---

[14] The Government's response correctly states that any ineffective assistance of counsel claim, and information in support of such a claim, does not constitute "newly discovered evidence" for purposes of Rule 33. *See United States v. Smith*, 62 F.3d 641, 648 (4th Cir. 1995). Given the posture of the case, Defendant's avenue for prosecuting an ineffective assistance of counsel claim is under 28 U.S.C. § 2255. *Smith*, 62 F.3d at 650-51 (setting forth the "proper means for advancing ineffective assistance claims" and the limited circumstances for adjudicating an ineffective assistance claim on direct appeal).

"Supplemental Memorandum" as largely cumulative, and not indicative of any different result, the memoranda and attachments have been considered notwithstanding the Government's opposition.

In fact, many of Defendant's post-conviction arguments are more appropriate for consideration at sentencing.  *See* 18 U.S.C. § 3553(a) (identifying factors to be considered in imposing a sentence).

## IV.    STATUTES

The alleged objects of the 18 U.S.C. § 371 conspiracy charged in **Count One** are set forth within 18 U.S.C. §§ 485, 486, and 2.[15]  **Section 485** has two avenues of proof and reads:

> "Whoever falsely makes, forges, or counterfeits any coin ... in resemblance or similitude of any coin of a denomination higher than 5 cents ... coined or stamped at any mint or assay office of the United States, ...or in actual use and circulation as money within the United States; or
> Whoever passes, utters, publishes, sells, possesses, ...any false, forged, or counterfeit coin ..., knowing the same to be false, forged, or counterfeit, with intent to defraud any body politic or corporate, or any person, or attempts the commission of any offense described in this paragraph –
> – shall be guilty of an offense against the United States.

18 U.S.C. § 485.  Therefore, the first avenue of proof under Section 485 contemplates a conviction for the acts of making, forging, or counterfeiting coins "in resemblance or similitude."  Id.  The second avenue of proof under Section 485 prohibits passing, uttering, publishing, selling, and possessing, and attempts to do the same.  Id.  This second prong of Section 485 likewise requires the subject matter to be either a "false, forged, or counterfeit coin" and adds an intent requirement – that the conduct be undertaken with intent to defraud.  Id.; *see also Curran v. Sanford*, 145 F.2d 229, 230

---

[15]  The conspiracy statute, 18 U.S.C. § 371, and the aiding and abetting statute, 18 U.S.C. § 2, are not germane to the post-conviction issues raised by Defendant and Amicus.

(5th Cir. 1944) (distinguishing between earlier versions of Sections 485 and 486 and holding that they define separate offenses).

**Section 486 reads:**

"Whoever, except as authorized by law, makes or utters or passes, or attempts to utter or pass, any coins of gold or silver or other metal, or alloys of metals, ***intended for use as current money***, whether in the resemblance of coins of the United States ..., or of original design ..."
— shall be guilty of an offense against the United States.

18 U.S.C. § 486 (emphasis added). Section 486 speaks to (and prohibits) the making, uttering, or passing coins of silver "intended for use as current money." Id. Two types of coins are addressed: coins "in the resemblance of coins of the United States"; and coins "of original design." Id.

## V.    DISCUSSION

Defendant appears to raise two primary categories of challenges to his conviction (and charging indictment). One, Defendant alleges that certain of the laws he was convicted under, 18 U.S.C. §§ 485 and 486, are unconstitutional *as applied* in this instance. Two, Defendant alleges that the evidence presented by the Government was insufficient, as a matter of law, to support any criminal intent (or counterfeit) finding given his good faith belief that his conduct and the LDO operation was lawful.

### A.

#### 1. Nature of Constitutional Arguments

The Defendant alleges that 18 U.S.C. §§ 485 and 486 are unconstitutional as applied in this instance.[16] More specifically, Defendant contends that this prosecution pursuant to §§ 485

_____

[16] "An as-applied challenge attacks the constitutionality of a statute "based on a developed factual record and the application of a statute to a specific person."" *Doe v. Virginia Dept. of State Police*, 713

and 486 infringes on the public's right to utilize private bartering systems and that it is not counterfeiting, and thus not illegal, to attempt to compete with the Federal Reserve. However, the Government did not contend at trial, and the Court does not find herein, that private barter systems are illegal.[17] In addition, as the Court understands Defendant's original as-applied challenge to application of 18 U.S.C. § 485, his constitutional argument is intertwined with his argument concerning lack of criminal intent, and is discussed within that context for that reason. The Court's constitutional analysis rightly focuses on Defendant's argument that Section 486 is unconstitutionally applied in his case, which is also the import of the Amicus papers.

With respect to Section 486, Defendant asserts that the Government put forth a trial theory (based upon indictment, evidence, and argument) contrary to law, namely, that an individual's competition with the Federal Reserve or U.S. currency − regardless of intent, or absent any element of deceitfulness − is not lawful. (Doc. 217 / Amicus Reply, 5−6). Relying on this premise, Defendant and Amicus suggest that, as a result, the jury's view of the case was irreparably skewed, in part by improper instruction on the law concerning Congressional power, such that all three counts of conviction were improper and must be vacated. At minimum,

---

F.3d 745, 762 (4th Cir. 2013) (quoting *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc)). "By contrast, a litigant asserting a facial challenge contends that a statute always operates in an unconstitutional manner." *Doe*, 713 F.3d at 762 (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

[17] Throughout this prosecution, the Court attempted to avoid a "mini-trial" on the flaws or weaknesses of the existing United States' monetary system and / or the propriety of private local barter alternatives. Instead, the Court strove to place only the *factual questions* attendant to the essential elements of the charged offenses before the jury. In the instant Memorandum and Order, the Court likewise declines to comment on any of the interested parties' characterizations of the underlying facts and prosecution of Defendant (*e.g.*, "a unique form of domestic terrorism," "a dangerous step on the path to tyranny," etc.).

Amicus argues Defendant is entitled to a new trial.  For the reasons explained herein, the Court is not persuaded.

Amicus urges the Court to construe Section 486 narrowly (<u>not</u> <u>literally</u>) to avoid any potential constitutional weakness − the weakness being that if construed literally, Congress has been permitted "to create a money monopoly, with full powers to outlaw any and all competing currencies . . . .").[18]  (Doc. 212 / Amicus Brf., 6).  Amicus asks the Court to "scrutinize carefully whether there actually exists any Constitutional predicate for the Government's assertion of the authority to criminalize an American citizen's effort to offer his fellow citizens an opportunity to participate voluntarily in the selection of the means of exchange in what remains of our free market economy."  (Doc. 212 / Amicus Brf., 16).  Amicus favors a policy recognizing the "inherent power and natural right of the People to ascribe value to certain metals, predominantly gold and silver, for consensual use as money or a medium of exchange."  (Doc. 212 / Amicus Brf., 21).

Thus, these post-conviction filings present a question as to the scope and extent of Congress's constitutional power to coin money and regulate its value − whether Congress, under the Constitution and by enactment of 18 U.S.C. § 486 and its prohibition of coins "intended for use as current money," has the power to coin money to the exclusion of all others, including individuals like Defendant von Nothaus.

## 2.  Constitutional Authority For Enactment Of 18 U.S.C. § 486

In Article I, Section 8, the United States Constitution specifies that Congress, within its enumerated powers, has the power to "coin money," "regulate [its] value," and to "provide for

---

[18]  Amicus states, "The Court's instruction on Count III tracked the literal words of section 486 . . . ."  (Doc. 212, 18).

the punishment of counterfeiting."  U.S. Const. Article I, Section 8.[19]  Congress also has the

power to pass any laws "necessary and proper" to achieve those ends that are specifically

enumerated.  *See* U.S. Const. Article I, Section 8, cl. 18.[20]  (3/9/11 Tr. 130–31).  Whether

characterized as an enumerated power or as "necessary and proper" to any of the enumerated

powers within Clauses 5 and 6, it is undisputed that Congress has the ability to enact

comprehensive laws concerning the coinage of money, the value of money, and counterfeiting.

*See Norman v. B & O R. Co.*, 294 U.S. 240, 302–04 (1935) (emphasizing "the broad and

comprehensive national authority over the subjects of revenue, finance, and currency"); *see also*

*United States v. Yeatts*, 639 F.2d 1186, 1190 (5th Cir.), *cert. denied*, 452 U.S. 964 (1981) (citing

U.S. Const. Art. I § 8, cl. 6 and cl. 18, rejecting constitutional challenge to conviction under 18

U.S.C. § 485 for counterfeiting of gold coins no longer in circulation as current coins; finding

"Congress had a rational basis for protecting the integrity of non-current gold United States

coins.").

   The Constitution does not expressly state within Article I, Section 8, clause 5 that the

Congressional power to coin money is "exclusive."  *See* U.S. Const. Art. I § 8, cl. 5.

Nonetheless, the exclusive power of Congress and the federal government can be reasonably

---

[19]  Article I, Section 8, Clauses 5–6 provide that the Congress shall have Power . . .

   "To coin Money, regulate the Value thereof, and of foreign Coin, and fix
   the Standard of Weights and Measures;

   To provide for the Punishment of counterfeiting the Securities and
   current Coin of the United States;"

U.S. Const. Art. I § 8, cl. 5, 6.

[20]  The Necessary and Proper Clause provides in part that Congress is authorized "to make all laws necessary and proper for carrying into execution the foregoing [enumerated] powers."  U.S. Const. Art. I § 8, cl. 18.

inferred from the fact that in Section 10 of Article 1, the Constitution expressly prohibits States from coining money.[21] *See* U.S. Const. Art. 1 § 10, cl. 1.

The Government's legal position that Congress has the constitutional power to enact laws to regulate matters of *commerce, finance, and money* finds significant support in our jurisprudence. (Doc. 201, 7–8, 12) (citing *Norman v. B & O R. Co.*, 294 U.S. 240 (1935); and *United States v. Marigold*, 50 U.S. 560 (1850)). *United States v. Marigold* stands for the proposition that the United States, through Congress, is tasked with regulating commerce via the power to coin money found within Article I, Section 8, clause 5 of the Constitution.[22] The Supreme Court described this power in terms of "the execution of an important trust invested by the Constitution . . . ." *Marigold*, 50 U.S. at 567. In *Marigold*, the Supreme Court explained in dictum:

> The power of coining money and of regulating its value was delegated to Congress by the Constitution for the very purpose, as assigned by the framers of that instrument, of creating and preserving the uniformity and purity of such a standard of value; and on account of the impossibility which was foreseen of[or] otherwise preventing the inequalities and the confusion necessarily incident to different views of policy, which in different communities would be brought to bear on this subject. The power to coin money thus given to Congress, founded

---

[21] Article I, Section 10 prohibits individual States from coining money.

> **No State shall** enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; **coin Money**; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

[22] *Marigold* concerned the measures Congress could legitimately take to that end, specifically, whether Congress could enact laws designed to punish not only the "making" of counterfeit coins but also the "bringing into the United States" (importation) and "uttering, publishing, passing, and selling" of counterfeit coins. *Marigold*, 50 U.S. at 566. The Supreme Court found that Congress, in fact, possessed the constitutional power necessary to prohibit both types of conduct through the enactment of new criminal statutes. *Id*. at 570.

on public necessity, it must carry with it the correlative power of protecting the
creature and object of that power.

*Marigold*, 50 U.S. at 567.  Therefore, in the mid-1800's, *Marigold* anticipated that without the

power to maintain uniformity and the value of a national money, different views of policy

stemming from different communities might threaten to undermine a "constitutional currency."[23]

*Id*. at 567−68.  Indeed, to hold otherwise would deny Congress the power to protect the value of

federally issued currency, a currency backed by the United States.

Some years later, the Supreme Court weighed in again concerning the constitutional

authority granted to Congress in this area.  *Norman v. B & O R. Co.*, 294 U.S. 240, 302−04

(1935).  In relation to currency, and express congressional powers, the Supreme Court stated in

*Norman* that "the source of [Congressional] authority was in all the related powers conferred

upon the Congress and appropriate to achieve 'the great objects for which the government was

framed' −'a national government, with sovereign powers.'" *Norman*, 294 U.S. at 302−04

(quoting *McCulloch v. Maryland*, 17 U.S. 316, 4 Wheat. 316, 404−407 (1819); citing *Knox v.*

*Lee (Legal Tender Cases)*, 12 Wall. 457, 545 (1870)) (other internal citations omitted). *Norman*

provides insight as to what types of laws could be "necessary and proper" to Article I, Section 8:

> The Constitution 'was designed to provide the same currency, having a
> uniform legal value in all the States.' It was for that reason that the power to
> regulate the value of money was conferred upon the federal government, while
> the same power, as well as the power to emit bills of credit, was withdrawn from
> the states. The states cannot declare what shall be money, or regulate its value.
> Whatever power there is over the currency is vested in the Congress. . . . [T]he
> Congress is empowered 'to issue the obligations of the United States in such
> form, and to impress upon them such qualities as currency for the purchase of

---

[23] Amicus contends that individual persons, unlike a sovereign, are not capable of introducing or
mandating a competing "legal tender" and therefore present less of a threat to a uniform national
monetary system.  (Doc. 212 / Amicus Brf., 21−22).

merchandise and the payment of debts, as accord with the usage of sovereign governments.' The authority to impose requirements of uniformity and parity is an essential feature of this control of the currency. The Congress is authorized to provide 'a sound and uniform currency for the country,' and to 'secure the benefit of it to the people by appropriate legislation.'

*Norman*, 294 U.S. at 303−04 (internal citations and quotation marks omitted).  Both *Norman* and

*Marigold* place a premium on the ability of Congress to promote a uniform "constitutional

currency."  The undersigned turns now to cases applying 18 U.S.C. § 486.

Cases dealing with the enforcement of Section 486 are scarce, yet there is authority for

the proposition that the predecessor statute to Section 486 was, in fact, aimed at prohibiting

competition with U.S. currency.  In *United States v. Gellman*, which is not controlling, another

federal district court interpreted an earlier version of § 486 in a manner consistent with the

Government's legal position in the instant case.[24]  44 F.Supp. 360 (D.C. Minn. 1942); *see also*

*United States v. Falvey*, 676 F.2d 871, 876 (1st Cir. 1982).  That is, the *Gellman* court was of the

view that a coin of original design could support a § 486 conviction if intended for an improper

---

[24]  The earlier version of the statute, then identified as 18 U.S.C. § 281, read as follows:

> Making or uttering coins resembling money. Whoever, except as authorized by law, shall make or cause to be made, or shall utter or pass, or attempt to utter or pass, any coins of gold or silver or other metal, or alloys of metals, intended for the use and purpose of current money, whether in the resemblance of coins of the United States or of foreign countries, or of original design, shall be fined not more than $3,000, or imprisoned not more than five years, or both.

18 U.S.C. § 281 (repealed 1996).  Section 281 required that the coins be "intended for the use and purpose of current money" and encompassed coins in resemblance to genuine U.S. coins as well as coins "of original design."  Id.  As explained by the First Circuit, "Section 486 may be traced back substantially unchanged through a 1909 codification . . . and an 1873 codification . . . to its enactment in 1864. . . ."  *Falvey*, 676 F.2d at 876 (internal citations omitted).

use.[25]  *See Gellman,* 44 F.Supp. at 363−64 (applying tests for determination of "counterfeit" and concept of "resemblance" cited in *Bogart* and *Hopkins, supra*); *see also Curran v. Sanford*, 145 F.2d 229, 230 (5th Cir. 1944) (predecessor statute to § 486 recognized as applying to coins "intended for the use and purpose of current money" regardless of whether the coins are similar to domestic coins in the United States or are of original design).   According to *Gellman,*

> A reading of [§ 281] induces the view that [§ 281 was] ***primarily adopted to prevent the coining of money in competition with the United States***; ***resemblance or similitude is not necessarily an element***. The United States has the sole power to coin money under the Constitution, and if anyone, ***individual or State***, assumes to supplant the medium of exchange adopted by our Government, or assumes to compete with the United States Government in this regard, a violation of these statutes would follow. Undoubtedly, no one can interfere with the monopoly which this Government has obtained by reason of the Constitutional provisions without running afoul of these statutes. If one manufactures a coin, a five cent piece, for instance, in an oblong shape, and although much larger than a genuine five cent piece, for the purpose of circulation as money within any area of the United States, a violation would occur. But the intendment must be that the coin shall be 'for the use and purpose of current money' under Section 281 . . .

*Gellman,* 44 F.Supp. at 364 (emphases added); *see also Falvey*, 676 F.2d at 876 (same). Thus, *Gellman* assumed the existence of a government monopoly and opined that the United States had the "sole power to coin money under the Constitution." *Id*. As explained in *Gellman*, a violation of the statute would occur if either an *individual* or a State attempted "to supplant the medium of exchange adopted by [the] Government" or otherwise "compete with the United States Government in this regard." *Id*.

The Government cites *Gellman* for the proposition that individuals are likewise prohibited from competing with the United States currency while Defendant and Amicus

---

[25]  The facts in *Gellman* are readily distinguishable.  The tokens had inscriptions stating "No Cash Value" and "For Amusement Purposes Only."  *Gellman*, 44 F.Supp. at 364.  In addition, the *Gellman* tokens were made to be inserted into various types of vending machines as opposed to being passed to individuals as current money.  *Id*. at 362−63.

question application to the individual as opposed to another sovereign. [26] Whether the rationale

set forth in *Gellman* is adopted or not, the Court finds that under the construction of Section 486

applied here, contemplating that if a coin is intended for use as current money then there is

necessarily a deceptive quality about its design, Defendant's conviction on Count Three must be

upheld.

For the reasons set forth herein, the undersigned is of the opinion, and this Court so finds

as a matter of law, that Congress indeed possesses the power to criminalize an individual's

minting of coinage, whether in resemblance of U.S. coins or of original design, that is intended

for use as current money.[27]

### 3. Statutory Construction of 18 U.S.C. § 486

"Our first step in interpreting a statute is to determine whether the language at issue has a

plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v.

Shell Oil Co.*, 519 U.S. 337, 340 (1997). "Our determination of whether a statute is ambiguous

is guided "by reference to the language itself, the specific context in which that language is used,

and the broader context of the statute as a whole."" *In re Coleman*, 426 F.3d 719, 725 (4th Cir.

2005) (quoting *Robinson*, 519 U.S. at 341.); *see also William v. Gonzales*, 499 F.3d 329, 333 n. 4

(4th Cir. 2007) (ambiguity depends upon "whether the statute's text, on its face, is reasonably

---

[26] In light of the Court's construction of § 486, the undersigned does not consider reconciliation
of Article I, Section 8, clause 5 and the express prohibition that States not coin money within Article
I, Section 10 dispositive of the legal issues presented.

[27] Alternatively, if it is subsequently determined that § 486 is unconstitutional as applied to this
Defendant, the Court also hereby finds, as a matter of law, that the convictions for Counts One and Two
stand firm.

susceptible to multiple meanings"). "If the language is plain and the statutory scheme is coherent and consistent, we need not inquire further." *In re Coleman*, 426 F.3d at 725 (quoting *United States v. Ron Pair Enters.*, 489 U.S. 235, 240–41 (1989) (internal quotation marks omitted)); *see also Yeatts*, 639 F.2d at 1189 ("A statute should ordinarily be interpreted according to its plain language, unless a clear contrary legislative intention is shown.") (internal citation omitted). "In that situation, "the sole function of the courts is to enforce [the statute] according to its terms."" *Id*. (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917) (alteration in original)).

The Court finds that Section 486 means exactly what it says, and that the language within Section 486 is, in fact, plain and unambiguous, with the possible exception of the phrase "intended for use as current money."  To the extent deemed ambiguous, the Court construes the phrase "intended for use as current money" consistent with its "ordinary and plain meaning." *See e.g.*, *Yeatts*, 639 F.2d at 1189 ("A basic canon of statutory construction is that words should be interpreted as taking their ordinary and plain meaning.") (internal citation omitted). "Current money" is defined by Black's Law Dictionary as "money that circulates throughout a country; currency."  BLACK'S LAW DICTIONARY 1021 (7th ed. 1999).  Commonly understood definitions of related terms such as "money," "currency," and "legal tender" all refer to *United States-approved money*.[28]  Applying plain meaning to the terms themselves, and considering

---

[28] "Legal tender" is defined by statute as "United States coins and currency (including Federal Reserve notes of Federal Reserve banks and national banks) are legal tender for all debts, public charges, taxes and dues.  Foreign gold or silver coins are not legal tender for debts."  31 U.S.C. § 5103.  In a broader context, "legal tender" refers to the money (bills and coins) *approved in a country* for the payment of debts, the purchase of goods, and other exchanges for value.

"Current money" means the *currency of the country*; whatever is intended to and does actually circulate as currency, every species of coin or currency.  The term "current" describes money which passes from hand to hand, from person to person, and circulates through the community and is generally received.  Money is current which is received as money in the common business transaction and is the common medium in barter and trade. "Money" is defined as something generally accepted as a medium of exchange, a measure of value, or a means of payment; a form or denomination of coin or paper money.

that the thrust of § 486 is to penalize competition with U.S. currency, Section 486 is not meant to be applied unless actual U.S. currency is being competed with. *See United States v. Falvey*, 676 F.2d 871, 876 (1st Cir. 1982) ("[W]e believe that Congress intended the statute only to reach coins intended for use as currency money in the United States."); *see also United States v. Gertz*, 249 F.2d 662, 668 (9th Cir. 1957). The *Falvey* court explained that its construction of § 486 accounted for the lack of an express intent to defraud element, was "buttressed by the "except as authorized by law" proviso, which in context seems to refer to the possibility that some entity other than the federal government might be permitted by law to issue and use *unofficial coinage*," and also comport with the principal requiring narrow construction of criminal statutes. *Falvey*, 676 F.2d at 876−77 (citing *Perrin v. United States*, 444 U.S. 37, 49 n. 12 (1979)). The Court interprets Section 486 such that the scope of the statute is limited to coins intended for use as United States-approved or backed money.

Defendant contends that in order to be "current," the U.S. money with which the Liberty Dollar is accused of seeking to compete must be genuine items of U.S. currency presently in circulation and of the same denomination. (3/10/11 Tr. 400−401). According to the defense, because the United States does not mint silver coins in denominations of $5, $10, $20, and $50, the values of the accused Liberty Dollar pieces, the conviction under § 486 must be vacated. The undersigned declines to construe the phrase "intended for use as current money" as narrowly as the defense proposes. At least one circuit court has held that the purported counterfeit United States coins need not be negotiable to violate the companion to Section 486, Section 485. *See*

---

A "coin" may be defined as a piece of gold, silver or other metal, fashioned into a prescribed shape and stamped, *by authority of the government*, with certain marks and devices and put into circulation as money at a fixed value. A coin is money.
The Court provided definitions for all of these terms to the jury. (3/17/11 Tr. 1080−81).

*e.g., United States v. Cardillo*, 708 F.2d 29, 30 (1st Cir. 1983) (rationale in *Falvey* does not apply to United States coins; court assumed $20 gold coins were non-negotiable and rejected defense argument that non-negotiable coins could not support § 485 conviction); *but see United States v. Yeatts*, 639 F.2d 1186, 1189 (5th Cir. 1981) (in *dictum* contrasting §§ 485 and 486, stating that § 486 offense qualifies application to "current money" or "coins in actual use and circulation as money within the United States, or to legal tender"). To adopt Defendant's construction, the Court would have to disregard the term's statutory context, namely, that the statute contemplates that "any" coin "intended for use as current money" could violate § 486, and likewise that a violation of § 486 could be had whether that coin is of resemblance or of original design. If § 486 only applied to coins of exact denominations of existing U.S. currency, the "of original design" provision would be rendered meaningless. Rather, it is the view of this Court that the phrase "intended for use as current money" speaks to the requisite statutory *intent* for conviction under § 486. The Liberty Dollar can be "intended for use as current money" even if the specific coin denominations are different.

The Court further holds as a matter of law that if a coin is "intended for use as current money" for purposes of § 486, then there must necessarily be a deceptive quality about its design. The few cases that apply or comment on § 486 teach that a coin does not fall within the scope of the statute unless this is so. *See e.g., Gellman,* 44 F.Supp. at 364; *see also Gertz*, 249 F.2d at 668 (applying 18 U.S.C. § 489, but pointing out correlation between similitude, use as current money, and fraudulent intent under § 486; discussing fraudulent intent in connection with practice of making change with a coin in the likeness or similitude of a genuine coin). This construction is consistent with our early jurisprudence concerning the essentials of counterfeiting. *See e.g., United States v. Bogart*, 24 F.Cas. 1185, 1185−86 (D.C.N.Y. 1878)

("One of the rules applicable to the offence[offense] of counterfeiting is, that the resemblance of the spurious to the genuine coin must be such as that it might deceive a person using ordinary caution, and a conviction cannot be had for uttering pieces of metal which are not in the likeness or similitude of genuine coins."); *United States v. Hopkins*, 26 F. 443, 445 (W.D.N.C. 1885) ("The highly penal laws in regard to the passing of counterfeit money were designed to secure against fraud and deception, not only experienced and cautious traders, but also poor and ignorant persons who seldom handle money, and have acquired no skill in detecting spurious coin. Statutes intended to remedy some existing mischief should be so construed and enforced as to render the remedy effectual, unless such construction and enforcement violate some fundamental principle of law.")

Moreover, the Court observes that if a coin is "intended for use as current money" for purposes of § 486, the coin is not being used as a means of private barter. Section 486 requires that Defendant seek to use the coins in a certain way – with the intent to deceive someone into thinking your coin or money is backed by the United States Government.[29]  In other words, the difference between a private barter system and counterfeiting is intent.  Much of the Defendant's "supplemental" evidence speaks to the legality of the private trading of an alternative currency and assumes use of the Liberty Dollar within a private barter system context.  However, this is not the context of Defendant's Liberty Dollar use shown in the Government's case-in-chief. (Doc. 201, 9–11) (summarizing evidence of deceptive techniques employed by the Defendant and the LDO).  The evidence at trial was starkly different than what Agent Romagnuolo described in connection with the "Ithaca Hours" and markedly different than the uses for tokens

---

[29]  This seems to fix any constitutional issues, as items exchanged as private barter such as tokens for amusement parks, or a private voluntary local currency, aren't intended for use as current money.

discussed in cases where the tokens were held not to come within the purview of § 486. (3/8/11 Tr. 72–73) (Agent Romagnuolo contrasting private barter / local currency with Liberty Dollar – fixed denomination coins).  Consider and contrast the evidence at trial, including the "Do the Drop" method of introduction, with the statement of Jason Pratt, Liberty Dollar Regional Currency Officer ("RCO") in Texas, concerning his use and presentation of Liberty Dollar.  Pratt provided his business card (complete with name, phone number, email address and a 10-point explanation of the Liberty Dollar) whenever he used a Liberty Dollar such that there could be no legitimate claim of fraud.  (Def.'s Suppl. Exh. L).  The jury saw a video recording of Defendant von Nothaus representing to a merchant that the Liberty Dollar is "the new $10 silver." (Government Exh. 25C-1; 3/8/11 Tr. 120–21).

In short, the Court construes 18 U.S.C. § 486 such that, regardless of the nature of the subject coin (in resemblance or of original design), if a coin is "intended for use as current money" then there must necessarily be a deceptive quality about its design.  In other words, resemblance and original design, while capable of independent existence, are not necessarily mutually exclusive under a plain reading of the statute.  While Defendant disputes the characterization of the Liberty Dollar coins as "counterfeit," there is no disagreement that both the resemblance and original design criteria are met.

Finding that the statutes Defendant was convicted under are constitutional as applied to this Defendant, this aspect of Defendant's motion will be <u>denied</u>.   The Court now turns to Defendant's Motions under Rules 29, 33, and 34 of the Federal Rules of Criminal Procedure and various evidentiary challenges.

**B.**

**1.  Rule 29**

According to Rule 29 of the Federal Rules of Criminal Procedure, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction." The standard for reviewing the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Shaver*, 651 F.2d 236, 238 (4th Cir. 1981) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). The Court must consider both circumstantial and direct evidence, and give the government the benefits of all reasonable inferences that can be drawn from the facts proven. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir.1982). Reversal for insufficient evidence is reserved for the case "where the prosecution's failure is clear." *Burks v. United States*, 437 U.S. 1, 17 (1978).

### a. Requisite Criminal Intent

Defendant contends that his conviction must be vacated, as a matter of law, because there was insufficient evidence that Defendant possessed the requisite criminal intent; that good faith reliance on counsel was a "complete defense." (Def.'s Suppl. Mem., 5–7). According to Defendant, "the trial record is … replete with evidence that Mr. von Nothaus relied on counsel, corroborated by government-sourced opinions, informing the reasonable belief that he was not breaking the law." (Def.'s Suppl., 8).

### i. Sufficiency of Evidence Regarding Criminal Intent, 18 U.S.C. § 485 – Counts One and Two

With respect to 18 U.S.C. § 485, the verdict is supported by the weight of the evidence. A jury finding that Defendant relied in good faith upon the advice of counsel would have justified

or excused his conduct.[30]  The jury was instructed that good faith reliance on counsel was a complete defense to Count Two, and was also relevant to certain alleged objects of the conspiracy alleged in Count One.[31]  *See United States v. Miller*, 658 F.2d 235, 237 (4th Cir. 1981); *United States v. Polytarides*, 584 F.2d 1350, 1353 (4th Cir. 1978).

In support, Defendant von Nothaus points to the evidence demonstrating his purposeful association of counsel and his historical pursuit of legal advice concerning the activities of NORFED and the Liberty Dollar. Defendant argues that his "deeply held conviction that this country's monetary system is terribly flawed" became well known in the seventies. (Def.'s Suppl. Mem., 9).  Defendant, by way of protest of the Federal Reserve, advocated for a way to engage in commerce and not use the Federal Reserve System – enter the Liberty Dollar. According to the Defendant, his views were promoted, even broadcast, such that the

---

[30] The second avenue of proof under Section 485 (Count Two) – the offense of passing or uttering counterfeit coins with the intent to defraud – includes a specific intent element.  The first avenue of proof under Section 485 (Count One) – making counterfeit coins – does not.  Section 486 (Count Three) does not explicitly state that the accused must possess the intent to defraud but nonetheless requires that the accused intended the coins for use as "current money."

[31] The Good Faith Defense instruction read in its entirety:
    In your deliberations as to each count separately, you are instructed that the good faith of a defendant is a complete defense to any of the charges in the Bill of Indictment where it applies.
    For example, the good faith of a defendant is a complete defense to certain crimes alleged in Count One as the objects of the conspiracy as well as the second section of the substantive offense alleged within Count Two of the Bill of Indictment because **good faith on the part of a defendant is simply inconsistent with the intent to defraud**. The good faith defense is not a defense as to part one of Count Two, nor is it a defense to Count Three.
    A person who acts, or causes another person to act, on a belief or an opinion honestly held is not punishable under this statute merely because the belief or opinion turns out to be inaccurate, incorrect or wrong.  **An honest mistake in judgment or an error in management does not rise to the level of intent to defraud**. The second section of the counterfeiting statute is written to subject to criminal punishment only those people who knowingly defraud, attempt to defraud or knowingly obtain or attempt to obtain money or property by means of false or fraudulent pretenses, representations, or promises.

Government's allegation of fraud (or any deceit concerning Defendant's purpose in designing the Liberty Dollar) is incredible. On the surface, Defendant's argument appears well taken in the broadest philosophical context. The specifics in evidence in this case, considered *in toto*, overcome Defendant's contention.

For purposes of the jury's findings with respect to Counts One and Two, the second avenue of proof under Section 485 requires an intent to defraud.[32] 18 U.S.C. § 485. In fact, the jury in this case was instructed that "intent to defraud" means "to act knowingly and with the intention or the purpose to deceive or to cheat."[33] The jury was asked to consider the two avenues of proof under Section 485 separately and told that their verdict must be unanimous as to those special interrogatories. The concepts of "resemblance," "similitude," and "intent to defraud" were all defined.[34] The jury verdict found that conviction was proper under both of the avenues of proof under Section 485.

---

[32] During the final jury charge as to Count Two, the elements under the second avenue of proof [passing / uttering counterfeit coins with intent to defraud] were identified for the jury as follows:

1) Defendant passed, uttered, published, sold, or possessed any false, forged, or counterfeit coins;
2) Defendant did so knowing the coins to be false, forged or counterfeit; and
3) The Defendant did so with the intent to defraud; or
4) Defendant otherwise aided, abetted, counseled, commanded, induced, or procured the commission of this offense.

[33] The instruction explained further that:
An "intent to defraud" is accompanied, ordinarily, by a desire or with a purpose to bring about some gain or benefit to oneself or to some other person or by a desire or with a purpose to cause a loss to some person.
In this case the government is not required to prove that the United States, or anyone, was actually defrauded.

[34] The jury was told that "[t]he term "resemblance" means the quality or state of resembling; especially correspondence in appearance or superficial qualities; a point of likeness; similarity" and that "[t]he term "similitude" means a counterpart, double; a visible likeness; correspondence in kind or quality; a point of comparison." An additional instruction was given for the stated purpose of "explain[ing] the concept of resemblance" in the context of the case:

The Government points out that much of what Defendant proffers in support of his contention does not relate to the Liberty Dollar *coins* (and their passing or uttering) but instead pertains to Liberty Dollar *paper certificates backed by silver* and offered for sale to the general public. (Sulla Aff., ¶¶ 1, 3, 6). In addition, much of Defendant's evidentiary proffer (both at trial and within post-trial filings) does not relate to the relevant time period or the manner in which Defendant trained his cohorts to place the Liberty Dollar coins into the United States currency system.

"[A] fundamental rule of the jury system is that this court is bound by the credibility choices of the jury." *United States v. Lamarr*, 75 F.3d 964, 973 (4th Cir. 1996) (internal quotation marks omitted). Defendant can't complain because the jury didn't believe his witnesses, and believed the Government's witnesses.

### ii. Sufficiency of Evidence Regarding Counterfeit Status

The Government presented sufficient evidence to support the jury's finding concerning the counterfeit quality of the Liberty Dollar.

The Court recognizes the jury was not squarely asked to decide whether the Liberty Dollar was "counterfeit" as an essential element of the charged offenses.[35] However, in light of

---

"A counterfeit coin is one made in imitation of some genuine coin. **It is not necessary that the resemblance should be exact in all respects.** The resemblance is sufficient if the coins are so far alike that the counterfeit coin is calculated to deceive a person exercising ordinary caution and observation in the usual transactions of business, though the counterfeit would not deceive a person who was expert or has particular expertise in such matters."

[35] The jury's specific findings of fact in their verdict on Count Two (1st and 2nd avenues of proof) show this. The jury answered both special interrogatories affirmatively, finding unanimously that both of the statutory avenues of proof were proven by the Government beyond a reasonable doubt. The first avenue of proof was described as "Making Counterfeit Coins" and the second avenue of proof was described as "Passing / Uttering Counterfeit Coins With Intent To Defraud." (Doc. 191 / Verdict Form, ¶¶ II(1) and (2)).

the verdict on Counts One and Two, the jury in this case would have necessarily found that the

Liberty Dollar had a counterfeit nature (*e.g.*, the ability to deceive a person exercising ordinary

caution and observation in the usual transaction of business) by way of its finding that Defendant

had the specific intent to defraud.[36]

The jury heard testimony from Agent Romagnuolo about the counterfeit nature of the

Liberty Dollar coins and how the Liberty Dollar coins were not counterfeit in the traditional

sense – *not exact reproductions of genuine U.S. coinage*.  On cross-examination, Agent

Romagnuolo explained:

> "I think you're defining counterfeit under the traditional terms of an exact
> reproduction. Counterfeit can also be something similar that is used fraudulently
> to deceitfully mix in and that's what the defendant is doing. He's using something
> similar to United States coins to mix in current money, and that is counterfeit."

(3/8/11 Tr. 57).  The jury was told, as a matter of law, that a coin's "resemblance" does not have

to be exact in all respects to be found a "counterfeit."

In addition, Brian Silliman ("Silliman"), the government's expert witness and

professional numismatist with Numismatic Guaranty Corporation, was offered as an expert in the

"authentication, grading, counterfeit identification of coins, tokens, and medals."[37]  (3/10/11 Tr.

343−47).  Silliman first explained how tokens and medals or medallions differed from coins in

both appearance and purpose.  According to Silliman, a "token" is designed to be used in a

transaction with a particular merchant and typically has a merchant's name on one side, an

---

[36]  The jury's factual finding concerning "counterfeit" status was necessarily limited to the items
that were produced by the Government during the trial and admitted into evidence.  (Government Exh.
77A, 79).  The majority of the Liberty Dollar coins admitted into evidence were either $5, $10, or $20
silver pieces.

[37]  The term "numismatic" refers to the collecting or assigning value to coins.  (3/9/11 Tr. 142).

address, and what the merchant sells with a nominal denomination on the other side. (3/10/11 Tr. 350−51). (Government Exh. 78A − sample "good for" token with designated value in trade at a specific merchant). "Medals" or "medallions" are commemorative in nature, memorialize important persons, places or events, can be made of precious metals, have plain edges, and typically will not have a denomination. (3/10/11 Tr. 354−55) (Government Exh. 78A − medals commemorating former U.S. Presidents). Coins include a denomination, a date, and a legend or motto that identifies the coin as being from a given country of origin. (3/10/11 Tr. 356). According to Silliman, coins are issued by a government. Id.

The Government, through Silliman's testimony, also established similarities in appearance between United States currency and Liberty Dollars by comparing numerous points of similarity in the design of various Liberty Dollar coins with specific items of genuine U.S. coinage. (3/10/11 Tr. 355−68). The types of design elements considered in Silliman's comparison included: the modern depiction of the head of the Statue of Liberty as the central device (placement of portrait of Liberty on the obverse or front of coin), the date below the Liberty, the style of torches (and placement of torch on reverse or back of coin), the motto ("we trust God" versus "In God We Trust"), writing out the denomination ("DOLLAR") or use of the dollar sign ($), diameter, weight, reeded edges, the lettering ("Liberty" spelled out across the top of the coin), use of serif font, etc. (3/10/11 Tr. 355−68) (Government Exh. 78B). Silliman's additional findings were submitted in written form and admitted into evidence. (Government Exh. 77A). Silliman stated that his examination and comparison between Liberty Dollars and United States coins was exhaustive ("I hit every comparison point that I thought was relevant.") (3/10/11 Tr. 375).

In addition to the testimony about the similarities between the Liberty Dollar and genuine U.S. coinage, there was evidence of distinguishing features as well. Silliman was asked by defense counsel whether the U.S. Mint coined pieces of the same denomination as the Liberty Dollar pieces in evidence − $5, $10, $20, $50 Liberties. (3/10/11 Tr. 391, 393). Silliman could only recall production of a U.S. one-ounce $1 Silver Eagle coin. (3/10/11 Tr. 393). Defense counsel questioned Silliman about the statutorily required elements for U.S. coinage, 31 U.S.C. § 5112, and Silliman acknowledged that he could not recite all of the specifications because he did not specialize in modern coins. (3/10/11 Tr. 391, 393−97). *See* 31 U.S.C. § 5112 (2010) (detailing denominations, specifications and design of coins).

In addition, during cross-examination of Agent Walsh, defense counsel was able to elicit her agreement that inscriptions for the LDO website and 800-number were also visible on the Liberty Dollar. (3/9/11 Tr. 241−42). According to Agent Walsh, the website address and 800-number were "pretty small" whereas the Liberty, the face of the Statue of Liberty, the dollar sign, and the 20 were big. (3/9/11 Tr. 242, 248−49). The jury was also informed that Liberty Dollars had an inscription of "BVNH" to represent the name of the Defendant. (3/8/11 Tr. 76).

Whether the coins at issue were sufficiently similar to genuine U.S. currency was a question of fact properly submitted to the jury. *See e.g., United States v. Brunson*, 657 F.2d 110, 114 (7th Cir. 1981), *cert. denied*, 454 U.S. 1151 (1982); *see also United States v. Hopkins*, 26 F. 443, 444 (W.D.N.C. November 1885) (describing well-known characteristics of genuine silver half dollars coined in the mint of the United States). In *Hopkins*, the role of the jury as fact-finder was explained:

> The questions as to what is a sufficient similitude to deceive, and what is ordinary caution in receiving money, must in every trial be determined by a jury, who in their investigations should consider the circumstances attending the particular

transaction involved. Ordinary caution is such caution as is usually exercised by prudent men in the particular transactions in which they are engaged.

*Hopkins*, 26 F. at 444; *see also United States v. Senatore*, 509 F.Supp. 1108, 1110 (E.D.Pa. 1981) (for purposes of 18 U.S.C. § 485, "[w]hether the coins sold by the defendant to the government agent were too poor a likeness to defraud anyone was a question for the jury."). Defense counsel conceded as much in describing the counterfeit question as "the only legitimate issue for the jury." (Doc. 197, 12).

More importantly, the undersigned is confident that the jury was properly instructed as to the meaning of the term "counterfeit." The jury was instructed consistent with *United States v. Bogart:*

> A counterfeit coin is one made in imitation of some genuine coin. ***It is not necessary that the resemblance should be exact in all respects.*** The resemblance is sufficient if the coins are so far alike that the counterfeit coin is calculated to deceive a person exercising ordinary caution and observation in the usual transactions of business, though the counterfeit would not deceive a person who was expert or has particular expertise in such matters.

24 Fed. Cas. 1185, 1185−86 (N.D.N.Y. 1878); *Gellman*, 44 F.Supp. at 363 (referring to this standard for deeming a coin "counterfeit" as "the test which has been universally applied by the courts for almost a century"). The definition of "counterfeiting" within *Bogart* and cited by Amicus − the same definition Amicus describes as "the settled law of counterfeiting in this [Fourth] Circuit" − was read (nearly verbatim) to the von Nothaus jury. (3/17/11 Tr. 1071−72). (Doc. 217 / Amicus Reply, 6) (quoting *United States v. Ross*, 844 F.2d 187, 190 (4th Cir. 1988)). In sum, the jury was in a position to evaluate the specific and fine points of the Liberty Dollars in evidence, apply the counterfeit definition provided by the Court, and the instructions as a whole, and draw inferences about Defendant's intent.

Disputing the conviction under § 485 and arguing that there can be no "counterfeit" finding as a matter of law, Amicus and Defendant point the Court to an internal memorandum of position dated January 19, 2005 and drafted by Chief Counsel for the U.S. Treasury Department's Secret Service, John J. Kelleher ("Kelleher"), following an interoffice inquiry from the Charlotte Field Office concerning the Liberty Dollar and Title 18 of the United States Code. (Doc. 197 / Def.'s Exh. B – "Kelleher Memo").  At the outset, Kelleher asserts that Article I, Section 8, clause 5 delegating to Congress the power to coin money "was intended by the Framers to give the federal government a monopoly over the production of coinage."  (Id. at 1). The *Kelleher Memo* analyzed only the likelihood of violation under 18 U.S.C. § 486 and reads in pertinent part:

> It is our understanding that the Liberty Coins are not counterfeits of or in similitude to any official United States coins.  However, given that section 486 specifically applies to coins of original design, the Liberty Coins would likely be found to violate this aspect of section 486.
> The primary focus for courts interpreting and applying section 486 has been the phrase "intended for use as current money."  This focus results from the legislative history indicating that the primary concern of Congress, in enacting the predecessor to section 486, was the prohibition of private systems of coinage erected for use in competition with the official United States coinage"

(Doc. 212 / Amicus Brf., 18–19; Doc. 197 / Def.'s Exh. B). The Chief Counsel expressly deferred to the DOJ.  Id.  The *Kelleher Memo* was not admitted into evidence and was not before the jury.  The Court also notes that the standard for evaluating the counterfeit nature of an item (and the standard applied by this jury) relies upon the perspective of a person who is not an expert and does not possess any particular expertise in counterfeiting matters.  *See Bogart*, 24 Fed. Cas. at 1185–86.

Also underlying the convictions pursuant to § 485 is the jury's implicit finding that the Liberty Dollar is counterfeit despite its intrinsic value.  Undoubtedly, the intrinsic value of the

Liberty Dollar presents a unique twist on the instant non-traditional counterfeiting case.  As

Amicus points out, "typically counterfeiting consists of taking a comparatively worthless item,

and making it appear to be an item of worth."  (Doc. 212 / Amicus Brf., 27) (citing BLACK'S

LAW DICTIONARY definition for "counterfeit coin": altering a coin "so as to resemble or pass

for coin of a higher denomination").  The Liberty Dollar was marketed by Defendant as

"America's Inflation-Proof Currency."  (Gvmt Exhs. 37, 44; 3/8/11 Tr. 71–72; 3/9/11 Tr. 213,

217–18).  In light of the intrinsic value of the silver, depending on the denomination minted on

the coin, the Liberty Dollar could have more intrinsic value (not less) than genuine U.S.

currency.  (Doc. 217 / Amicus Reply, 12 n. 10); s*ee also* Seth Lipsky, ed., The Citizen's

Constitution:  An Annotated Guide, Rev'd Basic Books (2011), p. 58 ("Liberty Dollars far

outperformed the dollar issued by the federal government, a fact that . . .   could invite this

question:  Is something counterfeit when it has value that is equal or greater than the original?").

However, one weakness in Defendant's intrinsic value argument is that von Nothaus and his

organization were making money *(U.S. money)* off of their sales of the Liberty Dollar.  *See*

Superseding Indictment, Paragraphs 5,21,23,25,30 (explaining profit scheme and how each level

of Liberty Dollar members benefitted financially); (3/9/11 Tr. 244–45 / Government Exh. 25A,

302) (highlighting profitability of Liberty Dollar with up to 20% return on investment).   The

LDO, at Defendant's leading, was in a position, based upon the average spot price of silver, to

remint coins with the same quantity of silver at a higher face value to ensure a profit to the LDO.

More importantly, as borne out by the evidence, the intrinsic value of the Liberty Dollar is not

determinative of its counterfeit status given its use by the LDO.

### iii. Sufficiency of Evidence Regarding Criminal Intent, 18 U.S.C. § 486 – Counts One and Three

<u>With respect to 18 U.S.C. § 486</u>, there was sufficient evidence presented by the

Government that Defendant intended that the Liberty Dollar be used as "current money."[38]

There was evidence presented at trial that the sophistication of the Liberty Dollar, and the

similarities in appearance between the Liberty and genuine U.S. coins, were improved upon or

enhanced over time.  (3/10/11 Tr. 369).  There was also evidence that Defendant personally

encouraged Liberty Dollar Organization members to use the Liberty Dollar instead or in place of

U.S. currency.  Excerpts from written materials within Welcome Packet to Agent Walsh *signed

by Defendant* state:

> "Please take action: Now is the best time to join the free money movement as a
> Liberty associate and start getting your money at a discount and using it at a
> profit. For just $250, you will receive $100 in Liberty Dollars, and $100 for every
> Liberty associate you refer."
> ***
> "The simple truth is that there is a simple solution: Stop using their money. Start
> using the Liberty Dollar. It is really that simple."
> ***
> "The Liberty Dollar ALD is the world's free market currency that functions in the
> marketplace. And while it meets the original mandates for being market-sensitive,
> it also functions dollar for dollar, i.e. in parallel, with the current Federal Reserve
> Notes."

(3/8/11 Tr. 100–103; Government Exh. 25E).  In addition, Agent Walsh recorded Defendant

training folks on "competing currencies" at the October 2005 Liberty Dollar University.

(Government Exh. 13E).  In other words, "the Liberty Dollar is to compete with the Federal

---

[38]  Defendant's position at trial was that the Liberty Dollar was not meant to compete with, or intended to be used as current money.  Defendant discounts the similarities and the significance of the recognizable inscriptions when the Liberty Dollar is viewed as a whole.  Defendant also represents that the Liberty Dollar, if meant to compete, is designed to compete with the Federal Reserve Note as opposed to genuine U.S. coinage.  (Doc. 197, 25) ("The question of similitude is really whether the Liberty Dollar looks like the Federal Reserve Notes it is intended to replace.").  In support of this representation, Defendant states that there are no circulating U.S. coins with the values on the Liberty Dollars, namely, denominations of $5, $10, $20, and $50.

Amicus, on the other hand, does not dispute that Defendant sought to replace U.S. current money with the Liberty Dollar and relies on the same for its legal argument.

Reserve Note" and other legitimate U.S. currency. (3/9/11 Tr. 20–21). Agent Walsh testified as follows:

> "When the defendant referred to the Liberty Dollar as a coin, I think it was oftentimes a slip of the tongue. His instruction was never call it a coin. His instruction to us was it's legal as long as we don't call it legal tender, as long as we don't call it a coin, and as long as we don't call it current money. Those were the three terms that were a big no-no. Never call it a coin, never call it legal tender, never call it -- coin, legal tender, current money."

(3/9/11 Tr. 105).

Although Defendant faults the Government for its concise case-in-chief, arguing that only one government witness, Ms. Kerri Belsito, former owner of Sir Pizza in Asheville, North Carolina, testified that she was misled when she accepted the Liberty Dollar, believing that she could deposit the Liberty Dollar into her bank account as legal tender, there is no rule of law requiring the testimony of more than one witness (or more than one item of documentary evidence) in seeking to establish any essential element of the offenses charged. (3/9/11 Tr. 277–80). When asked by the prosecution why she believed the Liberty Dollar to be U.S. currency, Ms. Belsito stated: "Because it looks like currency. It's got the Liberty on it. It's got – the same size, shape. I mean it's very misleading." (3/9/11 Tr. 279–80). Belsito also testified that Innes expressly told her that she could deposit the Liberty Dollar with her bank. (3/9/11 Tr. 283).

Most significantly, evidence concerning Defendant's deceptive "Do the Drop" technique that did not explicitly identify the Liberty Dollar as not being U.S. money or as a different type of currency undermined the defense theory. (Doc. 201, at 4–12).

Defendant's Rule 29 Motion is <u>denied</u>.

**2. Rule 33**

The Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. Proc. 33. The Fourth Circuit has held that the granting of a new trial should occur only "sparingly." *United States v. Wilson*, 118 F.3d 228, 237 (4th Cir.1997) (quoting *United States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir.1985)). "[T]he district court should grant a new trial based on the weight of the evidence 'only when the evidence weighs heavily against the verdict.'" *Id*. The district court should only grant a new trial if the "evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *Arrington*, 757 F.2d at 1485.

Defendant alleges that the jury was confused about the intent element and what was required for conviction under § 486.[39] In contrast with Counts One and Two, alleging violation of 18 U.S.C. § 371 (with § 485 as an object of the conspiracy) and 18 U.S.C. §§ 485 and 2, respectively, which explicitly require that the accused commit certain acts "knowingly with intent to defraud" as essential to conviction, Section 486 requires that Defendant seek to use the coins in a certain way. Therefore, in order to find unanimously Defendant guilty of the 486 offense, the jury had to find that the Defendant offered the Liberty Dollar and intended that it be used *instead of*, *or in place of*, United States "current money."

In an effort to avoid confusion and distraction by the Defendant's private barter contention, when the case was submitted to the jury, the Court agreed to redact the Paragraph 33 of the Superseding Indictment in its entirety, found within the Introductory Section, under the

---

[39] Defendant proffers an affidavit from Beth Deisher, Editor of *Coin World*, suggesting that there is a movement afoot to amend 18 U.S.C. § 486, to replace the "likeness and similitude" language. (Def.'s Suppl. Resp. / Exh. E, ¶ 12). Deisher avers that "Recently members of Congress have been made aware of the vagueness of the language and they agree that the language should be changed to more precise terms . . . ." Id. The undersigned notes that the terms "likeness and similitude" language is found within 18 U.S.C. § 485 as opposed to 18 U.S.C. § 486.

subheading entitled, "Resemblance to Legal Tender and Coins of the United States."[40]  (3/17/11

Tr. 1092−1093).  Paragraph 33 read:

> 33. Article I, section 8, clause 5 of the United States Constitution delegates to Congress the power to coin Money and to regulate the Value thereof.  This power was delegated to Congress in order to establish and preserve a uniform standard of value.  Along with the power to coin money, Congress has the concurrent power to restrain the circulation of money which is not issued under its own authority in order to protect and preserve the constitutional currency for the benefit of the nation.  Thus, it is a violation of law for private coin systems to compete with the official coinage of the United States.

(Doc. 103 / Superseding Indictment, at 7 ¶ 33).[41]

Consistent with the constitutional challenge to Section 486, Defendant also argues that it

was improper to tell the jury that the federal government has the "exclusive" power to coin

money.  Defendant objects to the Court's instruction to the jury that: "The Constitution gives

Congress the exclusive right to coin money." (3/17/11 Tr. 1071).  However, Defendant's

argument does not consider context or the jury instructions as a whole.  *See Noel v. Artson*, 641

F.3d 580, 586 (4th Cir. 2011) ("a single instruction to a jury may not be judged in artificial

isolation, but must be viewed in the context of the overall charge").  The three roles and

responsibilities of the U.S. Mint were described by Chief Counsel Daniel Shaver as: to mint and

issue circulating coinage to meet the needs of the United States; to prepare and distribute

numismatic items; and to manufacture bullion coinage (principally used by investors).  (3/9/11

---

[40] It is the Court's practice to provide the jury with a copy of the charging instrument, oftentimes in a redacted form, to aid the jury in their deliberations.  Having been successful in the request for redaction at trial, Defendant now contends that the *grand jury* was impermissibly influenced by the Government's presentation seeking indictment.

[41] The Court explained: "That is a statement of law that, if it were to be put before the jury at all, should have been a matter of discussion between the parties as to the court's instructions to the jury on the law.  In any event, it does not appear to the court to be a factual predicate that is supported by the evidence in the case." (3/17/11 Tr. 1092−1093).

Tr. 253–54).  As explained by Chief Counsel for the U.S. Mint, the principal authority to mint coins in the United States comes from the Constitution:

> The Constitution "gives Congress the power to coin money and regulate the value thereof.  The authorities to actually mint and issue coins are delegated by Congress, the Secretary of the Treasury under 31 U.S.C. Subchapter 51. And Congress by statute specifically authorizes the secretary. The mint is the United States Secretary of the Treasury's agent for minting and issuing coinage."

(3/9/11 Tr. 254–55).  Shaver's explanation of Congress' constitutional authority did not use the word "exclusive."  Id.  Nonetheless, Chief Counsel Shaver also explained that no other entity has the authority to mint legal tender U.S. coins because the Secretary of Treasury is obligated by statute, 31 U.S.C. § 5131, to use the facilities of the U.S. Mint to mint and issue all of the nation's coinage.  (3/9/11 Tr. 255).

Even if the jury was confused as to criminal intent for § 486 (or any of the charged offenses), this is likely harmless error.  As previously discussed in the Rule 29 analysis, there is ample evidence to support this verdict.  Defendant was free to present his theory of the case, namely, that the Liberty Dollar Organization was simply a private voluntary barter system, to the jury, and he did.  However, the jury believed the Government's competing theory that the "Liberty Dollars" were distributed with the intent to deceive people into believing that these coins were United States currency.  A jury could have found, and did find beyond a reasonable doubt, that the *"Do the Drop"* method for distributing Liberty Dollars was fraudulent.  For the reasons already explained, the Court rejects the defense position that a new trial is warranted because the jury's consideration of the case, and its verdict, was rendered on an improper basis. The law as it stands was faithfully applied and the jury properly instructed.  The parties were given latitude by the Court, one no more than the other, to make their arguments concerning what the evidence tended to show.

In conclusion, the evidence does not weigh so heavily against the verdict as to warrant a new trial. Defendant's Rule 33 Motion is <u>denied</u>.

### 3. Rule 34

The Constitution requires an indictment by a grand jury for all "capital, or otherwise infamous crime[s]." U.S. Const. Amend. V. The district court must arrest judgment if the "the indictment or information does not charge an offense." Fed. R. Crim. Proc. 34. An indictment must contain the elements of the offense charged. *Hamling v. United States*, 418 U.S. 87, 117 (1974). In addition, the indictment must "fairly inform[] a defendant of the charge against which he must defend, and, second, enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id.; United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002).

Defendant argued that "no offense is charged in the indictment because of the unique appearance of the Liberty Dollars, the promotion of the Liberty Dollar as a protest against the fiat nature and corresponding inflation prone current U.S. money, and the significant intrinsic value of the Liberty Dollar, all of which are admitted within the indictment and readily seen by inspection of the specimens identified by the indictment." (Doc. 114).

As the Court has found the statutes under which Defendant was charged constitutional, the Court finds the indictment to be sufficient. The indictment contained the statutes and the essential elements of those statutes under which Defendant was charged. The indictment also contained sufficient facts to notify Defendant which of his alleged actions were being prosecuted. Through this motion, the Defendant is essentially attempting to re-litigate factual questions that the Defendant had ample opportunity to present in court, and that the jury has already considered. Defendant's allegations mirror his pre-trial motions, which the Court has

already denied.  (Docs. 114, 121 and 141).  Accordingly, the Court hereby incorporates its reasoning stated during the Motion Hearing on March 3, 2011, along with the instant analysis.

Defendant's Rule 34 Motion is likewise <u>denied</u>.

### 4. Evidentiary Challenges

Defendant also dedicates a fair amount of time arguing that improper hearsay and opinion testimony were allowed at trial, allegedly creating a violation of his right to confront witnesses.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  U.S. Const. amend. VI. In *Crawford v. Washington*, the Supreme Court held that under the Confrontation Clause, the government is prohibited from introducing "testimonial" hearsay unless the witness who made the out-of-court statement was unavailable and previously had been subjected to cross-examination. 541 U.S. 36, 68 (2004).

Nonetheless, the admission of non-hearsay does not implicate a defendant's confrontation rights. *See Crawford*, 541 U.S. at 60 n. 9 ("The Clause ... does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); Fed. R. Evid. 801(c) (defining an out-of-court statement as hearsay if it is "offered in evidence to prove the truth of the matter asserted").

Here, Defendant argues that inadmissible hearsay statements were permitted by the Court.  Defendant contends that parts of Agent Romagnuolo's testimony on direct examination included hearsay (even double hearsay).  For instance, Defendant points to the testimony describing how the investigation began; specifically how the Secret Service and F.B.I. became aware of the Liberty Dollar activity within the Western District of North Carolina.  (Doc. 197, 8−

9). Most, if not all, of the testimony Defendant contends was impermissible was not offered for the truth of the matter asserted and is not properly defined as hearsay.

Out-of-court statements explaining or providing context for the actions of law enforcement officers are routinely admitted as non-hearsay. *See United States v. Love*, 767 F.2d 1052, 1063 (4th Cir.1985) (holding that agent's testimony concerning information received from another agent "was offered not for its truth but only to explain why the officers and agents made the preparations that they did in anticipation of the appellant's arrest."). Thus, information gleaned during the investigation, including information shared between Agents Romagnuolo and Walsh, the federal law enforcement officers in this case, and subsequent explanation by a federal law enforcement witness concerning law enforcement action taken in response to a given development in the investigation, does not fall within the definition of hearsay.

Further, "[s]tatements made by co-conspirators in furtherance of a conspiracy are not testimonial in nature, even when made unwittingly to undercover government agents." *Crawford*, 541 U.S. at 56. Therefore, any statements made by Defendant or Innes that were in furtherance of the conspiracy such as representations made during LDU training or in an effort to recruit merchants to participate do not run afoul of the Confrontation Clause.

Defendant's evidentiary challenges to the testimony of FBI Agents Romagnuolo and Walsh are founded, in large part, in his disagreement with the law. For instance, Defendant disputes the agents' factual descriptions concerning their respective roles and experiences during the investigation as well as the propriety of the LDO and legalities of Defendant's effort to compete with the Federal Reserve via the Liberty Dollar. (Doc. 197, 9, 23−24, 32−33). According to Defendant, the case agent gave "incorrect statements of the law that misled the jury and called upon them to adopt the government's personal policy preference that there be a single

currency system in which the government has a monopoly." (Doc. 197, 24). Similarly, Defendant states, "the undercover agent [Walsh] did improperly opine and mislead the jury into thinking that the "Liberty Dollar is not legal." (Doc. 197, 32). Any error associated with these asserted evidentiary issues, were mooted or ameliorated via cross examination.[42]

In connection with testimony about the 2006 U.S. Mint Press Release, Defendant alleges violation of Rule 803(8) of the Federal Rules of Evidence and *Beech Aircraft v. Rainey.* 488 U.S. 153 (1988). Rule 803 sets forth exceptions to the rule against hearsay regardless of whether the declarant is available as a witness. Subsection (8) of Rule 803 carves out an exception for records or statements of a public office given the record satisfies the following conditions:

(A) it sets out:
  (ii) the office's activities;
  (iii) A matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
  (iv) In a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
(B) The opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8); *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 300 (4th Cir. 1984) (explaining policy behind presumption that public records and reports are admissible given the "reliability of public agencies usually conducting the investigation, and their lack of motive for conducting the studies other than to inform the public fairly and

---

[42] Defense counsel cross-examined and attempted to impeach both the case agent, Special FBI Agent Andrew F. Romagnuolo, and the undercover agent, Special FBI Agent Karen Walsh. To name a few areas that were dealt with on cross-examination, Defense counsel cross-examined Agent Romagnuolo about a reference to Defendant as a "monetary architect" and his comparison of the LDO to a pyramid or multilevel marketing scheme. (3/8/11 Tr. 53−55). There was cross examination about the history of NORFED and Defendant and the concept of local currency or private barter currency. (3/8/11 Tr. 66−68). Defense counsel cross-examined Agent Romagnuolo about his review of the financial records and audits of the LDO and NORFED. (3/8/11 Tr. 55). Defense counsel cross-examined Agent Romagnuolo about the differences between the LDO Warehouse Receipts and the Federal Reserve Note, including that the Warehouse Receipt was redeemable for the value of silver noted on the receipt. (3/8/11 Tr. 63−66).

adequately"); *Zeus Enterprises, Inc. v. Alphin Aircraft, Inc.*, 190 F.3d 238, 241 (4th Cir. 1999) (Rule 803(8)(C) is a rule of admissibility); *see also Beech Aircraft v. Rainey*, 488 U.S. 153 (1988) (investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state a conclusion or opinion).

To clarify, the actual consumer advisory was not admitted into evidence or published to the jury. The consumer advisory was discussed within the context of notice provided to the Defendant and the LDO as a whole that the federal government, namely, the Department of Justice and U.S. Mint deemed their conduct to be in violation of federal law. In addition, Defense counsel cross-examined Agent Romagnuolo about the consumer advisory and his involvement in its issuance, which allowed the circumstances surrounding publication of the advisory to be considered by the jury. (3/8/11 Tr. 50–51). To the extent Defendant asserts that the Consumer Advisory was prepared at the urging of federal law enforcement agencies, or should *not* have been considered sufficiently reliable and trustworthy to be the subject of trial testimony, the Court viewed the testimony concerning the consumer advisory as part of the fabric or context of the case.

## VI.  ORDER

For the reasons stated herein, the Court finds that 18 U.S.C. §§ 485 and 486 are constitutional as applied to this Defendant. As a result, the Court finds no appealable defect in the indictment or the jury instructions. Defendant was given a chance to present his case before an impartial jury, and this jury found Defendant guilty and his defense unpersuasive. There is a heavy burden to prove that a jury's verdict and findings of facts are wrong. Defendant has not carried his burden, and the court <u>denies</u> Defendant's motions.

**IT IS, THEREFORE, ORDERED** that Defendant's Motions for Post-Conviction Relief are hereby **DENIED**. Gold's Amicus Curiae Brief in Support of Defendant is **ALLOWED**. Defendant's Motion to Adopt the Amicus Brief is **GRANTED**.

**IT IS FURTHER ORDERED** that this matter is to be calendared for sentencing during the Court's **December 2014 Sentencing Term**.[43]

Signed: November 10, 2014

Richard L. Voorhees
United States District Judge

---

[43] It appears that the sentencing of Defendant may proceed even though this Court has not yet undertaken final disposition of the related criminal forfeiture issues. *See e.g., United States v. Bailey*, Civil No. 1:11CR10-MR (Docs. 576–80) (W.D.N.C. 2012). At the directive of the Court, counsel in *Bailey* were required to brief their respective positions concerning the timing of sentencing where an involved third-party ancillary proceeding was anticipated prior to entry of a Final Order of Forfeiture. Although the presiding judge in *Bailey* elected not to proceed with sentencing until after issuance of the Final Order of Forfeiture, the restitution considerations that existed in *Bailey* do not exist here. The Government's filing cited Fed. R. Crim. P. 32.2(b)(4)(A) and pointed out that forfeiture *as to third parties* is only preliminary at the time of Defendant's sentencing; that Rule 32.2 contemplates that ancillary hearings may occur after sentencing. *See Bailey*, Civil No. 1:11CR10-MR (Doc. 577). *After issuance of a Preliminary Order of Forfeiture*, any potential crime victim (third-party claimant under 21 U.S.C. § 853(n)) may "be reasonably heard" at Defendant's sentencing. 18 U.S.C. § 3771(a)(4).