**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CRIMINAL DOCKET NO.:  5:09CR27-RLV**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Memorandum and Order** |
| | ) | |
| **BERNARD VON NOTHAUS,** | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Government's Motions for Preliminary Order of Forfeiture and Motion for Final Order of Disposal and Forfeiture of Contraband as well as related filings.[1]  (Docs. 196, 200, 280, 281, 283−84).  Also before the Court is a Motion for Return of Seized Property, filed by Defendant.  (Docs. 254, 255).

In March 2011, following Defendant von Nothaus's criminal conviction, a bench trial was commenced, the undersigned judge presiding.  The Defendant, through counsel, requested that the Court render the necessary factual findings and conclusions of law pertaining to forfeiture and the Government consented to bench trial.  (3/18/11 Tr. 5−6).  The preliminary forfeiture phase of the trial concluded on April 4, 2011.[2]  The parties were permitted to retain their own trial and forfeiture exhibits.  (3/18/11 Tr. 12−13).

---

[1]  The manner in which the Government has addressed these issues does not inspire confidence.  The Government filed two new motions in November 2014 seeking much of the same relief requested in its original motion while also paring down its request for forfeiture of items as contraband pursuant to 18 U.S.C. § 492.  (Docs. 280, 281).  On December 1, 2014, the Government submitted two additional filings – an Addendum to its November 2014 filings and an affidavit from the lead case agent, Special Agent Romagnuolo.  (Docs. 283, 284).  Together, the Government has submitted a total of eight filings on various forfeiture matters – in each instance, identifying evidence or advancing arguments that were not adequately addressed by the Government at the outset.

[2]  In light of the complexities of this particular case, and the various interests at stake, specifically, the implications of the analysis and preliminary findings on the subsequent phases of the forfeiture proceeding and on the third-parties involved, the Court was obliged to resolve these issues more promptly.

The Court's November 10, 2014 Memorandum and Order resolving the post-conviction challenges of the Defendant and Amicus, particularly the factual background describing the nature of the underlying criminal prosecution and evidence at trial, is hereby incorporated by reference.  (Doc. 270).

## I.    Government Seizure of Assets

In November 2007, the Government executed seizure warrants on entities associated with Defendant Bernard von Nothaus, including the Liberty Dollar Organization ("LDO") Headquarters in Evansville, Indiana (also known as the NORFED Fulfillment Office) and Sunshine Minting, Inc. ("Sunshine Minting") in Coeur d'Alene, Idaho.[3]  (Gvmt. Exhs. 55, F40–41).  The FBI seized approximately $3.5 million worth of assets, including Liberty Dollars, raw silver, coining dyes and other miscellaneous items.

The search and seizure at Sunshine Minting took the better part of two days.  (3/10/11 Tr. 331–32).  Collectively, the testimony of Buncombe County Sheriff's Deputy and FBI Task Force Agent Cody Muse ("Agent Muse"), Special FBI Agent Bryant Keith Gunnerson ("Agent Gunnerson"), and Special FBI Agent Andrew F. Romagnuolo ("Agent Romagnuolo"), describes the search and inventory of the items seized from Sunshine Minting during the search initiated on November 14, 2007 and concluded November 15, 2007, as well as subsequent interactions with Sunshine Minting that resulted in additional property being seized.  As the Chief Investigative Agent for the Government, Agent Romagnulo verified the accuracy of the

---

[3] Title 21, United States Code, Section 853(f) authorizes warrants of seizure:

> The Government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant. If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under subsection (e) of this section may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property.

quantities and weights of items seized from all of the various locations in connection with the investigation.

The law enforcement team responsible for executing the original search warrant at Sunshine Minting seized the following items:

> 11 Silver Bars and Silver Scrap totaling 10,720.60 troy ounces (or approximately 800–900 pounds);
>
> 168,599 Silver Troy Ounce Coins;
>
> 147 Gold Troy Ounce Coins;
>
> 17 Gold .05 Troy Ounce Coins;
>
> 710 Silver .5 Troy Ounce Coins;

(Gvmt. Exhs. 71, F-34). After receiving additional information from Sunshine Minting personnel, a second warrant was obtained, which resulted in the seizure of 16,000.05 Troy Ounces of Raw Silver (or approximately 1300 pounds).

The search of the LDO Headquarters in Evansville, Indiana, also occurred on November 14, 2007, and resulted in the seizure of the following items:

3039.375 Pounds of Copper Coins

5930.32 Troy Ounces of Silver Coins

63.24 Troy Ounces of Gold Coins

3 Platinum Coins

$254,424.09 in United States Currency

(Gvmt. Exh. F-34).

There were also two quantities of silver coins recalled from shipment by Sunshine Minting that were not actually seized during execution of the search warrants. On November 26,

2007, Agent Gunnerson returned to Sunshine Minting and seized the recalled shipment containing:

1,000.5 Troy Ounces of Silver Coins; and

1,000.5 Troy Ounces of Silver Coins.[4]

(3/10/11 Tr. 322−23; 3/18/11 Tr. 56).

An additional 100 Ounces of Copper Coins (100 coins weighing 1 ounce each) were subsequently seized in Asheville, North Carolina, from the residence of co-defendant Kevin Innes.  Id.

## II.     Federal Declaratory Judgment Action Allegedly Filed In Indiana

Shortly after execution of the search warrants and seizure of property, Defendant reportedly commenced a civil action in federal district court in Indiana seeking a declaratory judgment that the property seized by the Government must be returned.  (3/8/11 Tr. 51).  Agent Romagnuolo testified that Defendant's attempts to utilize civil litigation to thwart the criminal forfeiture proceedings were unsuccessful.  (3/8/11 Tr. 49−51).  Defendant did not provide this Court with any documentation or record of the federal declaratory judgment action.  The Defendant's sentencing memorandum references a purported federal declaratory judgment action brought against the U.S. Mint allegedly filed after issuance of the warning from the U.S. Mint. (Doc. 282, 19) ("After the 2006 Mint warning was posted, Mr. von NotHaus retained James Burk to file a federal lawsuit against the U.S. Mint for a declaratory judgment.")

## III.     Motion for Return of Seized Property / Fed. R. Crim. P. 41(g)

---

[4]  Agent Romagnulo testified that the two entries of 1,000.5 troy ounces of silver coins were, in fact, two different quantities of the same weight (as opposed to a clerical error).

In a related filing, Defendant has moved for the return of seized property pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure. (Docs. 254, 255). Defendant asserts that his mother, Mary S. Nothhouse, invested most of her life's savings in silver.[5] Defendant also represents that his mother and brother, Robert K. ("Bob") Nothhouse, as trustees of a revocable trust established in 1992 by Defendant's mother and deceased father, Bernard W. Nothhouse, are the rightful owners of the 16,000.05 troy ounces of raw silver seized from Sunshine Minting. (Doc. 255, 2−4 / Exhs. C−G).

### IV.     Related Civil Forfeiture Action Stayed

The Government has also commenced a related civil action pursuant to 18 U.S.C. § 981 and 18 U.S.C. § 492 seeking forfeiture *in rem* of Liberty coins made of copper, silver, and gold as well as the quantities of unminted silver, and the dies, molds, and casts seized at Sunshine Minting. *See United States v. 3039.375 Pounds of Copper Coins, et al. / 1:08CV230*. The Government filed an Amended Complaint on June 20, 2008 to correct an inadvertent omission. (Doc. 6). Numerous individuals and entities, *including Shelter Systems, Defendant Bernard von Nothhaus, and Mary Nothhouse*, submitted claims asserting an interest in the seized property. (Docs. 13−27). The group of claimants collectively filed an Answer to the Amended Complaint demanding a jury trial. (Doc. 28). The civil forfeiture proceeding has been stayed pending disposition of post-trial motions submitted in the criminal prosecution and the sentencing of Defendant Bernard von Nothaus. (Doc. 67).

### V.     Criminal Forfeiture Procedure − 21 U.S.C. § 853; Fed.R.Crim.P. 32.2

_____

[5] The last name of the Defendant and his relatives is spelled differently within the documentary record. The Affidavit of Defendant's mother, Mary S. Nothhouse, submitted by the defense uses the spelling "Nothhouse" when referring to her and her other son, Robert K. Nothhouse, yet uses the spelling "von NotHaus" when referring to the Defendant. (Government Exh. F59).

## A. Overview

"Forfeiture is a divestiture without compensation of property used in a manner contrary to the penal laws of the sovereign, and is regulated by statute." *Mayo v. United States*, 413 F.Supp. 160, 162 (D.C. Ill. 1976). In *United States v. Oregon*, the Fourth Circuit provided the following instruction concerning the procedure for criminal forfeiture:

> The United States' power to forfeit property arises from 21 U.S.C. § 853, which provides that any person convicted of certain crimes, ***"shall forfeit to the United States ... any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of"*** those crimes. 21 U.S.C. § 853(a). . . .

> Rule 32.2 sets forth the procedure of forfeiture. First, the United States must provide notice to a defendant by including a forfeiture allegation in the indictment or information filed against the defendant. Fed.R.Crim.P. 32.2(a). Next, "after [a verdict or finding of guilty], ... the court must determine what property is subject to forfeiture under the applicable statute." Id. at 32.2(b)(1)(A). "If the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria." *Id.* at 32.2(b)(2).

> After the property is seized pursuant to the preliminary forfeiture order, see id. at 32.2(b)(3), any third party who claims an interest in the property to be forfeited may file a petition with the district court contesting the forfeiture, id. at 32.2(c)(1). The district court considers this petition in what is called an "ancillary proceeding." Id. The preliminary order of forfeiture cannot become final until after the ancillary proceeding concludes. Id. at 32.2(b)(4)(A). As relevant here, the district court must first consider any motion by the United States to dismiss the petition for lack of standing before moving to the merits of the petition. Id. at 32.2(c)(1)(A), (B). "When the ancillary proceeding ends, the court must enter a final order of forfeiture by amending the preliminary order as necessary to account for any third-party rights." Id. at 32.2(c)(2).

*United States v. Oregon*, 671 F.3d 484, 487–488 (4th Cir. 2012).

Under Section 853(n)(6), a third party petitioner is entitled to amendment of the preliminary order of forfeiture if the petitioner demonstrates by a preponderance of the evidence that:

(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section....

21 U.S.C. § 853(n)(6). Thus, the property interests, and relative superiority of competing interests, are evaluated as of "the time of the commission of the acts which gave rise to forfeiture." 21 U.S.C. § 853(n)(6)(A). "Although . . . forfeiture . . . is a matter of federal law, [courts] generally refer to state law in determining whether a petitioner has a legal interest in forfeited property." *Oregon*, 671 F.3d at 490 and n. 7 (noting exception to the general rule where there is evidence a defendant has manipulated state law property rights to shield assets from the reach of forfeiture law) (internal citations omitted).

This Memorandum and Order, while providing the broader analytical framework for these criminal forfeiture proceedings, addresses only the proposed bases for the preliminary order of forfeiture. As a courtesy to any interested third-parties, the avenues for redress available to third-party claimants are discussed in greater detail, *infra*.

## B. Notice

The notice of forfeiture contemplated by Fed.R.Crim.P. 32.2(a) was provided in the Superseding Indictment since all of the seized items were identified within the "Notice of Forfeiture" section of the indictment. (Doc. 103, 11−13). The Superseding Indictment's "Notice of Forfeiture" cited both 18 U.S.C. § 492 and 18 U.S.C. § 982(a)(2)(B).[6] (Doc. 103, 11). Thus,

---

[6] Pursuant to 18 U.S.C. §§ 982(a)(2)(B) and 982(b)(1):

Defendant von Nothaus was placed on notice that *his interest* in "any property constituting, or derived from, proceeds the person obtained directly or indirectly," as the result of his convictions pursuant to 18 U.S.C. §§ 371, 485, and 486 would result in forfeiture to the United States upon imposition of sentence. 18 U.S.C. § 982(a)(2)(B).

Title 18, United States Code, Section 982(b)(1) incorporates both Rule 32.2 of the Federal Rules of Criminal Procedure and 21 U.S.C. § 853. *See Bailey I*, 2011 WL 5509027, * 5 ("The resolution of the Petitioner's claims is governed by Federal Rule of Criminal Procedure 32.2 and 21 U.S.C. § 853, as incorporated by 18 U.S.C. § 982(b).").

### C. Nexus Between Property Seized and Offense of Conviction Required for Preliminary Forfeiture

With respect to the preliminary order, the Court's "primary obligation" is "to determine whether the assets at issue are even properly subject to forfeiture in the first instance." *See e.g., United States v. Bailey*, 2011 WL 5509027, * 4 n. 2 (W.D.N.C. November 10, 2011) (hereinafter *"Bailey I"*). The Court "must determine whether the "requisite nexus" exists between the property to be seized and offense of conviction." *Bailey I*, 2011 WL 5509027, * 4; *United States v. Neal*, 2003 WL 24307070, * 3 (E.D.Va. 2003) (nexus inquiry "is the same regardless of whether the judge or the jury is the factfinder").

---

The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate – section[s] . . . 485 [or] 486 . . . shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.

***

The forfeiture of property under this section, including any seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by the provisions of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 853).

The Government takes the position that anything and everything associated with the Liberty Dollar Organization is forfeitable. As explained herein, the Government's "everything is everything" argument is not helpful.[7] (4/11/11 Tr. 12). In like fashion, the Government contends that the jury found a ten-year conspiracy. While the Superseding Bill of Indictment alleges that Defendant's conspiracy to violate 18 U.S.C. §§ 485 and 486 began as early as January 1998 and continued through on or about May 2009, Superseding Indictment, ¶¶ 1−46, the evidence presented during the Government's case-in-chief related to the time period between 2005 and 2009. The Government's case-in-chief also included evidence that the Defendant, and the activities of the Royal Hawaiian Mint in particular, likely had a legitimate (or non-criminal) origin. For these reasons, the notion that everything associated with Liberty Services or everything gained by LDO from 1998 through 2009 is forfeitable is subject to question.[8]

The Government also takes the position that any prospective third-party ownership interest is not relevant at the preliminary forfeiture stage. It is black letter law that *the adjudication of* third-party ownership interests pursuant to § 853(n)(6) follows issuance of the preliminary order. *See United States v. Cox*, 575 F.3d 352, 358 (4th Cir. 2009). However, there is authority in this district for the proposition that the court's finding of "nexus" justifying preliminary forfeiture, the "validity" of a preliminary order of forfeiture, should not be undertaken as lightly as the Government suggests. *See Bailey I*, 2011 WL 5509027, * 6 (speaking to the propriety of considering third parties' asserted interests in evaluating whether the requisite nexus for preliminary forfeiture is met; observing potential for "[s]erious due

---

[7] "[M]y point today is that everything is everything except the coins which are also contraband. But everything else is proceeds and everything else is property used." (4/11/11 Tr. 12).

[8] In short, there are lingering questions concerning the timing of the commission of offense(s) giving rise to forfeiture as well as the timing of vesting of third-party interests and the priority of competing interests that will warrant further attention in the next phase of these proceedings. 21 U.S.C. § 853(n)(6).

process questions" if third parties are barred from challenging the validity of forfeiture) (citing *United States v. Reckmeyer*, 836 F.2d 200, 206 (4th Cir. 1987)). In *Bailey I*, in response to a motion for clarification from interested third parties, a rehearing was ordered by the court *after* issuance of a proposed Consent Order and Judgment of Forfeiture to inquire whether the Government satisfied its initial burden of proving the requisite nexus. *Id.* According to *Bailey I*, "[t]he determination made at the defendant's criminal trial that the property was subject to forfeiture cannot be considered binding on persons who were not only not parties to the criminal action but were specifically barred from intervening." *Bailey I*, 2011 WL 5509027, * 6 (citing 21 U.S.C. § 853(k) (other citations omitted)). After the evidentiary hearing ordered in *Bailey I*, the court found in *Bailey II*, that the Government established the requisite nexus as to certain assets, but failed to make the necessary showing as to other assets.[9] *United States v. Bailey*, 2012 WL 569744, * 9 (W.D.N.C. Feb. 22, 2012) (hereinafter "*Bailey II*"). In any event, *the fact of an asserted third party interest*, whether ultimately proven up or not in the § 853(n) ancillary proceedings, is merely one part of the overall record to be considered in evaluating whether a nexus is, in fact, present.

## D. Government's Burden of Proof

The Government's burden of proof, as well as the attendant standards for the different theories of forfeitability, are as follows:

---

[9] The *Bailey* court dealt with both the preliminary order and third-party interest as to the asset lacking nexus contemporaneously without any additional hearing or process under § 853(n)(6). *See Bailey II, 2012 WL 569744,* ** 9−10 (imposing a constructive trust and explaining that the nexus issue need not be reached because even if court deemed certificates to be proceeds, petitioners had established a legal interest superior to any claim of defendant).

"[T]he Government bears the burden of proving nexus by a preponderance of the evidence." *United States v. Cherry*, 330 F.3d 658, 669–70 (4th Cir. 2003). "[W]here the government's theory is that the property was used to commit, or to facilitate the commission of, the offense of conviction, the government must establish that there was a substantial connection between the property to be forfeited and the offense." *United States v. Herder*, 594 F.3d 352, 364 (4th Cir.), *cert. denied*, 130 S.Ct. 3440 (2010). Where the Government's theory is that the property constitutes proceeds of the defendant's crimes, several courts, including courts in this Circuit, have applied the "but for" test first articulated by the Seventh Circuit in *United States v. Horak*, 833 F.2d 1235, 1242–43 (7th Cir. 1987). Applying this test, property is considered proceeds and therefore deemed forfeitable if "a person would not have [the property] but for the criminal offense."

*Bailey II*, 2012 WL 569744, * 9 (internal citations omitted).

## VI.    Forfeiture For "Counterfeit" or "Contraband" Items, 18 U.S.C. § 492

In addition to 18 U.S.C. § 982 and 21 U.S.C. § 853, and of particular import here, is a separate statutory provision mandating the forfeiture of counterfeit coins and paraphernalia:

All counterfeits of any coins . . . of the United States . . . or any articles, devices, and other things made, possessed, or used . . . or any material or apparatus used or fitted or intended to be used, in the making of such counterfeits, articles, devices or things, found in the possession of any person without authority from the Secretary of the Treasury or other proper officer, shall be forfeited to the United States.

18 U.S.C. § 492 (2002). Items that are considered "contraband" or "counterfeit" under Section 492 are deemed illegal *per se* and automatically forfeited without having to satisfy the otherwise applicable forfeiture procedures.[10] *See One Chief 1722 Offset Press*, 129 F.Supp. 276

---

[10] Although 18 U.S.C. § 492 does not expressly differentiate by type, there are actually two kinds of contraband: contraband *per se* and derivative contraband. Contraband *per se* is "intrinsically illegal in character." *Helton v. Hunt*, 330 F.3d 242, 247–48 (4th Cir. 2003) (quoting *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 699–700 (1965)). Derivative contraband is not "inherently illegal" but becomes unlawful because of its use. *Helton*, 330 F.3d at 248 (citing *Cooper v. City of Greenwood*, 904 F.2d 302, 304–05 (5th Cir.1990)). The characterization of any given item seized as contraband *per se* or derivative contraband determines the level of process warranted to any claimant-owner. Derivative contraband is subject to greater due process protection than contraband *per se*. *Helton*, 330 F.3d at 248 (analyzing due process protections required by North Carolina statute, N.C.G.S. § 14-298, declaring video gaming machines falling within designated statutory criteria subject to immediate destruction by law enforcement without any process to owner) (citing *Cooper*, 904 F.2d at 305).

(D.C.Mass. 1955). Additionally, if property is forfeited under Section 492 as "contraband," the property is not subject to third-party ancillary litigation under § 853(n). Rather, Section 492 provides that "any interested person" must seek redress from the Secretary of the Treasury by filing a petition for the remission or mitigation of forfeiture and making a showing that "such forfeiture was incurred without willful negligence or without any intention on the part of the petitioner to violate the law." [11] 18 U.S.C. § 492; *see also One Chief 1722 Offset Press*, 129 F.Supp. at 277 (construing § 492 as a remedial statute despite its mandatory language in light of the potential for a third-party claimant to petition for remission of forfeiture).

Although ownership rights are irrelevant under a literal application of § 492 seizure, in addition to the ability to seek redress from the Secretary of the Treasury, the Fourth Circuit has indicated that certain constitutional defenses still exist and are available to third-party claimants. *See e.g., United States v. Blair*, 843 F.2d 1388, 1988 WL 30680, * 3 (4th Cir. 1988) (noting due process as possible constitutional defense to forfeiture of contraband under 18 U.S.C. § 492 available to third-party claimant) (unpublished); *see also Bailey II*, 2012 WL 569744, * 7 (forfeiture pursuant to § 982 is mandatory, "subject only to statutory and constitutional limits") (internal citation omitted). In *Blair*, the Fourth Circuit reversed and remanded a summary judgment decision in favor of the government where the third-party claimant asserted facts

---

[11] Paragraph Three of Section 492 reads in pertinent part:

Whenever, except as hereinafter in this section provided, any person interested in any article, device, or other thing, or material or apparatus seized under this section files with the Secretary of the Treasury, before the disposition thereof, a petition for the remission or mitigation of such forfeiture, the Secretary of the Treasury, if he finds that such forfeiture was incurred without willful negligence or without any intention on the part of the petitioner to violate the law, or finds the existence of such mitigating circumstances as to justify the remission or the mitigation of such forfeiture, may remit or mitigate the same upon such terms and conditions as he deems reasonable and just.

creating genuine issues of material fact as to the existence of a "*Pearson Yacht* defense."[12] *Blair*,

843 F.2d 1388, 1988 WL 30680, * 3. The "*Pearson Yacht* defense" is explained as follows:

> [I]t would be difficult to reject the constitutional claim of an owner whose property subjected to forfeiture had been taken from him without his privity or consent. Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property; for, in that circumstance, it would be difficult to conclude that forfeiture served legitimate purposes and was not unduly oppressive.
> Maybe

*Id.*, * 3 ("*Pearson Yacht* defense" originated from *dicta* in Supreme Court case) (quoting *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 688−90 (1974) (internal citations omitted)).

The Court now discusses the categories of potentially forfeitable assets in turn,

recognizing that statutory provisions for forfeiture of property are to be strictly construed. *See One Chief 1722 Offset Press*, 129 F.Supp. at 277.

**VII.    Discussion**

**A.  Property Designated as "Counterfeit" or "Contraband" / 18 U.S.C. § 492**

Property designated as "counterfeit" is governed by Section 492 which, as relevant here,

calls for the mandatory forfeiture of "[a]ll counterfeits of any coins . . . of the United States . . .

or any material or apparatus used or fitted or intended to be used in the making of [] counterfeits

. . . ." 18 U.S.C. § 492.

The jury in the underlying criminal prosecution found, by way of its guilty verdict, that

the coins introduced into evidence were, in fact, "counterfeit." While not identified to the jury as

---

[12]  In *Blair*, the husband of a criminal defendant (who was himself imprisoned on unrelated charges) asserted exclusive ownership rights to photographic equipment seized by the government due to use of the equipment in a scheme to defraud the government that his wife was suspected of participating in and eventually pled guilty to. *See Blair*, 843 F.2d 1388, 1988 WL 30680, * 3. The scheme to defraud involved $500,000 in issued counterfeit treasury checks accompanied by phony identification cards to enable endorsement of the counterfeit checks. *Id.* The husband-property owner was permitted to challenge forfeiture of the photographic equipment under § 492 on due process grounds. *Id.*

an essential element of the § 485 offense, the counterfeit nature of the Liberty Dollar coins in evidence was nonetheless implicitly found.[13] (Doc. 270). As discussed at length in the Court's November 10, 2014 Memorandum and Order, the counterfeit determination already made enjoys the "sword and buckler" of a jury verdict.

In recognition of the fact that this prosecution was far from a garden-variety counterfeiting case, the undersigned held open whether a strict construction of Section 492 would limit its application solely to the more traditional counterfeiting case.[14] On its face, Section 492 appears to have application across all types of counterfeiting offenses. There is nothing in the plain language of 18 U.S.C. § 492 to suggest that § 492 relies on a different meaning of the term "counterfeit" than the definition used to describe and apply Section 485 here.[15] Indeed, there is no controlling authority for such a proposition. In fact, at least one court

---

[13] Neither of the Section 485 or 486 offenses has *an essential element* of determining whether the coins are "counterfeit." Contrast the statutory requirements for Sections 485 and 486 with the essential elements for proving actual or traditional counterfeiting of United States obligations or securities such as is found within 18 U.S.C. §§ 471, 472, 473. In each of these statutes, a false, forged, counterfeit, or altered obligation or security of the United States is an essential element of the offense. In this case, the relevance of the description of the Liberty Dollar coins (in appearance, as counterfeit, or otherwise) as a factual matter, was the Defendant's intent, namely, whether Defendant acted with intent to defraud for purposes of Section 485 or whether Defendant intended its use as current money for purposes of Section 486.

[14] The Government concedes that Section 492 is specific to counterfeiting offenses but insists that the counterfeit finding by the jury was a global or comprehensive finding. In *Mayo v. United States*, the court rejected the government argument that a printing press was subject to forfeiture pursuant to § 492 as contraband where the underlying conviction was for a violation of 18 U.S.C. § 2314 (interstate transportation of forged securities) and other offenses not before the Court. *Mayo*, 413 F.Supp. at 161−62. The district judge further stated that the record was devoid of any evidence showing that plaintiff was convicted of an offense for which § 492 forfeiture may lie (and distinguished between the § 2314 offense and traditional counterfeiting offenses, 18 U.S.C. § 471, *et seq.*, or 18 U.S.C. §§ 331−333, 335, 336, 642, or 1720).

[15] The jury was told that "[t]he term "resemblance" means the quality or state of resembling; especially correspondence in appearance or superficial qualities; a point of likeness; similarity" and that "[t]he term "similitude" means a counterpart, double; a visible likeness; correspondence in kind or quality; a point of comparison." An additional instruction was given for the stated purpose of "explain[ing] the concept of resemblance" in the context of the case:

opined that the availability of a third-party remedy tends to show that the legislature contemplated that "the purview of § 492 must encompass more than articles deemed illegal *per se*." *One Chief 1722 Offset Press*, 129 F.Supp. 276.

Nonetheless, in applying § 492, the undersigned is mindful of the evidentiary record that was before the jury. The significance of the jury's verdict, underlying factual findings, and limitations of the same (*e.g.*, what the jury necessarily found as well as facts the jury did not find), is explained in more detail within the M & O resolving post-conviction motions, which is incorporated by reference. (Doc. 270, 31 n. 36). To the extent the jury did not reach or decide a question, the undersigned is deemed the fact finder for purposes of forfeiture since Defendant waived jury trial as to forfeiture issues. *Neal*, 2003 WL 24307070, * 3.

The Government's approach to forfeiture presents an analytical hurdle given that the characterization of an item in some cases dictates the level of process a third party claimant is due. *See Helton*, 330 F.3d at 248. The Government does not address whether the jury's findings concerning the actual Liberty coins presented for their inspection and admitted into evidence would (or could) also be imputed to the entire array of seized Liberty coins, which is comprised of multiple versions of coins. (3/8/11 Tr. 77). The traditional counterfeiting cases cited by the Government offer little guidance on this point.[16] Furthermore, because the Government's evidence and argument concerning Defendant's intent was premised upon the suggested "use" of

---

"A counterfeit coin is one made in imitation of some genuine coin. It is not necessary that the resemblance should be exact in all respects. The resemblance is sufficient if the coins are so far alike that the counterfeit coin is calculated to deceive a person exercising ordinary caution and observation in the usual transactions of business, though the counterfeit would not deceive a person who was expert or has particular expertise in such matters."

[16] *See e.g., Boggs v. Rubin*, 161 F.3d 37, 41−42 (D.C.Cir. 1998) (counterfeit paper currency found to be reproductions of genuine currency of the United States in each instance and in violation of 18 U.S.C. §§ 472 or 481 deemed to be contraband for purposes of 18 U.S.C. § 492).

the Liberty Dollar coins and, thus, an aspect of the "counterfeit" status, the Court, seeking to adhere to the strict construction mandate, declines to deem the entire array of seized coins contraband for purposes of Section 492 as proposed by the Government.[17]  *See e.g., United States v. Ross*, 844 F.2d 187, 190 (1988)  (vacating conviction and reversing in traditional counterfeit case, 18 U.S.C. § 471, due to insufficient evidence that item in possession was "counterfeit" obligation due to lack of similitude; limiting holding that there could be no "counterfeit" obligation solely to the slips in evidence).  Rather, only the Liberty Dollar pieces admitted into evidence, and only those pieces of admitted evidence that otherwise comport with the "counterfeit" definition applied in this case and provided to the jury, are subject to the mandatory forfeiture as "counterfeit" under § 492.[18]

The Court renders the following **FINDINGS OF FACT** relevant to **18 U.S.C. § 492**:

**"COUNTERFEIT" COINS**

1)   The Government presented evidence in its case-in-chief consisting of a sample of Liberty Dollar coins seized from Sunshine Minting.  (3/18/11 Tr. 55).

2)   The Liberty Dollar coin design was not a static design but rather evolved over time.  (3/15/11 Tr. 598, 600).

3)   The 2005 Liberty Dollar design altered previous versions of the Liberty Dollar coin by deleting the reference to NORFED and the call for repeal of the Federal Reserve

---

[17]  The Court also notes that the classification of contraband, namely, derivative contraband status, can also depend on the use of the accused item.  *See Helton*, 330 F.3d at 248 (internal citation omitted).

[18]  The jury did not pass upon each and every Liberty Dollar item seized and find as fact that each item meets the legal definition of counterfeit.  Whether in evidence or not, there are Liberty Dollar coins that the jury was never asked to pass on.  For example, the jury was not asked to opine as to the counterfeit status of the $50 Liberty Dollar pieces stored at Sunshine Minting.  (Doc. 197, 20 / Exhs. 376, 377).

and replacing NORFED with "LibertyDollar.org" in order to make the Liberty Dollar more marketable. (3/15/11 Tr. 637−38) (Def. Exh. 320).

4) The purpose for altering the design in this way was to market a less controversial Liberty Dollar; a design where consumers would not necessarily have to subscribe to LDO philosophy regarding the Federal Reserve and United States monetary policy. (3/15/11 Tr. 637−638).

5) In October 2005, the Liberty Dollar University unveiled a new RCO strategy promoting the Liberty Dollar to merchants as a means of making change. (3/8/11 Tr. 117−18).

6) Defendant, via the Liberty Dollar Organization, issued a number of "specialty" versions of the Liberty Dollar coins.

7) Defendant created a Liberty Dollar that touted the Second Amendment and another Liberty Dollar that promoted Ron Paul as a 2012 Presidential Candidate.[19] (3/8/11 Tr. 58−59).

8) Defendant, via the Liberty Dollar Organization, produced state-specific Liberties in conjunction with its State Monetary Initiative.

9) Only the Liberty Dollar pieces admitted into evidence, and only those pieces of admitted evidence that otherwise comport with the "counterfeit" definition applied in this case and provided to the jury, are subject to the mandatory forfeiture as "counterfeit" under § 492.

---

[19] As for the Ron Paul Dollars, Defendant von Nothaus claims that approximately 2,000 of the 3,000 pounds of copper coins seized in Evansville, Indiana (the majority of what was seized) were likely Ron Paul Dollars that were intended to be used for the 2012 Presidential Campaign. (4/4/11 Tr. 7).

10) Coins <u>not</u> subject to a mandatory forfeiture under § 492, and not properly designated as "counterfeit" or "contraband *per se*" include:

- Early and less sophisticated versions of Liberty Dollar coins minted and dated from 1998 and through 2004;

- Liberty Dollar coins having no denomination or dollar sign imprinted on the coin;

- Liberty Dollar coins minted prior to the U.S. Mint / U.S. DOJ placing von Nothaus on notice in 2006 that the DOJ considered his activities illegal;

- Liberty Dollar coins bearing competing insignia (imprinting representing at least two different origins) such as both Liberty and the Hawaii Dala;

- Liberty Dollar coins with characteristics of multiple von Nothaus entities. For example, coins with the Liberty insignia on one side and Hawaii Dala on the other side. (Government Exh. F58).

### <u>DIES, MOLDS, AND CASTS</u>

1) Agent Muse identified pictures of the dies used by Sunshine Minting to produce coins for Liberty Services that were seized by the Government. (Government Exh. 72) (a composite of 20+ pictures).

2) Agent Romagnuolo testified that all of the dies seized from Sunshine Minting were "Liberty Dollar [O]rganization items." (3/8/11 Tr., 45) (Doc. 284 / Aff. Exh. 72).

3) Certain of the dies seized were for minting Hawaii Dala coins notwithstanding that the same die also had a Liberty Dollar imprint. (4/4/11 Tr. 29).

**B. Property Allegedly "Used, or Intended to be Used" to Commit, or to Facilitate the Offense of Conviction / 18 U.S.C. § 853(a)(2)**

With respect to property allegedly used or intended to be used to commit, or to facilitate the commission of the offense, the government must prove that a substantial connection between the property and the offense existed.  *See Herder*, 594 F.3d at 364.

The Government contends that the quantities of raw, unminted silver were intended to be used to commit, or to facilitate the commission of the charged offenses.  The Government further asserts that to the extent an item is not deemed to be contraband, it falls within § 853(a)(1) or § 853(a)(2), or both.

The Court makes the following **FACTUAL FINDINGS** in connection with **18 U.S.C. § 853(a)(2)**:

1) The Government learned of two accounts at Sunshine Minting associated with Liberty Services:  **Account No. 951650** with a Warehouse number of **"SK2"** (an account holding a large quantity of unminted silver); and an account in the name of the **Royal Hawaiian Mint**.

2) Agent Muse identified pictures of pallets of Liberty Dollar coins and ingots of raw silver seized by the Government at Sunshine Mint.   (Government Exh. 72)

**ROYAL HAWAIIAN MINT ITEMS**

3) Law enforcement seized the following items from Sunshine Minting's Royal Hawaiian  Mint account:

11 Silver Bars and Silver Scrap totaling 10,720.60 troy ounces (or approximately 800–900 pounds);

168,599 Silver Troy Ounce Coins;

147 Gold Troy Ounce Coins;

17 Gold .05 Troy Ounce Coins;

710 Silver .5 Troy Ounce Coins;

1,000.5 Troy Ounces of Silver Coins; and

1,000.5 Troy Ounces of Silver Coins.

4) The Defendant's project required Sunshine Minting to have a certain amount of unminted silver on hand available for satisfying Liberty Dollar purchase orders.

5) The raw unminted silver held in the Royal Hawaiian Mint account, 11 Silver Bars and Silver Scrap totaling 10,720.60 troy ounces, was held for use in the LDO organization.

6) The gold and silver Liberty Dollar coins held in the Royal Hawaiian Mint account are connected to the charged offenses.

7) The Royal Hawaiian Mint bank account was eventually merged into the NORFED account. (Government Exh. F-57) (5-16-2000 Bledsoe Letter requesting Royal Hawaiian Mint Account 54915160 be merged with NORFED's Account 54915579 and then closed). LIBERTY SERVICES was formerly known as NORFED. (3/8/11 Tr. 98; 3/9/11 Tr. 154);

8) After the Royal Hawaiian Mint entity was no longer active or in existence, the Defendant "used the name" of the entity Royal Hawaiian Mint.[20]

**16,000.05 TROY OUNCES OF UNMINTED SILVER**

---

[20] When the Government asked von Nothaus why checks from Account 2980 would have been written to the Royal Hawaiian Mint in 2006 and 2007, von Nothaus conceded that the Royal Hawaiian Mint was not in existence during that time period. (4/4/11 Tr. 10). The Government then asked whether the Royal Hawaiian Mint was an alter ego of von Nothaus. Von Nothaus didn't protest or disagree but stated, "I used the name, yes." (4/4/11 Tr. 10).

1) During the November 15, 2007 search, Agent Muse was informed by Ms. Sherry Galdi, Sunshine Minting Accounting Manager / Supervisor, that there was another account at the mint associated with Liberty Services, **Account No. 951650** with a Warehouse number of **"SK2"**.  Ms. Galdi produced documentation supporting the association and law enforcement applied for a second search warrant.  (Government Exhs. F40−41).

2) Pursuant to the second warrant, the Government seized **16,000.05 troy ounces (or approximately 1300 pounds) of raw or unminted silver** from Sunshine Minting.

3) According to records of Sunshine Minting, the unminted silver seized by the Government was purchased by Mary S. Nothhouse ("Mrs. N" or "Mrs. Nothhouse"), Defendant's mother, and placed in a special safekeeping account.  (Government Exhs. F42–43).

4) Sunshine Minting's records refer to this account as "Safekeeping 2 account for SK2."  (Government Exh. F50).

5) This safekeeping account identified with Mrs. N was opened September 26, 2005 and characterized as an "individual" account.

6) Mrs. N paid at least two annual "Safekeeping Premiums" in the amount of $50.00.  (Doc. 255 / Exh. 1).

7) Sunshine Minting also stated on its order form "New Whse set up SK2 for Liberty Dollars – NORFED."  (Government Exh. F41).

8) On October 23, 1992, Mrs. N and her husband, Bernard W. Nothhouse, since deceased, funded a revocable trust ("Trust") by combining their joint assets. (Doc. 255, 4 / Exh. D).

9) Under the Trust, Mr. and Mrs. Nothhouse served as trustees, with their son, Robert K. Nothhouse, named as successor trustee. (Doc. 255, 4 / Exh. D).

10) The Trust called for the trust estate to be divided equally and distributed amongst their three children upon their respective deaths. (Doc. 255 / Exh. C, ¶ 2).

11) When Bernard W. Nothhouse passed away in September of 1995, Mrs. N continued to serve as trustee. (Doc. 255 / Exh. C, ¶¶ 1, 10).

12) Approximately one week prior to the first silver purchase, Mrs. N closed a five-year CD account administered by the Trust worth $85,314.20 and placed that sum of money into the Trust account at Colonial Bank. (Doc. 255, 5 / Exh. E).

13) The accumulation of the 16,000.05 troy ounces of unminted silver is documented in Sunshine Minting's November 15, 2007 "Inventory Transaction History Report."[21] (Government Exh. F50).

14) The initial purchase of 11,475 ounces of silver were paid for, with funds withdrawn from a retirement account (the five-year CD account administered by the Trust) belonging to Mrs. N and her spouse. (4/4/11 Tr. 27–28).

---

[21] The opening of SK2, a safekeeping account for warehousing quantities of unminted silver, was prompted by Mrs. N's purchase of 11,475 ounces of 999 fine silver on September 26, 2005. The second purchase and deposit into SK2 was on March 20, 2006 for 4,300 ounces, which brought the SK2 balance up to 15,775 ounces. The third deposit into SK2 was made on March 30, 2006 for 225 ounces from the Royal Hawaiian Mint, which increased the total quantity in SK2 to 16,000 ounces.

15) A corresponding invoice from Sunshine Minting dated September 26, 2005 for 11,475 ounces of fine silver ($7.36 / ounce) was produced by the mint. (Government Exh. F45; Doc. 255 / Exhs. E−G and C).

16) The safekeeping account application listed Mrs. N as the only authorized signatory, yet had a handwritten directive stating: "Please grant access to: Suzy [] . . . or Bernard von Nothaus or Bob NotHaus." (Government Exh. F43).

17) There was testimony from Agent Muse that he believed the "Suzy" referred to in the handwritten note granting access to the account was Mrs. N since "Suzy" was her middle name. (3/18/11 Tr. 42). "Suzy" is, in fact, the middle name of Defendant's mother. (Doc. 255).

18) The reference to "Suzy" is to Mrs. N's daughter, Sue Voye, and the handwritten directive was intended to allow access to all three of the Notthouse children. (Doc. 255 / Exh. C, ¶¶ 2, 7).

19) On March 14, 2006, Mrs. N elected to close a four-year CD account she and her late husband had obtained during their marriage in favor of investing in more silver. (Doc. 255, 6−7 / Exh. C, ¶ 13 and Exh. J).

20) On March 14, 2006, the sum of $34,832.14 was withdrawn from the CD via Disbursement Account Check from First Bank of Missouri paid to "Bernard W. & Mary S. Nothhouse Rev Trust, Mary S. Nothhouse Trustee." (Doc. 255, 7 / Exh. C, ¶ 13 and Exh. J).

21) Mrs. N and her son, Robert Nothhouse, made arrangements to jointly purchase a quantity of silver (3,300 ounces for Mary and 1,000 for Robert). (Doc. 255, 7−8).

22) With reference to the second purchase by Mrs. N, another series of documents produced by the mint, and dated March 20, 2006, reflect a second safekeeping application, purchase order, and invoice from Sunshine Minting for 4,300 ounces of .999 fine silver. (Government Exhs. F46−F48). The 4,300 ounce silver purchase was kept in the same SK2 silver holding account identified as belonging to Mrs. N.

23) With respect to the March 20, 2006 transaction, Mrs. N personally made the silver purchase and request for safekeeping; however, in doing so, the file includes the notation: "Bernard for safekeeping." (Government Exh. F46).

24) The second purchase of 4,300 ounces of .999 fine silver (at $10.45 per ounce) totaled $44,935.00 and was paid by Mrs. N. (Doc. 255 / Exh. L, M).

25) Mrs. N's third purchase of silver was a joint purchase with Defendant Bernard von Nothaus, allegedly for the sake of obtaining a more desirable price. (Doc. 255, 8−10 / Exhs. C, ¶¶ 16−18 and M).

26) A March 30, 2006 invoice reflects that Mrs. N purchased a total of 2,050 ounces of silver, 225 ounces of silver for her own individual safekeeping account and the remaining 1,825 ounces for transfer to Defendant's Royal Hawaiian Mint account. (Doc. 255, 9 / Exh. N).

27) Payment for the third silver purchase was made by Mrs. N to Sunshine Minting via UMB Check No. 2360 for $2,137.50 paid out of a joint account

belonging to Mary Nothhouse and Robert K. Nothaus and Colonial Bank Check No. 597 dated March 30, 2006 for $20,987.50. (Government Exh. F49). Sunshine Mint's cash receipt journal shows that these two deposits were made into Royal Hawaiian Mint's account at Sunshine Mint. (Government Exh. F49A and B).

28)  Mrs. N advanced the money for Defendant's portion of silver, assertedly for convenience and in order to secure (lock-in) a desirable price. (Doc. 255, 9 / Exh. C, ¶ 20).

29)  A deposit in the amount of $5,500 was made into the Royal Hawaiian Mint account at Sunshine per an official check drawn on Colonial Bank dated August 20, 2003.[22] The check identified Mrs. N as the "remitter" and the Royal Hawaiian Mint Account No. 496468 was listed next to her name. (Government Exh. F51–52).

30)  Whether connection to the Royal Hawaiian Mint Account establishes nexus (or a "substantial connection" depending on the forfeiture theory) by a preponderance of the evidence is dispositive of this issue; (4/4/11 Tr. 17–18).

31)  Defendant claims that because Sunshine Minting ordinarily only serves corporate entities, Sunshine Minting would not agree to store his mother's unminted silver absent a recommendation from the Defendant (an established

---

[22]  The Government asserts that the 2003 transaction establishes Mary Nothhouse's involvement with Defendant's scheme at Sunshine Mint prior to the opening of the SK2 safekeeping account in September 2005. (Doc. 200). The Court does not find this remote transaction indicative of Mary Nothhouse's knowledge of, involvement in, or support of Defendant's illegal activities and does not find that the record evidence as a whole supports the Government's position on this issue.

Sunshine Minting customer) or absent an association with Defendant's corporate entity;  (Doc. 255, 2−3).

32)  Defendant further claims that, for the same reason, Sunshine Minting would not permit his brother to open his own individual account for the storage of such a small quantity of silver.  (Doc. 255, 2−3).  According to Defendant, this is why his brother's relatively small quantity of unminted silver was being stored in the SK2 account along with his mother's silver.

33)  Mrs. N supplied a handwritten affidavit dated February 17, 2008 demanding that the Government return 15,000 ounces of silver to her and 1,000 to her son Robert.  (Government Exh. F59).

34)  Mrs. N "swear[s] that all the money [she] used to purchase [the] 16,000 ounces of silver was from [her] savings except for the final 225 ounces that Defendant brought[sic] to repay [her] for money he owed [her] and the money from Robert Keith Nothhouse for his 1000 ounces."  (Government Exh. F59).

35)  Mrs. Nothhouse avers that she "never used any of [her] own money to purchase any silver for Bernard," but that she "did purchase silver for Bernard using funds from checks provided by him."[23]  (Government Exh. F59).

36)  Mrs. Nothhouse supplied a typed affidavit dated March 4, 2008, restating what she had included in her handwritten affidavit, namely, that she "used her life savings to purchase 16,000 ounces of silver" with the exception of the 225 ounces from Defendant and the 1,000 she claims to have purchased on behalf of her son Robert with his money.  (Government Exh. F59).

---

[23]  The typed copy of the Mary Nothhouse affidavit omits reference of any checks given to her by the Defendant and only mentions receiving funds from Defendant.

37) Mrs. Nothhouse filed a claim in the related civil forfeiture action asserting the same facts, namely, that the source of funds used to purchase the 16,000.05 troy ounces of silver was Mrs. N's and her former husband's personal retirement savings. (*See* 1:08CV230-RLV / Doc. 16 Claim of Mary Nothhouse)

38) There is no evidence that since the inception of the SK2 Safekeeping Account that any quantity of silver was taken out of this account for use in the minting of coins.

## C. Property Allegedly Constituting "Proceeds" (or "Derived from Proceeds") of the Crime of Conviction / 18 U.S.C. § 853(a)(1)

"[P]roperty is considered proceeds and therefore deemed forfeitable if "a person would not have [the property] but for the criminal offense." *Bailey II*, 2012 WL 569744, * 9 (quoting *Horak*, 833 F.2d at 1242–43); *United States v. DeFries*, 129 F.3d 1293, 1313 (D.C. Cir. 1997) ("causal link" required between offense of conviction and property sought to be forfeited as proceeds). For purposes of § 982, proceeds encompasses that which is gained / obtained by the Defendant directly or indirectly as a result of the offense of conviction. *See e.g., United States v. Warshak*, 631 F.3d 266, 332–33 (6th Cir. 2010) (affirming the forfeiture of all money generated as a result of defendant's conspiracy to commit fraud, including money obtained from potentially legitimate sales); *but see Bailey I*, 2011 WL 5509027, * 7 (expressing frustration with the Government position that "every asset purchased by the Defendant on behalf of his clients over the course of a decade . . . constitutes proceeds of [defendant's] fraud and is therefore forfeitable, regardless of whether those clients actually suffered a loss as a result of Defendant's fraud") (citing *Reckmeyer*, 836 F.2d at 206).

The Government relies upon § 853(a)(1) as a "catch all" for forfeiture. The Government argues that to the extent any of the Liberty Dollar coins or items seized (apparatus / devices / dies / molds) are not "contraband," they could not have existed "but for" Shelter Systems, NORFED, the Liberty Services entities, and The Royal Hawaiian Mint. (4/4/11 Tr. 11−12).

The Court renders the following **FACTUAL FINDINGS** pertinent to **21 U.S.C. § 853(a)(1)**:

### ACCOUNT 2980  $254,424.09

1) Ms. Kelly Schwartz, a Security Officer for Integra Bank National Association ("Integra"), located in Evansville, Indiana, appeared as a witness for the Government. (3/18/11 Tr. 17−33).

2) Ms. Schwartz provided testimony concerning a commercial (sole proprietorship) interest-bearing checking account identified as "XXXXXX2980" (hereinafter "Account 2980"). (3/18/11 Tr. 17−33). The bank's records of Account 2980 were admitted into evidence in their entirety as Government Exhibit Nos. F1–F23.

3) Account 2980 was opened on November 24, 2006 and closed February 5, 2008. (3/18/11 Tr. 18).

4) Account 2980 identified the account holder as "Bernard von Nothaus, doing business as Liberty Services," with an address of 527 North Green River Road, Number 158, Evansville, Indiana. Account 2980 was the operating account for Liberty Services.

5) The corresponding signature card for Account 2980 identified Bernard von Nothaus and Sarah Bledsoe as possible signatories, or individuals authorized to do business on the account. (Government Exh. F32−1).

6) On a "Certificate of Authority" for Account 2980, Bernard von Nothaus, designated as the owner, signed the card with a "B." Sarah Bledsoe was the designated agent. (Government Exh. F32−2).

7) The customer account profile on Account 2980 described the customer type as "Individual" and referred to Bernard von Nothaus.

8) Account 2980 was subject to a seizure warrant dated November 9, 2007. (Government Exh. F30).

9) Account 2980 was only active for approximately one year, from November 2006 through November 2007. (3/18/11 Tr. 18).

10) The FBI seized $254,534.09 from Account 2980. (3/18/11 Tr. 18).

11) The parties stipulated that between November 2006 and November 9, 2007, the date of seizure, the total amount of deposits made into Account 2980 was $2,190,150.79. (Government Exh. F2 / Statement ending 11/30/06). (3/18/11 Tr. 27).

12) The checks drawn on Account 2980 were imprinted with the name, "Liberty Services" and all signed by Sarah Bledsoe. (3/18/11 Tr. 31, 27−31).

13) Account 2980 Liberty Services checks were written in varying amounts to the following payees: Sunshine Minting (Exhs. F4, F11−12, 14−15, 19, 23−24), Rachelle Moseley (Exh. F5), Bernard von Nothaus (Exhs. F6, F8−F10, F16−18), Kevin Innes (F13, F21), and Sarah Bledsoe (Exh. F22). (3/18/11 Tr. 27−32).

14) Defendant von Nothaus testified that $98,000 of this money was paid into Account 2980 by Mr. Gerhart Reilly ("Reilly"), an alleged innocent third-party investor, for the purchase of Liberty Dollars. (4/4/11 Tr. 5−6). According to von Nothaus, Reilly sold his home and invested the proceeds from the sale in Liberty Dollars.

Reilly was never reimbursed; nor did Reilly physically receive any Liberty Dollars in exchange.   Von Nothaus testified that Reilly's purchase order, which was not produced by the defense, would have been filled from the quantity of Liberty Dollars seized by the Government.

15)  Account 2980 was the operating account for Liberty Services.  (4/4/11 Tr. 8) (orders for Liberty Dollars like the purported order of Gerhart Reilly processed out of Account 2980).

16)  VonNothaus conceded that he personally received payment from Account 2980.

17)  VonNothaus conceded that Account 2980 was also used to pay Sarah Bledsoe and Rachel Moseley on a monthly basis.

18)  Von Nothaus conceded that there were payments to the Royal Hawaaian Mint out of Account 2980.

19) At the time of the Sunshine Minting seizure, there were approximately 200 orders pending against the cash deposited in Account 2980.  (4/4/11 Tr. 6).

20) According to Defendant von Nothaus, certain of these pending orders were for $50 base silver Liberties and some were for Ron Paul Dollars, a copper Ron Paul Dollar, copper Tea Party Dollars, and possibly copper Gun Dollars.  (4/4/11 Tr. 6–7).

## WAREHOUSE RECEIPTS

1)  The Liberty Dollar Warehouse Receipts were not utilized in the same way as the Liberty Dollar silvers.  (3/8/11 Tr. 77–78).

2)  The Warehouse Receipt functioned as a receipt for a Liberty Dollar purchase.  It was "a scrip or paper document that indicates that the holder can redeem it for

whatever amount of silver is indicated on the Warehouse Receipt." (3/8/11 Tr. 63).

3) Agent Walsh described the Warehouse Receipts as "shares" of gold or silver stored in the warehouse. (3/9/11 Tr. 218).

4) Agent Walsh also differentiated between the silver business as an investment where a person could buy silver at bullion or market rate and Defendant's Liberty Dollar scheme that intended primarily that the coins be spent. (3/9/11 Tr. 142).

5) Unlike a Federal Reserve Note, the holder of a Warehouse Receipt is actually entitled to exchange the receipt for the amount of silver printed on the Warehouse Receipt. (3/8/11 Tr. 64).

6) Agent Romagnuolo testified that the Warehouse Receipts seized from the Sunshine Mint had not been redeemed. (3/8/11 Tr. 64–65).

7) Agent Romagnuolo stated that in his investigation, he concluded that Defendant was the owner of all of the seized property. He said: "And during the time of the search, all of the silver that backed those Warehouse Receipts was minted into $50 Liberty Dollar coins." (3/8/11 Tr. 65). Still, Romagnuolo conceded that if he were able, Defendant von NotHaus might redeem the Warehouse Receipts but would not be able to do so given their form ("$50 fake coins") and seizure.[24] (3/8/11 Tr. 65–66).

---

[24] In terms of an appropriate remedy for those interested third-party investors, the undersigned holds open whether the *actual value of the silver*, as shown by the Warehouse Receipts, could be returned to the investors since it may be improper to return any coins designated as "counterfeit" as minted in their existing form.

8) The promotional / training materials did not suggest that the Warehouse Receipts be passed or introduced as paper currency.  In fact, Agent Romagnuolo testified that the Warehouse Receipts were so different in appearance than U.S. paper money, that it would be difficult for someone to mistake it for U.S. currency. (3/8/11 Tr. 77–78).

9) Individual holders of Liberty Dollar Warehouse Receipts will have an opportunity to prove by a preponderance of the evidence under § 853(n) that they were bona fide purchasers for value of some of the unminted silver [or any Liberty Dollar coins that are not deemed to be "counterfeit" or "contraband *per se*"] and were "reasonably without cause to believe that the Liberty Dollar coins were subject to forfeiture.

## COPPER ITEMS & ITEMS SEIZED FROM LIBERTY SERVICES' FULFILLMENT OFFICE IN EVANSVILLE, INDIANA

1) Agent Romagnulo testified about the Government's seizure of the 100 hundred copper Liberty Dollar coins, weighing a total of 100 ounces, identified within the Indictment's "Notice of Forfeiture."  (Government Exh. F34).

2) The seizure of the copper coins occurred at 7 ½ Green Oaks Road, in Asheville, North Carolina.

3) The Green Oaks Road house was used by co-defendant William Kevin Innes.

4) Agent Romagnulo testified that the copper Liberty Dollar coins were addressed to Mr. Innes, arrived by post office box, and had been delivered from the Liberty Services fulfillment office in Evansville, Indiana.

5) FBI Agent Romagnuolo, who was present during the search, also testified about the seizure of items from the Evansville, Indiana office on November 14, 2007. (3/8/11 Tr. 41–42, 62 / Gvmt. Exh. 57). Specifically, the Government seized the following items:

   3,039.375 Pounds of Copper Coins

   5,930.32 Troy Ounces of Silver Coins

   3.24        Troy Ounces of Gold Coins

   3 Platinum coins

6) All of the coins seized in Evansville, Indiana had some reference or imprint indicating that the coins were associated with Liberty Services (Liberty, Liberty Dollar, NORFED, etc.).

## STATE MONETARY INITIATIVE ITEMS

1) During the search of the Evansville, Indiana headquarters, law enforcement recovered state dies for producing Liberty Dollar coins minted with the name of a particular state on one side. (3/8/11 Tr. 43–44 / Government Exh. 67).

2) The LDO State Monetary Initiative consisted of state-specific Liberty Dollar pieces produced for twenty-five states and three islands. (3/15/11 Tr. 639–41).

3) Defendant von Nothaus paid for the mold and minting of a North Carolina Liberty Dollar coin. (3/9/11 Tr. 148–49).

4) Innes paid for the minting of a North Carolina Liberty Dollar and promoted the coin in his region. (3/9/11 Tr. 314 / Government Exh. 68).

5) According to Agent Walsh, the state-specific coins were an exception to the ordinary Liberty Dollar coins because these were more of a collectible or keepsake item as opposed to its primary use as a currency. (3/9/11 Tr. 142–43; 3/15/11 Tr. 639−41).

6) These state Liberty Dollar coins were introduced contemporaneously with the United States quarters with state-by-state markings. (3/8/11 Tr. 44).

7) Government expert, Brian Silliman, compared several of the state-specific Liberty Dollar coins with genuine U.S. state quarters.[25] (3/10/11 Tr. 361 63).

8) The jury was never directly asked whether these coins could be deemed "counterfeit."

9) There was no evidence that the North Carolina (or other state) Liberty Dollar coins were passed in the same way as the other Liberty silvers.

## VIII. CONCLUSIONS OF LAW

Based upon the evidence presented at trial, the forfeiture hearings, the Court's review of the record as a whole, and the factual findings recited herein, the Court hereby finds the following as a matter of law:

---

[25] Specifically, the Government introduced and compared the following:
1. 2006 Liberty $20 CALIFORNIA and 2005 state quarter CALIFORNIA (Tr. 361)
2. 2006 Liberty $20 PENNSYLVANIA and 1999 state quarter PENNSYLVANIA (Tr. 362)
3. 2006 Liberty $20 NORTH CAROLINA and 2001 state quarter NC (Tr. 362)
4. 2006 Liberty $20 ILLINOIS and 2003 state quarter ILLINOIS (Tr. 363)

1) The entities that were used by Bernard von Nothaus in connection with operating this conspiracy, namely, Shelter Systems, the Royal Hawaiian Mint, NORFED, Liberty Services, and the Liberty Dollar Organization were essentially one entity and the alter ego of Defendant.

2) The Government has <u>not</u> established by a preponderance of the evidence that ALL Liberty Dollar coins, or the eleven groups of coins specified within its most recent filing, associated with the Liberty Dollar Organization from 1998 through the present are subject to 18 U.S.C. § 492 forfeiture as "counterfeit" or "contraband *per se*."

3) *With the exception of Hawaii Dala devices*, the items identified within Government Trial Exhibit 71 and Exhibit F34 as "Dies, Molds, and Casts Seized at Sunshine Minting, Inc. on November 14, 2007" are forfeited pursuant to 18 U.S.C. § 492.

4) *With the exception of Hawaii Dala devices*, the dies identified within Government Exhibit 71B (dies not located in the original search but subsequently identified by Sunshine Minting and seized by law enforcement) are also forfeited pursuant to 18 U.S.C. § 492.  (3/10/11 Tr. 324).

5) The funds seized from the Liberty Services Integra Bank Account 2980 in the amount of $254,534.09 are forfeitable under both §§ 853(a)(1) and (a)(2);

6) The 11 Silver Bars and Silver Scrap totaling 10,720.60 troy ounces (or approximately 800–900 pounds) is forfeitable pursuant to § 853(a)(2);

7) With respect to the 16,000.05 troy ounces of raw and unminted silver, the Court finds as a matter of law that the Government has <u>not</u> shown by a preponderance of the evidence the requisite nexus between the Defendant's LDO and the silver housed in this safekeeping account. The Government has <u>not</u> proven a "substantial connection"

that indicates that this quantity of silver was intended to be used to facilitate the conspiracy. 21 U.S.C. § 853(a)(2).  Likewise, the Government has <u>not</u> proven that this quantity of silver constitutes proceeds from the illegal activity or is derived from proceeds. 21 U.S.C. § 853(a)(1).

8)  All seized items associated or stored via the Defendant's Royal Hawaiian Mint account are forfeitable pursuant to both §§ 853(a)(1) and (a)(2).

9)  To the extent they are not already designated as falling within the "counterfeit" category of jury-determined forfeited items, the copper coins seized from the residence of William Kevin Innes are forfeitable pursuant to both §§ 853(a)(1) and (a)(2).

10)  The items seized from the Liberty Services' Fulfillment Office in Evansville, Indiana are forfeitable pursuant to §§ 853(a)(1) and (a)(2).

11)  The state monetary initiative Liberty Dollar coins are forfeitable pursuant to § 853(a)(1).

## IX.    Third-Party Ancillary Proceedings To Follow / 21 U.S.C. § 853(n)

Issuance of this Preliminary Order of Forfeiture triggers the third-party ancillary proceedings pursuant to § 853(n).  During the ancillary proceedings, it is the duty of the Court to determine whether the claimants have a superior legal interest in the forfeited assets.  The state law of the forum giving rise to the claimant's asserted property interest will govern the property right analysis.  *See Oregon*, 671 F.3d at 490; *Bailey II*, 2012 WL 569744, * 8 (looking to the law of the state that created the property right to determine nature of third-party claimant's interest).  The same burden of proof will be applied in the § 853(n) proceedings.  That is, the preponderance of the evidence standard will apply to each third-party claim and the Federal

Rules of Civil Procedure will govern. *See e.g.*, *Bailey I*, 2011 WL 5509027, * 3 (quoting Fed. R. Crim. P. 32.2 Advisory Committee Notes, subsection (c) (2000)) (recognizing applicability of the Federal Rules of Civil Procedure in third-party ancillary proceedings under § 853(n)). The requirements for third-party claims, as well as a description of what a claimant might expect to occur at a subsequent evidentiary hearing, are set out in 21 U.S.C. §§ 853(n)(3) and (n)(5).

After Section 853(n) ancillary proceedings have concluded, the U.S. Attorney General may exercise his discretion in distributing the forfeited assets for the purposes of awarding restitution to victims. *See* 21 U.S.C. § 881(e) (options for disposition of property forfeited to the United States by either civil or criminal forfeiture).

Potential third-party claimants are hereby **ADVISED** and **ON NOTICE** that the Court, and particularly the chambers staff of the presiding district judge, is not permitted to entertain inquiries by phone or letter about these proceedings; nor is it appropriate for the Court to entertain a claimant's personal opinion on the matter.

After discovery is completed, the Court contemplates that *a single evidentiary hearing* will be undertaken to adjudicate the relevant ownership issues asserted by all third-party claimants. 21 U.S.C. § 853(n)(4).

## X.     Third-Party Remedy For Forfeiture Of "Counterfeit" Items Pursuant To 18 § U.S.C. 492

For those items that have been deemed "counterfeit," the statutory remedy for third parties seeking to assert a property interest is to petition the Secretary of the Treasury for remission of forfeiture. 18 U.S.C. § 492.

Unlike the statutory ancillary proceedings prescribed in Section 853(n), this Court has no role, and is not involved, in the third-party remedial mechanism outlined within 18 U.S.C. § 492. This federal district court has <u>no authority</u> to direct or mandate that the Treasury proceed in any

particular manner. However, in the interest of justice, the Court will <u>respectfully</u> <u>recommend</u> that the Secretary of the Treasury thoughtfully consider whether remission of forfeiture is proper to any given extent as to any individual third-party investor(s) who can provide evidence of his or her "innocent owner" or "bona fide purchaser for value" status − and that the individual's only association with the Defendant or Liberty Dollar Organization is as an investor.

Third-Party Claimants should not contact the Western District of North Carolina, the Clerk's Office, or the judge's chambers in connection with this aspect of forfeiture.

## XI.    ORDER

**IT IS, THEREFORE, ORDERED THAT:**

1) The Government's Motions for Preliminary Order of Forfeiture (Docs. 196, 200, 281) are **GRANTED in part** and **DENIED in part** consistent with the terms of the instant Memorandum and Order.

2) The Government's Motion for Final Order of Disposal and Forfeiture of Contraband (Doc. 280) is likewise **GRANTED in part** and **DENIED in part**.  Within thirty days, the parties are directed to meet and compile a list of items (identified by either Trial or Forfeiture Exhibit Number) that, consistent with the terms of the instant M & O, are subject to forfeiture pursuant to 18 U.S.C. § 492 as counterfeit or contraband items.  The parties shall then file a document with the Court **no later than February 1, 2015** detailing their mutually agreed upon list of contraband items prior to further notice to third parties or publication.

3) Because the Court does not find any basis for forfeiture of the 16,000.05 ounces of unminted silver seized from the SK2 Account, Defendant's Motion for Return of Property (Docs. 254, 255) is **GRANTED**.

Signed: December 1, 2014

Richard L. Voorhees
United States District Judge