**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CASE NO. 5:09-CR-00027-RLV-DCK**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| BERNARD VON NOTHAUS, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| PETITION OF MINT HOLDINGS, INC ) | |
| d/b/a ROYAL HAWAIIAN MINT ) | |
| ) | |

**THIS MATTER IS BEFORE THE COURT** on the Government's Motion to Dismiss the Amended Claimant Petition ("Amended Petition") of Mint Holdings, Inc. d/b/a Royal Hawaiian Mint (Doc. 700) for lack of statutory standing/failure to state a claim. (Doc. 804). The matter having been fully briefed (*see* Docs. 804, 810, 811) and the parties having declined this Court's offer to hold a hearing on the Government's Motion, the matter is ripe for disposition. For the following reasons, the Government's Motion to Dismiss (Doc. 804) is **GRANTED IN PART** and **DENIED IN PART**.

**I.   PROCEDURAL & FACTUAL BACKGROUND**[1]

In 1985, Bernard von NotHaus ("von NotHaus") and Talena J. Presley ("Presley") established Royal Hawaiian Mint, Inc. ("RHM") to produce jewelry and medallions commemorating various historical events and Hawaiian leaders. (Doc. 700 at 1-2). Based on the

---

[1] When reviewing a motion to dismiss a claimant petition in an ancillary forfeiture proceeding, "the facts set forth in the petition are assumed to be true." Fed. R. Crim. P. 32.2(c)(1)(A).

1

growth of its business, RHM contracted with Sunshine Minting, Inc. ("Sunshine Minting") to assist in the minting and storage of precious metals. *Id.* at 2.

In 1998, von NotHaus began his own currency side project, which originated as a paper instrument entitled "American Patriot Currency" ("Patriot"). *Id.* at 2-3. The Patriot issued receipts for the purchase of silver, which were redeemable for specified amounts of silver stored in the Sunshine Minting warehouse, thus earning the name "warehouse receipts." *Id.* at 2. In April 1998, RHM invested $6,120.00 in Patriot Silver, providing the original backing for the Patriot.[2] *Id.* at 3. Later in 1998, von NotHaus, to further his currency project, created the National Organization for the Repeal of the Federal Reserve Act and the Internal Revenue Code ("NORFED") and Shelter Systems, LLC ("Shelter Systems"). *Id.* Around the time of the formation of NORFED and Shelter Systems, the Patriot became the "Liberty," backed by "Liberty Silver" and issued through "Liberty Certificates." *See id.*

Although von NotHaus initiated the venture involving the Patriot and the Liberty, RHM facilitated the venture by allowing von NotHaus use of RHM's warehouse connection with Sunshine Minting to secure Sunshine Minting's services and by issuing the first editions of the Patriot. *Id.* at 2. In August 1998, Shelter Systems and Sunshine Minting entered into an Exclusive Manufacturing and Warehouse Agreement (the "Warehouse Agreement"). *Id.* at 3; (*see also* Doc. 700-3).[3] Under the Warehouse Agreement, Shelter Systems provided Sunshine Minting unissued Liberty Certificates and Sunshine Minting agreed, for a set fee paid by Shelter Systems, to mint and store Liberty Silver and to issue Liberty Certificates to individuals buying into the currency

---

[2] RHM's investment came at a point in time when von NotHaus's currency endeavors were likely legitimate and non-criminal. (Doc. 700 at 3; *see also* Doc. 285 at 9).
[3] In assessing the legal sufficiency of a claim under Fed. R. Civ. P. 12(b)(6), a court may rely on a document "integral to and explicitly relied on in the complaint" so long as the non-moving party does not challenge the document's authenticity." *Phillips v. LCI, Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

system. (Doc. 700-3 at 1-2). The Warehouse Agreement further provided that Hawaiian law controlled the interpretation of the agreement, but the metal and certificates were physically located in Sunshine Minting's warehouse in Idaho. *Id.* at 1, 7.

The Warehouse Agreement did not mention or account for RHM's $6,120.00 investment, deposit, and backing in the Patriot/Liberty. (*See* Doc. 700-3). In March 2000, Shelter Systems and Sunshine Minting amended the Warehouse Agreement to, in part, address RHM's initial investment. (*See* Doc. 700 at 3-4). The amendment to the Warehouse Agreement granted RHM the rights to all deposited but unclaimed metals remaining in the warehouse after either the expiration of the twenty-year term of the warehouse receipts, or within 180 days of the warehouse closing. *Id.*; (*see also* Doc. 700-4 at 3).

In November 2007, law enforcement seized metals and related assets at various entities associated with von NotHaus, including Sunshine Minting. (Doc. 285 at 2). The Government filed forfeiture complaints against these seized properties in May and June 2008. (Doc. 804 at 3). Following the seizure of the metals and related assets, a grand jury indicted von NotHaus on charges of conspiracy and counterfeiting stemming from the minting and production of the Liberty. (Doc. 3). After von NotHaus's arrest and arraignment, the Court granted von NotHaus's request for release pending trial but imposed a condition precluding von NotHaus from circulating any coins or currency related to the Liberty. (oral order July 6, 2009). The Court subsequently modified von NotHaus's conditions of release to permit him to reside in Hawaii pending trial. (Doc. 60).

Following von NotHaus's return to Hawaii, von NotHaus's son, Random von NotHaus ("Random"), and Presley established Mint Holdings Inc. ("Mint Holdings"), with Random as the sole owner and Presley as the Chief Executive Officer. (Doc. 700 at 5; *see also* Docs. 700-6, 700-

3

7). Shortly thereafter, von NotHaus and Presley transferred complete ownership of RHM to Mint Holdings, completing the formation of the corporation presently referred to as Mint Holdings, Inc. d/b/a Royal Hawaiian Mint. (Doc. 700-8).

A jury convicted von NotHaus of conspiracy to defraud the United States by making, uttering, and passing counterfeit coins in violation of 18 U.S.C. § 371 (2006), falsely making and forging counterfeit coins in violation of 18 U.S.C. §§ 485, 2 (2006), and uttering and making coins of silver intended for use as current money, in violation of 18 U.S.C. §§ 486, 2 (2006). (Doc 287 at 1; Doc. 291). Based on the Superseding Bill of Indictment and the offenses of conviction, this Court determined that certain properties, including coins and bars of precious metals, were subject to forfeiture. (Doc. 297 at 1-2). To protect the rights of third parties with interests in the properties subject to forfeiture, the Court commenced an ancillary proceeding wherein third parties could file petitions instituting claims for the properties. *Id.* at 2-4. However, the Court determined that some of the seized property, including 1,000.5 troy Ounces of Silver Coins, 1,000.5 troy Ounces of Silver Coins, and certain dies for making Liberty silver pieces, were contraband *per se* and not subject to ancillary forfeiture proceedings under 21 U.S.C. § 853(n) (2012). (Doc. 296 at 2-4).

Mint Holdings petitioned this court for the remission of items seized from RHM's account at Sunshine Minting. (Doc. 700 at 6-7).[4] In an effort to establish its right over the seized property identified in its Amended Petition, Mint Holdings asserts that, as successor of RHM, it, rather than von NotHaus, has an interest in the property and that von NotHaus did not possess legal title to the property. *Id.* at 6. The Government filed a Motion to Dismiss Mint Holdings' Amended Petition,

---

[4] Mint Holdings specifically petitions for: "11 Silver Bars and Silver Scrap totaling 10,720.60 troy ounces (or approximately 800-900 pounds); 168,599 Silver Troy Ounce Coins; 147 Gold Troy Ounce Coins; 17 Gold .05 Troy Ounce Coins; 710 Silver .5 Troy Ounce Coins; 1,000.5 Troy Ounces of Silver Coins; and 1,000.5 Troy Ounces of Silver Coins." (Doc. 700 at 6-7). Mint Holdings also seeks the return of any dies, molds, and casts that are not contraband *per se*. *Id.* at 19. The Court rejects the Government's contention that Mint Holdings fails to specify what property it seeks through its Amended Petition. (*See* Doc. 811 at 3, n. 3).

arguing that Mint Holdings lacks statutory standing to challenge the forfeiture—i.e., the Amended Petition fails to state a claim upon which relief may be granted. (Doc. 804). Specifically, the Government argues that Mint Holdings' Amended Petition fails to allege a sufficient preexisting, vested interest for purposes of 21 U.S.C. § 853(n)(6)(A) because Mint Holdings did not exist at the time von NotHaus engaged in the conduct giving rise to his conviction and the forfeiture. (Doc. 804 at 8-11). Therefore, the Government urges, Mint Holdings is precluded from establishing a legal interest or right in the property prior to the commission of the offense. *Id.* Moreover, the Government maintains that the property at issue constitutes contraband *per se*, precluding Mint Holdings from lawfully possessing the property. *Id.* at 15-17.[5] In response, Mint Holdings contends its Amended Petition pleads the requisite legal interest required by 21 U.S.C. § 853(n)(6)(A). (Doc. 810 at 4-9). Mint Holdings also argues that the Government fails to establish that all of the property it seeks to recover is contraband *per se*. *Id.* at 11. After reviewing the parties' submissions, the Court contacted the parties regarding holding a hearing to permit arguments and the presentation of evidence on the Government's Motion to Dismiss and on Mint Holdings' Amended Petition. Both parties, standing on their pleadings and briefs, declined the opportunity for a hearing.[6]

---

[5] The Government also contends that Mint Holdings cannot demonstrate that it qualifies as a bona fide purchasers for purposes of 21 U.S.C. § 853(n)(6)(B). (Doc. 804 at 11-15). In response, Mint Holdings concedes that it "is not claiming to be a bona fide purchaser in its own, independent right, but rather to be a successor-in-interest to RHM." (Doc. 810 at 5, n.2) As a result of this Court's analysis of the Amended Petition under § 853(n)(6)(A), the Court need not consider whether a petitioner in an ancillary forfeiture proceeding can rely on an alleged bona fide purchase by its predecessor to advance a claim under § 853(n)(6)(b).

[6] The Court notes that the submissions of the parties largely talk past each other, do little to crystalize the issues before the Court on the Government's Motion to Dismiss, and include discussions of numerous issues not apparently relevant to the sufficiency of the allegations in the Amended Petition.

## II. DISCUSSION

### A. Procedures & Standard of Review Governing Forfeiture Proceedings

Federal Rule of Criminal Procedure 32.2 governs criminal forfeiture and sets out the procedures the Government and the Court must follow before the Court may enter a final order of forfeiture. *See United States v. Oregon*, 671 F.3d 484, 487-88 (4th Cir. 2012). Where a court enters a preliminary order of forfeiture, "any third party who claims an interest in the property to be forfeited may file a petition with the district court contesting the forfeiture." *Id.* at 488 (citing Fed. R. Crim. P. 32.2(c)(1)). If a third party comes forward and files a claim petition, a court must conduct an ancillary forfeiture proceeding. *Id.* The first step in an ancillary forfeiture proceedings is for a court to "consider any motion by the United States to dismiss the petition for lack of standing before moving to the merits of the petition." *Id.* (citing Fed. R. Crim. P. 32.2(c)(1)(A), (B)).

In its Motion to Dismiss, the Government challenges whether Mint Holdings has statutory standing to contest the preliminary order of forfeiture. (Doc. 804 at 8-15). The issue of statutory standing "is a separate inquiry from Article III standing," and presents a challenge to the sufficiency of the pleadings in the claim petition relative to the statutory elements a party must allege to challenge a preliminary order of forfeiture. *Oregon*, 671 F.3d at 490 n.6. In this respect, a motion to dismiss that challenges a party's statutory standing "is 'effectively the same as a dismissal for failure to state a claim'" under Fed. R. Civ. P. 12(b)(6).[7] *Id.* (quoting *CGM, LLC v. BellSouth Telecomm., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011)). To establish statutory standing, or

---

[7] Although review of a motion to dismiss a claim petition is governed by Fed. R. Crim. P. 32.2(c) rather than Fed. R. Civ. P. 12(b)(6), much like review under Rule 12(b)(6), a court, when resolving the motion to dismiss, must assume that the facts set forth in the petition are true. Fed. R. Crim. P. 32.2(c)(1)(A). Furthermore, "[d]ismissal of a claim is appropriate only where it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* (internal quotation marks omitted). "In ruling on a motion to dismiss, [a court] construe[s] all well-pleaded allegations of the petition as true and draw[s] all reasonable inferences in favor of the non-moving party." *Id.*

6

"the authority provided by statute to bring suit," a petitioner must have a "legal right, title, or interest" in the seized property that satisfies either of the subsections in 21 U.S.C. § 853(n)(2). *Oregon*, 671 F.3d at 490; *see also United States v. Timley*, 507 F.3d 1125, 1129-1130 (8th Cir. 2007). If the petitioner can assert a sufficient legal interest to satisfy standing, the petitioner may proceed to a hearing where the petitioner will need to prove, by a preponderance of the evidence, the validity of the petitioner's alleged interests under Section 853(n). *Oregon*, 671 F.3d at 488.

B. Statutory Standing Analysis

A petitioner may prevail in an ancillary forfeiture proceeding if the petitioner establishes that

> the petitioner has a legal right, title, or interest in property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in petitioner rather than the defendant, *or* was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property . . . .

21 U.S.C. § 853(n)(6)(A) (emphasis added). Based on the disjunctive nature of 21 U.S.C. § 853(n)(6)(A), a petition satisfies pleading requirements if a petitioner who alleges a legal right, title, or interest in property further alleges that either (1) "the right, title, or interest was vested in petitioner rather than the defendant" at the time of the acts giving rise to the forfeiture or (2) the right, title, or interest relied on by the petitioner "was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property." Mint Holdings alleges that, through its acquisition of RHM, it acquired two interests in the properties listed in its Amended Petition. First, Mint Holdings contends it acquired a future interest in the properties because the Warehouse Agreement granted RHM the rights to any metals not claimed by warehouse receipt holders within twenty years of the issuance of a warehouse receipt or within 180 days of the warehouse closing. Second, Mint Holdings contends that it

7

assumed the role of a bailee for the properties, thus inheriting responsibility for the properties and giving it a possessory interest in the properties.

The Government contends that any interest Mint Holdings acquired from RHM cannot satisfy § 853(n)(6)(A) because Mint Holdings did not acquire RHM until after von NotHaus committed the acts giving rise to his conviction. Because of the disjunctive nature of the § 853(n)(6)(A), the Government's argument is only half correct and does not defeat Mint Holdings' Amended Petition. While the fact—that Mint Holdings acquired RHM, and the claimed interest in the forfeited properties, subsequent to von NotHaus committing the acts giving rise to his conviction—prevents Mint Holdings from alleging that the right or interest was vested in Mint Holdings rather than the von NotHaus at the time of von NotHaus's criminal acts, it does not prevent Mint Holdings from establishing that the right or interest it relies on was superior to any right or interest held by von NotHaus at the time of his criminal acts.[8] Thus, the sufficiency of Mint Holdings' Amended Petition hinges on whether either of the rights or interests relied on by Mint Holdings is (1) the type of right or interest sufficient to sustain a petition under § 853(n)(6)(A) and (2) was superior to von NotHaus's interests at the time von NotHaus commenced his criminal action.[9]

The provisions governing ancillary forfeiture proceedings, including § 853(n)(6)(A), "shall be liberally construed to effectuate [their] remedial purposes." 21 U.S.C. § 853(o). The term "legal interest" is not defined within 21 U.S.C. § 853. *Timley*, 507 F.3d at 1129. Noting this

---

[8] A reading of § 853(n)(6)(A) in accordance with the Government's argument would eliminate the disjunctive nature of the subclause by effectively giving the same meaning to both portions of the disjunctive, rending part of the subclause superfluous.

[9] When determining the superiority of interests for the purposes of Section 853(n)(6)(A), courts directly compare the interests pled by a petitioner against the interests held by the defendant in the underlying criminal offense. *See Oregon*, 671 F.3d at 492-93; *see also United States v. Bailey*, 926 F.Supp.2d 739, 768 (W.D.N.C. 2013) (explaining this superiority-of-interest inquiry "is not a precise one, but instead involves equitable considerations and is necessarily fact-bound and value laden") (quoting *Oregon*, 671 F.3d at 490).

omission, courts, including the United States Supreme Court, have turned to Black's Law Dictionary to define "interest" as "the most general term that can be employed to denote a right, claim, title or legal share in something" and "legal interest" as "an interest that has its origin in the principles, standards, and rules developed by courts of law as opposed to courts of chancery." *See id.* (brackets omitted) (quoting *Russello v. United States*, 464 U.S. 16, 21 (1983) (quoting *Black's Law Dictionary* 729 (5th ed. 1979)); *Black's Law Dictionary* 829 (8th ed. 2004)); *see also United States v. Reckmeyer*, 836 F.2d 200, 205 (4th Cir. 1987) (giving a "broad construction" to "interest" so as to define the term to allow for "'the most general term that can be employed to denote a right, claim, title, or legal share in something'" (quoting *Rusello*, 464 U.S. at 21)). Applying this principle, the United States Court of Appeals for the Fourth Circuit construed "the term 'legal interest' [to] encompass[] all legally protected rights, claims, titles, or shares in real or personal property." *Reckmeyer*, 836 F.2d at 205. Further, to determine whether an asserted interest constitutes a legally protected right, courts "look to the law of the jurisdiction that created the property right to determine whether the claimant has a valid interest." *Timley*, 507 at 1129-30; *see also Oregon*, 671 F.3d at 490 ("Although the forfeiture issue here is a matter of federal law, we generally refer to state law in determining whether a petitioner has a legal interest in forfeited property."). However, in "circumstances where there is evidence a defendant has manipulated state law property rights to shield assets from the reach of forfeiture law," the Fourth Circuit has "departed from [reliance on] state law." *Oregon*, 671 F.3d at 490 n.7 (citing *In re Bryson,* 406 F.3d 284, 290-91 (4th Cir. 2005); *United States v. Morgan*, 224 F.3d 339, 343-43 (4th Cir. 2000)).

Mint Holdings alleges that it acquired RHM's future interest in the seized property under the amendment to the Warehouse Agreement. In property law, a future interest creates certain rights and privileges to property where the right of possession is postponed until the future. *See*

9

*In re Luna*, 406 F.3d 1192, 1199 (10th Cir. 2005) (citing RESTATEMENT (FIRST) PROPERTY § 153(1)(a) (1936)). Future interests can be contingent on other events to first occur before such interests can be enjoyed and relevant state law readily recognizes the validity of agreements granting a party a future contingent interest in property. I.C. §55-106 ("contingent interests); *see Kirk v. Wescott*, 382 P.3d 342, 350 (Idaho 2016) (recognizing validity of deed creating future interest in real property); *Linson v. Linson*, 618 P.2d 748, 750 (Haw. App. 1980).

The Amended Petition and supporting documents, particularly the amendment to the Warehouse Agreement, provide that RHM was granted the right of immediate possession of any unclaimed metal that remained in the warehouse upon expiration of the twenty-year period or the expiration of 180 days following a pre-term closing of the warehouse. (Doc. 700 at 14; Doc. 700-4 at 3). From these terms, RHM allegedly obtained a future contingent interest in the metal seized by the Government. That is, RHM would be entitled to any leftover metal remaining in their warehouse account presuming some warehouse receipt holders did not redeem their warehouse receipts, resulting in the unaccounted for metals. These alleged facts are sufficient to show RHM acquired a future interest in the metals, subject to the condition that the warehouse receipt holders failed to redeem them in the allotted time.[10]

The Amended Petition and supporting documents manifest that the amendment to the Warehouse Agreement, giving rise to the right relied on by Mint Holdings, was formed before von NotHaus engaged in the criminal activity giving rise to his conviction. (Doc. 700 at 3-4; *see also* Doc. 285 at 9). Additionally, the Amended Petition suggests that the future interest created by the

---

[10] The Government argues that it "has not found a case even remotely similar to this case that supports Mint [Holdings'] positions on vested future interests or fiduciary interests." While the absence of case law supporting Mint Holdings' alleged interest may prove highly relevant regarding Mint Holdings' ability to establish its interest by a preponderance of the evidence, the lack of case law supporting its interest does not defeat Mint Holdings' Amended Petition for pleading purposes where the Government provides no case law rejecting the interest relied on by Mint Holdings or rejecting Mint Holdings' ability to acquire RHM;s interest.

amendment to the Warehouse Agreement was independent from any interest belonging to von NotHaus and only inferior to the interests of individuals holding warehouse receipts.[11] Furthermore, in hinging its argument for dismissal on the timing of Mint Holdings' acquisition of the future interest under the amendment to the Warehouse Agreement, the Government does not present any argument that von NotHaus's interest in the properties was somehow superior to the future interest at the time of the amendment to the Warehouse Agreement or at any time between the amendment and von NotHaus committing the acts giving rise to his conviction. Accordingly, Mint Holdings' reliance on the future interest created by the amendment to the Warehouse Agreement satisfies the pleading requirements of 21 U.S.C. § 853(n)(6)(A).[12]

In the alternative, the Court concludes that Mint Holdings' pleadings as to its role as a bailee are sufficient to satisfy the requirements of 21 U.S.C. § 853(n)(6)(A). Mint Holdings' Amended Petition alleges that, because RHM stored in its warehouse the various metals over which the warehouse receipt holders possessed legal title, RHM acted as a "bailee." (Doc. 700 at 13). A bailment, defined as "the rightful possession of goods by one who is not the owner," is created by a consensual transaction in which the bailor intentionally provides possession of its property to the bailee, and the bailee accepts the possession and responsibilities entailed in such relationship. *Waugh v. University of Hawaii*, 621 P.2d 957, 968 (Haw. 1980); *see also State v. Johnson*, 326 P.3d 361, 364 (Idaho Ct. App. 2014). Thus, in a bailment, title to the property remains in the bailor, while the bailee acquires a possessory interest in the property. *Johnson*, 326 P.3d at 364. Moreover, the creation of a bailee/bailor relationship places upon the bailee

---

[11] Nothing in the Amended Petition or the Government's papers in favor of dismissing the Amended Petition suggest that von NotHaus held any warehouse receipts.
[12] The Court notes that the formation of Mint Holdings and its acquisition of RHM, a company established in part by von NotHaus, raises the specter of manipulation of state property law by von NotHaus to shield assets. The Court, however, concludes that consideration of this possibility is more appropriate at a later stage in this proceeding after the Court has received testimony and evidence about the formation of Mint Holdings and its acquisition of RHM.

obligations, including a duty of care and the responsibility to deliver or return goods to the bailor with legal title. I.C. §§ 28-7-102 ("'Bailee' means a person that by a warehouse receipt . . . or other document of title acknowledges possession of goods and contracts to deliver them"), 28-7-204, 28-7-403.

The Amended Petition sufficiently alleges facts showing that RHM assumed the role of bailee, acquiring a present possessory interest in the property. Namely, warehouse receipt holders were the legal owners of the metal for which they paid and received receipts, redeemable for the metal stored in the Sunshine Minting warehouse. RHM had constructive possession of the metals as Sunshine Minting maintained the metals under RHM's account. Further, RHM acknowledged the receipt holders were the legal owners and that RHM was obliged to return the stored metals if a receipt holder presented a receipt for redemption. These alleged facts are sufficient to show the creation of a bailee/bailor relationship through which RHM obtained a possessory interest in the metal. Further, RHM's initial investment and of the amendment to the Warehouse Agreement predated von NotHaus's criminal conduct. Finally, the Government has not identified or explained what, if any, interest von NotHaus had over the property for which RHM was a baliee or how any interest held by von NotHaus was superior to RHM's possessory interest given the interest of the warehouse receipt holders. Thus, Mint Holdings sufficiently pleads facts that demonstrates its predecessor, RHM, held two interests in the forfeited property, a future, contingent right to ownership and a right to possession via the bailment.

C. Contraband *Per Se* Exception

The Government also seeks dismissal of Mint Holdings' Amended Petition on the ground that the forfeited property is contraband *per se*. For this argument, the Government relies on this Court's prior rulings and the proposition that a petitioner in an ancillary forfeiture proceeding

cannot recover seized property that is contraband *per se* because the property is illegal to possess. The Court notes the dichotomy between the Government's claim that it cannot ascertain what property Mint Holdings seeks to recover through the Amended Petition and the Government's argument that the property Mint Holdings seeks to recover is contraband *per se*. Nonetheless, the Court concludes that the Government's contraband *per se* argument has merit with respect to some, but not all, of items Mint Holdings seeks to recover.

As the Government notes, this Court has previously held that no individual or entity, apart from the United States, may have a right or interest in property deemed "contraband." (Doc. 296 at 2-3). Such property judged as contraband *per se* is not subject to ancillary forfeiture proceedings under 21 U.S.C. § 853(n) and Fed. R. Crim. P. 32.2(c). *Id.* Although the Government properly observes this Court's other rulings regarding contraband *per se* in this case, the Government's argument fails to differentiate *which* items sought in Mint Holdings' Amended Petition are specifically contraband. Indeed, the court documents and other orders the Government itself cites clearly emphasize that the Court did *not* deem all the seized property "contraband." (Doc. 285 at 35) ("The Government has <u>not</u> established by a preponderance of the evidence that ALL Liberty Dollar Coins, or the eleven groups of coins . . . are subject to 18 U.S.C. § 492 forfeiture as 'counterfeit' or 'contraband *per se.*'") (emphasis in original); *see also* (Doc. 794 at 2-3) (dismissing petitioner's claims for coins made after the warning from United States Mint as this property was contraband, but granting petitioner's other claims for certain Liberty dollars and amounts of silver which were not deemed contraband); (Doc. 750) (granting in part and dismissing in part based on some coins constituting "contraband" and thus not subject to return under § 853(n), whereas others were not deemed contraband and could potentially be returned). To that point, the

Court orders relied on by the Government do not classify any of the raw silver as contraband *per se*.

Whether the requested property is contraband *per se* necessitates an examination of the Court's Consent Order and Judgment of Forfeiture (Doc. 296) and Preliminary Order of Forfeiture (Doc. 285 and Doc. 297) to determine what, if any, of the property so requested was finally forfeited and thus not appropriate for further review under Section § 853(n). *See* (Doc. 743 at 2). Upon review of these orders and Mint Holdings' Amended Petition,[13] the requested "1,000.5 troy Ounces of Silver Coins," and "1,000.5 troy Ounces of Silver Coins" were deemed contraband *per se* by this Court, making them finally forfeited and not eligible to be possessed by any individual or entity other than the United States. (Doc. 296 at 3). However, it is not apparent that the remaining items were deemed contraband *per se*. (*See* Doc. 296 at 3-4; Doc. 297 at 2-3).

### III. DECTRETAL

**IT IS, THEREFORE, ORDERED THAT** the Government's Motion to Dismiss (Doc. 804) Mint Holdings' Amended Petition (Doc. 700) is **GRANTED IN PART** with respect to the 1,000.5 troy Ounces of Silver Coins and 1,000.5 troy Ounces of Silver Coins and is **DENIED IN PART** with respect to all other items Mint Holdings seeks through its Amended Petition.

Signed: April 17, 2017

Richard L. Voorhees
United States District Judge

---

[13] Recall, the specific items Mint Holdings petitioned for return were: 11 Silver Bars and Silver Scrap totaling 10,720.60 troy ounces (or approximately 800-900 pounds); 168,599 Silver Troy Ounce Coins; 147 Gold Troy Ounce Coins; 17 Gold .05 Troy Ounce Coins; 710 Silver .5 Troy Ounce Coins; 1,000.5 Troy Ounces of Silver Coins; 1,000.5 Troy Ounces of Silver Coins; and dies, molds, and casts that were not contraband *per se*. (Doc. 700 at 6-7, 19).