# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### CIVIL ACTION NO. 5:09-CR-00027-KDB-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | **ORDER** |
| BERNARD VON NOTHAUS, | |
| Defendant. | |

**THIS MATTER** is before the Court for a final ruling on David L. Gillie's ("Petitioner" or "Gillie") Petition for the return of 500 half ounce silver coins, which have been seized by the United States in connection with this criminal action against Bernard Von Nothaus (Doc. No. 499).[1] The Court has carefully considered this Petition, the evidence of record (including testimony and other evidence presented at two hearings held by the Court), the parties' briefs and related exhibits, and oral argument on the Petition from the parties' counsel during both hearings. For the reasons discussed below, the Court will **DENY** the Petition.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Beginning in 1998, Defendant Bernard Von Nothaus ("Nothaus"), through his "Liberty Dollar" organization, designed and manufactured "Liberty Dollar" coins in various denominations,

---

[1] Petitioner requests that the United States return 500 half ounce silver coins (which he refers to as "Peace Coins" because they include the phrase "Stop the War") that were confiscated by the government on November 16, 2007. (Doc. No. 499). However, Gillie's purchase invoice for the coins shows that Petitioner ordered 600 coins. *Id.* at 2. Petitioner's counsel described the different number of coins as an error in the Petition, but, as discussed below, the difference between 500 and 600 coins is immaterial to the Court's ruling.

1

including $1, $5, $20, $50, that he distributed across the country to circulate among the public. *See* Joint Appendix (hereafter, "J.A."), Doc. No. 871-2 (pp. 1-488); 871-3 (pp. 489-947); 871-4 (pp. 948-1392); and 871-5 (pp. 1393-1758) at 259, 315–16, 802–810, 821 and 1462–67. Defendant's distribution network included several levels. *Id*. at 254. Fifty-five "regional currency officers" paid the Liberty Dollar organization an annual fee to serve as exclusive distributors of Liberty Dollar coins in an assigned geographic region. *Id*. at 255, 270–71, 318 and 331. Petitioner, a resident of Michigan, became a "regional currency officer" or "RCO" in 2001 or 2002.  Doc. No. 871-12 at 19-20.

RCOs could purchase coins from the Liberty Dollar organization in bulk, J.A. at 332–333, and then resell the coins to Liberty Dollar "associates," who paid a smaller fee to participate in the organization, or to merchants who sold ordinary goods and services to the public. *Id*. at 270, 276, 308–309. Because Nothaus had Liberty Dollar coins minted with dollar amounts greater than the cost of the metal they contained, participants at each level of Defendant's network could profit from the distribution of Liberty Dollar coins. *Id*. at 304-5. RCOs purchased coins from the Liberty Dollar organization at a cost lower than the dollar value stamped on each coin's face. *Id*. at 278– 79. For example, RCOs could purchase one-ounce silver Liberty Dollar coins stamped with a value of $20 for $11 each, depending upon the price of silver. *Id*. RCOs then resold the coins to associates or merchants for a price that remained lower than the value depicted on the coin but still provided the RCO with a profit, for example, $16. *Id*. at 279. A merchant could then net money by giving the coin as change at "face value" to a customer. *Id*. at 279–300 (e.g., a merchant who paid $16 for a Liberty Dollar that depicted $20 on its face, could make $4 by giving the Liberty Dollar coin

2

to a customer instead of $20 in United States currency).[2] *Id*. at 279–80, 304–05. In training sessions and materials, Nothaus emphasized that the coins he supplied were "meant to be spent" instead of collected or stored by investors, J.A. at 275, 293, 313, and that he wanted merchants and customers to conclude that the coins were a "useful viable currency." *Id*. at 309. With respect to Gillie, he netted a profit by selling "thousands of ounces" of Liberty Dollar coins of "all different designs" to customers of the restaurant he operated. Doc. No. 871-12 at 23:4-25:3, 33:3-16, 41:13-17.

The Liberty Dollar coins were minted with different designs. *Id*. at 832–833, 840-841. The front of many coins, for example, featured the head of the Statue of Liberty with the word "Liberty" in her crown, a year, and the words "Trust in God." *Id*. at 227–30, 352. The reverse of many coins featured a dollar sign and number such as $10 or $20, which corresponded to denominations in "the existing monetary system;" words, such as "twenty dollars," reflecting the denomination; the words "Liberty Dollar;" and a torch. *Id*. at 497, 816, 865–67; Doc. No. 871-9. The face of some coins included the word "Peace" above the head of the Statue of Liberty, with the word "Liberty" in the statue's tiara. J.A. at 497; Doc. No. 871-9. The Liberty Dollar coins distributed by Nothaus also reflected numerous other variations. J.A. at 832–33, 840-41. Some coins, for example, were made of silver. *Id*. at 785-86. Others were made of gold. *Id*. at 840–41. Some coins were one-ounce and others were half-ounce. *Id*. at 802, 842. And, the specific language that appeared on coins

---

[2] At his "Liberty Dollar Universities," (which Gillie attended for at least two seminars, J.A. at 289; Doc. No. 871-12 at 17:6-12, 43:1-11), Nothaus told participants that his techniques worked, and that, even though "prudence would seem to indicate that people would refuse a currency they've never seen[,]" "[a]fter thousands of transactions, the Liberty Dollar is readily accepted most of the time." J.A. at 293. Although Petitioner contends that he did not engage in or approve of all of the sales tactics encouraged by Nothaus, he does not dispute that he attended two Liberty Dollar Universities and was otherwise aware of Nothaus' suggested tactics. *See* Doc. No. 871-12 at 36:8-16, 45:20-47:13.

3

changed over time. *Id*. at 787–814. To manufacture the Liberty Dollar coins, Nothaus contracted with the Sunshine Mint in Idaho. J.A. at 321, 492, 748–49, 1462–63.

In September of 2006, the United States Mint informed Nothaus and other participants in the Liberty Dollar organization by letter that the Department of Justice had determined that the use of Liberty Dollars as "circulating money" was "a Federal Crime." *Id*. at 205, 435. The Mint also prepared a consumer advisory informing consumers that the Department of Justice had determined that Liberty Dollar coins were illegal. J.A. at 434. Gillie received a copy of the U.S. Mint letter and says he was aware of the warning at "right about the same time" that he was purchasing the coins at issue here, yet he continued with the purchase. Doc. No. 871-12 at 49:9-52:25, 55:8-14. Also, Nothaus and others in the organization continued to distribute Liberty Dollar coins even after being told that the circulation of the coins was illegal. J.A. at 476. Indeed, the Liberty Dollar organization provided its associates with T-shirts that advertised the Liberty Dollar and said, "The U.S. Mint can bite me." *Id*. at 207. Petitioner Gillie admits that he knew of the T-shirts and their message because he was friends with the person who produced them. Doc. No. 871-12 at 56:4-56:9; *see also* Doc. No. 871-13 at Exhibit 4 (Trial Exhibit 39).

In October 2007, Gillie purchased 600 "Peace Dollars" from Liberty Dollar for $5,022.00. Doc. No. 871-12 at 67:4-16, 69:1-3; Doc. No. 871-13. As part of their investigation of the Liberty Dollar organization, agents of the Federal Bureau of Investigation searched the Sunshine Mint in November of 2007. J.A. at 492–95. They recovered, among other things, a host of Liberty Dollar coins. *Id*. at 494–97; Doc. No. 871-6 (Trial Exhibit 71); Doc. No. 871-9 (Trial Exhibit 72). Sunshine Mint representatives told the agents that Sunshine had recently shipped some additional silver coins; and, the representatives called their shipping company and had the coins returned. J.A. at 495. Later in November, after the returned coins arrived at the Sunshine Mint, FBI agents

4

collected them. *Id.* at 495; Doc. No. 871-7 (Trial Exhibit 71A); Doc. No. 871-8 (Trial Exhibit 71B). Among the coins that law-enforcement seized from Sunshine Mint in November 2007 were two sets that each contained 1,000 half-ounce "silver liberty peace dollars," J.A. at 494–497, 1331–1332, 1703, 1741-1742; Doc. No. 871-7 (Trial Exhibit 71A); Doc. No. 871-8 (Trial Exhibit 71B). However, the record does not reflect how many of these coins were shipped to particular customers.

A Grand Jury in the Western District of North Carolina indicted Nothaus and charged him with three counts related to his Liberty Dollar operation. J.A. at 158–70. The indictment alleged that a number of different coins and other objects were subject to forfeiture because, among other things, they were counterfeits of coins of the United States subject to forfeiture under 18 U.S.C. § 492. J.A. at 168–69. Among the items that the indictment alleged to be subject to forfeiture were the half-ounce Liberty "Peace Dollars" seized from the Sunshine Mint. *Id.* at 169, 1741.

At Nothaus' trial, the Jury and the Court heard, among other evidence, the testimony of Brian Silliman, an expert in the authentication, grading, and identification of coins, tokens, and medals, including counterfeits. *Id.* at 515, 521. He testified about similarities between various Liberty Dollar coins and United States coins. *Id.* at 527–29. Using a demonstrative exhibit with illustrations, he identified a number of features of United States coins that appear on Liberty Dollar coins, including depictions of a torch; portraits of Liberty; the "use of the dollar sign"; spelled-out statements of the denomination on the bottom of the coin; a serif font; reeded edges, which are edges with lines; "Liberty" in cursive, and references to the United States of America or "USA." *Id.* at 527-540.

In his expert report, which was admitted into evidence, J.A. at 546–47, Silliman described the similarity of a "2008 Liberty Silver $10 'PEACE'" Liberty Dollar coin to United States coins.

5

*See* Doc. No. 871-10 (Trial Exhibit 77A at 3, 6). The Liberty Dollar "peace" coin weighed 15.5 grams — just over half an ounce, *United States v. Hackley*, 662 F.3d 671, 680 n.2 (4th Cir. 2011) ("One ounce is equivalent to 28.35 grams."), and was 32.3mm in diameter. *Id*. at 3. Silliman's report identifies features that appear on the "peace" coin that are similar to United States coins, including the depiction of Liberty with a tiara; a torch; a reeded edge; a silver color; the word "Liberty" in script letters; the motto "Trust in God"; the "$" dollar symbol; the word, "dollars"; and the abbreviation "USA." *Id*. at 6.

The Jury found Nothaus guilty of all counts. The Jury found that Nothaus counterfeited and passed counterfeit coins "in resemblance and similitude of" United States coins, in violation of 18 U.S.C. § 485. *Id*. at 1347, 1358. The Jury returned a Special Verdict finding Defendant guilty of both making counterfeit coins and passing and uttering counterfeit coins with intent to defraud. *Id*. at 1347. The Jury also found him guilty of making, uttering, and passing a coin of silver intended for use as current money, in resemblance of genuine coins of the United States, or of original design, in violation of 18 U.S.C. § 486. *Id*. at 1348, 1358. Finally, the Jury convicted Nothaus of conspiracy to violate sections 485 and 486. *Id*. at 1347, 1356–57.

After Nothaus was convicted, the parties presented additional evidence at a forfeiture bench trial. *Id*. at 1527. The United States argued that the half-ounce silver Liberty Peace Dollars recovered from Sunshine Mint were counterfeit coins that are "contraband *per se*," meaning that "their mere possession is illegal," and that they are subject to forfeiture under 18 U.S.C. § 492. *Id*. at 1508–11. The Court stated that it would consider to be contraband and subject to forfeiture "Liberty Dollar coins that were admitted into evidence via representative samples, comported with the definition of 'counterfeit' submitted to the jury, were definitely minted after 2006, bore a dollar sign or denomination, and did not bear competing insignia or characteristics of multiple entities

6

of" Von Nothaus. *Id*. at 1537-15445; 1563-1569; 1574-1577; 1662-1663, 1717. The Court then ordered the United States and Defendant to meet and compile a list of items that are "subject to forfeiture pursuant to 18 U.S.C. § 492 as counterfeit or contraband items." *Id*. at 1564.

Nothaus and the United States conferred and, upon a joint Motion by Nothaus and the United States, the Court found a number of items, including the 2000 half-ounce silver Liberty Peace Dollars recovered from the Sunshine Mint, contraband and subject to forfeiture under 18 U.S.C. § 492. *Id*. at 1575–77. The Court then held that the items should be "finally forfeited and disposed of by the United States without any further proceedings," including proceedings under 21 U.S.C. § 853(n) that govern third-party interests. *Id*. at 1575. The Court also entered preliminary orders of forfeiture "in which it forfeited, subject to third-party petitions," other assets, including "funds, coins that were not contraband *per se*, items used to make coins, and raw metals." *Id*. at 1578-1581.

Several weeks after the Court entered its order forfeiting contraband, Gillie filed a Petition asking this Court to "return [his] Liberty Dollar property or its[] equivalent in US dollars." *Id*. at 1583. He asserted that he "had ordered and paid for but did not receive" a number of items, including "500 half ounce silver peace" coins. *Id.* And, he attached an "invoice" dated October of 2007 from "The Liberty Dollar" describing an order that included "600 $10 Silver Peace Dollar — General Issue" at a price of $8.37 each. *Id.* at 1584.

The United States agreed that the Court should grant Gillie's Petition with respect to several of the non-contraband items in which he asserted an interest, *id.* at 1680-84, but asked the court to dismiss his claim for 500 half-ounce silver Peace Dollars because they are counterfeit coins and the Court had ordered them "forfeited to the United States as contraband *per se*," *id.* at 1680–81; *see also id.* at 1665–66, 1671, 1677. The United States asked the Court to dismiss Gillie's

Petition under Federal Rule of Criminal Procedure 32.2(c)(1)(A) for lack of standing and for failure to state a claim to the extent that it sought these items. *Id.* at 1682–83.

Gillie responded to the United States' Motion to Dismiss by asserting that the "half ounce 'Peace Dollars'" that he sought were "different from the items found to be counterfeit." *Id.* at 1685-89. "The items at issue in this motion," he said, "should more properly be called 'Stop the War' (STW)." *Id.* at 1685. He asserted that the items he sought were "NOT the same as the 1 oz. 'Peace Dollars' (Peace) that were used as an exhibit in the trial of this case." *Id.* at 1685. He contended that the coins he sought differed from the "Peace item that was used as an exhibit in court" because the coins Gillie sought are not a full ounce, they are a different size, and they display the words "Stop the War." *Id.* at 1686–87. He attached images of the "Peace item" that he conceded was "subject to forfeiture" along with images of the kind of half ounce coins that he sought. *Id.* at 1689.

The Court entered an Order granting Gillie's Petition in part and denying it in part. *Id.* at 1690-92. The Court denied Gillie's request for 500 half-ounce silver Peace coins, explaining that "[s]aid coins have been determined to be contraband." *Id.* The Court explained that, because "no person or entity other than the United States may have a property right or interest" in contraband, the Petition failed to state a claim to the extent it sought those coins. *Id.* at 1691–92. Three months later, Petitioner filed a document requesting a hearing "so that the Court may see and understand the issues addressed by [the] document." *Id.* at 1693-98. Petitioner reiterated that he was not "objecting to the forfeiture of any of the one ounce Peace Dollars." *Id.* at 1694. In a reply to Gillie's request, the Government asserted that the specific coins sought by Gillie are "similar enough to legal United States currency so as to make the coins counterfeit and therefore contraband." *Id.* at 1700. The Government attached its own photograph of examples of the coins that Petitioner sought. *Id.* at 1703. Petitioner responded with another filing asserting differences between the

8

coins he sought and United States coins, stating that he had purchased the coins as a political statement, and alleging that the coins were not "used as exhibits in the case in chief" of Defendant's trial. *Id.* at 1704-1, 1744–46.

Gillie asked the court to grant his claim for the half-ounce coins or "schedule a hearing to discuss and explore this matter." *Id.* at 1705, 1737–38. On August 4, 2017, the Court entered its Final Order and Judgment of Forfeiture. *Id.* at 1747. The Court explained that it found "certain coins Gillie sought to recover, including 'five hundred (500) ½ ounce silver Peace coins' were contraband *per se* and could not be returned to Gillie." *Id.* at 1752. The Court construed Gillie's filing as a motion for reconsideration of its order denying his claim to the extent it sought those coins. *Id.* at 1752 (1d). The Court found that "the coin Gillie refers to as the 'Stop the War' coin" was "the 'Peace' coin as the head's side of the coin features the word 'PEACE' above a head logo of the Statue of Liberty while the tail's side of the coin features the phrase 'STOP THE WAR' above a depiction of the Statue of Liberty's torch." *Id.* at 1752 (1d). The Court noted that it had "previously determined that the coin Gillie calls the 'Stop the War' coin is contraband *per se*." *Id.* at 172. The Court denied Gillie's motions. *Id.* at 1752.

Gillie appealed. Upon review of the record and without agreeing to any of Gillie's substantive contentions, the Government agreed to a remand to allow Gillie to have the hearing he had requested. Accordingly, the Court held an initial in-person hearing on April 15, 2021 and determined that further briefing and an additional hearing was necessary. Doc. No. 874. The Court then conducted a final evidentiary hearing on May 20, 2021. At each hearing, the Court gave Gillie and the Government a full opportunity to introduce evidence and present witnesses. As discussed further below, Gillie testified briefly at both hearings, but otherwise no new testimony was introduced. Also, at the second hearing, the Government provided the Court with specimens of the

silver coins in dispute for the Court's examination. Finally, counsel for the Parties made extensive arguments to the Court based on the existing trial record and the evidence presented at both hearings.

The matter is now ripe for a final decision on the merits.

## II.    LEGAL STANDARDS

In all criminal proceedings where a jury is not waived, a jury acts as the factfinder and makes the determination whether the defendant is criminally liable. The defendant's right to a jury trial on the merits is guaranteed under the Sixth Amendment. Here, a jury decided that Nothaus was guilty. Federal Rule of Criminal Procedure 32.2 and 21 U.S.C. § 853, as incorporated by 18 U.S.C. § 982(b), dictate the procedures applicable to a criminal forfeiture proceeding. Rule 32.2(b)(1) provides for entry of a preliminary order of forfeiture upon the entry of a guilty verdict or a plea of guilty if the Court determines by a preponderance of the evidence that there is a nexus between the identified property and the offense. *See Libretti v. United States,* 516 U.S. 29, 38–40 (1995).

Typically, the jury makes the factual determination of whether there is a nexus between the property and the criminal offenses committed as part of the forfeiture determination. *See* Fed. R. Crim. P. 32.2(b)(4). However, a defendant may waive his right to a jury on the issue of "nexus," and Nothaus waived his opportunity to have a jury trial on forfeiture. Accordingly, the Court determined the relevant facts on the forfeiture count, and then, as discussed above, entered a forfeiture order as part of the Defendant's sentence.

The Government bears the burden of establishing by a preponderance of the evidence that the property is connected by a nexus—sometimes defined as a substantial connection—to the conviction and are thus forfeitable. Fed. R. Crim. P. 32.2(b)(1); *United States v. Cherry*, 330 F.3d

658, 669 (4th Cir. 2003); *see also United States v. Herder*, 594 F.3d 352, 364 (4th Cir. 2010). At trial (and also before the Court at the hearings on Gillie's Petition), the Government satisfied its burden and established that the minting and sale of the half ounce silver coins in dispute had a substantial connection to Nothaus' unlawful scheme to circulate "Liberty Dollars."

Following the entry of a preliminary forfeiture order, a third party "asserting a legal interest in property which has been ordered forfeited ... may ... petition the court for a hearing to adjudicate the validity of his alleged interest in the property." 21 U.S.C. § 853(n)(2). The Court must amend the order of forfeiture pursuant to 21 U.S.C. § 853(n)(6) if the third party demonstrates by a preponderance of the evidence that:

> (A) **the petitioner has a legal right, title, or interest in the property**, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was **vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture** of the property under this section; or

> (B) the **petitioner is a bona fide purchaser for value** of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section....

*Id*. (emphasis added).

Thus, the possession of a "legal interest" in the forfeited property is "the touchstone for standing" of a third party to challenge a preliminary order of forfeiture. The term "legal interest in the property" is liberally construed and encompasses all legally protected rights, claims, titles, or shares in real or personal property. *See United States v. Schecter,* 251 F.3d 490, 494 (4th Cir. 2001). However, pursuant to 21 U.S.C. § 853(c), referred to as the "relation back" provision, title to property subject to forfeiture vests in the United States at the time of the act giving rise to forfeiture, so section 853(n)(6)(A) only protects a petitioner who acquires his or her interest in the

11

property at issue before the commission of the offense. *See United States v. McHan,* 345 F.3d 262, 271 (4th Cir.2003). Here, the offense was committed, at the latest, when the coins at issue were minted (and likely much earlier when they were ordered by Gillie and others in furtherance of Nothaus' conspiracy as found by the jury).

Although forfeiture is an issue of federal law, to determine whether an asserted interest constitutes a legally protected right, courts look to the law of the jurisdiction that created the property right to determine whether the claimant has a valid interest. *United States v. Oregon*, 671 F.3d 484, 490–93 (4th Cir. 2012) ("Although the forfeiture issue here is a matter of federal law, we generally refer to state law in determining whether a petitioner has a legal interest in forfeited property."). Once the legal interests have been defined under state law, federal law determines whether such interests are sufficient for the claimants to prevail under §853(n)(6). *Oregon,* 2012 WL 507050, at *6; *United States v. Buk,* 314 F. App'x 565, 568–69 (4th Cir. 2009).

Petitioner asserts that he is entitled to possession of the coins because his right to the coins was superior to Defendant's at the time of the commission of the crimes for which Defendant has been convicted. *See* 21 U.S.C. § 853(n)(6). However, even if the Court were to find (which it does not, as discussed below) that Gillie has a superior right to the coins, the Court must also address the issue of whether the coins are contraband, thereby extinguishing any alleged right of the Petitioner to possess the coins. *See United States v. Simmons*, No. CV F 96-5948 AWISWS, 2000 WL 33138083, at *3 (E.D. Cal. Dec. 14, 2000) ("In light of 18 U.S.C. § 492, the court cannot order the return of any counterfeit coin to [Defendant] because any counterfeit coin must be forfeited to the United States Secret Service … possession of them by [Defendant] would be illegal); *United States v. Von NotHaus*, No. 509CR00027RLVDCK, 2017 WL 1396043, at *4–5 (W.D.N.C. Apr.

12

18, 2017) (describing whether property was contraband as an "exception" that must be taken into account in the ancillary proceeding in determining which person or entity has a superior claim to the property in question under section 853).

In sum, Petitioner is entitled to the so-called "Stop the War" "Peace Coins" only if: (1) the Peace Coins themselves are not contraband; and (2) Petitioner has a superior right to the coins in relation to the Government or was a bona fide purchaser for value.

### III.    DISCUSSION

For the reasons discussed below the Court finds that Gillie does not have a superior right to the coins in dispute and is not a bona fide purchaser for value. Also, the Court finds that the coins are contraband so he would not, in any event, be entitled to possession of the coins.

### A. Does Gillie Have a Superior Right to the Coins?

Because the respective rights of Nothaus and Gillie to the coins is governed by state law, and Nothaus and Gillie did not agree to the application of a particular state's law to their relationship, the first question that must be addressed is which state's law controls the parties' respective rights. According to Gillie's Petition, the relevant transaction is Gillie's purchase of the coins from Nothaus' Liberty Dollar organization. *See* Doc. 499 ("I ordered and paid for but did not receive the following [silver coins]"). Liberty Dollar is located in Indiana and the coins were allegedly shipped to Petitioner who resided in Michigan at the time of the purchase. *Id.* Also, the Peace Coins were minted and seized in Idaho from Sunshine. Order of Dec. 1, 2014. Doc. No. 285 at 3. Thus, there are at least three states that are potentially relevant to the Court's choice of law decision: Michigan, Indiana, and Idaho.

Under the Michigan Uniform Commercial Code ("UCC") (and the other states have similar provisions), the Michigan UCC statute applies as follows:

13

TERRITORIAL APPLICABILITY AND GENERAL RULES
440.1301 Applicability of law of this state or other state or nation; applicability of
act to transactions bearing relation to state; provisions specifying applicable law.

Sec. 1301. (1) Except as otherwise provided in this section, when a transaction
bears a reasonable relation to this state and also to another state or nation, the parties
may agree that the law either of this state or of that other state or nation shall govern
their rights and duties.

(2) In the absence of an agreement effective under subsection (1), and except as
provided in subsection (3), this act applies to transactions bearing an appropriate
relation to this state.

Mich. Comp. Laws Ann. §§ 440.1301 (West); *cf* Ind. Code Ann. § 26-1-1-301 (West).

Accordingly, the question becomes which state(s) bear(s) a reasonable relationship to the

transaction at issue?  As noted, Gillie resides in Michigan and ordered the coins from the Liberty

Dollar company in Indiana. While the coins were minted in Idaho, the location of the manufacturer

does not relate directly to the allocation of rights between the coin seller (Liberty Dollar) and

purchaser (Gillie).[3] Indeed, there is no allegation that Gillie had any direct contractual contact with

the Sunshine Mint nor was any part of the transaction to purchase coins handled directly between

Gillie and Sunshine. Therefore, either Michigan or Indiana has the most significant relationship to

the transaction and the UCC law of one of those states should apply to determine Nothaus' and

Gillie's respective rights. However, because the Court finds that both Michigan and Indiana have

the same relevant UCC provisions, as acknowledged by the Parties, the Court need not choose

between them and will apply their similar UCC provisions to decide this dispute.

---

[3] Petitioner argues that Idaho law should control because that is where the coins were seized from
Sunshine, citing *United States v. Alquzah*, 91 F. Supp. 818, 828 (W.D.N.C. 2015). (Doc. No. 875
at 1). However, that case is readily distinguishable because the "property" at issue in that case was
real estate which is of course inherently connected to the place it is located. In contrast, determining
the applicable state law for movable goods, which may involve multiple jurisdictions as in this
case, calls for the application of the UCC's "appropriate relationship" test as discussed above.

Case 5:09-cr-00027-KDB-DCK   Document 879   Filed 06/09/21   Page 14 of 21

Applying the relevant UCC law, the Court finds that Petitioner does not have a superior right to the coins. UCC provisions 2-401 and 2-501 relate to the passing of title. In Michigan (which has the same statutory language as Indiana) the relevant rules state:

**440.2401 Passing of title; reservation for security; limited application of section; rejection; revesting.**

Sec. 2401. Each provision of this article with regard to the rights, obligations, and remedies of the seller, the buyer, purchasers, or other third parties applies irrespective of title to the goods except where the provisions refers to the title. In situations that are not covered by the other provisions of this article and matters concerning title become material, the following rules apply:

(a) **Title to goods cannot pass under a contract for sale before their identification to the contract under section 2501, and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this act.** Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of article 9, title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(b) **Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes its performance with reference to the physical delivery of the goods,** despite any reservation of a security interest and even if a document of title is to be delivered at a different time or place. In particular and despite any reservation of a security interest by the bill of lading, both of the following apply:

(i) **Unless subparagraph (*ii*) applies, if the contract requires or authorizes the seller to send the goods to the buyer but does not require the seller to deliver them at destination, title passes to the buyer at the time and place of shipment.**

(ii) **If the contract requires delivery at destination, title passes on tender there.**

**440.2501 Special property and insurable interest in goods; identification of goods.**

Sec. 2501. **(1) The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers** even though the goods so identified are nonconforming and he has an option to return or reject them. **Such identification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs**

(c) when the contract is made if it is for the sale of goods already existing and identified;

(d)  **if the contract is for the sale of future goods other than those described in paragraph (c), when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers;**

Mich. Comp. Laws Ann. §§ 440.2401, 2501 (West) (emphasis added); *cf* Ind. Code Ann. § 26-1-2-401, 501 (West).

Therefore, title to goods cannot pass under a contract for sale until their identification to the contract, which for "future goods" happens when goods are "shipped, marked or otherwise designated by the seller."  Here, there is no evidence that there was an explicit agreement between Petitioner and any other party specifying a method of identification which would confer a special property interest in the coins to Petitioner prior to when the coins were made and designated for him. For example, there is no credible evidence that the silver that was to be used for Petitioner's ordered coins was ever marked or otherwise designated as the raw materials specifically for those coins. Indeed, the FBI seized at least 2,000 of the coins in dispute which indicates that Sunshine created those coins for multiple customers in excess of the amount that Petitioner ordered. Thus, the Court concludes, pursuant to the governing state law, that Petitioner did not accrue an interest in his ordered coins until they were packaged for shipment to his residence, which is the earliest time the Court can reasonably infer that the goods could have been designated by the seller as the goods to which Petitioner's contract referred.

As discussed above, pursuant to 21 U.S.C. § 853(c), title to property subject to forfeiture vests in the United States at the time of the act giving rise to forfeiture, so section 853(n)(6)(A) only protects a petitioner who acquires his or her interest in the property at issue before the commission of the offense. *See United States v. McHan,* 345 F.3d 262, 271 (4th Cir. 2003). While there could be a strong argument that the interest in the subject coins vested in the United States

16

when the conspiracy began or upon Gillie's payment for the coins, it is certain that the United States had a vested interest in the Peace Coins no later than when they were first minted.

Therefore, the Court holds that Petitioner does not have a superior right to the coins in dispute because the earliest time he could have acquired a legal interest in the coins (upon packaging for shipment) occurred after Nothaus / the United States acquired their legal interest in the coins (no later than when the coins were minted).

Gillie argues that the Court should find that his interest in the coins preceded the Government's because he allegedly purchased the silver for the coins prior to and separately from the minting process. *See* Doc. No. 875 at 1, 3; Doc. No. 876 at 37:21-23, 41:1-5. Specifically, Petitioner testified at the first hearing that, as part of a small group, he "paid for the silver and the minting fee." Doc. No. 876 at 37: 19-23. Petitioner also testified that he purchased the silver in advance of the pressing process and referred to the silver as "blanks." *Id.* at 43:13-17. Based only on this oral testimony, Gillie argues that because he had obtained superior title of the raw materials before the coins were minted, he had a "superior legal interest in the property at issue upon or prior to its creation." *Id.*

The Court had a full opportunity to view and consider Gillie's in-person testimony and finds that he was not a credible witness. In particular, the Court finds that Gillie was evasive in his answers and his "newly minted" testimony plainly contradicts the documentary record attached to Gillie's Petition, as well as common sense. First, the Court finds nothing in the invoice provided with the Petition suggests Petitioner purchased any silver separately from, and prior to, the minting process. *See* Doc. No. 499. Rather, the invoice clearly states that Petitioner is purchasing 600 "Silver Peace Dollar[s] – General Issue[.]" *Id.* at 2. Indeed, at the final hearing, Petitioner testified that he did not actually purchase the silver as a separate transaction, but that he purchased the silver

used to press his coins only in the sense that the price of the silver coins included both the cost of the silver and the minting fee (in other words, Gillie ordered whole coins which, like most goods, includes several component costs). In sum, the Court finds that Gillie's testimony should not be accepted as true and that his legal interest only arose after the coins were made and designated for shipment in accordance with the governing state law discussed above. Thus, the Government has a superior right to the coins.

### B. Is Gillie a Bona Fide Purchaser?

In addition to not having a superior right to the coins in dispute, Gillie is also not a bona fide purchaser for value. *See* 21 U.S.C. § 853(n)(6). In his deposition, Gillie confirmed that he received a letter from the government on October 2, 2016 warning him that the Department of Justice was investigating activity regarding the coins produced by Liberty Dollar. Doc. No. 871-12 at 51:6-52:12. Petitioner testified that he believed that he received the letter around the same time as when he placed his order for the 600 silver coins. *Id.* at 52:20-25. However, again the documentary evidence contradicts Gillie. The invoice for the property at issue is dated October 23, 2007, over a year after Petitioner received the warning letter. Therefore, the Court can readily conclude that Gillie is not a bona fide purchaser for value because he had reason to believe that the property in question was subject to forfeiture prior to ordering the coins.

### C. Are the Silver Coins in Dispute Contraband?

Title 18 U.S.C. § 492 mandates that all counterfeit coins of the United States or any foreign government be forfeited to the United States. Counterfeit coins are contraband *per se*, their mere possession is illegal, and they must be forfeited to the United States. *See Boggs v. Merletti*, 987 F.Supp. 1 (D.C.C. 1997), *affirmed sub nom.*, *Boggs v. Rubin*, 161 F.3d 37 (D.C. Cir. 1998). In *United States v. Simmons*, No. CV F 96-5948 AWISWS, 2000 WL 33138083, at *3 (E.D. Cal.

18

Dec. 14, 2000) the court held, "[i]n light of 18 U.S.C. § 492, the court cannot order the return of any counterfeit coin to [Defendant] because any counterfeit coin must be forfeited to the United States Secret Service … possession of them by [defendant] would be illegal." Moreover, the Court has already specifically held in this case that no individual or entity, apart from the United States, may have a right or interest in property deemed "contraband." (Doc. 296 at 2-3).

After a careful review of the "Stop the War" "Peace Coins" presented at the final hearing and consideration of the government expert's testimony, the Court finds that the coins are contraband.[4] It is illegal to possess counterfeit coins that are "in resemblance or similitude of any coin of a denomination higher than 5 cents." 18 U.S.C. § 485. "All counterfeits of any coins . . . made, possessed, or used in violation of this chapter . . . shall be forfeited to the United States." 18 U.S.C. § 492. As described in the jury instructions in the underlying trial, which the parties acknowledge to be the relevant standard, "A counterfeit coin is one made in imitation of some genuine coin. It is not necessary that the resemblance should be exact in all respects. The resemblance is sufficient if the coins are so far alike that the counterfeit coin is calculated to deceive a person exercising ordinary caution and observation in the usual transactions of business, though the counterfeit would not deceive a person who was expert or has particular expertise in such matters."

The Court was presented with a demonstrative exhibit at the final hearing with multiple coins including the Peace Coins at issue here and the Liberty Dollars that were found to be contraband during the trial. The Court recognizes that the Peace Coins are not exactly the same as the Liberty Dollars. Specifically, Petitioner notes that the back of the Peace Coins contains

---

[4] Petitioner argues that the Peace Coins sought to be recovered are different from the Liberty Dollars found to be counterfeit at trial. However, the Court does not rely on the previous findings of the underlying case to make its *de novo* determination that the coins at issue here are contraband.

19

inscriptions of the motto "STOP THE WAR" and the web address "LIBERTYDOLLAR.ORG," and argues that these additions make clear that the coins are not valid currency. The Court, in the exercise of its judgment as the finder of fact, disagrees. First, the web address is in such fine print that the Court was not able to discern it until pointed out by Petitioner's counsel at the final hearing. Second, the Court was presented with evidence of valid currency with various slogans, including an actual "Peace" coin, such that the motto "Stop the War" would not necessarily inform a reasonable person that the coin is not valid.

More significant to the Court, the coins in dispute, as acknowledged by Petitioner, have eight of the nine characteristics of a contraband coin. Doc. No. 871-12 at 79:1-22. These eight characteristics include a Liberty head, date below the Liberty head, torch, motto, dollar or "$," a certain diameter, a reeded edge, and a serif font. J.A. at 1707. As to dollar amounts, the backs of the coins contain inscriptions that read "$10" and "TEN DOLLARS."

Also, the Court is not persuaded by Petitioner's argument that a reasonable person would not accept the coins as valid currency simply because all high denomination coinage is questionable. The record of the criminal proceeding underlying the Petition indicates that many of the coins produced by Liberty Dollar were accepted as valid currency and that Liberty Dollar had their own "university" to train distributors, such as the Petitioner, on how to pass the coins off as valid currency. Finally, Petitioner makes an off-hand claim, bereft of any corroborating evidence, that he purchased the "Peace Coins" as a political statement and did not intend to use them in the manner prohibited by statute. As with the rest of Gillie's testimony, the Court does not find this testimony to be credible. Rather, it appears from the amount of coins purchased and the other evidence discussed above that Petitioner purchased the coins in order to distribute them for profit

rather than use as a political statement.[5] In sum, the Court finds that the coins at issue are "in resemblance or similitude" to other United States currency and that a reasonable person acting with ordinary care could be led to believe that the Peace Coins are valid United States currency, 18 U.S.C. § 485, and are thus contraband *per se*.

## IV.  CONCLUSION

For the reasons discussed above, the Court will deny Gillie's Petition and decline to amend its order forfeiting the coins at issue to the United States.

## V.  ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1.  Claimant Gillie's Petition (Doc. No. 499) is **DENIED;**

2.  The Clerk is directed to close this matter in accordance with this Order;

**SO ORDERED ADJUDGED AND DECREED**.

Signed: June 9, 2021

Kenneth D. Bell
United States District Judge

---

[5] Indeed, Petitioner's attempt to cloak his mercantile actions with the protections of the First Amendment calls to mind Samuel Johnson's famous quote that "patriotism is the last refuge of the scoundrel."

21